FILED IN
COURT OF CRIMINAL APPEALS

February 3, 2015

ABEL ACOSTA, CLERK

NO. **AP-77,029**

IN THE COURT OF CRIMINAL APPEALS
AT AUSTIN, TEXAS

JAMES HARRIS JR.
Appellant

VS.

STATE OF TEXAS
Appellee

APPEAL FROM THE 149TH DISTRICT COURT
OF BRAZORIA COUNTY, TEXAS
AT
ANGLETON, TEXAS

TRIAL COURT CAUSE NO. 67063

APPELLANT'S APPENDIX

Jimmy Phillips, Jr.
P. O. Drawer 29
Angleton, Texas  77516-0029
Tel: 979-849-8511 Fax: 979-849-1409
email: jimmy@jpjlaw.com
SBN 15953000
Attorney for Appellant
JAMES HARRIS JR.

February 2015

APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PAGE

Appendix - Attachment 1  ( Reporter's Record Vol 73, Pg. 5 to 42). . . . . . . . . . . 3

Appendix - Attachment 2  ( Reporter's Record Vol 73, Pg. 125 to Pg. 129 ). . . . 41

Appendix - Attachment 3 ( Reporter's Record Vol 74, Pg. 60 to 61). . . . . . . . . . 46

Appendix - Attachment 4 ( Reporter's Record  Vol 74, Pg. 152 to 153) . . . . . . . 48

Appendix - Attachment 5 (District Clerks Record Vol 4, Pg.  115).. . . . . . . . . . . 50

Appendix - Attachment 6 (Reporter's Record Vol. 74, Pg.  10, line 6 to 17). . . . 51

Appendix - Attachment 7 (Reporter's Record Vol. 26, Pg. 48 to 139 ). . . . . . . . . 52

Appendix - Attachment 8 (Reporter's Record Vol. 27, Pg. 112 to 213 ). . . . . . . 144

Appendix - Attachment 9 (Reporter's Record Vol. 29, Pg. 48 to 253 ). . . . . . . . 246

Appendix - Attachment 10 (Reporter's Record Vol. 32, Pg. 34 to 109 ). . . . . . . 352

Appendix - Attachment 11 (Reporter's Record Vol. 49, Pg. 201 to 232 ). . . . . . 428

Appendix - Attachment 12 (Reporter's Record Vol. 32, Pg. 101 to 102 ). . . . . . 459

Appendix - Attachment 13 (Reporter's Record Vol. 27, Pg. 190 to 195 ). . . . . . 461

Appendix - Attachment 14 (Reporter's Record Vol. 27, Pg. 204 to 207 ). . . . . . 467

Appendix - Attachment 15 (Reporter's Record Vol. 23, Pg. 99 to 100 ). . . . . . . 471

**DECEMBER 9, 2013**

THE COURT: We're on the record. The record will reflect that counsel for the State, counsel for defense, the Defendant are present. The jury is not present.

Do I understand we have another 705 examination before the next witness?

MR. WOOTEN: Yes, Your Honor.

THE COURT: All right. Are you ready to proceed on that?

MR. WOOTEN: Yes, sir.

THE COURT: Ms. Yenne, are you ready to proceed?

MS. YENNE: Yes, Your Honor.

THE COURT: All right. Call your witness.

MR. WOOTEN: We call Dr. Raymond Singer.

**(Witness duly sworn by the Court.)**

THE COURT: Have a seat, please.

You may inquire when you're ready.

**RAYMOND SINGER**,

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. WOOTEN:**

Q. Would you state your full name for the record, please?

A. Raymond Singer.

Q. And how are you employed, sir?

A. I am a neuropsychologist and a neurotoxicologist.

Q.    Okay.  Could you tell us a little bit about your educational background?

A.    Sure.  After graduating high school I attended the University of Rochester in Rochester, New York, where I received a Bachelor's degree in psychology.

Following that I was accepted and attended graduate school in psychology at Washington State University where I received a Master's degree and a Ph.D. degree in psychology.

Following that I went to New York City and I accepted a National Institute of Health postdoctoral fellowship in biological psychiatry at New York University School of Medicine.

Following that I accepted a postdoctoral fellowship in environmental epidemiology, which is the study of diseases among -- in the population.  This program was a National Institute of Environmental Health Sciences program administered through the Mount Sinai School of Medicine, Environmental Sciences Laboratory, and Department of Community Medicine.  I studied under the direction of Dr. Irving J. Selikoff, who was the world's premier public health doctor who was devoting his energy and time and resources to studying the effects of toxic chemicals, particularly the effects of low level chronic exposures.  And this work was pioneering work and has set the standard around the world concerning how to

evaluate these types of exposures.

Q. Okay. So hang on. And I know we're going to talk a little more about neurotoxicology in a minute. Are you -- but let's get through.

So you have a Ph.D. in what, sir?

A. In psychology.

Q. Okay. And are you board certified?

A. Yes.

Q. In what?

A. In neuropsychology with added qualifications in forensic specialization.

Q. Okay. Now is there a board certification for neurotoxicology?

A. No.

Q. Okay. And so you said that you have added additional training. Is that in the area of what? Neurotoxicology?

A. Yes.

Q. All right. Can you tell us a little bit more, continuing with what you were saying before, about the specialized training that you've had in neurotoxicology?

A. Sure. At Mount Sinai School of Medicine I was -- I was within the group of people that was tasked with assessing the effects of neurotoxicity. My work at that time included evaluating patients at the Environmental and Occupational Health Clinic of Mount Sinai School of Medicine as well as

developing methodology to evaluate the effects of neurotoxicants.  Such methodology included nerve conduction, velocity assessment, which I studied and which I practiced and which I taught at Mount Sinai School of Medicine to other doctors and other personnel.  We applied this technique to studying Agent Orange and the results of that that we published was very helpful, apparently, to the Veteran's Administration, ultimately, when they were --

                MS. YENNE:  Objection.  Nonresponsive at this point in time, Your Honor.

                THE COURT:  I'll overrule it for purposes of this hearing.

   Q.    Is there any other further training that you've had or work you've done in the area of neurotoxicology?

   A.    Well, yes.  I was there for approximately four years, and I could talk about the work I did there or I can continue on after that.

   Q.    Well, so you were there four years.  Was it -- was that four years of work done specifically in the area of neurotoxicology?

   A.    Yes.  With regard to neuropsychological and neurophysiological and statistical applications to study neurotoxicology.

   Q.    Okay.  And then after those four years, what other training did you have or education in the area of

neurotoxicology?

A.   Since that time I have become a member of the Society of Toxicology.  And to become a member of that society, you have to get a recommendation from other toxicologists, as well as show that you are a toxicologist through publications and through your work.  And they accepted me as a full member. I've been a full member for over 25 years.  I've attended a number of their conferences.  I've made presentations at their conferences.

I became a member of the Roundtable of Toxicology Consultants, which is a subgroup of the Society of Toxicology, of toxicologists that have an independent professional practice in toxicology.  And there is maybe a hundred, 150 members of this group.

Q.   Okay.  Any other training or education in this area?

A.   Well, I just wanted to just elaborate a little more. And in that organization I have been elected an officer a number of times, and I've taught at seminars sponsored by the Roundtable of Toxicology Consultants.

Q.   Okay.  Any other courses or presentations that you've taught that you haven't already covered, either as a neurotoxicologist or as a neuropsychologist?

A.   There are numerous presentations that I've made in both of those fields that's cataloged in my vitae.

Q.   Okay.  And have you -- you've already talked about

publishing several articles.  Have you published any other articles?

A.    One of the -- yes, I have published several articles. And one of the -- one of my early, I might say, achievements in neurotoxicology was that I got a call from Van Nostrand Reinhold, which was one of the larger publication sources for toxicology and industrial hygiene, and they asked me to write a book on neurotoxicology, which I did at that time.  And they published, and that was one of the first books by a single author on the field of neurotoxicology.

Q.    And what is the name of that publication, sir?

A.    Neurotoxicity Guidebook.  And one of the peer reviewers was --

MS. YENNE:  Objection.  Nonresponsive at this point in time, Your Honor.

THE COURT:  I agree with you it is; but for the purposes of this hearing, I'll go ahead and allow him to elaborate.  But we're not before the jury at this time.

Q.    Could you tell me -- I'm sorry.  Could you continue about the peer review?

A.    Yes.  I just wanted to mention that one of the peer reviewers was -- is actually the editor in chief of the journal Neurotoxicology and is a prominent neurotoxicologist in the Society of Toxicology.

Q.    Okay.  Now other than the professional organizations

that you've already spoken of, are you a member of any other professional organizations?

A.   Yes.  I'm a member of the American Academy of Clinical Toxicology.  And again, they had admission requirements where you had to show that you're a toxicologist to get admitted there.

I was a member of the American College of Toxicology.  I'm no longer a member of that group.  But that is another group where you needed to present credentials to be accepted.

In addition, I'm a member of the National Academy of Neuropsychology.  I'm a fellow of that organization.  My work in neurotoxicology has been recognized there as well.

Q.   Now have you testified as an expert witness before?

A.   Yes.

Q.   In what areas?

A.   In neurotoxicology and neuropsychology.

Q.   Okay.  Let's take those separately.  How many times have you testified in neuropsychology?

A.   I think the most of the times that I testify I'm testifying in both fields, neuropsychology and neurotoxicology.

Q.   Okay.

A.   I'm not recalling that to be separate.

Q.   Okay.  Well, let me ask a better question then.

How many times have you testified in both those

areas?

A.    It's difficult for me to say exactly.  I tried to review my testimony records last night.  And I used to be testifying about six times year, and now it seems like I'm testifying about four times a year since approximately 1983.

Q.    Okay.  And is that in state court or federal court?

A.    Both.

Q.    Okay.  And have you testified only in one state or many states?

A.    A number of states.

Q.    Now what exactly is a neurotoxicologist?

A.    A neurotoxicologist is a scientist who studies the effects of poisons on the nervous system.

Q.    Okay.  And what is a neuropsychologist?

A.    A neuropsychologist is a scientist who studies the nervous system substrates of psychological function.

Q.    Okay.  Now what -- let's take one at a time.

A.    I would say they focus on the brain behavior relationship.  That will be a more cogent way to describe it.

Q.    Okay.  Now what does a neurotoxicologist actually do if they are asked to work on a case?

A.    There are many, many types of neurotoxicologists; and they -- it can range from looking at neurochemistry to looking at neuroanatomy or, in my case, I look at the nervous system function.

Q. Okay. Does this field of expertise rely upon accepted scientific principles in the scientific community?

A. Yes.

Q. Has it been recognized as legitimate science by the scientific community?

A. As far as I know it has. We have our journals. We have meetings.

Q. Okay.

A. We get referrals from doctors and other professionals.

Q. Okay. And what about neuropsychology? Is it based on accepted principles in the scientific community?

A. Yes.

Q. It has been recognized as a legitimate field of science?

A. Yes. As far as I know it is recognized.

Q. Okay. Now can you tell me a little bit about -- well, let me just ask you this. You were retained to work on the James Harris case?

A. Yes.

Q. Okay. What, in fact, have you done -- what work have you done on the James Harris case?

A. I've reviewed records in the case. I reviewed the neuropsychological findings of Dr. Kasper. I conducted my own evaluation of Mr. Harris. I've seen him on two occasions prior to today. I studied the research literature on pesticides and

other toxic substances to which Mr. Harris had been exposed.  I reviewed the latest thinking on the effects of toxic substances on developing nervous systems of children and adolescents.  I reviewed records including Mr. Harris' educational records and other cognitive testing that he underwent.  I reviewed information regarding the types of pesticides that had been applied to agricultural fields at the time Mr. Harris was working in those fields as a child.  And I probably did other things, too.

Q.    Okay.  Now when you reviewed Dr. Kasper's work in the case, did you form opinions as to her work?

A.    Yes.

Q.    Okay.  And did you accept her findings?

A.    Yes.

Q.    Did you form an opinion as to Mr. Harris', for lack of a word, mental health from a neurotoxicological and a neuropsychological basis?

A.    Yes.

Q.    And what, if any, are those opinions?

A.    I think he suffers from brain injury from exposure to numerous toxic substances, particularly from childhood, resulting in major neurocognitive disorder.

Q.    Okay.  Now what substances are we talking about?

A.    Organophosphate pesticides, organochlorine pesticides, hydrogen sulfide, lead, mixture of solvents, mercury, carbon

monoxide.  I may be missing some there in the occupation.  But as well I considered cocaine neurotoxicity.

Q.   Okay.  And in your work on this case did you form an opinion as to whether James Harris was exposed to the toxicants that you just listed?

A.   Yes.

Q.   Okay.  And what is that opinion?

A.   I don't understand.

Q.   Well, I asked you if you had formed an opinion.  Are you saying that your opinion is that he was?

A.   Yes.

Q.   Okay.  Sorry.

A.   My opinion was he was exposed to numerous neurotoxic agents that ultimately resulted in a brain injury.

Q.   Okay.

MR. WOOTEN:  May I have a moment, Judge?

THE COURT:  You may.

MR. WOOTEN:  Judge, just so the Court knows, because we've tried to accommodate the Court's directives on the record, we brought -- we had sent a bunch of CD's to Dr. Singer.  He brought those CD's back to us.  We've handed those exact CD's to the State.  Also -- and this is me learning internet or whatever.  There is also something called the Dropbox where we put stuff on the Dropbox and Dr. Singer would go to the Dropbox and retrieve.  We downloaded that material to

this stick.  Now -- and so we brought those to court.

Now -- and we don't mind doing this, but now what we're going to have to do is go and, I guess, print all that out.  But this is going to be, basically, all the records that are in this case.  We don't mind doing it, but we don't have any high speed --

MS. YENNE:  I would simply ask for a little bit of time.

MR. WOOTEN:  I'm just letting you know where we are at.

THE COURT:  That's fine.

MR. WOOTEN:  And I'm not objecting to what they are asking us to do.

THE COURT:  All right.  So we'll recess -- are you passing the witness at this time?

MR. WOOTEN:  Yes, Judge.  I'm sorry.  For the record we pass the witness.

THE COURT:  All right.  Then let's recess.  Get the records printed.  We'll give Ms. Yenne some time to look at that.

Dr. Singer, you may step down.  The Rule has been invoked in this case.  I assume since you've testified many times you know what that is.

THE WITNESS:  Please remind me, Your Honor.

THE COURT:  Okay.  You cannot discuss anything

about this case with anyone except the lawyers.  You're free to talk to the lawyers or you're free to talk to their investigators if you want to.  You can't read any notes or transcriptions that anybody may have taken about the case.  You can't ask, you know, what has somebody else testified to concerning this case.  Do you understand that?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Thank you.  You may step down.

We'll be in recess until the State has had the opportunity to review the records.

**(A short recess was taken.)**

THE COURT:  We're on the record.  The record will reflect that counsel for the State, counsel for the defense, the Defendant, as well as Dr. Singer are all present and seated in the courtroom.  The jury is not present.

Ms. Yenne, have you had time to review the records?

MS. YENNE:  Oh, yes.

THE COURT:  All right.  You may proceed.

**CROSS-EXAMINATION**

**BY MS. YENNE:**

   Q.   Just a few questions, Dr. Singer.  You talked about there is no license for a neurotoxicologist.  Is that a fair statement?

A.   Yes.

Q.   Okay.  Oh, by the way, my name is Jeri Yenne.  It's a pleasure to meet you.  I'm the District Attorney here, Dr. Singer.  If I ask you a question that you just don't understand, just tell me, I don't understand what you're asking.

A.   Sure.

Q.   You won't be the first person who says that.

But there are licensed toxicologists in various states, are there not?

A.   Not to my knowledge.

Q.   Okay.  So there is no licensed toxicologist in New Mexico?  You don't have to have a license or a credential or certified by the state to be a toxicologist?

A.   That's correct.  Let me just add.  Perhaps forensic laboratories might be licensed.

Q.   Okay?

A.   But other than that, no, there is no license for toxicologists.

Q.   Okay.  So that's my point.  So if I were a toxicologist performing duties as to determine if some of these substances were present, you would have to be licensed?

A.   You know, I'm uncertain about that.

Q.   Okay.  But labs have to be licensed and accredited?

A.   I know labs have to be accredited.  I'm not sure if

they have licensures.

Q.   Okay.  So let me go a little further.  You're a psychologist, correct?

A.   I'm a neuropsychologist and a neurotoxicologist.

Q.   Okay.  My first question was you are a psychologist, though, correct?

A.   Yes.

Q.   Okay.  You're not a medical doctor, correct?

A.   Correct.

Q.   Okay.  So you're not a radiologist, correct?

A.   Correct.

Q.   Okay.  And you're not a neurologist, is that correct?

A.   Yes.

Q.   Okay.  Let me go -- Mr. Wooten, I think, probably meant to ask you but forgot.  You are coming here today for compensation.  Is that correct?  You're getting paid for your services?

A.   I came here to testify, and I'm getting paid.

Q.   Okay.  And what is your hourly rate for your services as a neurotoxicologist?

A.   $350 an hour.

Q.   Okay.  And when were you first contacted?  And by the way, were you contacted by the defense in this case?

A.   Yes.

Q.   Okay.  Who from the defense contacted you?

A.    I believe it was Mr. Wooten.

Q.    Okay.  And when, please?

A.    I don't recall.

Q.    Okay.  All right.  And approximately -- when you say I'm getting compensated for my time and my testimony, that would be at the $350 an hour rate, correct?

A.    Yes, except for travel is --

        MR. WOOTEN:  Jeri?

Q.    Okay.  So I guess I'm asking for the financial arrangements made with the defense in this case.  There are times you have different hourly rates as defense counsel is passing to me here, correct?  Your average rate, maybe, is 350.  Is that a fair statement?

A.    Well, 350 is my rate for most of my work.

Q.    Okay.  Fair enough.  Fair enough.  And how many hours do you have in this case, preparation time?  How many hours do you have to date, Doctor?  Let me be a little more specific, if I could.

A.    Roughly, 85 hours.

Q.    Okay.  So what does that calculate to?  And you are authorized up to the sum of $30,000 in this case?  Is that what I'm --

A.    Yes.

Q.    Okay.  All right.  For preparation and testimony.  Is that a fair statement?  Your cap is up to $30,000?

A.    For preparation, testimony, and expenses.

Q.    Okay.  And right now it looks like you're at 29,750.  Is that a fair statement?

A.    Yes.

Q.    Do you intend to bill for any remaining hours over $30,000?

A.    Yes.

Q.    Okay.  Hoping that maybe the Court will authorize the same.  Is that a fair statement?

A.    First it goes to the defense attorneys --

Q.    Sure.

A.    -- and then they -- if they feel it's worthwhile, they present it to the Court.

Q.    Okay.  But I guess what I'm saying is right now you're at 29,750.  You are here today.  I would take it that you're almost at the 30,000 cap.  Is that a fair statement?

A.    Yes.

Q.    I'm not the greatest in math, Dr. Singer; but you do --

A.    I'm over the 30,000.

Q.    Okay.  You're over the 30,000.  At some point in time you will submit additional hours hoping that they are considered for compensation.  Is that a fair assessment?

A.    Yes.

Q.    Okay.  You have two offices.  Is that one in New York?

A.    I have an office in New York, but that is -- I'm not there very often, and I don't have to maintain that office.

Q.    Okay.  But that office exists.  Is that a fair statement?

A.    Yes.

Q.    And your other office is in New Mexico?

A.    Yes.

Q.    Okay.  Now I see that there was an MRI forwarded from St. Luke's Hospital.  Are you qualified yourself to read an MRI?

A.    No.

Q.    Okay.  When did you receive the MRI?

A.    I don't recall.

Q.    Okay.  Did you get the same report of that MRI that Dr. Kasper did from St. Luke's?  It's the little one-page report?

A.    I believe that I did.

Q.    Okay.  Thank you.

What do you base your opinion on that you've testified to about the -- I believe that the Defendant has been exposed to -- has had some effects of neurotoxicity.  Is that a fair statement?

A.    I don't understand the question.

Q.    Okay.  Well, refresh my memory.  It's been an hour, and I'm old.  How does that sound?  Okay?  You gave an opinion

to counsel about something that you believe has happened to Mr. Harris, the Defendant?

**A.** Yes.

**Q.** What is that opinion? And then I'm going to ask you a little further, please.

**A.** Okay.

**Q.** It's been an hour, Dr. Singer.

**A.** Uh-huh. My opinion is that Mr. Harris was exposed to numerous neurotoxic chemicals over his lifetime. I am particularly concerned about and I think -- I'm particularly concerned about the pesticide exposure when Mr. Harris was a child and its deleterious effect on his neurocognitive development. As well, he had further exposures as a child and as an adult, including exposure to cocaine.

**Q.** Okay. Could I ask -- when you talk about numerous exposures, can you list them for me? Because I want to make sure -- I saw your report. I want to make sure I understand it, Doctor.

**A.** Okay.

**Q.** So besides the pesticides, if you will, the crop dusting, the effects of crop dusting -- are those the organo -- help me. What do you call them?

**A.** Organophosphates and organochlorines.

**Q.** Thank you. Hang on just a minute. That will be the crop situation. Is that a fair statement? Crop dusting

situation?

A.   Yes.

Q.   Okay.  That's what -- I just want to make sure.  The agriculture exposure as a child.  Fair enough?

A.   Yes.

Q.   But you listed numerous other exposures.  One of those is cocaine, correct?

A.   Yes.

Q.   But there is a lot of others in your report.  Can you tell me the other exposures that you believe this Defendant has been subjected to?

A.   The occupational exposure to hydrogen sulfide.

Q.   Okay.  Where was that?

A.   That was when he worked at the New Gulf Sulphur Plant.

Q.   Okay.

A.   Lead -- occupational lead exposure and solvent exposure as a child working at the New Gulf Sulphur Plant.

Q.   Okay.  Thank you.

A.   His work in the refinery, the Phillips 66 refinery --

Q.   Okay.

A.   -- where he was exposed to -- where I have knowledge that he was exposed to welding fumes.

Q.   Where did that knowledge come from?

A.   That comes from Mr. Harris.

Q.   Okay.  Thank you.

A.    And sandblasting of paint.  Exposed to the dust of the sandblasting of paint.

Q.    Where was that?

A.    This is while working at Phillips 66 refinery.

Q.    Okay.  Thank you.

A.    Also at the refinery he had an exposure to something -- and we don't know what it is, and it made him sick for a day -- or a few days.

Q.    Okay.  And is this information from Phillips 66, the sandblasting and that, does that all come from Mr. Harris, the Defendant?

A.    A lot of the information comes from Mr. Harris.

Q.    The exposure of what you don't know what it is, some exposure, came from Mr. Harris?

A.    Yes.

Q.    Okay.  Fair enough.  And the welding -- welding fumes is the Phillips plant?  Is that accurate?

A.    Yes.  Welding fumes is the Phillips plant.

Q.    Any other exposures, please?  I see pesticide exposure as a youngster, correct, Doctor?

A.    Yes.

Q.    I see chemical exposure as an adult.  Okay.  Besides the Phillips 66 and what you described, any other adult chemical exposure, please?

A.    Okay.  I'm checking my notes.

Q.    Thanks, Doctor.

A.    The only other significant exposures that I found were that to cocaine.

Q.    Okay.  There was some other exposure that you put to food, though.  Likely unrelated exposures.  That's the beginning of your report.  Letter H, food pollution.

A.    Right.

Q.    Okay.  And what did that consist of?

A.    I don't think there was any.

Q.    Okay.  All right.  When did you visit with Mr. Harris about -- when did you interview Mr. Harris, and when was the first time you met Mr. Harris?

A.    The first time I met Mr. Harris was when I interviewed him November 27th, 2013.

Q.    Where was that?

A.    That was in the county jail.

Q.    Okay.  So you physically traveled to the county jail and interviewed him November 27th, in the last couple weeks?

A.    Yes.

Q.    Okay.  And how long did you spend with him then?

A.    All day.

Q.    Okay.  And how about the second time you met with him?

A.    That was last night.

Q.    Last night?  Okay.  How long did you have a chance to spend with him?

A.    About an hour.

Q.    Okay.  When you say all day, how many hours the first time, November 27th?

A.    About seven hours.

Q.    Thank you.  All right.  The jail was very accommodating, weren't they?

A.    Yes.

Q.    Very polite, courteous over there?

A.    Yes.

Q.    Okay.  Let me ask you just a couple other questions. Mr. Wooten indicated that you have testified before in other courts, right?

A.    Yes.

Q.    And that would be regarding various types of neurotoxicity, correct?

A.    Yes.

Q.    Okay.  And he asked if your testimony -- if courts had accepted your testimony, correct?

A.    Yes.

Q.    Okay.  It's true, also, that courts on more than one occasion have excluded your testimony, finding it to not be scientifically reliable.  Is that not true, Dr. Singer?

A.    It's true that my testimony has been excluded.

Q.    Okay.

A.    But I'm -- I would not characterize it as

scientifically unreliable.

Q.   Okay.  But courts have excluded it when you were offering scientific testimony.  Is that a fair statement?

A.   It's fair to say that an extreme minority of courts excluded my testimony.

Q.   Okay.  Let's talk about how many occasions that's happened.  How many times, Dr. Singer?

A.   Approximately, five times.

Q.   Okay.  And let's talk about the five times, please.  Okay?  Some of those have been in federal court.  Correct?

A.   I'm uncertain.

Q.   Okay.  Well, can you tell me the locations that occurred, please, Dr. Singer?

A.   One was in Virginia.

Q.   Okay.

A.   But I'm not sure if that counts because I don't know what happened.

Q.   We'll talk about that later.

A.   Okay.

Q.   So it was excluded in Virginia.  Civil suit, correct?

A.   Actually, I'm not certain what happened in that case.

Q.   Okay.  You know your testimony was excluded, correct?

A.   Well, I know that the case was dropped and then refiled.

Q.   Okay.  You're aware that a federal court excluded your

testimony in a matter in Virginia.  Is that true?

A.    Yes.  They excluded my testimony because I relied on another witness who they excluded.

Q.    Okay.  But your testimony was excluded, correct?

A.    Yes, but not on the ground of scientific unreliability.

Q.    My question is it was excluded, correct?  Your testimony was excluded, correct?

A.    Yes.

Q.    Okay.  Let's go a little further.  Your testimony has been excluded regarding matters in Texas in the past, correct?

A.    There was one case in Texas, yes.

Q.    Oh, by the way, what was the nature of your testimony? What kind of exposure was in Virginia, please?

A.    I believe it was pesticide exposure.

Q.    Okay.  Does refrigerant gas ring a bell in Virginia?

A.    Yes.

Q.    Okay.  The time you were -- testified in Texas that it was excluded, what kind of exposure was that?

A.    I believe it was herbicide.

Q.    Okay.  And that was a federal court, also, correct?

A.    That was back to 1985.  So I think it was, but I don't know for sure.

Q.    But it was excluded.  Your testimony was excluded by a federal court in the 1980's, correct?

A. Well, again, it was excluded. I believe it was excluded, but I don't know what court it was in.

Q. Okay. Let's go on to other courts. Your testimony has been excluded in the State of New Mexico, has it not?

A. I'm uncertain. I know that the case was dismissed for lack of evidence.

Q. Okay.

A. And I know I was testifying in that case.

Q. Was your testimony regarding electromagnetic hypersensitivity in New Mexico?

A. Yes.

Q. Okay. And you were not -- you never got to the point where you testified, correct?

A. Well, I testified in front of the Judge.

Q. Okay.

A. And the Judge was the only person hearing the case. There was not a jury.

Q. The case was dismissed, correct?

A. Yes.

Q. Okay. Give me the other two times that you've talked about it being excluded. What other two times was your testimony excluded other than we've discussed here?

A. In California.

Q. Okay. What was the nature of your testimony in California?

A.   It dealt with mold neurotoxicity.

Q.   Okay.  When was that?

A.   About a year ago.

Q.   Okay.  What location in California?

A.   Well, the incident took place in Santa Barbara County.

Q.   Okay.  Was that a state court in California, is what I'm asking?

A.   Yes.

Q.   So a state court in California excluded your testimony regarding mold neurotoxicity?

A.   They wouldn't let anyone testify with regard to mold neurotoxicity.

Q.   Okay.

A.   They would permit my testimony in neuropsychology, in cognition, and in neurology, but not in mold neurotoxicity.

Q.   Okay.  So as to the mold neurotoxicity your testimony was excluded, correct?

A.   Yes.  They would not permit anyone to testify to mold neurotoxicity.

Q.   And that included yours, right, Doctor?

A.   Yes.

Q.   And let's go on to the last one.  The fifth that you can remember.  Where was that?

A.   I'm not recalling.

Q.   What type of case was that?  You testified about five

times.  We have four.  What's the fifth time?

A.    I don't know.  Remind me.

Q.    Okay.  Well, you testified to five times, so I'm asking you.  You don't remember?

A.    I'm not recalling another.

MR. WOOTEN:  I'm going to object, Judge.  I think he was rounding up or guessing.

Q.    All right.  And so let me ask you this.  So what -- let me ask this.  So what did you base your opinion on regarding the exposure you've testified to, the neurotoxicity, here today on Mr. Harris?  What did you base your opinion on, sir?

A.    I based my opinion on my review of the records, my evaluation of Mr. Harris, Dr. Kasper's records, my review of the scientific literature, my expertise in neuropsychology and neurotoxicology.

Q.    Okay.  Did you ever meet with Dr. Kasper regarding this?

A.    No.

Q.    Have you ever met Dr. Kasper?

A.    I don't know.

Q.    Okay.

MS. YENNE:  I'll pass the witness.

MR. WOOTEN:  Nothing further, Judge.

THE COURT:  Thank you very much, Dr. Singer.  You

may step down.

We're continuing on the record. Counsel for the State, counsel for the defense, the Defendant are present. Dr. Singer has left the room.

Mr. Wooten, I'll hear your argument.

MR. WOOTEN: Judge, we would present him as an expert as a neuropsychologist and also a neurotoxicologist. I believe he's eminently qualified as to either and as to both. He's testified numerous times.

The fact that his testimony has been excluded several times I don't think is a bar to him testifying here. And we would also ask if the -- in the Court's ruling -- and I think that Ms. Yenne's questions were appropriate and proper as to this hearing as far as times when his testimony was excluded, but we would also ask the Court to bring up or address the subject of whether she would be able to go into that in front of the jury. I'm not arguing that. I'm just asking if the Court will give us a ruling or at least a motion in limine on that so we can approach.

But back to Dr. Singer. I think he's qualified, and we would present him as an expert and ask that his opinions be allowed to be put in front of the jury.

THE COURT: Ms. Yenne.

MS. YENNE: Judge, he's not qualified as to neurotoxicity. He's not a medical doctor. He's not a

radiologist.  He's not capable of reading an MRI.  He's going to be talking about physical effects.  There is no information that any medical testing from this man was done in any way, nor that he would be competent to express an opinion regarding the same.

Counsel asked him if he had testified before in federal and state court.  It is a legitimate area of inquiry for the State to bring up the fact that -- and to have an impression that he's testified in federal and state court and that he's never been excluded is the wrong impression.  He's been excluded twice in federal court and twice in state court regarding neurotoxicity.  And that is very valid, and it's a subject of his testimony here.  If the Court chooses to allow this man to testify, certainly it is a very proper area of inquiry regarding whether his testimony was ever been excluded before.  It goes to his area of expertise.  His testimony in this regard about being excluded is highly suspect, and I am greatly concerned about the information he's placed in the record as to why it was excluded.  It's certainly a proper area of inquiry.

But we do not believe that this man is qualified.  Certainly if the Court considers him to be marginally qualified to express an opinion, that should be limited as to neurotoxicity and the State should certainly, of course, be allowed to have all of the usual manners of cross-examination.

And to try to exclude that in advance would be highly misleading to the jury.

THE COURT:  Your limitation that you asked for -- he's a neuropsychologist and a neurotoxicologist.  You say his testimony should be limited to neurotoxicity?

MS. YENNE:  No.  It should be -- the Court should enter some limitations regarding neurotoxicity.  He's been excluded in those areas in federal and state court.  If the Court chooses to allow that he is minimally competent in neurotoxicology, which by the way, there is no license for, then certainly the areas of inquiry which the State brought up would be legitimate in front of this jury.

THE COURT:  All right.  Mr. Wooten.

MR. WOOTEN:  Judge, just very briefly, he's testified -- I mean, the Court can do the math; but I'm thinking over a hundred times.

Number two, I think it's -- he did testify that he relied on a radiological report.  Ms. Yenne brought that out herself.  So it's not that there is no medical evidence that he relied on.  He can't read an MRI, but he did rely on a report by someone who has every indication is qualified to read an MRI.

Lastly, I would say that my objection to her -- that would be bringing prior -- other court rulings in front of this jury, which is improper.

JILL FRIEDRICHS
Official Court Reporter
412th Judicial District Court          **01/28/2015**

And number two, the reason I would ask for a motion in limine is if he had testimony that was barred on refrigerant gas, that doesn't have anything to do with this case.  If he had mold testimony barred, it doesn't have anything to do with this case.  I think at least to keep a -- from a 403 standpoint, that we would have to approach and have a balancing test.  And then I think under no circumstances should the State be allowed to present a prior court ruling from some other court, some other place.  All we know is the state.

Or really -- if we knew the court, it really wouldn't make any difference because that's not this Court. This Court -- that's basically going behind this Court's ruling saying that he's qualified to testify, if this Court does.  If this Court say he's qualified in this 705 ruling, what they are doing is going behind this ruling and bringing in another court to say, yeah, but this court said something different.  It's almost like it's impeaching this Court's decision, and that's improper and that's why you can't bring other court's ruling into a trial and put them before the jury.

MS. YENNE:  Judge, may I respond?

THE COURT:  You may.

MS. YENNE:  For the purpose of the record -- I can introduce the cases, for purpose of this record, that he's been excluded in; and the Court can make an appropriate

decision whether the topics of his testimony mirror the topics here in cases.

THE COURT:  Well, do you have copies of them?

MS. YENNE:  I have copies.  I have the Viterbo case.  The Firstenburg case.  May I get an extra copy real quickly?  Judge, let me make an extra quick copy of the other, please.  Thank you.  We're getting the remaining one, Judge.

Certainly, it's the State's position that if you're holding him out as an expert, his qualifications and his prior expertise are subject to impeachment, the topics he's testified on.

Judge, I'm going to quickly make that extra copy, if I could?

Your Honor, it's, additionally, the State's position that the topics that he's previously testified on that are considered valid topics -- the State is not conceding the neurotoxicity a valid topic.  The topics that he's prone to testify to before a court and represent as valid science go to his motivation for compensation, and they should all be allowed as to what this man is willing to testify to.

MR. WOOTEN:  Judge, if they are going to give the Court cases, do you think we can have those cites?

MS. YENNE:  Sure.  I'll be happy to.  Let me get them an extra copy.

Judge, for purpose of full disclosure, also,

Mr. Wooten, there's a workers compensation on arbitration that his testimony was excluded, also, regarding the exposure case.

THE COURT:  Did you give me three opinions? Okay.  Thank you.

**(A short recess was taken.)**

THE COURT:  All right.  We're back on the record. The record will reflect counsel for the State, counsel for the defense, the Defendant are present.

Mr. Wooten, have you had time to review the cases?

MR. WOOTEN:  Yes, Judge.

THE COURT:  Do you want to respond specifically to the Fourth Circuit's opinion?

MR. WOOTEN:  And that is in Zellers, Judge?

THE COURT:  That's Zellers.

As to any knowledge or testimony as to what levels would have to have been exposed to cause these ill-effects?

MR. WOOTEN:  I think Ms. Conn would have to respond to that, Judge, because we split these cases up as we looked at them.

THE COURT:  Oh, okay.  All right.  Ms. Conn?

MR. WOOTEN:  I'm sorry.  I looked at the other two.

THE COURT:  Ms. Conn, on Page 14 of the opinion,

I didn't hear any testimony as to his opinion or knowledge as to levels that would be required.  Do you know does he have that knowledge?

MS. CONN:  Dr. Singer?

THE COURT:  Singer.

MR. WOOTEN:  Oh.  Well, I can respond to that, Judge.  I believe he does, Judge.  In fact, he has done quite a bit of independent research and brought reports, written reports, on hydrogen sulfide neurotoxicity, which we've given to the State, which is 13 pages.  And also toxaphene neurotoxicity, which is 9 pages.  He prepared these actual research documents for this case.  So I believe that --

THE COURT:  He is prepared to testify as to that?

MR. WOOTEN:  Well, I could go ask him, Judge; but I believe so, Judge.  But I can't say for sure.  I hate to tell the Court something.  We didn't go over it, but we do have these research materials.  I can talk to him.  I can certainly go into the levels that he feels and what he based the levels on.

And what I would say, Judge, is in several of these cases -- in fact, in all of these cases, Dr. Singer -- the underlying -- that one doctor's diagnosis was found unreliable, as you're talking about in Zellers, and that made his opinion, I guess for that court, unreliable.

EMS [sic] testimony, which is electric exposure,

was found to be unreliable in another case.

And where did the other case go? There is three.

And then, Judge, Tordon 10K or Picloram neurotoxicity in humans was found in the Viterbo case to be unreliable.

I could ask -- I mean, if this court wants me to ask about the levels that were found in -- about the levels that were found in this case. But I would respectfully say to the Court that if the Court is saying I read this and this seems like something that y'all should have brought up because I read another case, I think that's great. I mean, that's good of the Judge. But I don't know that this case stands for, out of the Fourth Circuit, that in a case of this magnitude if levels are not brought -- does that make sense? I don't think it's a precedent.

Now I think it sounds legitimate, to me, to go into that. I see the Court's concern. I understand it. But I would say I don't think that this case stands for Dr. Cooper being excluded, that he can't answer --

MS. YENNE: Dr. Singer.

MR. WOOTEN: Dr. Singer. I'm sorry. I don't know where that came from. I'm really at the end of my rope. I promise.

Dr. Singer -- I don't think that case stands for precedent that if we can't prove the levels, that Dr. Singer

should be excluded based on that case.

Now if the Court were to make that decision on its own, of course the Court can do that.  But I just wanted to make that distinction.  Would you like me to go talk to Dr. Singer?  Or we could bring him back and ask him, Judge.

THE COURT:  I'm going to go ahead and allow him to testify to the limited basis that he said he's qualified to attest to and to the things he testified to during this 705 examination.  I think the magnitude of the case would require me to allow that to be brought in.  But the defense is entitled to test his qualifications with regard -- I'm sorry.  I am looking at you.

MS. YENNE:  We're to the point where we could swap.

THE COURT:  You can go into prior cases where he has been found to be not qualified.  Because some of this language in these cases is pretty pointed as to going to his qualifications to give toxicology-type opinions.

But I will allow him to testify, but I will allow the State to go in on cross-examination to those other issues.

MR. WOOTEN:  Yes, Judge.  And for the record, we would object.

THE COURT:  I understand, and your objection is overruled.

MR. WOOTEN:  Okay.  I understand, Judge.

THE COURT: All right. Do y'all need 60 seconds?

MS. YENNE: Judge, 60 seconds. Thank you.

MR. WOOTEN: Judge, for the record, not to argue with your ruling in any way. I'd just like to federalize my objection.

THE COURT: You may do that, and then I'll rule on it.

MR. WOOTEN: Thank you, Judge.

The 4th, 5th, 6th, 8th, 14th Amendments of the United States Constitution; Article 1, Sections 3, 10, 13, 15 and 19 of the Texas Constitution. And we would renew our objection based on those.

THE COURT: All right. And those objections will be overruled.

MR. WOOTEN: Thank you, Judge.

**(A short recess was taken.)**

THE COURT: We're on the record. The record will reflect that counsel for the State, counsel for the defense, the Defendant are present. The jury has not entered the room.

Mr. Wooten, is there something you wish to put on the record before the jury is brought in?

MR. WOOTEN: Yes, Judge. We -- there was a recording of Mr. Anderson that has already been talked about during his testimony, the full recording. We would like to admit that recording, although I don't have my hands on it, as

A.    Yes.

Q.    Okay.  That was in the 1980's.  Fair enough?
Mr. Viterbo was suing Dow Chemical, was he not?

A.    I am uncertain.

Q.    Okay.

MS. YENNE:  May I approach, Judge?

THE COURT:  You may.

Q.    Maybe a copy of the case would jog your memory,
Doctor.  State's Exhibit 232, I'm going to ask you to look at
Viterbo versus Dow Chemical.  See if this jogs your memory just
a minute on the Tordon K?

MR. WOOTEN:  Judge, I'm going to object.  This
isn't past recollection recorded.  He didn't generate this
document.  This is improperly refreshing his memory.

THE COURT:  Are you asking about the facts of the
case only?

MS. YENNE:  Yes.

THE COURT:  All right.  Overruled.

A.    What am I -- what's the question?

Q.    Mr. Viterbo was suing Dow Chemical over pesticide
exposure, Tordon K, correct?

A.    Tordon K is an herbicide.

Q.    Okay.  Mr. Viterbo was suing Dow Chemical over Tordon
K, an herbicide, right?  Exposure?

A.    Yes.

Q.    Okay.  You rendered services in that case.  Correct?

A.    Yes.

Q.    Okay.  For Mr. Viterbo's side, correct?  For the plaintiff, correct?

A.    I was hired by the plaintiff.

Q.    Okay.  And you were compensated for those services, correct?

A.    At least some compensation.

Q.    Okay.  And your scientific testimony was excluded by a federal court in that case, was it not?

A.    Could I see that document again?

Q.    Sure.

A.    The defendant motion for summary judgment was granted.

Q.    Okay.

A.    And the Court made an opinion.

Q.    Okay.  The opinion was that your scientific testimony was so lacking in probative value, correct, that it needed to be excluded?

A.    Could you please return that to me?

Q.    Sure.  State's Exhibit 232, for the purposes of the record, is the Court's finding.

        MR. WOOTEN:  Judge, once again, this is an improper refreshment of recollection.  It's not his.  She's asking him to read off a document that's not in evidence.

        THE COURT:  I won't allow him to read to the jury

what's there; but to refresh his recollection to answer the question, he can do so.

A.   The offered expert testimony.

Q.   Yours was excluded, was it not?

A.   Yes.

Q.   Okay.  Let's go on to some other times your testimony has been excluded, Doctor.  Let me go to last year, 2012.  It's been excluded in New Mexico, has it not?

A.   Yes.

Q.   Okay.  That would be the Firstenburg case. Mr. Firstenburg was suing his neighbor, correct, for electromagnetic sensitivity.  He was exposed to electromagnetic forces.  He was suing his neighbor, correct?

A.   Yes.

Q.   Okay.  That was -- he alleged that the neighbor had exposed him to cell phone usage, computer usage and such, correct?  Mr. Firstenburg alleged that, did he not, in New Mexico?

A.   I don't recall computer usage.

Q.   Okay.  Well, what usage was Mr. Firstenburg alleging?

A.   I -- I need some instruction here because the case is under appeal.  I'm not certain that I can discuss it.

Q.   Okay.  The district court in New Mexico excluded your scientific testimony on electromagnetic hypersensitivity, did they not, Doctor, last year?

A.    I recall that the case lost on summary judgment.

Q.    Okay.

MS. YENNE:  Can I have just a second, Judge?

Q.    Okay.  Just for the purpose of jogging your memory, State's Exhibit 233, can you recognize or remember that the court in New Mexico, the First Judicial District Court, last year, September, 8th -- September, 2012, excluded your expert testimony in the Firstenburg case?

A.    The defendant's motion to exclude --

MR. WOOTEN:  Objection to him reading from it.

THE COURT:  Doctor, don't read.  Just use it to refresh your recollection and then answer the question.

A.    I believe it's yes.

Q.    Okay.  Let me go a little further.  Your testimony has also been excluded in the United States Court of Appeals for the Fourth Circuit, a Virginia case, Deborah Zellers versus Rite Aid of Virginia.  Correct?

A.    Yes.

Q.    Okay.  That case she was suing -- Ms. Zellers was suing for refrigerant exposure.  Is that correct?

A.    Yes.

Q.    Okay.  Suing her former employer.  Is that a fair statement?

A.    Yes.

Q.    Okay.  You provided services to Ms. Zellers.  Is that

correct?

**A.** Yes.

**Q.** Okay. And you took a position that Ms. Zellers had a nervous system dysfunction from neurotoxicity consistent with and caused by poisoning with refrigerant containing fluorocarbons. Correct?

**A.** Yes.

**Q.** And your testimony was excluded, was it not?

**A.** Yes.

**Q.** Okay. You've also had your testimony excluded in California?

**A.** Yes.

**Q.** That's regarding toxic mold exposure. Neurotoxicity from mold exposure, correct?

**A.** Yes.

**Q.** And you, likewise, have had your testimony excluded in worker's compensation cases. Remember the Dust Off case?

**A.** No.

**Q.** Okay.

          MS. YENNE: I'll pass the witness.

          THE COURT: Mr. Wooten.

          MR. WOOTEN: Nothing further, Judge.

          THE COURT: Thank you very much, Dr. Singer. You may step down.

          The Rule has been invoked. You understand the

jacket to Kirk Coleman.  Well, we know -- we watched that motel video.  You watched it.  We played it for you.  He had on a camouflage jacket.  You heard it in the 9-1-1 call.  Darla said camouflage jacket.  We know he had on a camouflage jacket.  He tells Kirk Coleman it was a blue jacket.  ILA 30 -- Local 30 on it.  So watch that.

Let's talk about his childhood or poor upbringing.  Lots of people grew up poor.  Lots of people had a bad childhood.  But let's look at what the evidence has shown us.  Look at what Dr. Farrell says about his bad childhood, and then look at Dr. Kasper's CTQ.  They are in dispute.  They are in conflict.  One is saying he had a really bad childhood.  The other one is saying that it really wasn't that bad.  And Dr. Kasper got her answers from the Defendant.  Then look at -- I mean, Mack Selman.  He came in here and he testified long before the Defendant was charged with Capital Murder when he was on probation, he talked about how he would not change anything about his childhood.  Does that sound like someone who had a bad childhood?  Does that sound like something that's mitigating?  No.

Exposure to pesticides and toxic chemicals.  Let's talk about that.  Where is the medical proof for any of this?  We've heard from Dr. Kasper and Dr. Singer.  Neither one of them are medical doctors.  And it was Dr. Singer who is saying that he was exposed to pesticides and exposed to toxic

chemicals.  No medical evidence to support it.  He spent a total of eight hours with the Defendant before he formed this opinion that he had been exposed to these things.  Go back and look at the book-in sheets and the medical from the jail.  The only mention of any kind of an injury is an injury to a foot or ankle and an injury to a knee.  There is nothing in there about being exposed to pesticides as a child.  There is nothing in there about being exposed to toxic chemicals, to sandblasting, to any of this.  Nothing in there to support that.

And how -- if you even thought that that was, how does that lessen his blame for what he did?  He stabbed an 85-year-old man in his home eight times.  He was minding his own business.  He stabbed Darla Wilcox 24 times, who all she did was answer the door to the doorbell.  I mean, how does any of this lessen his blame?

Cocaine usage.  Well, we know that he used cocaine.  He used crack cocaine because we've had witnesses that came in and said, oh, he used cocaine.  Crack cocaine.  I smoked crack cocaine with him.  Amy Spears.  Jean Rhodes.  So we know he did use cocaine.  How does voluntarily using drugs lessen your blame for a crime as brutal as the one that he committed?  How does that lessen your blame?  It doesn't.  I submit it doesn't.

Good worker at the Port.  They brought you a lot of the -- the defense brought you a lot of witnesses who said

incompetent.  Alton Murphy, who stabs a woman 20 times in Florida is insane.  That's her previous testimony.  Clifford Davis stabbed his elderly 77-year-old grandfather, strangled his mother, did other things to his mother; and she said he had a borderline personality disorder and bipolar.  I would like to know what Dr. Kasper considers more than borderline.  Somebody stabbing a 77-year-old man to death, strangling his mother is not just borderline.  It's way out there.  But she did all this for money.

She ordered an MRI and she never read it, didn't know where it came and wasn't qualified to read it.  And she testified there is other psychiatrists and doctors in the area that could have interpreted it.

And, you know, I guess it takes a lot of nerve when you're paid that much as Dr. Singer to come in and testify to what these guys are testifying to.  And so I call what we used to call it in the old days, snake oil salesmen.  They used to sell you snake oil to cure all your ailments.  And it was just a fraud.  Well, now we have fancy forms of strange snake oil.  They're called neuropsychologists.  And, you know, they're called neuropsychologists because you can't find any self-respecting medical doctor that would have the nerve to come in and testify to this.

But I found it interesting that Dr. Singer, he had only met the Defendant 15 days ago.  Really?  But how can

you ring up like $30,000 worth of bills when you only met the Defendant 15 days ago?  You know?  His testimony has been excluded in so many courts he just about can't count.  And now he says he's only called to testify one or two times.  Yes, because his science is not reliable.  He checked out nothing in this case.  This is a guy who has the nerve to call scientific evidence cell phone exposure on a lawsuit.  When one neighbor is suing another neighbor.  This man will find a toxin anywhere for money.  He's not a medical doctor.  He's not a neurologist. He's not a psychiatrist.  And, you know, he didn't even speak to any of the chemical companies.  And look at all the records he did not review.  Do you consider that thorough?  No.

So let me go a little further.  Evidence that a juror might regard as reducing the Defendant's moral blameworthiness.  There is none.  You know, you have some alleged drug addiction, alleged mitigating evidence.  We're going to finish up.  Alleged drug addiction.  There is a lot of drug usage but, you know, it's funny.  When they asked, I believe, Marcus Lincoln is he a drug addict, he paused.  And he knows him very well.  This man uses cocaine when he wants to use it.

Where is the toxic chemical exposure?  Did you ever hear one person that said the Defendant was exposed to toxic chemicals who actually saw it?  Even his sister just said he used to come in with dirty clothes from the fields; and that

NO. 67063

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| VS. | § | BRAZORIA COUNTY, TEXAS |
| JAMES HARRIS, JR. | § | 149TH JUDICIAL DISTRICT |

## CHARGE OF THE COURT

MEMBERS OF THE JURY:

The defendant, JAMES HARRIS, JR., has entered a plea of "GUILTY" to the offense of CAPITAL MURDER, as alleged in the indictment. This offense is alleged to have been committed in Brazoria County, Texas, on or about the 14TH day of January, 2012.

To this charge the defendant has pleaded "GUILTY" and he has persisted in entering such plea notwithstanding the Court, as required by law, had admonished him of the consequences of the same; and it plainly appearing to the Court that the defendant is competent and sane and that he is not influenced to make this plea by any consideration of fear, nor by a persuasive or delusive hope of pardon prompting him to confess his guilt, said plea is by the Court received.

You are therefore instructed to find the defendant guilty of CAPITAL MURDER, as charged in the indictment.

The mandatory punishment for the offense of Capital Murder of which the defendant has pled guilty is by imprisonment in the Texas Department of Criminal Justice, Institutional Division, for life without parole or death.

In deliberating on the issues submitted you shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the

1

**13876**

**01/28/2015**

first page, Your Honor.

THE COURT: All right.

MS. CONN: Starting with, To this charge the Defendant has pleaded guilty, et cetera.

MS. YENNE: Yes.

MS. CONN: There is a semicolon after the consequences of the same, and I would ask that the Court stop the paragraph at that semicolon. The jury is not to decide competence or sanity. That has not been an issue in the case. They are not supposed to consider any undue influence regarding the Defendant's plea. The word "pardon" is prejudicial, and should not be considered by the jury. All of that second part of that paragraph and/or sentence is prejudicial and inappropriate for the jury to consider. It's a comment on the weight of the evidence. It's confusing. It is not neutral, and not principle as required by Gregg and Tuilaepa versus California.

THE COURT: All right. Overrule that objection.

MS. CONN: All right. And the very last line of this Page 1, "in deliberating on the issues submitted you should consider," we did talk about that that language does track 37.071; but since he pled guilty, Your Honor, and the statute does not consider or give a special instruction in the event that the Defendant pleads guilty -- the statute was written for a person in the normal course of events where there

doing very good about giving verbal responses.  Some people give me nods of the head or shakes, but you've been doing very good.  If you'd just continue that because Mrs. Friedrichs, the court reporter, is taking down all these proceedings and it's just much easier for her to give a verbal -- record a verbal response than a shake of the head or an uh-huh or something like that.  Will you do that for me?

VENIRE PERSON:  Yes.

THE COURT:  Thank you very much.

All right.  Ms. Yenne, you may proceed.

**BRENDA WOODS**,

having been first duly sworn, testified as follows:

**VOIR DIRE DIRECT EXAMINATION**

**BY MS. YENNE:**

Q.    Good morning, Ms. Woods.  How are you?

A.    Good morning.  I'm fine.

Q.    My name is Jeri Yenne, and I'm the District Attorney in Brazoria County.  Mary Aldous is my first assistant.  She and I represent the State of Texas.

Jay Wooten and Mary Conn represent the Defendant, James Harris, Jr.  Okay?

As the Judge told you, this is Individual Voir Dire; and it's the only time lawyers have a chance to individually ask potential jurors questions because it's the nature of the charge of Capital Murder with a penalty range of

life without parole or the death penalty.  Okay?  That would be why we have a chance to interview you individually.  Okay?

A.   Okay.

Q.   So the only time -- the only answer that we want is your honest answer.  We're trying to pick a fair and impartial jury for the State and the defense.  Okay?

And as the Judge told you, the only wrong answer would be one that wouldn't be what you honestly feel.  So I'm going to pick your brain and ask you about some legal principles and things to see if you can honestly follow the law.  Some people say that they can in certain circumstances, some they can't.  Okay?  And there are no right or wrong answers.

MS. YENNE:  May I approach, Judge?

Q.   I'm going to pick your brain just a little bit, though.  I'm going to hand your questionnaire to you, if I can.

A.   Okay.

Q.   And the court reporter is taking down everything you have to say, so you might have to talk just a little louder.

A.   Okay.

Q.   Thank you.

You're a benefits manager?

A.   Yes.

Q.   Okay.  How big an organization?

A.   We have about 370 employees and over 2,000 volunteers.

Q.    Wow.  Human resources is becoming a complicated area these days, is it not?

A.    It is.

Q.    In the last 10 years, even at the County, I have seen it become more and more complicated.  Is that a fair assessment?

A.    That is fair.

Q.    Do you navigate a lot of things?  I notice that you went to some FMLA conferences and stuff.

A.    Health care reform has made my job more complicated and complex.

Q.    And probably adds an additional full-time job.

A.    It is a full-time job.

Q.    Just that aspect?

A.    Right.  The compliance.

Q.    Wow.  One of the things I noticed from your questionnaire that -- and I want to make sure I understand. You are in favor, at times, of the death penalty for certain circumstances?

A.    Yes, I am.

Q.    Okay.  So let me go a little further.  I wanted to pick your brain on a couple questions first, and then I'm going to launch into a bigger presentation.  But some of the things that you said I found interesting, so I want to pick your brain just a bit.

Page 16. Could you turn to page 16, Number 91? Are you there?

A.   Yes, I am.

Q.   Do you believe the type of victim or status of a victim should affect the punishment in a case?

You had indicated, Yes; and you wrote something that I wanted to pick your brain about. Why or why not? "If you're dealing with a minor or disabled person or senior citizen, it should affect the punishment."

A.   Yes.

Q.   Okay. Can you tell me your views on that a little bit? Do you feel that the individuals that you listed are more unable to defend themselves?

A.   Yeah. That is my belief, that they cannot defend themselves properly. You know, when you're dealing with a small child, a disabled person, they just don't have the strength as an ordinary person would have. So that's --

Q.   Disabled senior citizen, also?

A.   Disabled senior citizens, also.

Q.   Okay. In your mind is that something that you would factor in if they were a victim, a more defenseless victim?

A.   Yes.

Q.   Okay. One of the things I noted on page 15 -- could you go back? I'm going to stay in the same area a little bit.

You had put under Number 82: Do you feel that

prison serves the public in rehabilitating inmates?

And you had put, No.  Correct?

A.    That is correct.

Q.    Okay.  Is that your belief today?  Because, you know, we threw a bunch of questionnaires at about 200 people, Ms. Woods; and they had to answer questions without -- let me put it this way.  We handed them to people cold; and there are times when people say, well, you know, on reflecting on that, I have a different view.

But you had put, "I don't think so because they tend to repeat similar crimes, in my opinion."

A.    That is correct.

Q.    Okay.  So when someone continues to repeat crimes, is that something that you think is significant that you will take note of in sentencing?

A.    Yes, I would.

Q.    Okay.  You also put, basically, on Number 84:  What are your feelings in general about the criminal justice system?

You said, I do believe that it is a fair system.

A.    That's correct.

Q.    But it said:  What would you change about the system if you could?

You put, The cost to the system.

Now I'm smiling because you are a benefits manager.  Tell me how you would change the cost to the system.

Just give me your perspective on that.

A.    My perspective would be instead of having a person in prison for a long time, that you can try some alternative way to rehab them to keep the cost down.

Q.    Okay.  That's a fair statement.

A.    You know, if they are not a violent criminal, you know, you might, you know, let them loose, you know, and do --

Q.    Drug rehab?

A.    Yeah, something like that.

Q.    Okay.  Do you have a different view for violent criminals?

A.    Yeah.  That would be totally different.

Q.    Okay.  And let's go a little further.  If you go to page 19 of your questionnaire, it says -- we're talking about if you were on a jury to sentence a defendant who has already been convicted of Capital Murder.  If the law gives you a choice of death or life in prison without parole, you checked, I would consider all the penalties provided by law and the facts and circumstances of the particular case.

A.    That's correct.

Q.    And that's your view today?

A.    That's my view today.

Q.    Okay.  And the death penalty would, in your mind, also be one of the those appropriate considerations one way or the other?

A.    That is correct.

Q.    Okay.  Let me go a little further.  Can you go to page 21 for a minute?

And I -- you know what?  We -- it's hard for anybody to answer these questions because they are pretty black and white to me.  There is lots of times you'd like probably an in between to agree or disagree.  You know what I'm saying?

But the jurors -- on page 21 you had put, The death penalty is sometimes more compassionate than life without parole.  You had agreed with that?

A.    I agree with that.

Q.    So tell me your perspective on that.  When would you think it would be?

A.    In violent crimes.

Q.    Okay.  Also can you go back to page 20 and Number 109 on the agree or disagree?  You believe that capital punishment is absolutely justified at times?

A.    I do agree with that.

Q.    Okay.  And by capital punishment I'm referring to the death penalty.  Was that what your thought was?  I wanted to make sure that I understood you.

A.    Yes.

Q.    Okay.  And let me go a little further.  Now I notice that you worked for Catholic Charities?

A.    Yes.

Q.    That's a large organization as you've described it.  I don't want to pick your brain too much.

And by the way, Mr. Wooten, Mr. Aldous, Ms. Conn, myself, I wouldn't want to be in your spot there.  Let me put it this way.  I respect our potential jurors because we are picking your brains, given the nature of the case.

Could I ask you -- but you put in your questionnaire that you did not attend church.

A.    That is correct.

Q.    Okay.  Do you have a religious belief?  Did you attend church?  Because I know you work for Catholic Charities, so I'm trying to pick what yours is.

A.    2005 I stopped going to church.  I was a member of a Baptist church at that time, and since then I just stopped going.

Q.    Okay.  All right.  Fair enough.

Also on page 16 of 30 -- by the way, I also noticed that you -- do you like to sew?

A.    I do.

Q.    That's a lost art and -- becoming a lost art, and I so appreciate it.  One of the things I've always wanted to do if I ever had the opportunity was actually get good at sewing.  I actually sewed my sock to a skirt one time I was wearing when I was mending a sock, and I don't think sewing was in my future.  When I mended that sock and it was attached to the skirt, I

know that sewing was not going to be what I was going to be doing for a living.

And you also said you watched the Antiques Roadshow?

A.   Yes.

Q.   Do you have -- just a curiosity question.  Do you have any antique sewing machines, like the old Singers?  I have one at home.

A.   Well, I have a Kenmore that's --

Q.   Antique?

A.   Over 30.  Let's see.  It's over 35 years old.

Q.   Okay.  So do you actually sew some of your own clothes?

A.   Yes, I do.

Q.   Wow.  Okay.  Do you -- can you still find patterns somewhere?

A.   I custom make my patterns.

Q.   Wow.  I notice that on page 16, Number 88:  Should people accused of murder be treated differently than people accused of other crimes?  And you feel those should be harsher sentences?

A.   Yes.

Q.   Okay.  One of the questions -- also on Question No. 65 on page 12, if I can, and then I'm going to launch into -- it said:  What do you think -- Question No. 65 -- are the reasons

that people commit most of the violent crimes in our society?

And you put, The personal choices they make?

A.   That is correct.

Q.   Okay.  Is that still your belief today?

A.   It is my belief.

Q.   Okay.  I probably agree with that belief.

Okay.  Have you ever at any time been opposed to the death penalty, or have you always thought of it as an appropriate punishment if the circumstance fits?

A.   If the circumstance fits.

Q.   Okay.  Let me go a little further.  There was one concern that you had if you were selected as a juror.  Page 28. I wanted you to expound on that just a little bit.  It said, Number 153:  What would be your greatest concern if you were to be selected as a juror in a capital case?

You put, Media stalking and my family privacy.

A.   That is correct.

Q.   Okay.  Can you give me a little bit of perspective on that, please?

A.   I would not want the media to approach me.  As far as my family, for them to have privacy because they work and go to school.  You know, I just wouldn't want any attention drawn to them or myself.

Q.   It seems like these days there is almost no privacy.

A.   Right.

Q. But lucky that I'm not really on the internet much because as one of my family members says, you can't get out of that cyber world once you're in it, it seems like.

A. Right.

Q. So I've chosen not to get in, Ms. Woods.

A. Uh-huh.

Q. I may have a few other questions about your questionnaire when I finish up. Okay?

So this is the State of Texas versus James Harris, Jr.; and the charge is Capital Murder. Okay? It alleges on or about the 14th day of January, 2012, in Brazoria County, Texas, the Defendant did then and there intentionally cause the death of an individual, to-wit: Alton Wilcox, by stabbing Alton Wilcox with a knife, and the Defendant was then and there in the course of committing or attempting to commit the offense of Robbery of Darla Wilcox. Okay?

It also alleges on or about the 14th day of January, 2012, in Brazoria County, Texas, the Defendant, did intentionally cause the death of an individual, Alton Wilcox, by stabbing Alton Wilcox with a knife, and the Defendant was then and there in the course of committing or attempting to commit the offense of Burglary of a Habitation owned by Darla Wilcox.

Also, on or about the 14th day of January, 2012, before the indictment was presented, the Defendant

intentionally caused the death of Alton Wilcox by stabbing Alton Wilcox with a knife, and the Defendant was then and there in the course of committing or attempting to commit the offense of Burglary of a Habitation owned by Alton Wilcox.  Okay?

It's one charge of Capital Murder but different ways to commit it, during the course of burglary or during the course of robbery.  Okay?

A.   Okay.

Q.   All right.  Now let me tell you what murder is. Murder is intentionally causing the death of an individual, Ms. Woods.  No justification, no excuse, no self-defense, no defending other people, no defending property, no insanity, no mental health issue.  Cold-blooded I intended to kill them.

Let's say a neighbor gets mad at another neighbor, okay, and decides they're going to go kill them. They get a gun, they approach them on the street, and they shoot them to death.  They intended the result.  Cold-blooded, non-justified killing.  Okay?

A.   Okay.

Q.   I just want to give you that, all right, because some people ask about self-defense.  The definition of murder is non justified.

So let's go a little further.  That's regular murder.  What raises it up to Capital Murder?  I call it -- it's murder plus.  Capital Murder is murder plus something else

because it raises it to the potential for the death penalty.

And so what raises it up? Capital Murder could be intentionally killing a police officer in the line of duty, knowing they are a police officer. Intentionally killing a child under the age of 10. Intentionally killing more than one person during the same criminal transaction. I walk into a convenience store and I start shooting people up and I want to kill them, more than one person. Intentional murder for hire. Somebody hires somebody to kill somebody else intentionally.

Or there is this kind of Capital Murder. The person intentionally commits murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat. Okay?

**A.** Okay.

**Q.** So remember what raised that intentional killing up to Capital Murder was it was during the course -- in the indictment, as alleged -- of a burglary or robbery. Okay?

**A.** Okay.

**Q.** All right. Let's go a little further. And as I said, the person acts intentionally or with intent with respect to a result of his conduct when it is his conscious objective or desire to cause the result. Cause the death. Okay?

**A.** Okay.

**Q.** All right. Let me go a little further. The

prosecution has the burden of proving the Defendant guilty and it must do so by proving each and every element of the offense beyond a reasonable doubt.  It is not required that the prosecution prove guilt beyond all possible doubt.  Okay?  It is required that the prosecution's proof excludes all reasonable doubt concerning the Defendant's guilt.  Okay?

A.    Okay.

Q.    So my question for you is could you follow that instruction?

A.    Yes, I can.

Q.    Could you hold me to my burden of beyond a reasonable doubt?

A.    Yes.

Q.    Oh, I noticed in your questionnaire you have a brother-in-law in -- is it law enforcement?

A.    Yes.

Q.    Okay.  Where does your brother-in-law work?

A.    The Harris County Adult Probation Department in downtown Houston.

Q.    How long has he been working there?

A.    He retired out of the military.  About 17, 18 years I would say.

Q.    Okay.  You also have relatives that have been in the military?

A.    Yes.

Q.   Did your brother-in-law retire from the military?

A.   Yes, he did.

Q.   So he's a retired vet?

A.   Yes.

Q.   Was he in the military like 20 years or something?

A.   23 years.

Q.   Okay.  Do you believe that as a veteran we should have respect for our veterans?

A.   Yes.

Q.   They hold a special status in our society?

A.   Yes.

Q.   Okay.  One other question on your questionnaire. Before I keep going, I want to double-check something.  I want to catch your true feelings.  Okay?

On the agree or disagree section just a couple questions, and then I'm going to launch into it a little further.  On page 20 you put, We must have capital punishment for some crimes.  You agreed with that.

A.   Yes.

Q.   Okay.  You still agree with that today?

A.   Yes, I do.

Q.   Okay.  And on page 21 you also put, Capital punishment is just and necessary.  You agreed with that.

A.   Yes.

Q.   Okay.  And that meaning the death penalty, right?

A.   Yes.

Q.   There is one I was going to ask you about.  Capital punishment is justified only for premeditated murder.  You agreed with that.

A.   Yes, I did.

Q.   Okay.  Let me ask this.  If somebody formed an intent on the spot to kill somebody, they flew into a rage in the course of a burglary or robbery or a kidnapping or something like that, would you believe that capital punishment were justified for that, the death penalty?

A.   Yes, I would.

Q.   Okay.  So let's go a little further from beyond a reasonable doubt.  The State is required to prove to you the elements alleged in the indictment.  You know, the intentional killing of Alton Wilcox during the course of burglary or robbery.  Okay?

A.   Okay.

Q.   There will always be inconsistencies, Ms. Woods, in any case.

A.   Okay.

Q.   Let me give you an example.  Pretend there is a car wreck outside the courthouse.  Okay?  The guy is charged with running a red light.  Ten people saw him do it.  He admits he did it.  He's charged with running a red light, and I prove to you beyond a reasonable doubt he ran the red light.  There will

always be people -- let's say some of the witnesses -- they all agree that he ran the red light.  Okay?

A.   Okay.

Q.   But some of the witnesses -- we used to have watches. We don't have watches anymore -- they disagree on the time. Was it 3:20 or 3:30?  Okay?  Was it drizzling or misting?  Am I making sense?

A.   Yes.

Q.   There is always going to be -- human beings are always going to have -- there is going to be inconsistencies in any case.  They may not go to the elements of what's alleged. Okay?

A.   Okay.

Q.   All right.  Let me go a little further.  Levels of burden of proof.  You said you could hold me to beyond a reasonable doubt.  So let me go over that.

Now the lowest level of burden of proof is preponderance of the evidence.  Means the greater weight and degree of credible evidence.  Civil cases seeking money or damages.  That's kind of like just tipping the scales.  When somebody sues somebody else, they just have to tip those scales.  Okay?

A.   Okay.

Q.   Clear and convincing evidence is the next highest burden of proof in the civil system.  It's that measure or

degree of proof that produces a firm belief or conviction that the allegations sought to be established are true. Okay? That's a higher burden. CPS is trying to take your kid away. Okay?

A. Okay.

Q. And that should be a higher burden for that, shouldn't it?

A. Yes.

Q. Than a car accident?

And then there is beyond a reasonable doubt. That's the highest burden of proof, criminal burden of proof. Okay?

A. Okay.

Q. There is no definition, though. Isn't that interesting? The highest burden of proof has no definition. But would you agree with me that beyond a reasonable doubt is higher than those two?

A. Yes.

Q. Okay. Let me go a little further. All persons are presumed to be innocent and no person may be convicted unless each element of an offense is proved beyond a reasonable doubt. The fact that a defendant has been arrested, confined, or indicted for or otherwise charged with an offense gives rise to no inference of guilt at his trial. Okay?

A. Okay.

Q.   So as he sits here today, can you presume Mr. Harris to be innocent of Capital Murder?

A.   Yes.

Q.   Okay.  So you can follow that instruction?

A.   Yes, I can.

Q.   Okay.  Let me go a little further.  The Defendant never has a burden of proof.  The law does not require a defendant to prove his innocence or produce any evidence at all.

Some people say, oh, I wish the defendant would have brought me some witnesses.  No defendant in any criminal case has to produce any evidence.  Okay?

A.   Okay.

Q.   Okay.  So could you follow that instruction?

A.   Yes.

Q.   Okay.  Now if any of us were accused of a crime, we have a Fifth Amendment privilege not to testify.  In other words, against self-incrimination.

People say, well, if it was me, I'd have to talk. I'd have to say something.  But every defendant, no matter what they are charged with, a misdemeanor or a felony -- or if you or I were accused of something, we have a right, a Fifth Amendment right, not to testify or provide any information against ourselves.  So every defendant in any criminal case has a right not to testify.  Okay?  I never know whether someone is

going to testify or not.

Can you agree with me that sometimes people are better off before they open their mouth, Ms. Woods?

A.    Yes.

Q.    Okay.

A.    I can agree with you on that.

Q.    Okay.  Let me be honest with you.  I bet as a benefits manager they would be better off before they open their mouth.

A.    Yes.

Q.    The things you probably see in human resources are probably very similar to law enforcement.

A.    Yes.

Q.    Let me ask you a question.  Just a curiosity question. Do some of the things you see in human resources over the last 10 or 15 years or maybe 5 -- I'm going to say 5 to 10 years, are you seeing things from employees that you thought you would never see?

A.    Yes.

Q.    Taking advantage of situations that you thought you would never see?

A.    Yes.

Q.    Okay.  It's disappointing, isn't it?

A.    Very.

Q.    Very.  Okay.  I've had the same experience.

So can you follow that instruction that every

defendant in any criminal case has a right not to testify and you cannot consider it for any reason?

A.   Yes.

Q.   Okay.  Now if you had to vote right now, you would have to vote not guilty because you haven't heard any evidence yet, right?

A.   Correct.

Q.   So let me ask you this.  I have the burden to prove to you beyond a reasonable doubt the elements in the indictment. Okay?  Let's say I was having a bad week and I didn't do it, Ms. Woods.  Okay?  And I just fell on my face.  I forgot to prove to you the county it happened in or during the course of burglary or robbery.  I mean, it's my job to prove it to you. You know?  Could you find the Defendant not guilty of Capital Murder if I didn't prove to you beyond a reasonable doubt the elements of Capital Murder?

A.   Yes.

Q.   If I did prove to you beyond a reasonable doubt the elements of Capital Murder, could you find the Defendant guilty?

A.   Yes.

Q.   Okay.  Now the indictment alleges one charge of Capital Murder of victim Alton Wilcox with alternate methods of committing the same offense, by robbery or by burglary.  As long as the jury unanimously agrees beyond a reasonable doubt

that the elements of Capital Murder are met, the jury does not need to agree unanimously on which manner and means. As long as I showed you that he intentionally caused the death of Alton Wilcox by stabbing him with a knife, six of the jury can agree that it was in the course of burglary and six of the jury can agree that it was during the course of robbery. Am I making sense?

A.    Yes.

Q.    Okay. Direct evidence. If you sat on a jury, you would get evidence -- certain types of evidence. Direct evidence is evidence that directly demonstrates the ultimate fact to be proven. Eyewitness testimony, video of a crime, confession. Okay?

A.    Okay.

Q.    Those are some examples.

Now I hate this definition, but this is what it is. Circumstantial evidence. Evidence that is direct proof of a secondary fact which, by logical inference, demonstrates the ultimate fact to be proven.

Let me give you an example. There's a child by the pool. Actually, there is a little 5-year-old little boy. He wants to go swimming. He's got a backyard pool. His parents say not right now. You can go later.

They go back to their household work. The next thing you hear is the pitter-patter of little feet going down

the stairs, the back door opening, they hear a big splash. Parents go outside and the little boy is in a lawn chair with a swimsuit dripping wet. Well, they can figure that he went in the pool, right?

A.    Right.

Q.    Even though they didn't witness it.

I'm going to give you another example from my childhood. You and I are probably in the age range where you remember St. Joseph's baby aspirin?

A.    Yes.

Q.    Okay. And in the old days they would give it to kids when they had a headache or something. Now you're never supposed to give a child aspirin. Times have changed. You're supposed to get it if you're old now for a heart attack or something.

But anyway, we had St. Joseph's baby aspirin at the house. My mother had several bottles on top of the refrigerator, three bottles. She was sick, and she would check on us every 15 minutes. She would set the timer, and she would get up. She would listen while we were playing with Play-Doh. I was 4, my brother was 3.

Well, when she went back to lay down, my brother looked at me and said I'm hungry. We got on the stool, got on the refrigerator, got the baby aspirin. We ate three bottles of St. Joseph's baby aspirin. When my mother got up -- we did

that in like 10 minutes, too.  We loved it.  It was orange tasting candy.

My mom got up and she saw the aspirin on the table.  She saw the orange on our face.  She saw the cotton all over and she said who ate these aspirin?  My brother and I told my mother the cat ate the aspirin.  Okay?  My mother knew the cat did not eat the aspirin, and she had to call my father to come back and drive us to the hospital to have all of our stomachs pumped.  So my brother and I, our stomachs were pumped.

She had to make a decision on what she did not personally witness.  Am I making sense?

A.   Yes.

Q.   Okay.  So that's the best example of circumstantial evidence.

Now my question for you is if the State proved to you beyond a reasonable doubt the elements of the offense, can you convict someone of Capital Murder based on circumstantial evidence?

A.   Yes.

Q.   Okay.  Now crimes are not going to all be committed in the same way, are they, Ms. Woods?

A.   No.

Q.   Okay.  Some crimes are going to be committed in front of no witnesses.  Some crimes are going to be committed in

front of an entire baseball stadium of people.  Okay?

A.   Okay.

Q.   And some are going to be on video.  Some are not. Some are only going to be committed in front of one eyewitness.

If I prove to you -- if you were a juror on a Capital Murder case and there was an eyewitness testifying and that eyewitness' testimony established all of the elements of the indictment to you beyond a reasonable doubt and you believed that eyewitness beyond a reasonable doubt, one eyewitness, could you convict someone of Capital Murder based on the testimony of one eyewitness?

A.   Yes.

Q.   Now in order to sit on any jury -- burglary, theft, robbery, drugs -- you have to be able -- anybody has to be able to say they could consider the full penalty range before they could sit on a jury.  Okay?  The full penalty range for Capital Murder is life without parole or the death penalty.  Okay?

A.   Okay.

Q.   So if you were sitting on a jury and you had convicted someone of Capital Murder, could you consider the full penalty range, life without parole or the death penalty?

A.   Yes.

Q.   And you told me you do believe in the death penalty.

A.   Yes.

Q.   And you have your whole life?

**A.** Yes.

**Q.** Is that a fair statement?

**A.** Yes.

**Q.** Okay. Let's go a little further. If a person was sitting on a jury, they have to be able to consider any penalty range for an offense before them. So in a prosecution for an offense with lesser-included offenses -- and I'm going to explain that in a minute -- the jury may find the Defendant not guilty of the greater offense but guilty of any lesser-included offense. Okay?

Now, let's say I didn't prove to you the burglary or the robbery. Okay?

**A.** Okay.

**Q.** All right. So you would have to find him not guilty of Capital Murder, right, if I didn't prove that to you?

**A.** Yes.

**Q.** Okay. But then you would go on to consider if they were guilty of first-degree murder, the lesser charge of regular murder, just intentionally causing the death. Because I didn't show you any of those aggravating circumstances. Okay?

**A.** Okay.

**Q.** All right. So the penalty range for regular murder is not less than 5 years nor more than 99 years or life and up to a 10,000-dollar fine. Okay?

A.    Okay.

Q.    Can you consider the full penalty range for murder, not less than 5 years nor more than 99 years or life and up to a 10,000-dollar fine?

A.    Yes.

Q.    Okay.  By consider I mean really look at.

A.    Yes.

Q.    Okay.  Can you do that even if you convicted someone of Capital Murder?  Let's say it was a horrible set of circumstances.  You'll agree with me there are no good Capital Murders, are there?

A.    No.

Q.    They are all going to be ugly, aren't they?

A.    Yes.

Q.    Okay.  So if you found somebody not guilty of Capital Murder, you could consider the full penalty range, not being less than 5 -- not less than 5 years, up to and including 99 years or life for murder?

A.    Yes.

Q.    Okay.  Let's go a little further.  Jurors are the sole judge of the credibility of the witnesses.  Jurors can believe all, some, or none of what a witness says.  All witnesses have equal credibility before they begin to testify.  Okay?

Some people say if it's a doctor or a lawyer, I'm going to automatically believe them or not believe them.  Okay?

Or a police officer, they are sworn to tell the truth. They are a law enforcement officer. I'm going to start them out a little ahead because of their profession.

How do you feel?

A. I feel that it goes both ways.

Q. Okay. Tell me what you mean by that.

A. I mean, they can come across -- you know, listening to them, you'd have to listen to the facts first.

Q. Okay. So you wouldn't judge somebody just by their profession. You would start them out equally with all other witnesses?

A. That is correct.

Q. Okay. All right. Now let's go a little further. A confession. A confession of a defendant is admissible in evidence if freely and voluntarily made, electrically recorded or written, the confession shows that the accused has been warned prior to making such confession of the right to remain silent, that it could be used against him in court, the right to a lawyer, if he cannot afford a lawyer the right to have a lawyer appointed, the right to stop questioning at any time, and if the person intentionally -- I'm sorry. The person knowingly, intelligently and voluntarily waives those rights. Okay? Gives up those rights.

A. Okay.

Q. So are those important rights to you?

A.    Yes.

Q.    And so that's what's required on a confession.  All right?  The requirements.

So it's up to the jury whether they believe that the police complied.  Okay?  So it would be up to you on a jury to determine whether the confession was freely and voluntarily given or whether the police complied with what I just read to you, all of those warnings.  Okay?

A.    Okay.

Q.    So if you do not believe the police complied -- if you do not believe the police complied or if the confession was involuntary, then you would get an instruction that you will wholly disregard the alleged statement or confession and not consider it for any purpose.  Okay?  Can you follow that instruction?

A.    Yes.

Q.    Okay.  So let me put that in context.  Okay?  Because I call this the cat-out-of-the-bag thing.  Let's pretend you have a confession to Capital Murder.  It's ugly.  It's grizzly.  It's unjustified, horrible, intentional killing of another human being, an innocent victim.  And the defendant, male or female, goes into the grizzly details of what they did.  Okay?

A.    Okay.

Q.    Grizzly details.  Okay?  And you've heard it now, but you believe that a warning is missing.  Okay?  The police

didn't comply because there is a warning missing.  Okay?

A.   Okay.

Q.   One or two of the warnings are missing.  They didn't technically comply.  You believe they didn't comply.  Can you wholly disregard that confession and not consider it for any reason?

A.   I can disregard it.

Q.   Okay.  So let me ask this going a little further.  Can you disregard it if it were the only piece of evidence that got me beyond a reasonable doubt?  Can you disregard it if you believe the police did not comply, okay, with those warnings, okay, that we talked about or you believe the confession was involuntary?  You said you can disregard it.

Let me tell you what disregard means then.  It's not in evidence.  You can't consider it.  If that was the piece of evidence, can you disregard it if it means finding the Defendant not guilty because I haven't met my burden beyond a reasonable doubt without that confession and find someone not guilty?

A.   I could.

Q.   Okay.  Great.

Voluntary intoxication.  Voluntary intoxication does not constitute a defense to the commission of crime.  I go out and I tank one on.  I decide to drink 20 or 30 beers and then I go and I get in a fight with someone and punch them out

at a bar.  The fact that I have made a personal choice, as you say, to voluntarily intoxicate myself is not a defense to crime.  Can you follow that instruction?

     **A.**    Yes.

     **Q.**    Okay.  All right.  Causation.  A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

               Just a minute, Ms. Woods.

               MS. YENNE:  Judge, can you tell me how much time I've used, please?

               THE COURT:  You have gone 38 minutes.

               MS. YENNE:  Okay.  So 22 minutes left.

               THE COURT:  I'm sorry.  You started at 9:39 so that's 21 -- 38 minutes.

     **Q.**    (BY MS. YENNE)  Okay.  A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

               That's a mouthful, but let me give you an example.

A.    Okay.

Q.    Let's say somebody sets an apartment fire.  They set an apartment fire and it kills the family next door.  The fire department is having a bad day, Ms. Woods.  They are having a bad evening.  Two engines break down, and it's a holiday weekend and they don't get there as timely as they can.  The response time is twice the response time or maybe they could have saved the family next door, but they didn't.  And they are a good fire department.  They just had a bad night.  Something happened.  Human nature.

The conduct of the actor in setting the fire was clearly sufficient to kill the family next door.  Am I making sense?

A.    Yes.

Q.    Separate and apart with the fire department not being able to get there in time.  Okay?

Now let's go on to burglary.  A person commits an offense if, without the effective consent of the owner, the person enters a habitation with intent to commit a felony, theft, or an assault; or enters a habitation and commits or attempts to commit a felony, theft, or an assault.  Okay?  Those are the definitions.  They can enter with the intent to commit a felony, theft, or assault or -- with the intent or form it right inside the residence.  Okay?

A.    Okay.

Q.   All right.  Can you follow the burglary instructions if you got them on a jury?

A.   Yes.

Q.   Let's go to robbery.  A person commits an offense if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another.

In the course of committing theft means conduct that occurs in an attempt to commit, during the commission or in immediate flight after the attempt or commission.

I decide I'm going to steal from Wal-Mart, Ms. Woods.  Steal from Wal-Mart.  The manager stops me.  I'm stealing makeup and I punch the manager out and I give him a black eye.  Okay?  Bodily injury.  I'm intentionally causing bodily injury in the course of committing theft.  Okay?

A.   Okay.

Q.   Could you follow that instruction?

A.   Yes, ma'am.

Q.   Okay.  So two parts of a trial.  There is guilt/innocence, and there is punishment.  So let me go a little further.  You told me that you can hold me to my burden beyond a reasonable doubt.

A.   Yes.

Q.   Okay.  If I don't meet my burden, you could find someone not guilty of Capital Murder?

A.    Yes.

Q.    Okay.  If I meet my burden, you could find them guilty?

A.    Yes.

Q.    Now if a jury finds someone not guilty, the trial is over.  They go home.  Okay?  It's over.  Someone is acquitted, and they go to their home or their community or wherever.  Okay?

A.    Okay.

Q.    That's the end of the trial if the person is found not guilty.

Now if they are found guilty, in order to sit on a Capital Murder jury you have to be able to follow the process.  So it's kind of a little more complicated process than what people would think.  It's not just a vote of life or death.  Okay?

A.    Okay.

Q.    There are a question -- and maybe two questions -- that would be given to you, okay, if you sat on a Capital Murder jury.  All right?  And right after the guilty verdict, before any punishment evidence is presented, you cannot have made up your mind as to the answers.  Okay?  You have to be able to consider guilt/innocence evidence, but you must be able to consider any and all punishment evidence as well.  Okay?  In order to consider all evidence, you have to keep an open mind.

Okay?

**A.** Okay.

**Q.** Each question is independent of the verdict. Each question is independent of each other, and each question is based only on the evidence presented. Okay?

So some people say the minute I convict someone of Capital Murder, I am going to automatically sentence them to life without parole. Okay? Is that you?

**A.** No.

**Q.** Okay. Someone says the minute I convict someone of Capital Murder, I'm going to automatically give them the death penalty. Is that you?

**A.** No.

**Q.** Okay. So while you think the death penalty is an appropriate penalty -- is that a fair statement, at times?

**A.** Correct.

**Q.** You're telling me that you haven't automatically made up your mind yet?

**A.** Correct.

**Q.** Okay. So -- and you see what I'm saying? Because all Capital Murders are going to be horrible.

**A.** Yes.

**Q.** They are all going to be ugly, and they are all going to be rotten to sit on.

Let me ask you a question. You had checked

Number 160, page 29, that you wanted to be a juror.  Maybe -- is that a yes?

   **A.**   Yes.

   **Q.**   Okay.  Can you tell me why?

   **A.**   It's just a civic duty.

   **Q.**   Okay.  All right.  Let me go a little further.  So you will not have automatically made up your mind?

   **A.**   Correct.

   **Q.**   Okay.  So then if the jury found someone guilty of Capital Murder, you go on to what's called a Special Issue.  So let's talk about that Special Issue.

        Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?

        Now I have to prove that to you beyond a reasonable doubt.  And what we're doing is predicting future danger.  Okay?

   **A.**   Okay.

   **Q.**   All right.  So I have to prove to you beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society.  So my question to you is what does probability mean to you?

   **A.**   The likelihood that it would be a repeat of something

similar.

Q.   Okay.  Maybe murder.  Could it be repeat of property crimes or assaults?

A.   Correct.

Q.   Okay.  So property crimes could be criminal acts of violence to you?

A.   Correct.

Q.   Okay.  And would it be more than one act?  It's plural there.  It says "acts."

A.   Acts.  Okay.

Q.   So you can consider property crimes acts of violence?

A.   Yes.

Q.   Okay.  And I think one of the things you said is that you had put in your questionnaire that you had a concern about the people that continue to repeat acts?

A.   Yes.

Q.   Okay.  Does that include repeating property crimes?

A.   Yes.

Q.   Okay.  So now I have to prove that to you beyond a reasonable doubt.  Can you hold me to that burden?

A.   Yes.

Q.   Now let me tell you what society is.  Society is not limited to but includes prison.  Let me tell you why.  Because once you're convicted of Capital Murder, there is only one place you're going if you're a defendant.  Because the penalty

range is life without parole or the death penalty, you're going to a prison, right?

   **A.**   Correct.

   **Q.**   Okay.  So society has to include prison.  It's not limited to but it includes prison.

            So let's go a little further.  So can you consider prison to be society?

   **A.**   Yes.

   **Q.**   Okay.  Do you believe that inmates in prison have a right to be safe from other inmates?

   **A.**   Yes.

   **Q.**   Okay.  Do you believe prison personnel have a right to be safe from other inmates?

   **A.**   Yes.

   **Q.**   Ministers, prison ministry?

   **A.**   Yes.

   **Q.**   Nurses, doctors in prison have a right to be safe?

   **A.**   Yes.

   **Q.**   Visitors to prison have a right to be safe?

   **A.**   Yes.

   **Q.**   Okay.  Now let me go on to the focuses on this.  She runs the power point.  I do not.  In addition to her legal talent, she can at least run a power point.  I cannot.

            Special Issue No. 1 focuses on the character for violence of the particular individual, not merely on the

quantity or quality of the institutional restraints put on that person. In other words, this Special Issue focuses on the internal restraints of the individual to behave. Am I making sense?

A. Yes.

Q. Not merely what a jail would restrain you from. The person's restraints. Would they commit continuing acts of violence that would constitute a continuing threat to society? Am I making sense?

A. Yes.

Q. Their internal control. Kind of a weird Special Issue, but it has -- society has to include prison. Okay?

A. Okay.

Q. Let's go a little further. In deliberating on the issues submitted you shall consider all evidence admitted at the guilt or innocence stage of the trial, including evidence of the Defendant's background or character or the circumstances of the offense that militate for or mitigates against the imposition of the death penalty. Okay? So you're supposed to consider all the evidence. Okay?

A. Yes.

Q. Guilt/innocence, all the circumstances of the horrible crime. Okay?

A. Okay.

Q. And all of the evidence at punishment, Defendant's

background or character, that militates for or mitigates against the imposition.  Can you follow that instruction?

A.  Yes.

Q.  Let's go a little further.  So Special Issue No. 1 is a future dangerousness issue.  It's predicting future dangerousness.

Some people say that's never me.  I can never predict future danger.

Can you predict -- can you answer that question even if it's predicting future dangerousness?

Some people say, well, I don't know how you could ever prove to me beyond a reasonable doubt that there is a probability that a defendant would commit criminal acts of violence that constitute a continuing threat to society.

What I have to prove to you, again, do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant -- I have to prove to you beyond a reasonable doubt there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society.  Can you answer that question?

A.  Yes.

Q.  Okay.  Could you agree with me that past behavior can sometimes predict future behavior?

A.  Yes.

Q.  Okay.  Because you yourself, in your questionnaire,

had put repeated behavior.  Sometimes it seems that some people don't learn, right?

A.  Yes.

Q.  Okay.

THE COURT:  Just for your information, you have 10 minutes.

MS. YENNE:  Thank you.

Q.  (BY MS. YENNE)  Let's go a little further.  So let me go to the grid, please.

So if I prove to you beyond a reasonable doubt that the Defendant -- there is a probability the Defendant will commit criminal acts of I violence that constitute a continuing threat to society, can you answer Special Issue No. 1 yes?  Could you answer that if I proved it to you beyond a reasonable doubt?

A.  Yes.

Q.  Okay.  And the reason that I'm asking that -- and it takes all of the jury.  The jury must be unanimous in answering Special Issue No. 1 yes.  Do you want to know why?  Because that's the road to the death penalty.  Okay?

A.  Okay.

Q.  All right.  So they have to be unanimous in finding him to be a future danger based on all the evidence you looked at at guilt/innocence and punishment.

Now no requires ten or more jurors.  Okay?  And

then the Judge --

MR. WOOTEN:  Judge, I believe that's a little bit misleading.  Because if you need 12 to get to the next part, then an individual vote of one would keep that 12 from happening.  So I really think that almost makes it sound like you're only going to have one of two possibilities.  You're going to have 12 or 10, whereas -- and I don't want this juror to think that 10 people have to get together and cast that vote.

THE COURT:  Do you want to rephrase that, Ms. Yenne?

MS. YENNE:  Well, in order to return an answer of no, it requires 10 or more jurors.

THE COURT:  Overrule your objection.

Q.   (BY MS. YENNE)  In order for the jury to return an answer of no, it requires 10 or more jurors; and then the Judge would sentence the Defendant to life without parole.  Okay?

A.   Okay.

Q.   And that will be over.

But if the jury answered unanimously yes, they have already found him to be a guilty Capital Murderer and now the jury has found him to be a future danger.  Right?

A.   Okay.

Q.   Am I making sense?

A.   Yes.

Q.  Okay.  Some people say, well, once I found someone to be a guilty Capital Murderer, horrible crime, and once I found that they are a future danger, I'm going to automatically sentence someone to life without parole or the -- I've already got my mind made up.  Okay?

Would that be you, already having your mind made up?  If you found him to be a guilty Capital Murderer and a future danger, you can't have your mind made up at that point in time.

Some people say, really, ma'am, I've already found him to be a guilty Capital Murderer and a future danger.  My mind is made up about what I'm going to do after that.  Is that you, or could you keep an open mind?

A.  I can keep an open mind.

Q.  Okay.  If that's the case, then you go on to Special Issue No. 2.  It's called the mitigation issue.

Now I have the burden of proof on Special Issue No. 1, don't I?

A.  Yes.

Q.  Okay.  You said you could hold me to it.  Special Issue No. 2 is whether taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of

life imprisonment without parole rather than a death sentence be imposed.  Okay?

**A.**   Okay.

**Q.**   Now nobody has the burden of proof on that.  Neither the State nor the defense.  So you would not hold the Defendant to any burden, would you?

**A.**   No.

**Q.**   Okay.  Neither would you hold the State.  There is no burden of proof.

You're always going to hear some mitigation in a case, and I'll tell what you what that mitigation is.  But you have to take into consideration all the evidence, circumstances of the offense, Defendant's character or background, personal moral culpability.  You have to determine if there is a sufficient mitigating circumstance or circumstances to warrant life in prison or a death sentence.  Okay?

**A.**   Okay.

**Q.**   So let's go a little further.  What is mitigating evidence?  Evidence that a juror might regard as reducing the Defendant's moral blameworthiness.

MR. WOOTEN:  Judge, at this time we would make an objection to this slide.  What's being projected on the screen is identical to what has been entered as Defendant's Voir Dire Exhibit No. 1.  We believe that the slide violates Eddings versus Oklahoma.  Also, I believe that it violates the Eighth

Amendment.  We think it's a misstatement of the law of mitigation in Texas.

THE COURT:  Overrule your objection.

Q.   (BY MS. YENNE)  Now it's evidence a juror might regard as reducing the Defendant's moral blameworthiness.  Lessening his blame is what it means.  Basically, evidence you might regard as lessening the Defendant's blame.  Never lessening the Defendant's guilt.  They are already guilty, aren't they?

A.   Okay.

Q.   Okay.  Am I making sense?

A.   Yes.

Q.   That's kind of a hard one.  Okay?  In other words, guilty Capital Murderer, future danger; but is there something that lessens their blame?  Okay?  In other words, something that will warrant a sentence of life imprisonment versus the death penalty?

A.   Okay.

Q.   So what can that be?

MS. YENNE:  Go to mitigation.

Q.   Now the jury must consider and give effect to mitigation.  That doesn't mean you have to find it.  Okay?  Remember we talked about "might regard" and that it only -- and even if you found there to be mitigation, Ms. Woods, it has to be sufficient to warrant a life sentence.  Am I making sense?

A.   Yes.

Q.    Okay.  What one juror thinks is mitigation, another may not.

So let me give you an example.  Some people have seen children with families.  They look at them and they say, oh, my God.  That kid doesn't have a chance.  Those parents -- do you know what I mean -- never cared about them their whole life.  You wish somebody would take them away.  Am I making sense?

A.    Yes.

Q.    Okay.  Because you know where that road is headed because that kid never had a chance.  Am I giving an example of something that might lessen someone's blame?

A.    Yes.

Q.    But you get to decide if it does -- if.  You don't have to -- or if it's sufficient enough a mitigating circumstance.  Am I making sense?

A.    Yes.

Q.    Okay.  So youth.  To one juror youth could be it.  Could be not.  A young person.  To another old age could be.  To another child abuse, physical or sexual injuries during childhood, good work history, drugs abuse, acts of kindness for others.

Let me go a little further.  You're always going to have mitigation in a case.  Somebody is always going to have done something nice for somebody else in their life, aren't

they?

A.    Yes.

Q.    Somebody is always going to have a bad experience happen to them in life.  The college of hard knocks hits us all, doesn't it?

A.    Yes.

Q.    Okay.  So there is always going to be mitigation.  The jury gets to decide is it in one way or another sufficient.  So it just doesn't matter if it's mitigating.  It has to be sufficiently mitigating to warrant a life without parole sentence.  Am I making sense?

A.    Yes.

Q.    Okay.  Could be acts of kindness, could be alcohol abuse, could be low IQ, low intellectual functioning.  It could be -- remember causation, the fire department example?  It could be that the Defendant was less responsible in the crime.  Am I making sense?

A.    Yes.

Q.    It could be the circumstance of the offense.  It could be a family breakup, single parent home, intellectual issues, poverty, exposure to chemicals, poisons, toxins, toxic material, toxic mold, mental retardation.  It could be desperation.  Okay?  Which you have to be able to say honestly that you could consider and give effect to -- that doesn't mean that you have to find it -- that there is weight in it to be

mitigating.  Am I making sense?

A.   Yes.

Q.   All right.  Let's go back then.  So if there is sufficient mitigating circumstance, you as the jury get to determine it.  Am I making sense?

A.   Yes.

Q.   Okay.  Let's go to the grid then just a minute.

Let's say you found there -- could you answer that question, Special Issue No. 2 -- could you answer Special Issue No. 2 if you took all the evidence into consideration, the background, character, personal moral culpability of the Defendant, if there was no sufficient mitigation, no sufficient mitigating circumstance -- there could be one.  If the evidence didn't show you that there was a sufficient mitigating circumstance to warrant life in prison without parole rather than a death sentence, would you answer that no?

A.   Yes.

Q.   Okay.  And if there was a sufficient mitigating circumstance or circumstances could you answer it yes?

A.   Yes.

Q.   And the reason I ask you that is because if he or she is guilty of Capital Murder and you found them to be a future danger and there is no mitigation, a no answer has to be unanimous from the jury because then the defendant receives the death penalty.  Okay?

**A.**    Okay.

**Q.**    So if I prove to you Special Issue No. 1 yes beyond a reasonable doubt, that there is a probability he would commit criminal acts of violence that constitute a continuing threat to society, I met my burden, can you answer that question?

**A.**    Yes.

**Q.**    Okay.  And if there is no sufficient mitigation -- there is mitigation, but it's not sufficient enough -- can you answer it no?

**A.**    Yes.

**Q.**    Knowing that the Defendant receives a death penalty?

**A.**    Yes.

**Q.**    Okay.

         THE COURT:  For your information, two minutes.

         MS. YENNE:  Thank you.

**Q.**    Oh, I notice you watch Cops on TV.

**A.**    True Confessions.

**Q.**    True Confessions.  I'm sorry.  You watch it every week?

**A.**    Saturdays.

**Q.**    Is that your -- mine is NCIS and I like Person of Interest.  Okay?

**A.**    Okay.

**Q.**    But what do you like about Cops?

**A.**    They just mainly pull over to give traffic violations.

That's it.  None of these murders or anything like that.

Q.    Not any murder, just traffic tickets?

A.    Right.

Q.    My favorite pullover still is the Geico pig behind the wheel.  Do you know why I pulled you over?  No taillight.  Do you know which one I'm talking about, that commercial?  The Geico commercial?  The officer giving the pig a citation?  Okay.  That hasn't made Cops yet.

A.    Okay.

Q.    All right.  Let me check one other thing.  You answered you thought the death penalty was used too often on your questionnaire.  I have one last question about that.  Let's go to page -- page 120, and then I'm about ready to wrap it up.  You said page 20:  Capital punishment may be wrong, but it is the best preventative to crime.

Is that still your belief?

A.    Yes, it is.

Q.    Okay.  And is it still your belief that we must have capital punishment for crimes?

A.    Yes.

Q.    Okay.  You had put that you thought the death penalty was used too often, okay, on page 18.  But you also put -- what's your best argument for the death penalty?

If the crime fits.  Right?

A.    Yes.

Q.    You still believe that?

A.    Yes, I do.

Q.    Okay.

MS. YENNE:  I'll pass the venire person.

THE COURT:  Mr. Wooten?

**VOIR DIRE CROSS-EXAMINATION**

**BY MR. WOOTEN:**

Q.    Is it Ms. Woods?

A.    Ms. Woods.

Q.    Ms. Woods, my name is Jay Wooten; and along with Mary Conn and some folks in the back we represent James Harris.

I wanted to ask you a few things today about your views on Capital Murder.  And the first thing I'd like to do is get your reaction to some statements.  Now you know what the law is now.  I think the District Attorney has talked to you about that.  And so what I want to tell you is that, first off, if I'm unclear, would you please tell me that I'm being unclear?

A.    I will.

Q.    As I often am.  If I say that you said something in an example like, Well, Ms. Woods, you said this; and you say, No, I didn't say that.  Please say that to me if I'm misstating what you said.

A.    Okay.

Q.    And then I want you to know that I don't have the

ability nor the desire to change the law.  So whenever I talk to you, I'm not trying to get you to say you would do anything that was outside the law.  Does that make sense to you?

     **A.**   Yes.

     **Q.**   Sometimes I ask you questions that make you stop and think, I hope, because that's my job.

     **A.**   Okay.

     **Q.**   Does that make sense?

     **A.**   Yes.

     **Q.**   So because I'm trying to get your true feelings about the issues that would lead to whether you're a qualified juror for this case.

               Now let me ask you this.  If I said to you what are your feelings about the following statement, that anyone that's convicted of Capital Murder should get the death penalty, what are your feelings about that statement?

     **A.**   Anyone that commits capital --

     **Q.**   Capital Murder.

     **A.**   Should get the death penalty?

     **Q.**   Right.  Knowing that I'm not saying that's the law, obviously.  I'm giving you an extreme statement, asking you what your opinion is or what your feelings are about that statement.

     **A.**   Okay.

     **Q.**   Does that make sense?

A.    I'd have to hear all the facts of the case.

Q.    Right.  But let me ask you -- let me tell you one more time.  Like, for instance, I'll give you an example.  If somebody said to me the Tennessee Titans are better than the Texans.  Okay?  I would have a -- I would say that strikes me as wrong.  Here's why.  You know, Arian Foster, J.J. Watt.  Does that make sense to you?

A.    Yeah.

Q.    I wouldn't say -- me, personally, I wouldn't say, well, you know, we'll just have to wait and see.  Because I have an opinion right now about it.

And so I'm just trying to get to your opinions.  And what I'm not trying to do is change your opinions.

A.    Okay.

Q.    Does that make sense?

A.    Yes.

Q.    So let me go back to that.  If I said to you every -- like let's just say you're standing around the watercooler and -- I don't know if people use watercoolers anymore, but it's a term.  You're standing around the watercooler and somebody says that, one of your friends that you like to converse with.  You know, what would be your opinion?  What might you say to that person if they said I think anybody convicted of Capital Murder should get the death penalty?  What would be your feelings about that statement?

A. It would be their opinion.

Q. Okay. Would you agree with them? Would you disagree with them?

A. Depending on the facts.

Q. Okay. All right. Well, would you believe that -- if you said depending on the facts, would that mean that you disagree with that statement?

A. I could, yes. I could.

Q. Okay. If I had said to you the opposite, every Capital Murderer that is convicted -- or any person who is convicted of Capital Murder should get life without the possibility of parole, what are your feelings about that statement?

A. It could be the death penalty to me.

Q. Okay.

A. In that opinion. Or it could be -- like I said, the facts.

Q. If you were queen of the world and it was up to you every time, would either one of those statements be true for you as queen of the world?

A. Either/or? The death penalty or life parole?

Q. Yeah. Like, every time. Would that fit you?

A. On a capital? Yeah.

Q. Okay. What I want to ask you is -- I want to give you a hypothetical. And a lot of times people talk about Capital

Murder, but I want to make sure you understand what I mean in my hypothetical about Capital Murder because sometimes people throw in factors and those factors can change their opinion.

Sometimes -- like, for instance, I'm about to give you a hypothetical and tell you that self-defense wasn't involved. Well, the lawyers in this room know that if -- in a hypothetical when you say somebody was convicted of Capital Murder, well, of course self-defense wasn't involved. But if you sent me down to try to do your job, I would be lost. So the bottom line is, we understand that not everybody knows those things. So I want to go through and give you a hypothetical and make sure you understand what I'm talking about when I -- about the crime and the conviction in that hypothetical. Does that make sense to you?

A.   Yes.

Q.   All right. And please tell me if I lose you somewhere along the way.

A.   Okay.

Q.   Now let's say that you -- and by the way, when I say a hypothetical, this is not a thinly veiled hypothetical about this case. I'm talking about a whole different case that I'm making up. Okay?

A.   Okay.

Q.   You and 11 other jurors have been selected to be on a Capital Murder.

A.    Okay.

Q.    And I'm taking you to the jury room and y'all have just decided or just found that defendant guilty of Capital Murder.  Obviously, it was unanimous.  Okay?

A.    Okay.

Q.    All right.  So you and the other 11 jurors have found this hypothetical defendant guilty of Capital Murder.  And in this crime, this hypothetical crime, there was no self-defense, there was no defense of a third person, there was no defense of property.  The criminal act that constituted Capital Murder is not a mistake, not an accident.  No one forced this hypothetical defendant to commit the murder.  Also, the victim did not provoke the act of Capital Murder, and they did not in any way deserve to die.  Are you with me?

A.    Yes.

Q.    And then finally I'll make sure -- just so you understand what I'm talking about, you understand that in this hypothetical there is no issues of insanity of the defendant and the defendant was not retarded or incompetent.  Are you with me?

A.    Okay.  Yes.

Q.    Now what are your feelings about the statement that the death penalty is the only appropriate penalty for that guilty Capital Murderer?

A.    You want to know if I would say they were guilty or

not guilty?

Q. No, ma'am. I'm asking you what are your feelings with me saying that guy, that -- it could be a woman, I guess.

A. Okay.

Q. That hypothetical defendant under those hypothetical facts, if I say to you the death penalty is the only appropriate penalty for that particular Capital Murderer, what are your feelings about that statement?

A. I would think that it would be accurate.

Q. Okay. Can you tell me why you would feel that way?

A. Because you kind of laid everything out. You were clear.

Q. Okay. And when you say we were clear -- and remember, I'm just trying to get in your head a little bit.

A. Right. Right.

Q. Can you tell me what you mean by I laid it out and it was clear? Or -- or the defendant laid it out and it was clear?

A. You painted a big picture.

Q. Okay. What about that picture made you think that it was appropriate?

A. Because it was where they were at, the property, you know. And the victim, you know, they didn't fight back or anything. So --

Q. Okay. Now those feelings about -- and I'm just

talking about your feelings wrapped up in a little ball. I can't -- there is not a good term for that. But your feelings about the death penalty, have they been consistent throughout your life or have they changed any?

A. They have pretty much been the same throughout my life.

Q. Okay. And your opinion regarding the death penalty, are they -- do you feel like they are strong? Like, I've got those strong feelings for the Texans. I don't have very strong feelings about the Kansas City Chiefs. I don't care. You know? And I'm not trying to make light of it, but I'm just trying to say -- you know, my religious feelings are very strong, you know; but my feelings about property taxes are not as strong but kind of strong. Feelings about the Kansas City Chiefs, I don't care.

A. Yeah.

Q. Where are your feelings as far as on the death penalty?

A. It would be strong.

Q. Okay. Now, if you know, where do you feel like your feelings about the death penalty came from? Was that anything that you spoke about to your parents or --

A. It probably came from my views growing up with my father's view about the death penalty.

Q. Okay. And if you don't mind, could you tell us what

you believed your -- or what you believe your father's views were?

    **A.**    That you needed the death penalty in society.

    **Q.**    Okay.

    **A.**    That was just a part of it.

    **Q.**    Okay.  My father felt the same way.

    **A.**    Uh-huh.

    **Q.**    Do you know why -- why do you think, if you know, he felt that way?  Do you know what he based it on?

    **A.**    Because of the crime.  You know, crime and people, you know, just -- you know, they choose to, you know -- you know, they make their decisions to just take, you know, from others.

    **Q.**    Okay.  And --

    **A.**    And then my family has always been a hardworking family.  You know, we always worked for what we wanted.  And then that's where that view is coming from.  My daddy always had a strong work ethic with us.  You know?  And it's like work for your keeps.

    **Q.**    Absolutely.  Absolutely.

    Are there any differences, do you believe, between your views now and the views that you feel like your father had?

    **A.**    No.  I pretty much got the same view as my father.

    **Q.**    Okay.  When you talked about the -- I notice on -- and you don't have to go into these unless you think I'm misstating

them.  I think the D.A. probably talked about most of these so you probably looked them over.  But please feel free to look them up if you want to.

I show on Question 100 you said, I respect the death penalty.

And I can help you with that page if you want to look it up.  We're getting to know these kind of well.  18 at the top?

A.   Yes, I see it.

Q.   Okay.  And first off -- and once again, when I ask you these things, I know sometimes that you -- it maybe sounds like I'm in disbelief like, do you think that?  I'm not saying that at all.  When I say do you still feel that way, sometimes people have thought about these questionnaires over the weekend and they decided they feel a different way.  I'm just trying to get to your true feelings.

Do you still feel that way today?

A.   Yes, I do.

Q.   Can you tell me what you mean when you say, I respect the death penalty?

A.   Because it's a part of our society.  It's just a part of human -- you know, mankind.

Q.   Sure.  And let me ask you this.  And this is where I'm putting my little spin on it.  So please call me on that if I'm wrong.

I will say there is a lot of things that are part of our society that I realize are part of our society, but I don't necessarily respect all those part.  Is there something that makes the death penalty be in the category of the things that you respect about, you know, what's part of humankind, like you said?  Or when you say you respect the death penalty, are you more saying I'm just acknowledging that it's there?

A.   Acknowledging that it's there.

Q.   Okay.  Do you feel that -- have you always felt like you respected the death penalty?

A.   Yes, I have.

Q.   Okay.  Now I know that you said that you felt like -- if you look on that same page just a couple down -- well, in fact, let's go in order, if that's okay with you.

On Number 101 I think it says -- you tell me if I'm wrong -- what purpose, if any, do you think the death penalty serves in our society?

And you said, To remove those that cannot be rehabilitated.

Do you still feel that way today?

A.   Yes, I do.

Q.   Okay.  What do you mean by that?  Could you elaborate on that just a little bit?

A.   Just repeat criminal, you know, just keep, you know, getting in trouble.

Q. Now can I ask you if this makes a distinction for you? Let's take two different categories of criminals, if we may. Let's say that you're talking about someone who commits Capital Murder and gets convicted and somebody who commits robbery and gets convicted. Now there's all sorts of factors that can go into what kind of a sentence somebody convicted of robbery gets. So let's just say this is a 10-year robbery for whatever reason. Because we don't want to go down that path. We'll be here all day.

That person -- for that robbery that person may get back out into the society we talk about that's -- for lack of a better word, criminal law people say free world. Have you ever heard anybody say that term?

A. Yes.

Q. Free world. Okay. And I know that's not a great term, but it really does go right to what I'm saying. So that person who's convicted of robbery, there is a very good chance that they are going to someday get out into the free world. Okay?

Now as you know now from talking to Ms. Yenne, if a person is convicted of Capital Murder in Texas, they are not ever going to be free world, if you will. They are going to go to prison for one of two different purposes. They are going to go to the prison to await an execution date, or they are going to go to prison to spend the rest of their life because it's

life without possibility of parole.

Now do you distinguish -- going back to your question now -- I said all that to say this. Back to your question, does -- do you still -- if we're talking about Capital Murder, how do you feel about your answer to remove those that cannot be rehabilitated? Does that change it at all, knowing that those two things -- that there is two different scenarios in the law, the difference between somebody that's going to get out and somebody that's not?

A. On that when I wrote that response --

Q. Yes, ma'am?

A. -- I was speaking -- I was thinking when you take a life.

Q. Okay. Okay.

A. That's what I was referencing to the death penalty.

Q. And so when you say somebody who can't be rehabilitated, you're talking about somebody who is in prison?

A. Right.

Q. Okay. What would you think would be the definition of somebody would can't be rehabilitated who is sentenced to life without the possibility of parole?

A. What would be my definition?

Q. What does it mean to you?

A. Repeat the question again.

Q. And it was a bad question so please let me. What does

it mean -- when you say somebody who can't be rehabilitated and you're talking about them being in prison, what is your definition that they couldn't be rehabilitated? A lot of times people would say, well, you know, to be rehabilitated in the free world somebody has to get out, they have to find a job, support themselves, stay out of trouble, you know, become a productive member of the free-world society.

What is your definition in prison, if you will, of a person who can or cannot be rehabilitated?

A.    You have to look at the past crimes on that individual.

Q.    Yes, ma'am.

A.    And then that kind of sets the mind frame of, like, the past predicts the future.

Q.    Okay. And by the way, that makes sense to me. Perfect sense. But let me ask you this. The elected D.A. here talked to you about Special Issue No. 1, which is the future danger issue. And my question is is there a possibility that somebody who has taken a life, to use your word, and been convicted for it, is there a -- because if you look at their past and apply kind of your formula that we talked about a minute ago, it would seem like if the past is an indicator of what's going to happen in the future, then you would expect them to do that again. Does that -- are you able to keep your mind open to the thought that somebody could break that cycle?

A.    Yes, I can.

Q.    Okay.  Now going to Number 102, if you don't mind, which is right under that, it says:  Do you think the death penalty in Texas is used too often or too seldom?

And you put, Too often.  And I know we talked a little bit about -- I mean, you talked a little bit about that with Ms. Yenne; and you were talking about the cost to society.  Am I stating that correctly?  Is that what you talked about when she asked you about that answer?

A.    Yes.

Q.    Okay.  And so is the cost, the potential cost to the taxpayer or to society, something that is important to you in deciding whether the death penalty is used too seldom or too often or just right?

A.    The cost is a concern, and it is used a lot.

Q.    Okay.  Well, let's take the last part of that answer for a second, if you don't mind.

A.    Okay.

Q.    So when you say it's used a lot, would you think that -- why do you think it's used a lot?  Let me ask you that question.

A.    Because of the crimes that are committed here in Texas.

Q.    Okay.  If I asked you -- okay.  So -- and I'm just trying to get a feel for what you're saying.  Is your answer

that it's used a lot because there is a whole lot of crime?  Or when you say it's used -- and so in that general view you would say, well, it's used too often but it's because there is -- too often there is capital crime?

A.   That is correct.

Q.   Okay.  So it's that one?

A.   Uh-huh.

Q.   All right.  Now going back to the first part of your answer about three answers ago, how important is it to you -- or how important is it to you the difference between the cost, for instance, of the death penalty versus the cost of life without possibility of parole?

A.   The difference -- I guess you will have to look at the person's age because if they are older, you know, they will tend to cost more because of health conditions, in addition to housing them in the system, compared to a younger person.  And then you're dealing with the probability that they will die in prison.

Q.   You know, you can take the administrator out of the office, but you can't take the office out --

A.   I know.  I know.

Q.   And what's funny is I never thought about it that way. But that makes perfect sense when you said it that way; but you turned on that expertise, didn't you?  That makes a lot of sense to me.  That made a lot of sense.  I'm sure you are a

very good administrator.  Okay.

So it is a case by case for you in that regard?

A.   It is.

Q.   Okay.  No, going down to Number 103:  What is your best argument for the death penalty?

And you say, If the crime fits.  What do you mean by that answer, ma'am?

A.   If it's a murder case and then that's the option you have is the death penalty.

Q.   Okay.  Well, let me ask you this -- or point this out to you and see if it changes your opinion at all or how you feel about this statement.  You know if you're on a Capital Murder jury and there is a conviction, then obviously there would have been a murder because remember Ms. Yenne talked to you about it being murder plus?

A.   Uh-huh.

Q.   So it's not just a murder.  And I can't believe I'm saying the words "just a murder."  Okay?

A.   Okay.

Q.   But from a legal standpoint -- I don't want to take anything away from the fact that a person has died by violence.  But from a legal standpoint, you have to have a murder and something else.  So if, in fact, it is singularly just a murder, legally you're -- I mean, you're going to have that.  You're going to always have that component because if you --

I'll just give you a dumb example to illustrate my point.

If halfway through the trial the person walks in and says, "Hi, I'm here.  I'm not really dead," like on TV -- that doesn't really happen in the real world -- that would shut that trial down pretty quick, as you might imagine?

     **A.**   Yes.

     **Q.**   Of course, that never happens.  It's just an illustration.

So you're always going to have, unfortunately, a deceased or what we call a decedent by violence.  So I guess what I'm saying is if you have a guilty on a Capital Murder and you say "if the crime fits," then every time -- I mean, every time you're going to -- you find somebody guilty of Capital Murder, there is going to be a decedent, a dead person.

So if that's the best argument for the death penalty, does that mean that every time that there is a dead person involved, then the death penalty would fit the crime and be the appropriate -- the only appropriate punishment?

     **A.**   No, not necessarily.

     **Q.**   Okay.  Tell me about that.  What are your feelings about me -- that statement I just said?

     **A.**   Because there could be other -- another whole side to why was that crime committed.  You know?

     **Q.**   Okay.  And when you say a whole other side, let me ask you -- you're not talking about a legal defense, right?

A.   No.

Q.   You're talking about maybe just the circumstances?

A.   The circumstances, right.

Q.   Okay.  So when you're talking about that, you're saying you've found somebody guilty of an intentional Capital Murder, not anything that would keep that from happening but other things -- other things, other circumstances.  Is that right?

A.   Yes.

Q.   Okay.  Can you think of any other circumstances that would, for you, be important in that situation?

A.   Just listening to the facts.

Q.   Okay.  And so the facts would be one.  Any other categories of things that would be important to you in making that call?

A.   No, other than just the facts.  I will just want the facts.

Q.   Okay.  And that would be -- so when you say if the crime fits, you're talking about all the facts of that crime?

A.   Yes.

Q.   Okay.  And just to be sure, that goes beyond whether there is somebody who is deceased?

A.   Yes.

Q.   Now in Number 104 it says:  What is your best argument against the death penalty?

MR. WOOTEN:  May I just have a moment, Judge?

THE COURT:  You may.

MR. WOOTEN:  How much time do I have, Your Honor?

THE COURT:  30 minutes.

MR. WOOTEN:  Thank you, Judge.

Q.   (BY MR. WOOTEN)  All right.  For a moment, ma'am, I'm going to get away from your questionnaire.  I would like to talk to you a little bit about the Special Issues.  I'd like to go to Special Issue No. 1 and talk to you a little bit about that.  And the elected D.A. covered a lot of things here, the probability and that's not just mere possibility and all of that.

I guess my main point or main concern is that when people are -- I'm just trying to figure out -- number one, I want to point out to you that beyond a reasonable doubt is their burden on this part.  And to know how high that is -- because this is a -- these two Special Issues don't exist in any other crime in this State.  But I think we all know about the criminal justice system, and we all know how high the burden is on convicting somebody of the actual underlying crime.  Does that make sense to you?

A.   Yes.

Q.   Okay.  And the first thing I'd like to say to you is that's the same burden.  It's a big one.  Can we agree?

A.   Yes.

Q. Okay. So what I would say to you is -- and we talked about this a little earlier. If you're looking into the future, is it possible for you, given that burden, even if you heard -- and you will have if you hit this point. I mean, we've talked about this. I won't talk about it a lot more; but if you get to this point, it means that you have found somebody guilty of a horrible crime. And that's going to be right -- and these are not done months apart. You know, this is fresh.

So you've just found somebody guilty of a horrible crime. Can you hold them to their burden and can you envision yourself -- even though you've heard this horrible crime, can you envision yourself possibly answering this question no?

MS. YENNE: Your Honor, I'm going to object to the form of the question, that it's a commitment question attempting to commit her as to how she would answer the question.

MR. WOOTEN: Judge, Ms. Yenne always goes --

THE COURT: Overruled.

Q. (BY MR. WOOTEN) And you understand I'm probably going to ask you the other side to that coin in a minute. I'm not trying to commit you to anything. I'm saying that if you say to me, Wooten, would you ever be a -- I'm trying to think of a good example. If you said to me as a juror, you know, Wooten, if you were on this jury, could you keep an open mind on

Special Issue No. 1?  Well, I might say yes.  But then if you said to me could you conceivably answer -- and you put yes or no there.  And I said no or I replied in the negative, then I don't have an open mind.  Does that make sense?  Because remember there is two choices.

So I'm what asking you is can you envision yourself saying one of those choices?  Because I think that's the definition of having an open mind.  You say, yeah, I can do that.

A.   Yes, I can have an open mind.

Q.   Okay.  But let's apply that for a second.

A.   Okay.

Q.   You just found this Capital Murderer guilty of a horrible crime.  Now can you envision yourself, knowing that that is out there, knowing that that's already been done once, can you envision yourself answering Special Issue No. 1 no, not a probability that the Defendant would commit criminal acts of violence that will constitute a continuing threat to society?

A.   Can I see it?  Could I see the slide that it had the -- the wording?

Q.   I believe that -- I promise you if this wasn't the right slide, Ms. Yenne would be mad at me.  This is a different font, but I believe it's a correct interpretation of the law.

A.   Give me a better example.

Q.   Well, unfortunately, this is the law.  Now let me ask

you this.  Maybe I'm misunderstanding you.  What do you mean by better example, ma'am?

     **A.**   Because I'm not --

     **Q.**   There is two different Special Issues.  You may be thinking about the second one.  I'm going to get to that one, but remember they go in order.

     **A.**   Okay.

     **Q.**   And they are sequentially ordered.  That's why this one is Number One.  But see, if you -- if the State cannot prove to the jury beyond a reasonable doubt and get a unanimous 12-juror vote of yes, then we never get to the second one.  These are like little speed bumps or little gates we go through, or whatever example works for you.

          And it starts off as a juror.  See, to be a juror you have to -- and to give the death penalty in Texas it requires three unanimous 12/0 verdicts.  So the first one would be that you found this person guilty beyond a reasonable doubt of Capital Murder.  This horrible crime.  Then the next thing is they are going to attempt --

          MS. YENNE:  I'm going to object to the form -- verdicts.  Form of the question, Judge.

          MR. WOOTEN:  I'm sorry.  They are Special Issues.  I think once the jury answers a Special Issue, I think it's a verdict; but I can change that word.  That's fine.  Answers.  That's fine with me.

Q.    (BY MR. WOOTEN)  There are going to be three different votes.  But anyway, bottom line is this.  You found somebody guilty of Capital Murder of a horrible crime.  Now my question is knowing that that's fresh in your mind, that you know that -- because remember it says from the evidence, and the law will tell you that you're supposed to consider all the evidence in the guilt/innocence part of the crime -- guilt/innocence part of the trial concerning the crime.

Can you envision yourself, knowing that, knowing that somebody has committed Capital Murder, can you answer this Special Issue?  Can you envision yourself being able to answer that Special Issue no?

A.    I would have to answer yes.

Q.    Okay.  And that's based on your belief system?

A.    Yes.

MR. WOOTEN:  May we have a moment, Judge?

THE COURT:  You may.

Q.    Now you understand that the law would require you to be able to answer that either way, yes or no, to be a qualified juror for a Capital Murder.  Are you telling me that you will have to answer yes?

A.    I wasn't really clear.  Because that's why I asked you for the example.

Q.    Well, the problem is the example is this.  I can't give you what the evidence would be.

A.    Uh-huh.

Q.    Because that would be telling you about the case.

A.    Uh-huh.

Q.    That would be real easy if we were talking to jurors -- like say on a marijuana case, it would be great if we could ask them, hey, could you be a fair and impartial juror on this marijuana case?  Let me tell you.  He was going down the road.  It was a legal stop.  It was in his pocket.  Do you see what I'm saying?  We can't ask you that.

A.    Uh-huh.

Q.    I can't tell you the facts of the case because that would be improper.  So all I can tell you is that's what you're going to be looking at that Special Issue.  And the State will attempt to prove, as is their duty, and they will try to reach their burden on that issue.  What I'm saying is it wouldn't be fair to my client if you can only answer it one way.  Does that make sense to you?

A.    That does make sense.

Q.    Okay.  And if you can't answer it no, then that tells me -- and I think what you said is it was -- it would have to be yes for you.

MS. YENNE:  I'm going to object.  That was not the form of the question.  May we approach?

THE COURT:  I'll sustain the objection. Rephrase.

Q. (BY MR. WOOTEN) I thought you -- you said to me -- and tell me if I'm wrong -- that it would have to be yes for me. I thought that's what you said. And I took that -- you tell me if I'm right. I took that that you will say that the answer for that would always have to be yes.

MS. YENNE: I object. That's not what the question was. It was not whether it would always be yes or that it would only be yes. You could answer yes or no. I'm going to object to the form of the question.

MR. WOOTEN: I'm going to object to the speaking objection to the juror.

THE COURT: Ms. Yenne, restrict them to legal objections.

MR. WOOTEN: I thought I was trying to clear that up.

THE COURT: Okay. I think she had some confusion in her answer so why don't you ask it again?

MR. WOOTEN: Yes, sir.

Q. (BY MR. WOOTEN) Can we go back through it? And by the way, ma'am, I'm not trying to get you to say anything in particular. I'm just trying to figure out where you're at. So let's go through this for a second.

Do you understand that there is Special Issues in Capital Murder and there is a guilt/innocence portion of the trial? Right?

A.    Yes.

Q.    Okay.  And then you ask the jury whether they think that the -- they ask the jury this Special Issue, and we call that the future danger issue.  And then if somebody is found beyond a reasonable doubt by unanimous vote that they are a future danger, then we move over to Special Issue 2, which you and I haven't spoken about yet.

But what I'm asking you is if you -- because we can't just pretend that you haven't -- if you're a juror and you're looking at Special Issue 1, the one thing we know for sure is that you've found a defendant guilty of Capital Murder.  Because that's the way it works.  It's got to go one, two, three.  Does that make sense to you?

A.    Yes.

Q.    Okay.  Now if you have found a defendant guilty of Capital Murder, which as we know is the death of another person by violence, if you found that defendant guilty of Capital Murder, can you envision yourself answering Special Issue No. 1 no?

MS. YENNE:  Object to the form of the question.

THE COURT:  Overruled.

A.    I would have to say that from the evidence, and without hearing the evidence, that I would have to be open until I hear all the evidence.

Q.    Okay.  And based -- based on that, are you saying to

JILL FRIEDRICHS
Official Court Reporter
412th Judicial District Court        **01/28/2015**

me that you can envision yourself answering that question no?

A.    I can answer yes or no.

Q.    Okay.  Now let's talk a little bit about Special Issue No. 2.  Well, let's stop for a second and talk a little bit about some of the stuff that Ms. Yenne went through, the presumption of innocence and testifying.

You know, what I find is that sometimes people do expect, just through human nature, to hear from somebody.  And it doesn't -- it seems to be the thought out there -- because I've heard a lot of jurors talk.  This may not be you.  Please tell me if it's not -- that if somebody were to say to me about me, Wooten, you're on trial now.  You stole a loaf of bread.

You would expect Wooten to stand up and say, if Wooten was innocent, that Wooten would stand up and say, no, I didn't.

Now maybe not if it was just a loaf of bread case.  Okay?  But as it gets more and more serious -- because, obviously, the more serious the crime, the worse it is for the person or about the person that's accused, right?  Like I'm not as worried about being accused of getting pulled over the other night after this trial as I am -- true story -- as I am about being accused of some -- of a robbery.  You know, robbing somebody with a knife or something.  That would -- obviously, people would think worse of me if they thought I robbed somebody with a knife than they would think of me if they

thought that I had sped down 35.  Right?

A.    Yes.

Q.    Does that make sense?

A.    Yes.

Q.    And what I'm getting at is this is the most serious criminal charge we have.  And so a lot of time people will say, man, if somebody accused me of Capital Murder, I would stand up if I was innocent and I would say, oh, heck no.  That was not me.  Let me tell everybody I can find.

And then that -- since they would do that, we then come -- that's in their heads.  So we come back to them and say, listen, to be a good juror, you have to be -- and let me be real clear.  You can't consider it at all for any purpose.  You have to take it totally out of your mind.  And it seems to me in my experience that the more serious the crime is, the harder people have with this concept.  The harder time they have with this concept.

Do you feel like if you're in a jury room and you're deliberating on a Capital Murder case and the defendant did not testify, that you could not consider that in any way in your deliberations?

A.    Yes.  Without them testifying, I would be open, you know, to that.

Q.    Okay.  And to be clear, you're telling me that you could not consider it for any purpose at all in any way?

A.    That they didn't have to testify on their behalf?

Q.    Yes, and -- I'm sorry.

A.    That they would not have to testify on their behalf, would I have to consider that?

Q.    Yes, ma'am.

A.    That's the law.

Q.    It is the law, but a lot of times -- and see, what we're doing here is the law doesn't change, right?  What changes are the people that get in that chair.

A.    Uh-huh.

Q.    And sometimes people don't -- they are not the best person for a case.  You know?  I'm not saying that about you or not about you.

A.    Right.

Q.    But, you know, the law stays the same; but the people in the chair change.  And sometimes they can do what the law requires and sometimes they find it too difficult.  Because they might need to go down the road in two years and serve on a civil case.  So -- and I'm not saying that's you or not you.  We talk to a bunch people.  I'm about to go hoarse at the end of this week.

A.    Uh-huh.

Q.    So I'm asking you, you know, on this kind of case could you sit back there -- and I know -- I want to make sure you don't think I'm saying that would you find him guilty.  Of

course you wouldn't do that.  But I'm saying can you go through this process that I'm describing, which is all the way through your jury deliberations, and you could not consider the fact that he didn't -- hadn't testified for any reason?

A.    Yes, I can consider that.

Q.    Or follow that?

A.    Follow that.

Q.    Okay.

A.    You know, that he didn't testify.

Q.    Okay.  Yes, ma'am.  And let me go ahead and segue into what I think is the hardest thing I'm going to ask you about, which is -- let's say you're in that same jury room we talked about.  And Ms. Yenne talked about this, but I want to make sure that we put it in context.

Let's say that there is a confession in the case that you're a juror on a Capital Murder.  Ms. Yenne talked about that.  And let's say that, as she says, the cat is out of the bag.  Because as the normal process, the Defendant has the right to ask the Judge to get rid of a -- of what they believe is an illegally obtained or impermissibly obtained or something is wrong with a confession.  They also have the ability to ask the jury to do that.

So sometimes what that means -- I know all that just sounded like blah, blah, blah to you.  But what that means is that you've heard it now.  Okay?  And what I'm asking you is

you're sitting in the jury room.  You've heard that confession, a videotaped confession in full color and sound and everything; and the person that you're sitting in judgment of has told an officer in detail over a couple hours time exactly how he committed that crime.  Furthermore, you believed him.  Because there is a reason why confessions come in, they are not hearsay or whatever.  It's because generally people don't falsely confess.

So you believed it for whatever reason.  Now you're in the jury room and the Judge has now told you it turns out that that confession was not kosher for whatever reason.  Now, Juror, I need you to 100 percent disregard that confession.  Don't consider it at all.

And further, so I can make this a harder example for you, that's what did it for you on their beyond a reasonable doubt.  Like maybe there wasn't much evidence other than that; but of course, there is this confession.  And so the confession is there.  You believed it.  Now the Court is saying to you that you have to disregard it.  And because of the way you judged the evidence, you believe that without that confession, you have to find a person who is charged with Capital Murder, who you believe their confession, you have to find that person not guilty because of that instruction from the Court.  Could you in all honesty be able to do that?

**A.**   Yes, I can.

Q.    Okay.  That was a strong answer.  I like that.

Okay.  Now let's talk a little bit about Special Issue No. 2.  This is the one I think you were talking about a minute ago, and I want to talk to you a little bit about mitigation.  Mitigation is -- well, I think the elected D.A. talked to you about it.  I just want to ask you -- first off, we ask people if they can consider and give effect to mitigation.  Consider it and give effect to it.  Now what I would say is I agree with what the elected D.A. said.  You have to decide whether something is mitigation, and then you have to decide whether it's sufficient for you.

Now I want to be clear.  That's for you.  We call it a personal moral judgment.  You decide what is mitigating.  I want to make sure you understand that list that the elected D.A. put up there, that's not a finite list.  That was her way -- and it's a really good way because it really does go across the spectrum -- of showing you different things that can be mitigating.  But what she's really saying to you when she showed you that giant spectrum of all those things is it can be anything.  Do you understand that?

A.    Yes.

Q.    Okay.  And what I need to know is -- and by the way, you can find mitigation based on mercy alone.  Do you understand that?

A.    Yes.

Q.   Okay.  But I want to ask you could you consider and give effect to low intellectual function for somebody on a Capital Murder case?  Could you consider and give effect to that as mitigation?

A.   I can be open to that.

Q.   Okay.  Could you consider and give effect to drug addiction?

A.   I can be open to that.

Q.   And when you say open to that, are you agreeing that you could consider and give effect to it?

A.   Yes, I can.

Q.   Okay.  What do you mean by open to it?

A.   It means that did it drive the behavior or are we going to get into a repeat crimes.

Q.   Okay.  Could you consider and give effect to brain damage as a mitigation circumstance?

A.   Yeah.  It could have affect on their behavior.

Q.   Okay.  Would it -- could it lead to -- could it, not would it.  Could it lead to you saying that it's a -- sufficient mitigating circumstance for you in a Capital Murder case?

A.   It could be either/or.

        MS. YENNE:  Your Honor, I'm going to object to the weight.  I think this goes down to weight.

        THE COURT:  I'll sustain the objection as to

weight.

MR. WOOTEN:  Yes, sir.

Q.   (BY MR. WOOTEN)  Let me ask you this, ma'am.  We're talking about personal moral judgments.  There is a reason we call it that funny name, reasoned moral response, personal moral judgment, is because this is a very odd situation.  This is a safety valve in the law allowing the jury, a jury that has found somebody guilty of Capital Murder and found them to be a future danger, it's a safety valve that allows them to still spare their life.

You'll notice there is no burden on this.  Nobody has to prove that to you beyond a reasonable doubt.  Nobody is required to bring it to you.  It's up to you to make that personal moral judgement as to whether something is mitigating and whether something is sufficient.  Does that make sense?

A.   Yes.

Q.   Okay.  And what I would say is that in your deliberations in a jury room sometimes things can get very heated.  Does that make sense to you?

A.   Yes.

Q.   And just like politics or religion or any other really serious topic, sometimes people have views and they really want other people to follow their views.  Can you agree with me?

A.   I can agree that that -- I can see that happening.

Q.   Uh-huh.

A.    But my own individual mind of thinking, you know --

Q.    Yes, ma'am.

A.    -- I would have to, you know, just look at it from when we get into the room.  You know?

Q.    Right.  And what I'm saying is would you be -- would you let somebody bully up on you?

A.    No.

Q.    Or harass you?

A.    No bullying, no harassing.

Q.    Okay.  Would you let that happen to any other juror?  I mean, you seem like a take-charge kind of woman.  Could you at least say to somebody, hey, that poor little person over in the corner, you know, let's keep this civil.  Let's not have any bullying.  Let's not have any harassing.

A.    I would go with let's keep it civil and do what we were sent in here to do.

Q.    Okay.  And what I would say to you is that, you know, at some point there are oaths that you take as jurors.  The oath you have now is just to tell the truth.

A.    Yes.

Q.    But if you take an oath to be on the jury, it starts out it says you and each of you.  Does that make sense to you?

A.    Yes.

Q.    Okay.  And does that suggest to you that every person, every juror's decision, especially in Special Issue No. 2,

should be their own decision?

A.   Can I ask a question?

Q.   Absolutely.

A.   If each person has they own view, then how would we come to a decision?

Q.   Well, here is what I will say to you is -- and notice that if I say something wrong, the State always jumps up.  So what I'm about to say is true.

MS. YENNE:  That's my job.

Q.   I'm citing Ms. Yenne is still seated, okay, as authority.

MS. YENNE:  Not yet.

Q.   It's up to you what's mitigating.

A.   Okay.

Q.   Up to you to decide if it's sufficient.  And so what I would say to you is everybody gets their own vote.

A.   Okay.

Q.   And they go with that.  And I think what I think everybody in this room will believe is if Juror No. 8 gets on this jury, we want to know what Juror No. 8 thought about all these Special Issues.  We don't want it to be Juror 9's opinion twice.

A.   Okay.

Q.   We really want it to be Juror No. 8.

A.   Yes.

Q.    Because we qualified that juror.  We like that juror. We want to hear from that juror.

A.    It would be individual.

Q.    Okay.

MR. WOOTEN:  I pass this juror, Judge.

THE COURT:  Thank you very much.  Ms. Woods, if you will just step down, the bailiff will take you out to the walkway.  We'll be back with you in a few minutes.  Leave your questionnaire.  Just leave your questionnaire there.  Just remember all the instructions I've previously given you.

VENIRE PERSON:  I will.  Thank you, Judge.

**(Venire person out.)**

THE COURT:  We are continuing on the record. Ms. Woods has left the courtroom.  Mr. Harris and counsel are all still present.

I present Ms. Woods to the State for challenge for cause.

MS. YENNE:  None.

THE COURT:  I present Ms. Woods to the defense for challenge for cause.

MR. WOOTEN:  Yes, Judge.  We have several challenges for cause.  After the first question that I asked her with the hypothetical, she said that the only appropriate penalty was the death penalty.  She said that is accurate.

I believe that based on that that she has shown a

lack of an open mind, a lack of fairness for that particular situation, as the death penalty being the only appropriate response.

I also would say that several times on Special Issue No. 1, even though she was confused about it, admittedly, I do believe if the Court looks to the totality of her answers that she seemed to say definitively, at least at one point, that she would -- it would always have to be yes for me.  Then I think later -- and this is just my argument.  I think later she started thinking to herself that's not really the way a juror is supposed to act, and I think she conformed herself.  I think she conformed herself with the later questioning.  But I think what we got a glimpse of was her true original first thoughts before she then started thinking how am I supposed to act?

And I think Patton versus Yount that we talked about this morning, I think the Court can, obviously, look through the things that she said and come to a decision. Because obviously, Judge, it's up to the Judge to decide these causes; and I would ask that you look and look at her totality of her answers.

And I believe -- she also said she had shared her father's views.  Her father seemed to be pretty -- he's not here, but he seemed to be pretty pro death penalty.  So I believe overall if you look at her answers and look through to

what I thought were glimpses of her true feelings, I believe that she's not qualified for this jury.

THE COURT:  Response from the State?

MS. YENNE:  I believe this juror is very qualified.  I too ask the Court to look at the totality of her responses.  The juror on multiple occasions asked counsel to clarify what he was asking.  The hypothetical question suggested one answer as the only appropriate penalty, again, which was the same objection the State has been making repeatedly.  The juror themselves thought about it and corrected it and said it would be yes or no.

The line of questioning that suggested could you ever answer that question yes, well, certainly that will be an appropriate response, yes, because you're not saying is it the only answer you'd ever have.  This juror repeatedly said she could keep an open mind, could answer yes or no to all of the questions, including mitigation.

THE COURT:  Considering the totality of it, her response to queen of the world was either.  Her response to facts and circumstances, she did say to that first hypothetical that the answer would be the only appropriate; but I think that later on it came back that she clearly said she could consider all the facts and all the circumstances.  And I think that on totality I'm going to overrule your objection to the challenge for cause.

Present the witness to the -- or pass the witness to the State for any peremptory challenge.

MS. YENNE:  None.

THE COURT:  Pass to the defense for a peremptory challenge.

MR. WOOTEN:  Yes, Judge.

THE COURT:  Do you want to visit with your client?

MR. WOOTEN:  Yes, Judge.

Judge, I've spoken to my client.  He agrees with the decision, and he certainly welcomes your questions.

THE COURT:  Mr. Harris, you understand that your counsel wishes to exercise another peremptory challenge on this potential juror?  Have you had a chance to discuss that with them?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And you are in agreement to -- you have no objection to your attorney exercising a peremptory challenge to this potential juror?

THE DEFENDANT:  No, Your Honor.

MR. WOOTEN:  Judge, may I ask my client a question?

THE COURT:  Yes, you may.

MR. WOOTEN:  Mr. Harris, you told me, if you don't mind me saying so, that you feel -- you felt that she was

too much in favor of the death penalty for you?

THE DEFENDANT:  Yes, Your Honor.

MR. WOOTEN:  Is that correct?

THE DEFENDANT:  That's correct.

THE COURT:  All right.  I believe that is Defendant's Peremptory 5.  I'll grant Peremptory 5.

Mr. Falks, would you have Ms. Woods come back?

**(Venire person in.)**

THE COURT:  We're continuing on the record.

Counsel, you may be seated.

The record will reflect that all counsel and Mr. Harris are present.  Ms. Woods has now returned to the courtroom.

Ms. Woods, I want to thank you very much for your desire to do your civic duty, for giving three days of your life to perpetuate the system that is very important and that's a right of trial by jury.  At this time I'm going to excuse you from any further jury service in this case.  However, before I do that, I want to ask you to please remember and continue to follow all of the instructions that I gave you last week.  Do you remember all of those?

VENIRE PERSON:  Yes.

THE COURT:  The one exception is since you will not be serving as a juror on this case, if there is any media publicity about it, you will be free to look at it and read it

VENIRE PERSON:  Yes, sir.

THE COURT:  All right.

Ms. Yenne, you may proceed.

**STEPHANIE COOPER,**

having been first duly sworn, testified as follows:

**VOIR DIRE DIRECT EXAMINATION**

**BY MS. YENNE:**

Q.   Good afternoon, Ms. Cooper.  How are you?

A.   Fine, thank you.

Q.   My name is Jeri Yenne, and I'm the Criminal District Attorney here for Brazoria County.  Seated to my left is Mary Aldous, my first assistant; and we represent the State of Texas.

Mary Conn and Kerri Mallon represent the Defendant, James Harris, Jr., seated over there at the left.  Okay?

The Judge has told you that this is a Capital Murder case, the State of Texas versus James Harris, Jr. Whenever anyone is on trial, the goal of the State and the defense -- we're both entitled to a fair trial -- is just to obtain jurors who can be fair and follow the law as given to them from the Court.  Okay?

A.   Yes.

Q.   So this is the only time we have an opportunity -- because of the nature of the case, a potential death penalty --

to talk to jurors individually.  Okay?

**A.**    Yes.

**Q.**    So I want to go through some things with you.  All right?

This is the State of Texas versus James Harris, and the indictment charges -- there is a copy of the indictment -- that on or about the 14th day of January, 2012, and before the presentment of the indictment, in Brazoria County, Texas, the Defendant did then and there intentionally cause the death of an individual, Alton Wilcox, by stabbing Alton Wilcox with a knife, and the Defendant was then and there in the course of committing or attempting to commit the offense of Robbery of Darla Wilcox.

It also alleges in the second paragraph on or about the same day, January 14th, 2012, in Brazoria County, Texas, the Defendant did then and there intentionally cause the death of an individual, to-wit: Alton Wilcox, by stabbing Alton Wilcox with a knife, and the Defendant was then and there in the course of committing or attempting to commit the offense of Burglary of a Habitation owned by Darla Wilcox.

And the third paragraph alleges on or about the same day, the 14th day of January, 2012, before the indictment was presented in Brazoria County, Texas, the Defendant did then and there intentionally cause the death of an individual, to-wit: Alton Wilcox, by stabbing Alton Wilcox with a knife,

and Defendant was then and there in the course of committing or attempting to commit the offense of Burglary of a Habitation owned by Alton Wilcox.

So it's one charge of Capital Murder, just different ways of committing it.  Okay?

**A.**  Yes.

**Q.**  Now that's what I have to prove to you if you were a juror.  So I'm going to ask you some principles.

Murder is intentionally causing the death of an individual.  No accident, no mistake, no self-defense, no insanity, no defending anybody else, nobody defending property.  Intending the result.  Intentional, cold-blooded, unjustified killing.  Okay?

**A.**  Yes.

**Q.**  So if a neighbor gets mad and decides he is going to kill the neighbor, so they plan a little bit, go get a gun, catch the neighbor on the street and shoot the neighbor to death, they intended to cause the result.  Am I making sense?

**A.**  Yes.

**Q.**  Okay.  Unjustified.  No reason.

Now Capital Murder is murder plus.  So I'm going to tell you -- before you look at the screen, I'm going to tell you some of the things that can raise -- that was regular murder.  I know that's hard to believe I call it plain-vanilla murder.  Then what raises regular murder -- intentionally

causing the death of an individual, meaning the result, killing them, intended result -- to Capital Murder?  I call it murder plus something else.  Okay?

If I intentionally kill a police officer, knowing that they are a police officer in the line of duty, while they are performing their duties.  If I intend to kill more than one person -- I intend to kill them and I walk in a convenience store and I shoot the place up, intending to shoot the patrons.  Okay?  More than one person during the same criminal transaction.  If I hire somebody to intentionally kill someone else, murder for higher.  If I intentionally kill a child under the age of 10, that's Capital Murder.

And now there is this type on the screen.  The person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat.

And as you can see, the indictment alleges that they intended the murder, to cause the murder, during the course of burglary or robbery.  Okay?

A.   Yes.

Q.   Those are the things that aggravate it and raise it up.  Okay?

Now a person acts intentionally or with intent with respect to a result of his conduct when it is his

conscious objective or desire to cause the result.  Intend the death.  Am I making sense?

**A.**   Yes.

**Q.**   Okay.  So let's go a little further.  Now what I read to you in the indictment is what I have to prove to you beyond a reasonable doubt.  Not beyond all doubt.  So you would get an instruction if you were on a jury that the prosecutor has the burden of proving the Defendant guilty, and it must do so by proving each and every element of the offense charged beyond a reasonable doubt.  It is not required that the prosecution prove guilt beyond all possible doubt.  It is required that the prosecution's proof excludes all reasonable doubt concerning the Defendant's guilt.  Okay?  Could you follow that instruction?

**A.**   Yes.

**Q.**   Okay.  Now that's the highest burden of proof.  We're going to talk in a minute.

Let's say that I had a bad week, Ms. Cooper.  I just didn't prove to you -- and I intend to prove to you everything -- Brazoria County.  You know, I only have jurisdiction over this county, but -- I mean, I can't prove a crime out of the State or Texas or El Paso or Houston, nor should I.  Would you hold the State to their burden of beyond a reasonable doubt?

**A.**   Yes.

Q.    Okay.  That's my job.  The police have their job and I have my job, right?

A.    Yes.

Q.    So I had a bad week, and I did not prove to you the elements of Capital Murder beyond a reasonable doubt.  That's my problem.  I either prove it to you or I don't.  It's not the jury's problem.  Can you find someone not guilty if I do not prove to you beyond a reasonable doubt what's alleged in the indictment?

A.    Yes.

Q.    Okay.  But by the same token, if I prove to you beyond a reasonable doubt what is alleged in the indictment, can you find someone guilty?

A.    Yes.

Q.    Okay.  Let's go a little further.  The State is required to prove to you the elements alleged in the indictment.  Okay?  There will always be inconsistencies in any case.

And let me give you an example.  The element intending to cause the death, Brazoria County, is not an element.  It's a presumptive fact.  It's not actually an element, but I intend to prove that to you.  I haven't ever forgotten yet.  Okay?  In the course of the robbery or burglary, okay, that's what I'm required to prove to you beyond a reasonable doubt.  And I either do it or I don't, right?

A.    Right.

Q.    It's a serious charge, is it not?

A.    Yes.

Q.    And I have some serious responsibility.

A.    Yes.

Q.    So there will always be inconsistencies in any case. Let me give you an example.  Let's pretend there is a car wreck outside the courthouse.  A guy is charged with running a red light.  Ten witnesses saw him run the red light.  He hit another car.  He admits he ran the red light, and he's charged with running the red light.  So I proved to you beyond a reasonable doubt what he's charged with.  There will always be inconsistencies with people thinking, well, was it 3:20 or 3:30 in the afternoon.

A.    Right.

Q.    Or the color of the car.  They may not go to the elements of the indictment.  Okay?  So can you see the distinction?

A.    Yes.

Q.    Let's go a little further.  Levels of burden of proof. The lowest burden of proof is preponderance of the evidence. It's the greater weight and degree of credible evidence.  Civil cases where people sue one another, car accidents.  It's just slightly tipping the scales.  50 percent plus a little grain of sand.

A.    Yes.

Q.    I always try to tip the scales the other way in the morning.  It doesn't work for me.  But this is slightly tipping them up.

The next highest burden of proof, civilly, is clear and convincing evidence.  That measure or degree of proof that produces a firm belief or conviction that the allegations sought to be established are true.  Parental rights termination cases when CPS tries to terminate parental rights in court.  That's a higher civil burden.  It should be, shouldn't it?

A.    Yes.

Q.    Okay.  And then the highest burden of all.  Beyond a reasonable doubt is higher than preponderance and higher than clear and convincing.  Okay?  See, the lowest is preponderance, the middle one is clear and convincing, the highest burden of proof is beyond a reasonable doubt.  So you told me you could hold me to that burden?

A.    Yes.

Q.    It's the only one that doesn't have a definition.

A.    Right.

Q.    It's up to the jury.  Okay?

A.    Right.

Q.    Let me go a little further.  You would get a legal instruction.  All persons are presumed to be innocent and no person may be convicted unless each element of an offense is

proved beyond a reasonable doubt.  The fact that a defendant has been arrested, confined, or indicted for, or otherwise charged with an offense gives no rise to inference of guilt at his trial.  Okay?

That's the presumption of innocence.  If you or I were charged with a crime or a family member or a friend, that person is presumed innocent until the State comes forward with evidence to show you otherwise.  Okay?

A.    Yes.

Q.    So my question for you is as he sits here today, can you presume Mr. Harris innocent?

A.    Yes.

Q.    Okay.  And require me to produce evidence, right?

A.    Yes.

Q.    Now the defense has no burden of proof.  The law does not require a defendant to prove his innocence or produce any evidence at all.  The Defendant never, ever, ever has to bring you any evidence, whether it's a DWI, a misdemeanor, a felony, a burglary.  The defense has no burden of proof.  So could you follow that?

A.    Yes.

Q.    I either make my case or I don't.

A.    Right.

Q.    Okay?

A.    Yes.

Q.   Let me go a little further.  Fifth Amendment privilege against self-incrimination.  Every defendant in any criminal case has a right not to testify.  You cannot consider it for any reason.  That's an instruction.  Can you follow that instruction?

A.   Yes.

Q.   Okay.  If you or I were charged with a crime or a friend or anybody we knew, misdemeanor or felony, we all -- and this is a fundamental right in our country, which to me distinguishes us from other countries.  Okay?

A.   Uh-huh.

Q.   We each have a right, a Fifth Amendment privilege, against self-incrimination.

A.   Yes.

Q.   Now would you agree with me, Ms. Cooper, that some people are just farther ahead before they open their mouths?

A.   Yes.

Q.   I'm always told that at my house.  You were ahead until you tried to explain it.  So some people don't present themselves as well as they hope to.  Is that a fair statement?

A.   Yes.

Q.   Okay.  Sometimes they make it worse.  So there might be various reasons besides someone's guilt that they might choose not to testify.

A.   Correct.

Q.   Okay.  So we never know whether a defendant is going to take the witness stand or not.  But if they did not, you would get that instruction that you cannot consider it for any reason.  Can you follow that?

A.   Yes.

Q.   So if I don't prove to you beyond a reasonable doubt the elements of the indictment and the Defendant didn't testify, I just fell on my face.  I didn't prove it to you.  Am I making sense?

A.   Yes.

Q.   It doesn't matter and you can't consider the fact a defendant didn't testify.

A.   Right.

Q.   Okay.  Now let's go a little further.  If you had to vote right now, you would have to vote not guilty.  You haven't heard any evidence.

A.   Correct.

Q.   Okay.  So am I sort of making my point?

A.   Uh-huh.

Q.   Okay.  A defendant never has the burden of proof, right?

A.   Right.

Q.   Okay.  The indictment alleges one charge of Capital Murder of victim Alton Wilcox with alternate methods of committing the same, by robbery or by burglary.  Okay?

Intentionally causing Alton Wilcox's death by stabbing him to death.

As long as the jury agrees beyond a reasonable doubt that the elements of Capital Murder are met, the jury does not need to agree unanimously on which manner or means, being robbery or burglary. Six of them could believe he intentionally caused the death of Alton Wilcox during the course of committing robbery. Six could believe he intentionally caused the death during the course of committing burglary. Am I making sense?

A. Yes.

Q. Okay. Direct evidence. If you were on a jury there is certain types of evidence. Evidence that directly demonstrates the ultimate fact to be proven. Direct evidence is maybe eyewitness testimony, a video of a crime, sometimes a confession. Okay?

A. Right.

Q. Now I hate this definition, but this is what it is. Circumstantial evidence is evidence that is direct proof of a secondary fact which, by logical inference, demonstrates the ultimate fact to be proven.

Okay. There is a little 5-year-old boy. His parents have a backyard pool. He asks his mom -- he wants to go swimming; and she says, not right now, honey, later.

And so she goes about her housework. The next

thing you know, pitter-patter of the feet on the stairs, back door opens, big splash is heard.  Mom goes to the backyard, the little boy is laying in the lawn chair dripping wet in his swimsuit.

Now Mom can figure out from those secondary facts that he had been in the pool, right?

A.    Right.

Q.    Without witnessing it?

A.    Right.

Q.    I'm going to give you an example from my own childhood when I was 4 years old and my brother was 3.  My mom was sick.  She was -- this was long before the days -- they used to use St. Joseph's baby aspirin for kids.

A.    Right.

Q.    Now it's supposed to kill children, but we got it as a child.

A.    Yeah.

Q.    I always think medicine seems to change these days, doesn't it?

A.    Yes.

Q.    So we had three bottles of St. Joseph's baby aspirin -- tasted like orange candy -- on top of the refrigerator.  All right?  Good tasting.  Have you had some?

A.    I have.

Q.    Okay.  It's like candy.  So my mom went down to bed

after checking on her kitchen timer when she gets back up in 15-minutes.  But when she went to lay down, my brother looked at me and said he was hungry.  We got on the stool.  We got the St. Joseph's baby aspirin down.  We ate about 150 aspirin.  I ate one bottle.  My brother ate two.

My mom gets up and she panics.  She sees the aspirin bottles, the cotton laying all over, and she says, who ate these aspirin?  My brother and I looked at her.  We pointed to the cat.  Now my mom knew the cat had not eaten the aspirin.

A.   Right.

Q.   So she had to make a decision based on those secondary facts.

A.   Sure.

Q.   So my question to you is if the State proved to you beyond a reasonable doubt the elements of the offense, can you convict someone of Capital Murder based on circumstantial evidence?

A.   Yes.

Q.   Okay.  Now there are other types of evidence.  I had mentioned to you on direct evidence there was eyewitness testimony.  Now some crimes are committed in front of a football stadium full of people these days.  Some are on videotape.  Some are committed in front of no one.  Some are committed in front of ten witnesses, two, or one.

So if this were a case with an eyewitness, one

eyewitness, if I prove to you the elements of the indictment beyond a reasonable doubt, if you listen to an eyewitness' testimony, one eyewitness, and you believed that eyewitness' testimony beyond a reasonable doubt and that eyewitness' testimony established all of the elements of the indictment to you beyond a reasonable doubt, could you convict based on testimony of that eyewitness?

A. Yes.

Q. Okay. Let me go a little further. Penalty range for Capital Murder. In order to sit on any jury you have to be able to consider the penalty range. If this were a robbery, you would have to be able to consider the robbery penalty range. DWI, you'd have to consider it. Whatever drug level offense. Consider means that you will -- you know, I can't give you a legal definition; but it means that you will keep an open mind and fully and fairly review and consider both options before making a decision.

MS. CONN: I'd object. I didn't hear the first part of that. I think you said something about you were not giving a definition?

MS. YENNE: I was not giving a definition.

MS. CONN: Okay.

Q. (BY MS. YENNE) When I say consider I mean unless -- the law is not going to give you a definition. So will you fully and fairly review and consider the full range of

punishment?

A.   Yes.

Q.   So I'm going to say to you the penalty range for Capital Murder is a very limited range.  Two options.  If you were to convict someone of Capital Murder -- or the jury was to convict someone of Capital Murder, there is two options.  Life without parole or the death penalty.  Okay?

A.   Right.

Q.   Just two.  Life without parole or the death penalty.  Would you consider both of these to be serious punishments?

A.   Yes.

Q.   Okay.  Life without parole is serious?

A.   Yes.

Q.   Is the death penalty the ultimate serious?

A.   Absolutely.

Q.   Okay.  Could you consider the full penalty range for Capital Murder?

A.   Yes.

Q.   Okay.  Some people say, well, the minute I find someone guilty of Capital Murder, I'm going to give them the death penalty.  I don't need to hear anything else.  Is that you, or will you consider the full penalty range?

A.   I will consider it.

Q.   Okay.  And there's never going to be a good kind of Capital Murder, is there?

A.    No.

Q.    Okay.  There is never going to be a good kind of murder, is there?

A.    No.

Q.    Okay.  One of the things before -- when you're sitting on a jury, we have to know that someone can honestly keep an open mind.  Would you agree with me that no two circumstances of a murder are the same?

A.    Yes.

Q.    Would you agree with me that no two circumstances of Capital Murder are the same?

A.    Yes.

Q.    Okay.  People could know each other, they could be strangers, they could be drug related or substance abuse related, could not be.  All right?

A.    Right.

Q.    Victim could have placed themselves in a situation or not.  So there is a reason the legislature has a penalty range.  No one can commit you to what you would do; and in order to sit on a jury, you have to be able to honestly consider the full range of punishment and apply the facts when you hear all the evidence.  Am I making sense?

A.    Yes.

Q.    That's why there is a penalty range for each crime.  Do you think that's a pretty good reason, too?

A.    Yes.

Q.    Okay.  Lesser-included offense.  In a prosecution for an offense with lesser-included offenses the jury may find the Defendant not guilty of the greater offense but guilty of a lesser.

So let's say I did not prove to you beyond a reasonable doubt the burglary or robbery elements of Capital Murder, and the Defendant -- and the jury decided that I didn't prove that beyond a reasonable doubt.  They would find the Defendant not guilty of Capital Murder, right?

A.    Right.

Q.    They may then be asked to go on and consider a lesser-included because murder is always an included in capital murder.  Okay?

A.    Right.

Q.    And that would be regular murder, intentionally causing the death of an individual.  No justification, no excuse.  Never self-defense because if it was self-defense, you would have acquitted him.  He would have been found not guilty.  Am I making sense?

A.    Right.

Q.    The penalty range for regular murder is not less than 5 years nor more than 99 years -- it includes a life sentence, but that's with parole possibility -- and up to a 10,000-dollar fine.  So if you had found someone not guilty of Capital Murder

and you convicted them of murder, in order to sit on a jury you have to be able to honestly consider the full penalty range. Can you consider the full penalty range for murder, including from the minimum to the maximum?

     A.   Yes.

     Q.   Okay.  Would you apply the facts of the case?

     A.   Yes.

     Q.   Even if you had found someone not guilty of Capital Murder, then you had to consider murder, you can honestly keep an open mind and consider the full penalty range for murder and determine what's fair?

     A.   Yes.

     Q.   Okay.  No one can commit you to what you would do. Would you say it's a fair statement that I can't commit you to what you would do without hearing all the evidence?

     A.   That would be true.

     Q.   Okay.  And if someone were a juror, they would need to listen to all the evidence, wouldn't they?

     A.   True.  Yes.

     Q.   Not make up their mind before hearing that evidence.

     A.   No.

     Q.   Especially in a Capital Murder case.

     A.   Yes.

     Q.   All right.  Witness credibility.  Jurors are the sole judges of the credibility of the witnesses.  Jurors can believe

all, some, or none of what a witness says. All witness have equal credibility before they begin to testify. You get to decide whether you believe them or not after they testify.

A.   Right.

Q.   Okay. But you got to start them out equally. Can you do that?

A.   Yes.

Q.   Okay. Now some people -- I notice that you're married to a police officer?

A.   I am.

Q.   Okay. Now you of all people -- and I'm in law enforcement -- see the humanity of other people, right?

A.   Right.

Q.   Okay. Now to me people are just people. Some people present themselves well. Not all cops are honest. Is that a fair statement?

A.   That's fair.

Q.   Okay. Lots of police officers are honest, and there are some that are not. Fair enough?

A.   True.

Q.   So some people say, well, the minute a police officer takes the stand I'm going to automatically believe them or not believe them. Is that you, or will you start everybody equally?

A.   I will start everyone equally.

Q. Same thing with doctors?

A. Yes.

Q. Okay. Same thing with all witnesses?

A. Yes.

Q. Okay. Let's go on. If you sat on the jury, there are going to be some law given to you regarding confessions if there were to be a confession. Sometimes there are. Sometimes there aren't.

A confession of a defendant is admissible in evidence if freely and voluntarily made, electronically recorded or written, the confession shows that the accused has been warned prior to making such confession of the right to remain silent, used against him or her in court, the right to have a lawyer, if he cannot afford a lawyer the right to have a lawyer appointed, the right to stop questioning at any time, and that the accused knowingly, intelligently, and voluntarily waives these rights. Okay?

A. Yes.

Q. Okay. Do you believe that those rights are important?

A. Yes.

Q. Okay. So you're going to be given an instruction that that's what's required for a confession. Do you believe it's important that the police follow the rules?

A. Yes.

Q. Okay. We in the criminal justice system, we hold

people's lives in our hands, don't we?

A.  Yes.

Q.  We have to play by the rules, don't we?

A.  Absolutely.

Q.  Do you believe we have some consequences when we don't?

A.  Absolutely.

Q.  Okay.  And sometimes public servants should be held to a higher standard when they don't behave, right?

A.  Yes.

Q.  Let's go a little further.  Let's say there were a confession in a case.  Now if you were on the jury it's up to you to decide whether the police complied with the confession rules.  Okay?  What I just read you.

A.  Right.

Q.  But if you do not believe the police complied -- that's the jury's decision based on the evidence -- or the confession was involuntary, in other words, not voluntary, you will get an instruction from the Court that you will wholly disregard the alleged statement or confession and not consider it for any purpose.  Can you follow that law?

A.  Yes.

Q.  Let's go a little further.  That's not going to be real popular, but that's --

A.  Right.

Q.    In other words, let's say that you got a confession on a Capital Murder case and it's an ugly -- grueling, ugly, unjustified crime.  Innocent victim.  Describes in detail what they did to the victim.  The police miss a couple warnings or a vital warning.  They have not complied.  The jury honestly has determined the police have not complied.  Can you disregard that statement and not consider it for any purpose?

A.    Yes.

Q.    Okay.  Now it doesn't say it would be popular, right?

A.    Right.

Q.    Okay.  Let's go a little further.  I told you the burden is on me, and you agree that the State has the burden to prove this to you beyond a reasonable doubt?

A.    Yes.

Q.    By credible evidence, right?

A.    Yes.

Q.    Okay.  Is it important to you that the State prove their criminal case beyond a reasonable doubt?

A.    Yes.

Q.    Okay.  And that's a burden that I gladly assume.  And do you believe it's a burden that should be there?

A.    Yes.

Q.    Okay.  So let's say you had a grizzly, ugly confession in a Capital Murder case and you believe that the police didn't comply -- that's a jury decision -- or that it was truly

involuntary. You said you could wholly disregard it. And that's means that if I don't have enough evidence to prove it to you beyond a reasonable doubt, you could find someone not guilty?

A. Yes.

Q. Okay. Now some people say but you've already heard it. The cat is out of the bag.

That's a legal instruction from the Court, but you get to determine whether the police complied. Can you follow that law?

A. Yes.

Q. And as unpopular as it is, can you find someone not guilty if we didn't comply with what we are supposed to do?

A. Yes.

Q. Okay. Let's go a little further. Voluntary intoxication does not constitute a defense to the commission of a crime. I decide to go out and drink 20 beers and I'm going to go beat somebody up. That's not a defense, is it?

A. No.

Q. Okay. Can you follow that instruction?

A. Yes.

Q. Let's go a little further. Causation. A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly

sufficient to produce the result and the conduct of the actor clearly insufficient.

Now that's a mouthful, but let me give you an example.  I live in an apartment.  I decide to set a fire.  I'm setting a fire in an apartment.  An apartment.  I kill my neighbors next door.  I set the fire, and it's a bad weekend for the fire department.  It's a holiday weekend.  Three engines are down, and response times are double the amount of time.  Maybe on a good day if the engines were working and it wasn't a holiday, the staff wasn't down, the family next door could have been saved.  But my conduct in setting the fire was clearly sufficient to cause the result.  Do you see the distinction?

A.   Yes, I do.

Q.   All right.  Let's go a little further.  If you were on a jury, you might get an instruction about burglary.  A person commits an offense if, without the effective consent of the owner, the person enters a habitation with intent to commit a felony, theft, or an assault, or they enter the habitation and commit or attempt to commit a felony, theft, or assault.  They form the intent on the spot.

A.   Right.

Q.   Can you follow that instruction and hold me to my burden?

A.   Yes.

Q.    Okay.  Robbery.  A person commits an offense if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another.

I decide to shoplift.  I'm going for makeup at Wal-Mart.  The manager interrupts me, and I deck the manager and give him a black eye.  I've intentionally, knowingly, or recklessly caused injury in the course of committing theft.  Okay?

A.    Uh-huh.

Q.    And that means conduct that occurs in an attempt to commit, during the commission or if I'm running away and I knock the manager down to keep the product.

A.    Okay.

Q.    Okay?  Can you hold me to my burden on robbery?

A.    Yes.

Q.    Now Capital Murder -- and I notice you do believe in the death penalty?

A.    Yes.

Q.    Okay.  Is this serious for you to be here today, Ms. Cooper?

A.    Yes.

Q.    It's a serious matter.

A.    Yes.

Q.    Now I told you there is two parts of -- two penalty

ranges, life without parole and the death penalty.

A.   Correct.

Q.   All right.  You've told me you could honestly consider both.

A.   Yes.

Q.   Okay.  Now let's talk about two parts of a trial, and I want to know if you can follow this process honestly. Because, truthfully, a man's life is at stake, isn't it?

A.   Right.

Q.   Guilt/innocence part of the trial.  Either guilty or not guilty.  I either prove to you beyond a reasonable doubt the elements of the indictment or I don't, right?

A.   True.

Q.   It's my responsibility.

A.   Yes.

Q.   Not the jury's, right?

A.   Right.

Q.   But the jury's responsibility is to follow whether I did it or not, right?

A.   True.

Q.   All right.  If guilty, you proceed with punishment. If not guilty, you're acquitted.

A.   Right.

Q.   And to me that's what it should be, right?

A.   Yes.

Q. Do you feel that way?

A. Yes.

Q. All right. Now if someone is guilty of Capital Murder, if I prove to you beyond a reasonable doubt the elements of that indictment, you found someone -- the jury found someone guilty of Capital Murder, you go to the punishment phase. You have to be able to keep an open mind. Can you keep an open mind as to both penalties at that point?

A. Yes.

Q. Okay. You've told me neither are minor, correct?

A. That's true.

Q. All right. It's not just a vote for life or death. So here's the principles we're going to talk about. Right after a guilt verdict, before any punishment evidence is presented, you cannot have made up your mind as to the answers. Okay? Now you're not going to feel good about the facts, are you?

A. No.

Q. It's going to be ugly, right?

A. Right.

Q. There's going to be emotion?

A. Right.

Q. Can you separate that emotion and follow the legal instructions?

A. Yes.

Q.   Okay.  Now you're telling me you don't have your mind made up.  You can go on to the process?

A.   Yes.

Q.   That process would involve answering some questions. Some people say the minute I found them guilty of Capital Murder I would automatically give them the death penalty.  Is that you?

A.   No.

Q.   Would you consider both options?

A.   Yes, I would.

Q.   Okay.  Would you agree with me this is the most serious of all penalties anybody could ever face?

A.   Yes.

Q.   All right.  So you must be able to consider all guilt/innocence evidence but must be able to consider any and all punishment evidence.  And we're going to go over that in a minute.  In order to consider all the evidence, you have to keep an open mind.  Okay?

A.   Yes.

Q.   Now that open mind would mean that there are two appropriate penalties possible for you to decide, life without parole or the death penalty, right?

A.   Correct.

Q.   Okay.  And at that point in time do you honestly feel that there is still two appropriate penalties, life without

parole or the death penalty?

A.   Yes.

Q.   Okay.  Each question is going to be independent of the verdict.  Each question is independent of each other.  It has to be based only on the evidence presented.

Let me show you what you're going to have to consider.

MS. YENNE:  Go to that slide, please.

Q.   She's terrific.  She's a lawyer, and she can operate a power point.  I cannot.

In deliberating on the issues submitted you shall consider all evidence -- all, not some -- all evidence admitted at the guilt/innocence stage, the guilt/innocence trial of the offense, and the punishment stage -- not just some, but all -- including evidence of the Defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.  Okay?  So can you follow that instruction?

A.   Yes.

Q.   It says you have to consider it.  You shall consider all evidence admitted at guilt/innocence and punishment, right?

A.   Yes.

Q.   So it's not over until the punishment phase is concluded.  Is that a fair statement?

A.   That is fair.

Q.    Okay.  Even though he's a guilty Capital Murderer by that time, right?

A.    Right.

Q.    Okay.  That's not the end of it.  You have to honestly keep an open mind.

Okay.  So let's go -- in deliberating you told me you can consider all the evidence.  You would consider it all?

A.    Yes.

Q.    Okay.  It wouldn't be fair if you wouldn't, would it?

A.    No.

Q.    Okay.  Let's go a little further.  Let's go back to Special Issue No. 1.

Okay.  So guilty Capital Murderer.  You have to keep an open mind, right?

A.    Right.

Q.    Then you will get a special issue.  Now your mind is not made up at this time, is it?

A.    No.

Q.    Okay.  There are two appropriate penalties by the time you go into punishment, right?

A.    Yes.

Q.    Life without parole or the death penalty.  Is that a fair statement?

A.    It is.

Q.    Okay.  And you've told me neither are minor.

A. That's true.

Q. Okay. Special Issue No. 1. You'd get a Special Issue. You may get one or more, depending on how you answer.

Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society? Okay?

A. Okay.

Q. So the State has to prove to you from the evidence -- all of it, guilt/innocence and all the punishment evidence -- beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society. My question for you, first of all, is will you consider all the evidence?

A. I will.

Q. Okay. Will you hold me to my burden to prove to you beyond a reasonable doubt that there is a probability the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?

A. Yes.

Q. Okay. If I told you that the law says that probability is more than a mere possibility, would you agree with that?

A. Yes.

Q. Would you consider probability to be something like

more likely than not?

A.   Yes.

Q.   Okay.  Now so we're predicting future danger.

A.   Right.

Q.   Okay?  It says that the Defendant would commit criminal acts of violence.  Now that is plural.  Would that mean more than one to you?

A.   Yes.

Q.   Now let's go to the predicting -- well, let me go a little further.  Okay?  Society.

Now there is only two penalties for Capital Murder, both of them very stiff.  Life without parole and the death penalty.

A.   Right.

Q.   Now if it's life without parole the place where the Defendant is going in any Capital Murder conviction case is prison, right?

A.   Yes.

Q.   So society is not limited to but includes prison.  It has to, right?

A.   Yes.

Q.   Kind of an interesting question.  So can you consider prison to be society?

A.   Yes.

Q.   All right.  Would you agree with me that we have

various types of societies?  Cities could be a society?

A.  Yes.

Q.  School districts?

A.  Yes.

Q.  Okay.  Courthouses?

A.  Yes.

Q.  Workplace environments?

A.  Yes.

Q.  A jail setting can be?

A.  Yes.

Q.  Okay.  Do you think it is important that inmates be safe from other inmates?

A.  Yes.

Q.  Okay.  And prison personnel, that they be safe from other inmates?

A.  Yes.

Q.  Okay.  Ministry?  Medical?

A.  Yes.

Q.  And that visitors be safe from other inmates?

A.  Yes.

Q.  Okay.  So society can include prison for you?

A.  Yes.

Q.  Let's go a little further.  Criminal acts of violence. Okay.  Criminal acts of violence can be violence against property and violence against people.  Okay?  Arson could be

violence against property.  Criminal mischief, throwing objects, threats.  Can you consider criminal acts of violence to be violence against people and violence against property?

A.    Yes.

Q.    Okay.  And what do you consider a continuing threat to society?  What would continuing be?  What does that mean?

A.    Someone who could, under the right circumstances for that person, be able to commit another crime in the future.

Q.    Ongoing threat?

A.    Yes.

Q.    Okay.  Now that's the future danger issue.  Predicting future danger, Special Issue No. 1.  Remember what I just read to you?  Do you find from the evidence beyond a reasonable doubt there is a probability the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Some people say, oh, I could never predict future danger.  Can you answer Special Issue No. 1 based on the evidence?

A.    Yes.

Q.    Let's go a little further.  Special Issue No. 1 focuses upon the character for violence of the particular individual, not merely the quantity or quality of the institutional restraint put on that person.  This Special Issue focuses upon the internal restraint of the individual, not

merely the external restraints of incarceration. Can they behave themselves? Am I making sense?

**A.** Yes.

**Q.** Kind of a strange question, but would they constitute a continuing threat to society?

**A.** Right.

**Q.** Okay? All right. And can you answer that Special Issue based on the evidence?

**A.** Yes.

**Q.** Now I told you on Special Issue No. 1 -- I'm going to -- I'm going to go through burden of proof on future dangerousness real fast, and then I'm going to go back.

Now the State has to prove future dangerousness. Remember, I have to prove to you beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society? Society including prison. Okay?

**A.** Yes.

**Q.** Now can you hold me to my burden of beyond a reasonable doubt to prove that to you?

**A.** Yes.

**Q.** Okay. Let's go a little further to the grid. The reason I'm asking this is -- okay. Now if I prove to you beyond a reasonable doubt that there is a probability the Defendant would commit criminal acts of violence that would

constitute a continuing threat to society, can you answer that question yes?

    **A.**   Yes.

    **Q.**   Okay.  And the reason I'm asking is because that's the road to the death penalty.  Okay?

    **A.**   Right.

    **Q.**   Okay.  Now if I don't prove it to you beyond a reasonable doubt that there's a probability the Defendant will commit criminal acts of violence that will constitute a continuing threat to society, can you answer it no?

    **A.**   Yes.

    **Q.**   Even though -- some people say, well, he's a guilty Capital Murderer.  He's got to be a future danger.

            That's not the way the law works.

    **A.**   Right.

    **Q.**   So I want to ask you, just because you've automatically found someone guilty of Capital Murder, are you going to find them a future danger?  Are you going to automatically answer that question yes, or are you going to look at all the evidence?

    **A.**   I'll look at all the evidence.

    **Q.**   Okay.  So he's a guilty Capital Murderer.  You get to Special Issue No. 1.  If I prove it to you beyond a reasonable doubt, you can answer that yes?

    **A.**   Yes.

Q.    Okay.  Because some Capital Murderers could be Capital Murderers and not be future dangers.  Would you agree with that?

A.    Yes.

Q.    Okay.  So yes must be unanimous from the jury.  Do you want to know why?  Because it's the road to the death penalty.  Okay?

No requires ten or more jurors.  And if ten or more jurors answer that, the Judge will sentence the Defendant to life without parole.  Okay?

A.    Okay.

Q.    Because sometimes Capital Murderers are not future dangers, based on the evidence.

A.    Right.

Q.    Okay?  Am I making sense?

A.    Yes.

Q.    Okay.  So if there is a no answer, the Judge will sentence the Defendant to life without parole.  Okay?

A.    Okay.

Q.    If there is a yes answer, that's unanimous and the jury has found him to be a guilty Capital Murderer and a future danger, you now go on to Special Issue No. 2.  As I said, this is the road to the death penalty.

A.    Yes.

Q.    Now I want to go back to deliberating for just a

minute.  Remember, in deliberating on this evidence, all the issues, you can't have your mind made up.  Even if you answer Special Issue No. 1 yes, your mind still has to be open to both possible penalties.

A.    Right.

Q.    Life without parole and the death penalty.

A.    Right.

Q.    Will it be open?

A.    Yes.

Q.    Now if I say to you, what is your feeling on the appropriate punishment, the truth of the matter is is you haven't heard all the evidence yet.

A.    Right.

Q.    Am I making sense?

A.    Yes.

Q.    There is going to be a lot of emotion and there is never going to be a good Capital Murder, Ms. Cooper.

A.    Right.

Q.    So in deliberating on the issues -- you notice how it doesn't just say one.  It says both issues, right?

A.    Right.

Q.    If you've gotten that far, you shall consider all evidence admitted at the guilt/innocence stage and punishment stage, including evidence of the Defendant's character and background, or the circumstances of the offense that militate

for or mitigates against the imposition of the death penalty. Will you do that?

A.   Yes.

Q.   Okay.  Will you do that and keep an open mind past Special Issue No. 1 if you found him to be a future danger?

A.   Yes.

Q.   Okay.  Let's go to Special Issue No. 2.

Now I told you that I had the burden of proof on Special Issue No. 1.  Special Issue No. 2 -- now that's not the end of it because, otherwise, the sentence would be automatic. The law provides, as it should, for a mechanism to spare someone's life.

A.   Right.

Q.   Do you think that's important?

A.   Yes.

Q.   Okay.  Even though they have done a horrible, awful thing and they may be a future danger, sometimes it's just right to spare someone's life, isn't it?

A.   Yes.

Q.   Okay.  So here's how that's determined.  Special Issue No. 2.  Nobody has a burden on that, and you can get evidence from guilt/innocence or punishment that apply to this.

Whether taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral

culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed. Okay?

A. Yes.

Q. All right. Now the defense doesn't have a burden, and neither do I. You wouldn't hold the defense to any burden, would you?

A. No.

Q. Okay. And all of the evidence -- consideration of evidence includes the circumstances of the offense because they can be mitigating.

Let's talk about what mitigation is defined as in Texas. Evidence that a juror might regard as reducing the Defendant's moral blameworthiness. I'm going to explain it in a minute.

MS. CONN: Objection, Your Honor. We would object to that slide in violation of Eddings, 445 U.S. 104, and the Eighth Amendment. This slide misstates the law. It misrepresents the law -- misrepresents the caselaw, the Constitution, and we would object and ask that the slide be stricken. Also Lockett versus Ohio.

THE COURT: Overruled.

Q. (BY MS. YENNE) Okay. Mitigation. In order to sit on a Capital Murder jury you have to be able to consider and give

effect to mitigation. That doesn't mean you have to find it. Okay?

**A.** Right.

**Q.** And even if you found mitigation -- I'll explain in a minute -- it doesn't have to be sufficient. Okay?

**A.** Okay.

**Q.** To warrant life without parole versus the death penalty.

Evidence that a juror might -- it doesn't say shall, right? Might regard as reducing the Defendant's moral blameworthiness. Lessening his blame, but not his guilt. Making sense?

**A.** Yes.

**Q.** Took me about three months to figure out how to explain that.

So let me go a little further. Ms. Cooper, let me throw something out to you. How would you ever lessen anybody's blame?

Have you ever seen kids who -- you see them with their parents and their parents don't care about them. They don't have a chance in the world. Drug addict, horribly treated, horrible abuse, or they just don't really care one bit. Never loved the kid a day in his life. Have you ever looked at a kid and you just wish that somebody would take them away, a grandparent or somebody, because they don't have a

chance in life?

    A.    Yes.

    Q.    So it's almost like the road is paved.

    A.    Yes.

    Q.    Okay.  So that might lessen somebody's blame, but not their guilt.

    A.    True.

    Q.    Lessen it enough, be sufficient enough, to give them life without parole.  Am I making sense?

    A.    Yes.

    Q.    Okay.  Now let's go back to the first Special Issue No. 2 for just a minute, then we're going to talk about mitigation.

          All right.  You take into consideration all the evidence, the circumstances of the offense, the Defendant's character and background, personal moral culpability, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.  It has to be sufficient.  Okay?

    A.    Uh-huh.

    Q.    But there will always be mitigation.  Will you agree with me that human beings, somebody has always done something nice for somebody in their life?

    A.    Sure.

Q.   Somebody has always been to the college of hard knocks in their life?

A.   Right.

Q.   Parent leaves.  We all have terrible things happen to us.  And we all do good things, right?

A.   Right.

Q.   So there may be mitigation, but you would have to determine it to be sufficient.  Okay?  So let's go a little further.

Okay.  You have to consider and give effect to mitigation.  Now nobody can define what "give effect to" is.  The law doesn't define it.  But you have to be able to consider and give effect to it.  You don't have to find it.  Okay?

Some of the things that could lessen the blame, mitigation, for one juror might not for another.  Okay?  Youth -- some people could consider youth mitigating, lessening the blame.  Some might not.  Some people might consider old age lessening the blame.  Some might not.  Some might consider child abuse or physical injury or sexual injuries during childhood lessening the blame.  Some might not.  Good work history could be.  Some might not.  Drug abuse, drug addiction might consider it lessening the blame.  Never the guilt. Lessening the blame.

A.   Right.

Q.   Is it sufficient enough to warrant a sentence of life

without parole versus the death penalty?

Acts of kindness for others, alcohol abuse, low IQ, low intellectual functioning, family breakup, single parent home, intellectual issues, poverty, exposure to chemicals, exposure to poisons, exposure to toxins, exposure to toxic mold or toxic material, mental retardation, desperation on an event, or even the causation part, that they are not wholly responsible in the circumstances.

A.    Right.

Q.    Can you consider all of the evidence, consider and give effect to any mitigation that comes?  I'm not asking you could you find it to be.  Could you consider all the evidence and give effect to mitigation --

A.    Yes.

Q.    -- before answering Special Issue No. 2?

A.    Yes.

Q.    Nobody can tell you what weight you'd give it, but will you keep an open mind and consider and give effect to whatever comes in evidence?

A.    Yes.

Q.    Okay.  Not rule anything out, consider and give it effect?

A.    Yes.

Q.    All right.  Let's go back to Special Issue No. 2, and then I'm going to the grid.  So when taking into consideration

all the evidence -- and we talked about what could be mitigation. What one person thinks might, another person might not -- including the circumstances of the offense, the Defendant's character and background and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed. Can you answer that question based on the evidence?

    **A.**   Yes.

    **Q.**   If there is a sufficient mitigating circumstance, can you answer it yes?

    **A.**   Yes.

    **Q.**   If there is not a sufficient mitigating circumstance -- and I said sufficient because there will always be mitigation -- can you answer it no if there is not?

    **A.**   Yes.

    **Q.**   Let's go a little further. Let me tell you why.

          MS. YENNE: Go back to the grid, if we could. Thank you.

    **Q.**   Because you've already found him to be a future danger. I said it's the road to the death penalty. Requires all the jury to answer yes to future danger.

          Okay. Mitigation issue. Is there sufficient mitigation? No must be unanimous because if the jury

unanimously found him to be a future danger and unanimously answered no, no sufficient mitigation, then the Defendant receives the death penalty.

A.   Right.

Q.   Am I making sense?

A.   Yes.

Q.   Okay.  Can you answer these questions honestly without making your mind up?

A.   Yes.

Q.   Okay.  Now a yes requires ten or more jurors and the Judge will then sentence the Defendant to life without parole. Okay?

A.   Okay.

Q.   Have I made it sort of clear?

A.   Yes.

Q.   Okay.  A yes for a future danger and a no to sufficient mitigation, the Defendant receives the death penalty.

A.   Correct.

Q.   Okay?  Can you honestly answer those questions based on the evidence?

A.   Yes.

Q.   Okay.  Do you take this lightly?

A.   No.

Q.   Okay.  Can you honestly answer after you've found them

guilty of Capital Murder you will keep an open mind?

A. Yes.

Q. As ugly as you feel about it?

A. Yes.

Q. Will you keep an open mind and decide -- and if I don't prove to you that he is a future danger beyond a reasonable doubt, will you answer it no if I haven't proven it to you?

A. Yes.

Q. Will you answer it yes if I have proven it to you?

A. Yes.

Q. Once you've found somebody to be a future danger and a guilty Capital Murderer, guilty Capital Murderer first and a future danger, will you keep an open mind to mitigation?

A. Yes.

Q. Okay.  Because now it's getting very, very serious, isn't it?

A. Right.

Q. It's serious as you sit there, isn't it?

A. Yes.

Q. Okay.  And if you found someone guilty and a future danger, can you honestly find sufficient mitigation if it's there?

A. Yes.

Q. To spare his life?

A.    Yes.

Q.    Okay.  Let's go a little further.  So when you get in the punishment phase, is your honest feeling that there are two appropriate penalties, life without parole or the death penalty?

A.    Yes.

Q.    When you get past future danger, there still could be two appropriate penalties, life without parole or the death penalty, couldn't there?

A.    Yes.

Q.    Okay.  And you will answer based on the evidence?

A.    Yes.

Q.    Okay.  Let me go to murder.  Murder can be a man intentionally killing a man, a man intentionally killing a woman, a woman intentionally killing a woman, a woman intentionally killing a man.  Do you make any distinction, or is murder murder?

A.    It's murder.

Q.    Okay.  Let's go a little further.  Murder can be a white person intentionally killing a white person, a white person intentionally killing a black person, a black person intentionally killing a black person, a black person intentionally killing a white person, a Hispanic person intentionally killing a Hispanic person, a Hispanic person intentionally killing a white person.  Do you make any

distinction based on race, or is murder murder?

A.    Murder is murder.

Q.    Okay.  Can you judge this case based on the evidence and the law provided to you by the Court?

A.    Yes.

Q.    If you were governor for a day and you had the ability to end the death penalty in Texas, would you?

A.    No.

Q.    Okay.  Do you believe that there are some rare circumstances where it's warranted?

A.    Yes.

Q.    Okay.  Now in answering the questionnaire, you're the wife of a police officer.

A.    I am.

Q.    Okay.  Can you separate that and not have any feelings that are based on the fact that your husband is a police officer?  Can you judge it based on the evidence?

A.    Yes.

Q.    Okay.  Let me go to page 18, for a minute, of your questionnaire.

You know we gave you these questionnaires, and you get it cold.

A.    Right.

Q.    It's really not fair.  You don't know any of the circumstances.

A. Right.

Q. But we're not allowed to tell you. So then I ask you have you answered these questions that I've asked you so far, Ms. Cooper, based on your honest feelings?

A. Yes.

Q. Okay. I'm not putting words in your mouth?

A. No.

Q. Okay. Page 18, Number 100. When you talk about your feelings on the death penalty you said, It makes more sense than sending someone to prison for life without parole so they can spend 30 years in prison only to die there.

A. And I've had a lot of time to consider these questions; but in respect to that particular question, if you know beyond a reasonable doubt that someone is guilty and there aren't mitigating circumstances sufficient, then I believe the death penalty is warranted. But if there is doubt and you're unsure, I think it would be unfair to send someone to the death penalty.

Q. Okay. So let's go a little further. Let's say there is no doubt. He's a guilty Capital Murderer. No extenuating circumstances. Okay?

A. Right.

Q. Because when you found him guilty, there is no extenuating circumstances. Innocent victim, didn't provoke anything. Can you still keep an open mind?

A. Yes.

Q. Okay. Let me go a little further. Because you said -- when you said there is no doubt. Because there will be no doubt when you find someone guilty of Capital Murder. I've proven it to you beyond a reasonable doubt there.

A. Right.

MS. CONN: Objection. The test is beyond a reasonable doubt, not beyond no doubt. I heard Ms. Yenne say something about there will be no doubt.

MS. YENNE: I'll rephrase it.

Q. (BY MS. YENNE) All right. So somebody is guilty of Capital Murder. My question for you is if they are guilty of Capital Murder -- no justification, no excuse, innocent victim, no provocation, no doubt in your mind they did it -- can you still keep an open mind when you go into punishment as to life without parole or the death penalty?

A. Yes.

Q. Okay. That's what I wanted to clarify. And so it's not going to feel good.

A. Right.

Q. It's not a feel-good crime. You're going to have a completely and totally innocent victim. Unprovoked. No insanity. No self-defense because they would have been acquitted by that.

A. Right.

Q.   And like you said, at the time you answered the question -- and a lot of people said, well, that's not exactly what I meant.

A.   Right.

Q.   You've handed this to us cold.

Now that I've explained the process to you, is it a fair process?

A.   Yes.

Q.   Okay.  Is it one that you will follow?

A.   Yes.

Q.   But let me go a little further on your answers then. You're going to feel pretty bad that somebody committed a Capital Murder, aren't you?

A.   Absolutely.

Q.   Okay.

THE COURT:  You have 10 minutes.

Q.   And let's say it's no doubt in your mind that they committed a Capital Murder.  Are there still two appropriate penalties?  Life without parole, depending if there is mitigation, sufficient mitigation?

A.   Yes.

Q.   And the death penalty?

A.   Yes.

Q.   Depending on the facts?

A.   Yes.

Q.   So the fact that you've convicted someone of Capital Murder, you haven't made up your mind as if there is only one appropriate penalty because the legislature says there is two.

A.   Right.

Q.   Okay.  Is that what you believe?

A.   Yes.

Q.   Okay.  Given the fact that we're talking about executing that man over there --

A.   Yes.

Q.   -- graveyard death, do you take this serious?

A.   Absolutely.

MS. CONN:  I'm sorry.  I didn't understand the word, Your Honor.

MS. YENNE:  Graveyard death?  We're talking about executing him.

Q.   (BY MS. YENNE)  Do you take this seriously?

A.   Yes, I do.

Q.   All right.  Let's go a little further.  Do you believe that sometimes the death penalty is a deterrent?

A.   Yes.

Q.   Okay.  So let's say you convicted someone of Capital Murder.  You've told me that there are two appropriate penalties, even though it's the most horrendous crime in the world and there's no excuse for it.  Is that what you believe?

A.   Yes.

Q.    Okay.  Do you think that this is a fair punishment scheme where someone's life is in their hands?

A.    Yes, I do.

Q.    Okay.  So let's say then you've found him to be a future danger, that I have proven that to you beyond a reasonable doubt that there is a probability that he would commit criminal acts of violence that constitute a continuing threat to society.  There are still two appropriate penalties, are there not?

A.    Right.

Q.    Life without parole and the death penalty.

A.    Yes.

Q.    Okay.  So once you've found him to be a future danger and a guilty Capital Murderer -- guilty Capital Murderer first, future danger -- will you still keep an open mind and listen to all the evidence to see if there is sufficient mitigation?

A.    Yes.

Q.    Is that really the way you feel?

A.    Yes.  It's the only fair way to be.

Q.    Okay.  And could you do that fairly?

A.    Yes.

Q.    And I guess what I'm trying to find out is there is no good kind of murder, no good kind of capital, is there?

A.    No.

Q.    Based on the crime, would you just automatically make

up your mind one way or the other and find a way to justify it?

A. No.

Q. Okay. Is this process important?

A. Yes.

Q. Okay. So you're telling me that after somebody would be convicted of Capital Murder, that as bad as you felt, there are two appropriate penalties, life without parole or the death penalty, depending on the facts?

A. Yes.

Q. And after you convicted someone of Capital Murder and found them to be a future danger -- I had to prove that to you, right?

A. Right.

Q. That there is still two appropriate penalties, life without parole and the death penalty?

A. Yes.

Q. Because there could be sufficient mitigation?

A. Yes.

Q. Okay. Would you keep an open mind to that and consider and give it effect?

A. Yes.

Q. Mitigation?

A. Yes.

Q. And could you be fair if you sat on this jury?

A. Yes.

Q.   Would you take it seriously and concentrate on this case?

A.   I would.

Q.   Okay.

          MS. YENNE:  Pass the juror.

          THE COURT:  Ms. Conn?

                    **VOIR DIRE CROSS-EXAMINATION**

**BY MS. CONN:**

Q.   Ms. Cooper, my name is Mary Conn.  This is Kerri Mallon.  This is my client, James Harris.  We have a couple other lawyers in the room.

A.   Yes.

Q.   I heard Ms. Yenne say at least 30 times, can you be fair?

A.   Yes.

Q.   And we talked about being fair is real important.

A.   Yes.

Q.   Or at least Ms. Yenne wants you to keep saying yes to that answer -- to that question.  Is that right?

          MS. YENNE:  Objection.  Sidebar comment, Judge.

          THE COURT:  Sustained.

Q.   Ms. Yenne asked you repeatedly, could you be fair?

A.   That's correct.

Q.   And she also used the word "serious."  In other words, you take this real seriously?

A.    I do.

Q.    Okay.  You also heard can you keep an open mind?

A.    Yes.

Q.    And you heard that about 30 times or more?

A.    Correct.

Q.    What does that mean to you, an open mind?

A.    To be able to consider all the evidence presented from both sides or -- well, she has the burden of proof; but to listen to all the information presented by both sides and to consider everything before making the decision.

Q.    And do you have other circumstances in your life other than a trial, for example, where you want to keep an open mind?

A.    Yes.

Q.    Like do you have a daughter?

A.    I have a daughter, yes.

Q.    So when she tells you something, do you want -- and it doesn't sound right, do you want to keep an open mind?

A.    Sure.

Q.    But when she does that -- and I have college kids myself, so I am kind of relating to this as a mom.  But when the kid says something and it just doesn't sound right, you want to keep an open mind, right?

A.    Right.

Q.    But you also kind of have an idea of what really happened and what the real truth is.  Is that fair?

A. Yes.

Q. Our purpose in being here this afternoon -- Ms. Yenne has the burden of proof -- she gave you a lot of law. For the most part we believe that was correct statements of the law. My interest here is to try to find out how you feel about things. So I'm less interested in getting those short yes answers from you than I am in just trying to kind of elicit how you really feel about things. Okay?

A. Okay.

Q. So one of the things we've talked about, or she talked about a little bit, is your husband is a police officer.

A. That's true.

Q. So a question that I have -- and frankly, you know, my client's life is at stake here.

A. Right.

Q. We're talking about a Capital Murder, so I think you can reasonably presume that somebody is deceased here.

A. Sure.

Q. But my concern is that my client get a fair trial and that the State get a fair trial.

A. Right.

Q. And you understand that the State has the burden of proof, and you probably heard some of that over the time that you've been married.

A. Yes.

Q.    You've heard a little bit about cases, the burden of proof, and what people will do to get somebody acquitted and what somebody else will do to get somebody convicted.  You've heard that kind of stuff?

A.    Somewhat.

Q.    What is your attitude on a sliding scale, I guess is one way to ask it, of the credibility of the police officers? Like do you think that they are more likely than not to not maybe tell the whole truth or maybe fabricate a little bit to get the result that they believe is justified in testifying in court?

A.    Okay.  Well, from things that I have seen on television I know that there are plenty of police officers, good and bad, and some choose to take the wrong road and not follow the law and some do choose to follow every aspect of the law because they want justice served.

My husband is very much by the book kind of a person.  I have ridden with him on shifts before.  He's a very much by the book kind of a person, and he doesn't take unnecessary risks or put people who he has arrested in position of being abused by law enforcement or anything like that.  So there are good and bad in any profession, and I recognize that.

Q.    And so you've seen that from your own life and your personal experience as well as what you've seen on TV?

A.    Yes.

Q.    And, you know, you answered a question about the credibility of the witnesses; but do you believe that a police officer may have a little bit of an edge with you?  Do you believe that maybe you can tell whether or not they are telling the truth as opposed to some other witness?

A.    I would hope so.

Q.    And you believe that you can tell personally whether or not they are telling the truth or not more than maybe you could with some other kind of witness?

A.    I don't know if it would be more, but I would hope that I would be able to tell or discern whether they were telling the truth or not.

Q.    Several questions -- several answers in your questionnaire were of interest to me.  One is I want to know how you know Ted Poe.

A.    Well, I don't know him personally; but I do more remember some of the judgments and things that he's passed and his conservative viewpoints.

Q.    Was Toothbrush Ted, right?

A.    I don't know that I've ever heard of him referred to that way before.

Q.    He used to do that.  He used to tell people when they came back to his court they better bring a toothbrush.

A.    Oh.

Q.    And there is a Question No. 28.  You said -- and I'm

jumping here a little bit.  That's on page 5.  It says:  Is there any reason, be it your health, occupation, et cetera, that you may feel would cause you to be unable to serve?  And you circled yes.

And then back on page 29 you said you didn't want to be a juror and you said -- list anything you believe the Court and the lawyers should know about yourself.  That's Number 161.

A.    What was the second one?

Q.    I'm sorry.  Page 29, and it's Number 161.  And please stop me if I move too -- talk too fast because I tend to do that.

A.    Okay.

Q.    You said that being on a jury for several weeks seems really overwhelming.  You said you're going -- I'm going to school, working full-time, coordinating and managing a magnet school with over 450 students, and taking care of my own family.  Being on a jury for several weeks seems really overwhelming.

Has anything about that statement changed?

A.    No.

Q.    So you really don't want to be on this jury?

A.    As much as I would like to do my duty, it is very overwhelming to me to consider.

Q.    And is it fair to say that you're going to be thinking

about your other obligations and maybe even working -- if you have a break like a lunch break, you're going to be checking with family, checking with your work, checking with the school. Is that fair?

A.   Most likely, yes.

Q.   Are you going to be a little distracted during the trial, perhaps?

A.   I don't know that I would be distracted during the trial itself, but I am the only person at my school.  I coordinate a magnet school.  I'm the only person who does the job I do.  So I would be probably somewhat preoccupied at least on breaks or recesses to accomplish what I need to.

Q.   And I appreciate that.  Because it is quite a burden. I mean, it's a big commitment, time commitment, and a focus commitment.

And as Mr. Harris sits here, we've already established that's he's innocent as he sits here.  So he's not guilty.

A.   That's correct.

Q.   So we want to be sure, with that concept of being fair, that he gets a fair trial.

A.   Absolutely.

Q.   Is that right?

A.   Yes.

Q.   And you would want him to have your full attention?

A.    Yes.

Q.    And you're basically saying that you don't -- not sure you can apply that?

A.    That's true.

Q.    Would your other obligations in life, which I appreciate and respect, honestly, would that substantially impair your duties as a juror in the case?

A.    No.  I mean, because I'm assuming what you're asking is would that make me more likely to find him guilty; and no, that would not be the case.

Q.    And thank you.  That was a real reasonable inference from what I said.  No, I'm asking you really just would you find that these -- that your other duties would substantially impair?  In other words, would you be distracted?  Would you become, perhaps, quick to make a decision?  Less thoughtful or whatever that means to you, that you will be impaired in some way in serving as a juror?

A.    No.  If I was asked to serve, I would do what was asked of me and consider everything.

Q.    So you'd set aside your occupation and your family and other things that you mentioned here in the questionnaire?

A.    Yes.

Q.    All right.  You said -- a little bit later you said something about -- Ms. Yenne asked you about page 18, Question 100.  You said now that you've had some time to think

about the questions.  Because I know you came to the general voir dire and you were perhaps surprised by that questionnaire.  Is that fair?

**A.**   Yes, I was surprised by it; but I was also -- I've never sat on a criminal jury before.  And, I mean, I know why the questions were asked and I understand that; but maybe my preliminary feelings about, you know, just the death penalty or whatever, I've, you know, had more of an opportunity to consider my thoughts on the option of life without parole versus the death penalty.

**Q.**   And have you had an opportunity to talk with your husband about that this is a Capital Murder jury?

**A.**   We talked about that it was a Capital Murder jury, but I have not discussed anything detailed with anyone else.

**Q.**   Well, you didn't really know anything about it, right?

**A.**   Right.  But not even -- not even Mr. Harris.  I haven't even mentioned his name.

**Q.**   Okay.  But you and your husband did have a chance to talk about -- did you talk about the questionnaire at all?

**A.**   No, not really.

**Q.**   But you did talk about that it was a Capital Murder case?

**A.**   Yes.

**Q.**   And can you tell me something more about what y'all discussed?

A.    Well, in the questionnaire I mentioned that he would probably be more -- his idea would be more harsh, but I didn't even ask him because it -- because I didn't want to know.

Q.    And y'all --

A.    I just didn't want to know.

Q.    And y'all had not previously talked about the death penalty or Capital Murder or anything?

A.    No.

MS. CONN:  Judge, may I approach?  Well, Judge, the bottom of page 6 is cut off in my version; and I'd like just --

THE COURT:  You may look at the original.

MS. CONN:  Thank you.

Q.    (BY MS. CONN)  Thank you.

A.    Uh-huh.

Q.    I just didn't want to miss anything that you said was important there, and I read that that says that your husband -- or that your cousin is currently employed by the -- as a police officer?

A.    That's true.

Q.    And that was just cut off on my Xeroxed copy.

One jury that you served on was a traffic -- you were in a traffic case and then you were in a civil case?

A.    That's correct.

Q.    What was the civil case about?

A.   It was like a personal injury kind of a thing between HEB and a lady who was mugged in their parking lot.

Q.   Were criminal charges filed in that case?  Do you know?

A.   I don't think so.  I don't know that they ever found the person who mugged her.

Q.   And they'd have to be -- they certainly would have to be found to be charged, wouldn't they?

A.   Yes.

Q.   You said that -- sorry.  You said that -- now, again, back to Question 100 and that little series there, you said now, you know, you've considered more carefully the questionnaire.  I understood you to say -- and correct me if I'm wrong -- that you think deterrence is an important factor in deciding how someone is sentenced.  In other words, you believe the death penalty is important as a deterrent?

A.   Yes.

Q.   You said specifically, One would hope it would be a deterrent to those who would commit crimes that would result in the death penalty sentence.

A.   That's true.

Q.   And that's your belief?

A.   Can you tell me what question that was?

Q.   That's Number 101.

A.   Okay.  Yes.  I mean, I would hope that if someone were

going to commit a crime that if they knew that the death penalty was an option of punishment, that that might deter them from committing the crime.

Q.   Sure.  And a lot of people feel that way.  And that would be in considering what punishment is appropriate, you would consider that factor.  Is that right?

A.   Yes.

Q.   And then Question No. 100 you said, It makes more sense -- talking about the death penalty.  It makes more sense than sending someone to prison for life without parole so they can spend 30 years in prison only to die there.

A.   Well, and to clarify, if you found someone guilty beyond a reasonable doubt, then it seems more humane to give them the death penalty than it does to just give them life without parole, although I would consider both options based on the information presented.

Q.   Sure.  And you said -- actually, to tag on to that a little bit, you said -- and you still believe that?  You still think it's better -- that it's more compassionate in some ways to give somebody a death sentence than to give them a life sentence.  Is that right?

A.   Yes.

Q.   And you think it's an economical --

MS. YENNE:  I object.  I think it was life without parole sentence.

Q.    Life without parole.

A.    Yes.

Q.    Okay.  When I said life, you understood I meant life without parole?

A.    Yes.

Q.    And you understand that life without parole means there really is only one sentence here in this kind of case, if you'll bear with me my entire thought.  It's either a death sentence by killing or it's a death sentence by dying in prison.

A.    Yes.

Q.    But there is no way somebody who is found guilty of Capital Murder is going to walk away from prison.

A.    True.

Q.    Do you understand that?

A.    Yes.

Q.    Okay.  You did say -- in Number 102 the question was: Do you think the death penalty in Texas is used too often or too seldom?  Is that still -- and you said you weren't sure. Do you have any -- have you changed your mind about that?

A.    I think that probably the media feels like in Texas we use the death penalty too often, but I don't really follow it that closely to know if we really do or not.

Q.    And that's fine.  And, again, I'm trying to find out what really -- how you feel about things and what you think and

not so much --

A.    Sure.

Q.    -- anything.  I'm not trying to elicit, you know, opinions or facts from you or other than how you feel and how you think.

A.    Sure.

Q.    You said, I do think convicted murderers, where the evidence is definite, should not be given life without parole sentences.  And then you said, See Number 100.

So you think that's -- you think when you've got definite evidence -- or excuse me -- definitive evidence, you think that convicted murderers should not be given life without parole?

A.    Well, again, I mean, it was helpful to see the grid today just to see what the different pieces were.  Because I don't know that I was aware of all that when I was filling out the questionnaire.  I could still consider both options and listen to all the evidence and information.

Q.    Yes.  And I'm not implying in any way your ability to think and consider and be fair and all that.

A.    But I do think it's more humane that -- if it's beyond a reasonable doubt and someone has been convicted of Capital Murder, it still seems more humane to me to give the death penalty.  But I'm not going to, you know, make that judgment before I've heard everything.

Q.    If you do believe that -- let me just ask another question.  You said -- what is your best argument for the death penalty?  And you said, If there's definitive proof that the Defendant took a life, I feel that he or she should pay with his own life.

A.    Yes.

Q.    And that's your belief?

A.    Yes.

Q.    And as I understood, you would consider life without possibility of parole and you would consider death; but you believe that's the appropriate remedy?

A.    Yes.

Q.    All right.  What's your best argument against the death penalty?  You said, If evidence is not definitive and there is any chance the individual is innocent, I would argue against it.

A.    Yes.

Q.    In other words, you don't want somebody to come back after they are executed and a lawyer or somebody find out that that person was actually innocent?

A.    That's correct.

Q.    Okay.  So you'd want -- but that's your main reason against the death penalty?

A.    Right.

Q.    On Question 105, the same page, Ms. Cooper, you

said -- you checked -- excuse me.  The question is:  Check the one statement that best summarizes your general views.

You checked the fourth one down, which is, I am in favor of capital punishment, except in a few cases where it may not be appropriate.

A.   Well, and I think that would go back to what we were just discussing, that if there was any doubt or, as was pointed out earlier, sufficient mitigating circumstances, that I might not be focused on giving the death penalty but on life without parole in such a situation.

Q.   So if there is doubt in the case, if there is doubt as to say whether the person may actually -- may be innocent, then you don't -- then you're not going to give them the death penalty?

MS. YENNE:  Your Honor, I'm going to object to the form of question as implying that's her only answer.  It's a bifurcated answer.

THE COURT:  Your objection is bifurcated question?

MS. YENNE:  Yes, sir, suggesting that the response is only one way.

THE COURT:  All right.  Sustain the objection. Just rephrase your question.

Q.   (BY MS. CONN)  Ms. Cooper, I understood you to say that -- well, why don't you -- do you mind saying what you just

said? Because I was just trying to understand what you said.

A. If someone is convicted of Capital Murder and it's beyond a reasonable doubt, then I think the death penalty is justified. But if there is, I think, any mitigating -- sufficient mitigating circumstances or -- I think you said that there had to be ten or more in the number one special case and in order -- can you go back to the grid?

MS. CONN: May I respond?

THE COURT: Just go ahead and finish your question.

A. Okay. Well, in my mind if there is some doubt, I mean, his life is at stake; and so I don't just want to send someone to the lethal injection if there is any doubts, is what I'm getting at.

Q. So if there is any reasonable doubt in the case -- if there is some doubt in your mind as to whether or not he's guilty, you're going to at that point give him life without possibility of parole rather than death. Is that fair?

A. Yes.

Q. I also notice on the next page on Question 108 it says: Do you believe the death penalty should be used for other crimes? You said -- there your response was yes.

And you said -- if yes, which one? You said, It should be considered for all types of murder convictions.

And that's your personal belief. Is that right?

A. Yes.

Q. So I think that sort of ties back to what you said earlier in your questionnaire that -- you said, basically, if you kill somebody, you get killed. And that is a very valid, very normal -- lots of people feel exactly that way. You know, it's sort of -- it goes back to the Bible, the eye for an eye thing. You kill somebody, you die.

MS. YENNE: Your Honor, I'm going to object to the form of question as a misstatement of what the juror said before.

THE COURT: Sustained.

Q. (BY MS. CONN) So you have said -- in your questionnaire you've made a couple of references that, you know, people -- crime is bad because people are not following God's law, basically.

A. Right.

Q. And I'm taking you back to your Question No. 103. You said, If there is definite proof the Defendant took a life, then he or she should pay with his or her own life.

And that's what you said in your questionnaire?

A. That is what I said.

Q. And my understanding of that is that based on your beliefs about God and I'm assuming the Bible --

A. Right.

Q. -- that part of that is -- belief is based on the law,

this biblical law that -- you know, an eye for an eye?

A.   Right.

Q.   If you kill somebody, then you pay with your own life?

A.   Right.

Q.   And that would be the normal sort of punishment -- or the normal sort of a first response in your belief system?

A.   It would be my first response, but I'm not an attorney and not completely skilled in the nuances of the law.  So I mean, I feel like I could, you know, when the law is presented to me and if I were asked to consider options, I could follow it.

Q.   Okay.  If somebody asked you to violate your own conscience and to do something that's opposed to what you truly believe, how can you do that?

A.   When I was answering that question, really the kind of things that were running through my mind are, you know, if someone that I loved was killed or someone that I knew was killed; and that always is much more personal than -- unfortunately, it's more personal than, you know, just another individual in your hometown or whatever.

The Bible says an eye for an eye, but it also -- you know, Jesus also said if someone strikes you once, then turn the other cheek, too.  So I think I could consider all the options in front of me and really weigh the information before making a judgment on someone else's punishment.

Q.    So you think you can do that?

A.    Yes.

Q.    Okay.  I wanted to clear something up that -- again, Ms. Yenne did a reasonably good job of describing the law; but I wanted to be real clear on what she calls the grid.  And I'm sorry because our power point is not operating that well today, but there is a -- you know, a juror, to reach a death penalty, it has to reach a unanimous verdict three times.

A.    Yes.

Q.    They have to unanimously decide on guilt.  If they don't get there, then there is no punishment.

A.    Correct.

Q.    They have to unanimously decide beyond a reasonable doubt that there is a future danger.  That answer has to be unanimous.

A.    Yes.

Q.    And they have to -- there has to be an answer that there is no mitigation and there is no Special Issue No. 2 to reach a death sentence.  Do you understand that?

A.    Yes.

Q.    So the numbers -- we talk about 10 of this and 12 of that and whatever.  I just wanted to make sure you understand that piece of law.

A.    Yes.

Q.    All right.  You know, there is no definition for the

word consider, and so I wanted to just see what -- you said that you would consider -- when you were talking about -- we were talking about one eyewitness and proof beyond a reasonable doubt and if you believe that witness you said yes, you can do that. And then Ms. Yenne went on to talk about the range of punishment. You said you could consider the full range of punishment. There is no definition of that. Do you understand what that means? Excuse me. My question is what does consider mean to you?

A.   To weigh both options in light of the information that's been presented.

Q.   All right. And to weigh both options. Okay. So if you consider -- you know, there is a whole long list of things that might be mitigating factors that Ms. Yenne gave you. And that's, you know, obviously a partial list. The law says anything -- you can consider the fact that someone is black or the fact that someone is wearing a blue shirt. The fact of anything can be mitigating to you or not.

A.   Right.

Q.   So that's certainly not an exhaustive list, but you said you could consider those things. In that sense, what does consider mean?

A.   I'm not exactly sure how to put this into words.

Q.   I'm sorry?

A.   Well, seriously evaluate. That's what I would say

consider would mean, to seriously evaluate.

Q.   And you know the mitigation, that second issue, the second Special Issue that's actually here on the board, you have to consider and give effect.  And I wonder what the word "give effect" means to you?

A.   Can you repeat your question?

Q.   Yes, ma'am.  The issue as stated -- the Special Issue is stated in this way that's on the board that you saw previously, the same exact words.  But the law says you have to consider and give effect.  In other words, it's not a matter of -- if I say, Ms. Cooper, please consider setting your hair on fire and running around the room, you might consider that.

Now you have that thought in your head so you're thinking about it, right?

A.   Yes.

Q.   It's sort of like the pink elephant.  Don't think about the pink elephant.  What do you think about?

A.   Right.

Q.   So you're considering it, but you're not going to give it full effect.  In other words, you're not going to look for a match to light your hair on fire when I say -- if I were to make some remark like that.

A.   Right.

Q.   So you're not giving full effect to it.

A.   Okay.

MS. YENNE: Object to full effect. Object to the form of the question.

THE COURT: Sustained.

Q. (BY MS. CONN) You're not going to give effect to that?

A. Okay.

Q. I want to ask you a hypothetical question. So can you just go with me on a hypothetical?

A. Yes.

Q. This is not as much as -- it's not this case. It's not disguised -- this case is not being disguised. This is really just a hypothetical question.

I'd like you to consider that you sat as a juror on a different Capital Murder case and you know that -- and the Judge instructs you that Capital Murder is an intentional murder where it was the Defendant's conscience desire to kill and the Defendant accomplished that desire along with some other serious crime. Like, for example, one of the things Ms. Yenne mentioned was killing a police officer. You know that could be a Capital Murder.

A. Right.

Q. So you and the 11 other jurors heard all the evidence and decided beyond a reasonable doubt that the Defendant in that case intentionally or knowingly killed --

MS. YENNE: Objection. Not knowingly.

MS. CONN:  I'm sorry.

Q.    Intentionally killed an innocent victim who did not deserve to die.  Are you with me?

A.    Yes.

Q.    And in that case there was no -- you found that there was no self-defense.  There was no defense of another person.  There was no defense of property.  It was not a mistake.  It was not an accident.  The Defendant in that case was not forced to commit the murder.  Nobody made him do it.  And the victim did not provoke the Defendant, nor did the victim deserve to die.  You had an innocent victim.

A.    Okay.

Q.    So are you following me?

A.    Yes.

Q.    All right.  Despite whatever evidence you heard concerning those defenses, you and 11 other jurors decided beyond a reasonable doubt that the Defendant acted intentionally and he knew what he was doing.  He meant to do it.

A.    Okay.

Q.    Just a senseless, cold-blooded killing.  And, further, you found that there was -- that no matter what evidence you might have heard or not, you found that the Defendant was not insane, he was not mentally retarded, and it was a murder in which the Defendant was able to form the specific intent or

conscious desire to commit the murder and did so.

A. Okay.

Q. You also found that he wasn't so drunk that he couldn't act intentionally or he wasn't so high on drugs that he couldn't act intentionally.

A. Okay.

Q. So no -- there was no -- he has no -- one way to say it is he has no defenses. No defenses and no other circumstances. It was just plain-vanilla, cold-blooded killing.

A. Right.

Q. Assume that you and the 11 other jurors all agreed beyond a reasonable doubt that all that's true. I'm going to ask you about your feelings. What are your feelings in that hypothetical about the death penalty being the only appropriate remedy for that guilty murderer?

MS. YENNE: I'm going to object to the form of the question. It's an improper commitment to an improper hypothetical, injecting a police officer and being the only appropriate. The question is misleading as to the options available. Object.

MS. CONN: May we approach, Your Honor?

THE COURT: You may.

**(The following discussion was held at the bench.)**

THE COURT: We're at a bench conference. The

venire person cannot hear.

MS. YENNE:  The State is going to object that is an improper hypothetical, improper commitment.  It adds a factor -- a specific police officer factor, knowing that this juror's husband is a police officer, and suggests once again what has been attempted to be suggested to every juror, that there is only one appropriate penalty.  What are your feelings?  It is a unique creative hypothetical; but it suggests, based on emotions in an improper hypothetical, that there is only one appropriate penalty.  I would object to this continuous form of this question.

THE COURT:  Ms. Conn?

MS. CONN:  Your Honor, it was a proper question under Standefer v. State and Cardenas v. State.  And you have the cases, I believe, Your Honor; and if you don't, I'd be happy to provide them again.  It was a proper question under the 5th, 6th, 8th, and 14th Amendments.  An instruction from the Court to not allow me to ask that question denies effective assistance of counsel to my client, it denies his rights to be heard under the Texas Constitution and, again, violates Standefer and Cardenas.

It is the -- I was very careful to say what are your feelings about this issue?  This is not wouldn't you agree?  I counted no less than 30 or more times Ms. Yenne said wouldn't you agree with this?  Wouldn't you agree with that?

So I'm not asking would she agree on this.  I'm not committing her at all.  I am asking her what her feelings are, and that's the way I asked the question.  I was very careful to approach it in that respect.

It's Morgan versus Illinois and Standefer and Cardenas versus State.  The law is, Your Honor, that a commitment question is proper if one of the possible answers gives rise to a challenge for cause; and automatic death penalty is a possible answer to this question.  Then it's proper.  It contains no unnecessary facts and tracks the penal code elements and the defenses.

Ms. Yenne herself gave a homicide of a police officer as a death penalty as a Capital Murder, and I'm certainly entitled to use the same example she used.

MS. YENNE:  And we don't believe that "what are your feelings" is an appropriate mechanism to arrive at a challenge for cause.  Yet this is what defense counsel is attempting to do by what are your feelings questions; and therefore, it is improper.  And the manner in which they are doing it.

THE COURT:  Okay.  I think that I understand under Standefer -- you know, not all open-ended questions are -- I mean, open-ended questions can be commitment questions.  And I think it is misleading in the example of the officer, so I'm going to sustain the objection to the way the

question was asked.

MS. CONN:  Does the Court have a recommendation as to how I can ask the question that would be non-objectionable?

THE COURT:  I can't.  I can't give you suggestions on how to ask them.

MS. CONN:  I'd like to make a bill.

THE COURT:  Okay.

**(Bench discussion concluded.)**

Q.   (BY MS. CONN)  Thank you for your patience.  I ask you to look further back at Number 157.  That would be page 29.

A.   Okay.

Q.   You said -- the question is:  Do you believe that the death penalty should be a possible punishment for someone who participated in the crime but who did not personally do the actual killing?

And you said yes.  And you explained, If someone helped plan the crime and/or helped acquire the means for the killing, they should also be held responsible and they should also get the death penalty.

Is that your feeling?

A.   Yes.

Q.   You said further -- you told Ms. Yenne that if there was doubt in the case, that it would be unfair to send someone to the death penalty.  Is that right?

**A.**   Yes.

**Q.**   My sense of this is that you feel that there is a -- that you have a serious responsibility to follow the process in the case.  Is that fair?

**A.**   That's true, yes.

**Q.**   And after you find someone guilty of Capital Murder, you're going to carefully consider the evidence as required when you consider Special Issue No. 1, which we call the future danger question, right?

**A.**   Right.

**Q.**   And you're going to carefully consider the evidence in the trial and any additional evidence that's brought in that part.  Is that fair?

**A.**   That's fair.

**Q.**   And it's important to go through this process before you find -- before you give somebody the death penalty.

**A.**   Right.

**Q.**   Back to my hypothetical, with a little different twist.  Again, you and 11 other people have found somebody guilty of Capital Murder beyond a reasonable doubt and there were no self-defense or defense of others.  There was no mental illness or mental retardation.  There was no defense of property, no mistake, no accident.  No one forced the Defendant to commit the murder.  The victim didn't provoke the murder or deserve to die.  All right?

A.   Okay.

Q.   There is no insanity.  We said that.  And the Defendant was able to form the specific intent.  You found that person guilty beyond a reasonable doubt.

A.   Yes.

Q.   Then you found -- you answered this question, which is based -- you know, you found that beyond a reasonable doubt that there was a probability that that defendant, that hypothetical defendant, will commit criminal acts of violence, in other words, plural acts of violence, that will constitute a continuing threat to society.

A.   Okay.

Q.   And you found that beyond a reasonable doubt.  At that point are you -- in your own belief system, are you -- can you honestly consider somebody who is that awful, that there may be some mitigation?

A.   Yes.

Q.   Do you believe, Ms. Cooper, that some segments of the society or some groups of people or some -- I mean, honestly, we can talk now about even some religions that are so sort of against our normal way of life, against law or against doing what we're supposed to do as we go through our lives, that they are prone to be lawless, to be -- you know, to not follow the law, to be criminals, to be murderers or to be -- just criminals of whatever.  Do you believe that?

MS. YENNE:  Your Honor, I'm going to object to the form of the question.  Improper commitment question.

THE COURT:  Sustained.

MS. CONN:  May I ask another question, Your Honor?

Q.    (BY MS. CONN)  Do you believe that there are groups of people that are sort of predisposed toward criminal behavior?

A.    No.

Q.    Ms. Cooper, I understood earlier that you said it would be actually difficult or hard or something along those lines -- and I don't have that exact wording.  I'm not finding it -- for you to give a life sentence to somebody that you had found guilty of Capital Murder?

A.    Yes.  But that was, again, before I considered the different phases and the different situations that have been presented.  Because, again, when answering the questionnaire, I was considering it more from my own personal -- a very personal perspective and not -- an outsider is not the right word, but just someone who I don't know.

Q.    Have you ever known anyone personally who was murdered?

A.    No.

Q.    You know, this will be real personal to Mr. Harris.

A.    Right.

Q.    And you've got an hour and a half here that you've

spent with us today getting some law and getting some --
hearing some arguments and actually being led quite a bit,
which is not a comment or a complaint about this type of voir
dire that's been done here.  We do ask you leading questions
like wouldn't you agree this?  Wouldn't you agree that?

     **A.**    Right.

     **Q.**    So you're grown.  I never like anybody to talk about
my age, and you're a lot younger than I am.  I'll just leave it
there.  But are you telling me that you've had lifelong beliefs
that are probably reflected in your questionnaire and you're
able to just set all that aside?

     **A.**    Yeah.  I would think that in the questionnaire lots of
questions were asked, even about the types of television
programs and things likes that.  And I am a fan of crime dramas
and I do watch the news, but I also think that people who play
the role of murderer in a crime drama or people who are
portrayed in the media or in a murder trial are also portrayed
in a certain way with a certain slant.  And one of the things
that gave me pause in this -- because, again, I've never sat on
a criminal jury before -- was actually having Mr. Harris in the
courtroom.  You know, you can't just walk down the street and
know if someone has committed a crime or not; and you can't
judge a book by its cover.  So it couldn't be fair to make
judgment on him until I've heard everything in the case and
then follow the law as it has been presented.

Q.    And it's really important to be fair.

A.    Yes.

Q.    And have you ever in your life -- I mean, I have; and I'm guessing that you have, too -- realized later that you were not fair?

A.    Yes.

Q.    And is that -- has that caused you -- given you pause, as we say?

A.    Yes.

Q.    And do you understand that it's -- that some cases are harder?  There are cases that I wouldn't want to sit on, honestly, as a juror, just because of my life experiences and my background.  Some cases I would be comfortable sitting on.

A.    Right.

Q.    Do you have anything like that?

A.    The whole idea of holding someone's life in your hand is not a pleasant thought.  But, I mean, if you're called to do it, then you have to do it fairly.

Q.    I'll ask you another personal question.  If you were related to Mr. Harris, hypothetically, or -- let's rephrase that.  Erase that.

          If you were related to somebody who is charged in a Capital Murder case, not Mr. Harris but some hypothetical, would you be -- would that person be safe --

          MS. YENNE:  Your Honor, I'm going to object to

improper commitment.

THE COURT: Let her finish the question.

Q. (BY MS. CONN) Would that person be safe or would you -- would they be comfortable with you sitting, knowing what your lifelong or long-held beliefs are about the death penalty, just being -- you lean toward the death penalty. Is that fair?

A. Yes.

Q. You have a leaning towards the death penalty?

A. Yes.

Q. And would it be -- I don't want to -- again, I want you to tell me what you believe. Could I call that a bias, a slight bias even?

A. Yes.

Q. Okay. Would somebody in that position be comfortable with you sitting in judgment as a juror on a case if you knew what you know about yourself?

MS. YENNE: I'm going to object to improper commitment question, Judge.

THE COURT: I'll overrule commitment.

MS. YENNE: I'm going to object to the form of the question as conflict.

MS. CONN: That's not an objection in voir dire. I object to the objection. I'm sorry.

THE COURT: Sustained. Rephrase.

Q. (By MS. CONN) Would you be comfortable -- would you

want you -- if you were charged with Capital Murder, would you want you sitting in that jury box?

A.    Yes.  Because I feel like I can be fair.

Q.    And despite your feelings about the death penalty, you can be fair?

A.    Yes.

Q.    Even though you know that your instinct is to vote for death.  Is that right?

MS. YENNE:  I'm going to object to the form of the question.  May we approach, Judge?

THE COURT:  You may.

**(The following discussion was held at the bench.)**

THE COURT:  We're at a bench conference.

What's your objection?

MS. YENNE:  I'm going to object to the form of this question.  There has been no testimony that her instinct is to vote for death, and I am objecting to her suggesting that her instinct is to vote for death.  That has not been the testimony of this prospective juror.

THE COURT:  Okay.  Just rephrase your question.

**(Bench discussion concluded.)**

THE COURT:  Ms. Conn, 9 minutes.

MS. CONN:  Thank you.

Q.    (BY MS. CONN)  Ms. Cooper, if this is -- I don't want to misstate what you said.  I don't want to misquote you, okay,

if this is not what you said.  But it's important to you to be fair, right?

    A.    Yes.

    Q.    And my concern is that you're going to be able to toss aside all your feelings and do some sort of mental calculations, some calculus, to be fair?

    A.    Yes.

    Q.    And toss aside all your feelings?

    A.    Yes.  Because I'm typically a rule follower anyway. And so when given a directive and given the options and being asked to weigh everything, I would do so.

    Q.    And you're going to be able to go home and tell your husband, in the event that you do so, that you gave a awful -- use whatever adjective you want -- man, a murderer in a Capital Murder case, a life sentence?  You could do that?

    A.    Yes.

                MS. CONN:  Pass the juror, Your Honor.

                THE COURT:  All right. Ms. Cooper, if you would step outside.  Remember all the prior instructions I gave you last week, as well as the verbal ones.  You can just leave your questionnaire there.  We'll be back with you in a few minutes.

                **(Venire person out.)**

                THE COURT:  We are continuing on the record. Counsel for the State, counsel for the defense, and the Defendant are present.  Ms. Cooper has been excused.

I will present Ms. Cooper to the State for any challenges for cause.

MS. YENNE:  None, Your Honor.

THE COURT:  Present Ms. Cooper to the defense for challenges for cause.

MS. CONN:  Your Honor, I am not prepared at this moment to do that; but I would like to make a bill before I exercise any challenge.

THE COURT:  You may.

MS. CONN:  Okay.  The question that I asked, Your Honor, that I want to have answered is I asked Ms. Cooper, assuming with me that you sat in a hypothetical death penalty case, not this case, and in that case you were instructed that Capital Murder is an intentional murder where it was the conscious desire of the defendant to kill and he accomplished that desire, along with some other serious crime, for example, a homicide of a police officer.  You and the 11 other jurors heard all the evidence and decided beyond a reasonable doubt that the defendant intentionally killed an innocent victim who did not deserve to die.

Further, in that case there was no self-defense, no defense of another person, no defense of property, it was not a mistake, it was not an accident.  The Defendant was not forced to commit the murder.  The victim did not provoke the murder or deserve to die but was innocent.  Despite whatever

evidence concerning those defenses that I just discussed you heard during that trial, you and 11 other jurors decided beyond a reasonable doubt that the defendant acted intentionally.  He knew what he was doing and he meant to do it.

Further, it was not a murder where the defendant was insane, mentally retarded or -- mentally retarded.  It was a murder where the defendant was able to form the specific intent or conscious desire to murder and did so.  The defendant was not so drunk that he couldn't act intentionally, not so high on drugs that he couldn't act intentionally, and you and 11 -- excuse me.  Despite any evidence you heard about those things, you and 11 other jurors decided beyond a reasonable doubt that the defendant acted intentionally, he knew what he was doing and he meant to do it and did it.  You and 11 other jurors all agreed beyond a reasonable doubt that he is guilty, along with all those other things that we discussed.

I'm asking about your feelings.  What are your feelings about the death penalty as the only appropriate remedy -- or excuse me, penalty -- not remedy -- for this guilty murderer?

This is a proper question under Morgan versus Illinois and under Standefer versus State and under Cardenas.  Standefer says that a commitment question is proper in the event that it is one of the possible answers -- excuse me.  That one of the possible answers to the question gives rise to

a challenge for cause. An automatic death penalty answer is a possible answer to this question in this case so, therefore, it's a proper question under Standefer.

It contained no unnecessary facts and tracked the penal code elements and the defenses. We want to ask the question pursuant to the 5th, 6th, 8th and 14th Amendments, the denial of the right to be heard under the Texas Constitution, right to effective assistance of counsel under the U.S. Constitution, Cardenas versus State and Standefer versus State.

And what I'd like to do is get the juror back and ask the question and receive an answer to my ultimate -- to my question to -- to the question at the end that has the question mark, Your Honor, if I may.

THE COURT: All right. Does that conclude your bill?

MS. CONN: Yes.

THE COURT: All right. Do you have a challenge for cause?

MS. CONN: Yes, Your Honor. May I have just a moment for that? May I have a ruling on my bill?

THE COURT: You made the bill. You requested a bill, and I gave you a bill. It's in the record.

MS. CONN: May I ask the question of the juror, Your Honor, before we go further?

THE COURT: I ruled on the question you asked

before and you asked to make a bill and you've made your bill.

MS. CONN: All right. May I have just a moment, Your Honor?

THE COURT: You may.

MS. CONN: Your Honor, if I may, initially, Your Honor, I talked with Ms. Cooper about her distractibility. She had said she did not want to sit. I know it was the very end of the questionnaire she said that she was -- Number 161 and also up earlier she talked about she would not be able to sit. She said specifically that it seems really overwhelming. She said she did not want to sit. She said she would be distracted. She said she would be thinking about her work, her obligations at home, and her responsibilities outside of the courtroom. So I believe that's a reason for her not to sit.

She said that she considered the death penalty as a deterrent, which is a factor in her applying the death penalty. I asked her that specifically, in those words, whether or not she believed it to be a factor in her consideration; and she said it was. A deterrent is not a proper reason for giving death, Your Honor, in that the Defendant in a Capital Murder case -- you know, death is different. He is entitled to an individualized sentencing based on the individual facts and the other Special Issues in this individual case. And a deterrent or a message to the community is not a proper consideration. It's not a factor for

a death penalty case.  Deterrence is not ever appropriate as a reason to give someone a death penalty.

Multiple times -- she said multiple times that the death penalty was more humane than a life sentence, which again, is a misapplication of the law.  She said specifically with regard to page, I think, 18, she said she had fleshed that out a little bit since filling out the questionnaire; but she said specifically in response to these questions on the questionnaire that the death penalty makes more sense than sending someone to prison for life without parole so they could spend 30 years in prison only to die there.  And that's Question 100 and 103 -- excuse me.

Number 102 she said, I do think convicted murderers where evidence is definitive should not be given life without parole sentences, again, and then, See Number 100, and references back to Question No. 100.

Number 103:  What is your best argument for the death penalty?  She said, If there is definitive proof that the Defendant took a life, he or she should pay with his or her own life.  I asked her if she still feels that way, and she said yes.

She said -- with regard to 104, Your Honor:  What is your best argument against the death penalty?  She said, If evidence is not definitive and there is any chance the individual is innocent, I would argue against it.  I asked her

specifically what -- would you give someone -- if there was some doubt as to their guilt, you would give them LWOP, or life without parole, and she said yes.  In other words, she is holding a person who is accused as worthy of life without possibility of parole rather than giving a death penalty to someone who is accused but not found guilty beyond a reasonable doubt.  If there is any doubt in the case, she's not going to find them not guilty.  She's going to give them life.  That's what -- that was what she said.

Then again, she said if there is any doubt, she would give them LWOP.  She said if there is some doubt she would give them LWOP.  If there is any reasonable doubt, she would give them LWOP.  We wrote those things down, Your Honor, direct quotes from this potential juror.

She believes strongly in the eye for an eye.  She did consider herself to be a religious person.  She does have a basis in her personal and religious beliefs for the death penalty.

I asked her specifically if she had -- if she leaned toward the death penalty in a Capital Murder case and she said she did.  Further, she said in her own words that she had a bias.  And I -- I'm sure the Court recalls, but I did try to pose the question in such a way that she could answer it.  And if she did not, if that was an incorrect understanding on my part that she would -- she had an opportunity to correct me;

and she said, yes, she has a bias in favor of the death penalty.

So I have a challenge for cause.

THE COURT: Response?

MS. YENNE: May I respond? I wonder if I was in the same courtroom. This prospective juror went through the sentencing phase and answered repeatedly, first of all, she could find someone not guilty if there was a reasonable doubt on phase one. She could find that person not guilty and never get to the second phase of the trial and would hold the State to its burden beyond a reasonable doubt.

Then went on to the punishment phase, and on numerous occasions -- as Ms. Conn would say, I guess I must have asked 30 times. I did ask repeatedly, once someone is found guilty, would you automatically consider one penalty or the other? No. She indicated she could consider both appropriate penalties and established very clear for the record that she would not automatically consider one sentence or the other upon the finding of guilt.

We then went very methodically through the future danger question, Special Issue No. 1; and she said even if he was guilty, no excuse, Capital Murderer, she could answer future danger no. That was clear from the record. And then said that based on the evidence if I proved it to her beyond a reasonable doubt she could answer it yes. But even if that

were the case, it wasn't over.  She would still have to consider mitigation.

This juror volunteered on questioning -- this prospective juror -- to Ms. Conn that there were some things in reflection on her questionnaire that after it was explained to her, she knew she could follow the law.  She even volunteered if there were sufficient mitigation.  This juror from the stand volunteered, I'd have to consider mitigation.

Additionally, she also said she could be fair when I asked her could you be fair?

The work-related question she actually clarified quite well that she will not be distracted during this trial.  She would be distracted during a recess to address her job, which is what every other juror does on a recess.  They take a break and they address their other responsibilities.  But that she could be fair and fairly weigh the evidence.

When she was asked by counsel -- when bias was suggested by counsel -- not by the juror -- when she was asked, would you want you as a juror, knowing your beliefs, she said yes.  This juror, prospective juror, was humble, took the process serious, said having the Defendant in the courtroom made her realize it and she could be fair.

MS. CONN:  May I respond briefly?

THE COURT:  You may.

MS. CONN:  Thank you, Your Honor.  The Defendant

is entitled to jurors who are free from bias, Morgan versus Illinois, United States versus Cornell at 25 Fed. Case 650.

General questions, Your Honor, generally do not comport with Morgan versus Illinois. Questions such as you can follow the law; you can be fair, can't you; and you can follow the Court's instructions are insufficient to provide the kind of test that the juror is expected to have here. We're not saying this is not a very nice person, Your Honor. We're saying that she's unable to follow the law based on her bias toward the death penalty.

I have another -- well, to quote it directly is: These general questions "you can be fair" are unable to detect those jurors with views preventing or substantially impairing their duties in accord with their instructions and their oath.

THE COURT: All right. As I recall, that question was by you and it was a question something like, Do you have a slight bias? And I think throughout all of her questioning I think that she made it very clear that she could consider everything, especially in your question -- that Ms. Yenne objected to, but I allowed her to answer it -- that she felt she would feel comfortable with a person like herself on the jury if it was one of her loved ones on trial.

And I think judging by all of the answers and the way she dealt with the questionnaire, the Court believes that she could be fair, and that given the totality of the answers,

I'm not going to grant your challenges for cause.

Does the State have a peremptory you wish to exercise?

MS. YENNE:  No, Your Honor.

THE COURT:  Does the defense have a peremptory you wish to exercise?

MS. CONN:  Yes, Your Honor.

THE COURT:  Defense exercises Peremptory No. 6.

Could you have Ms. Cooper come back in?

**(Venire person in.)**

THE COURT:  We're continuing on the record.  The record will reflect that counsel for the State, counsel for defense, and the Defendant are present.  Ms. Cooper has reentered the courtroom.

Ms. Cooper, I want to thank you very much for participating in the jury selection process.  I will excuse you at this time from further consideration on the panel.  However, before I do that, I would like to instruct you to follow all the instructions that I previously gave you.  Remember I gave you long written ones as well as some verbal ones?

VENIRE PERSON:  Yes, sir.

THE COURT:  All right.  The only exception to that is since you will not sit on this jury if you -- if we have media publicity and you choose to follow it, you would be free to follow that.

THE COURT:  Okay.  And you've been doing very well about giving very clear and audible responses.  Sometimes we have people that want to nod their head or say uh-huh or something like that.  That just makes it difficult for the court reporter and record.  So if you can just continue to give the verbal audible responses that you're doing, that will make things go better.  Can you do that for me?

VENIRE PERSON:  Yes, sir.

THE COURT:  All right.  You may begin.

**BRENDA LEE**,

having been first duly sworn, testified as follows:

**VOIR DIRE DIRECT EXAMINATION**

**BY MS. YENNE:**

Q.   Good morning, Ms. Lee.  How are you?

A.   I'm fine, thank you.

Q.   My name is Jeri Yenne, and I'm the District Attorney here in Brazoria County.  And Ms. Mary Aldous, seated to my left, is my first assistant.

Further left is Kerri Mallon and Jay Wooten, who represent the Defendant, James Harris, Jr.

The Defendant is charged with Capital Murder, and so it's the only time we as attorneys have an opportunity to speak to you individually because it is the highest crime that could be possibly committed.  It's the highest allegation against a person and it involves the possibility of the death

penalty; and so because it involves the possibility of death as a possible punishment, we get to talk to you individually. Okay?

A.    Okay.

Q.    And we're trying to find people that could be fair and impartial jurors.  And in order to be a fair juror, you have to honestly be able to say you could follow the law and the evidence given to you by the Court.  Okay?

A.    Yes.

Q.    So I'm going to go over some legal concepts and see if you could follow the law in that regard.

Now I noticed from your questionnaire something --

MS. YENNE:  May I approach, Judge?

THE COURT:  You may.

Q.    I may not go over specifically.  I will at a later -- that it was important to you to be fair here.

A.    Yes, ma'am.

Q.    Okay.  So I want to know if you could fairly follow the law, and then I'm going to pick your brain about this later.  Okay?

A.    Okay.  But if you're going to do that, I'm going to put my glasses on.

Q.    Go for your glasses.  Okay.

Ms. Lee, I have about ten pair of cheaters, I

call them. Okay? I have them all over the house and the office. Now I never thought I'd need them.

So as the Court said, this is the State of Texas versus James Harris; and the Defendant is charged with Capital Murder. The indictment alleges on or about the 14th day of January, 2012, before the presentment of the indictment, in Brazoria County, Texas, the Defendant did then and there intentionally cause the death of an individual, Alton Wilcox, by stabbing Alton Wilcox with a knife, and the Defendant was then and there in the course of committing or attempting to commit the offense of Robbery of Darla Wilcox.

It also alleges that on or about the 14th day of January, 2012, in Brazoria County, Texas, the Defendant -- before the presentment of the indictment, the Defendant did then and there intentionally cause the death of an individual, Alton Wilcox, by stabbing Alton Wilcox with a knife, and the Defendant was then and there in the course of committing or attempting to commit the offense of Burglary of a Habitation owned by Darla Wilcox.

The last paragraph alleges that on or about the 14th day of January, 2012, before the indictment, in Brazoria County, Texas, the Defendant did then and there intentionally cause the death of an individual, Alton Wilcox, by stabbing Alton Wilcox with a knife, and the Defendant was then and there in the course of committing or attempting to commit the offense

of Burglary of a Habitation owned by Alton Wilcox.  Okay?

A.   Okay.

Q.   So that's what I'm going to have to prove to you.  Now would you agree with me that the State has a huge responsibility here?

A.   Yes, ma'am.

Q.   Okay.  We hold other people's lives in our hand, right?

A.   Correct.

Q.   And is it important to you that the State, meaning the prosecution, play by the rules?

A.   Definitely.

Q.   Okay.  And that the police play by the legal rules?

A.   Definitely.

Q.   Okay.  And to me, the end never justifies the means.  It can't.

A.   No, ma'am.

Q.   Because the rules are important to me.  And I want to maybe get your view because when we follow the rules appropriately, then innocent people shouldn't be convicted.  Am I making sense?

A.   Yes, ma'am.

Q.   Okay.  The rules are there to protect you.  Okay?  So let me go a little further.  That's what I have to prove to you.

Now let's talk about what murder is.  Murder is intentionally causing the death of an individual.  Cold-blooded, unjustified, no excuse, no self-defense, no defending other people, just intending to cause someone's death and doing it.

A neighbor gets mad at another neighbor and decides he's going to kill the neighbor.  And so he gets a gun, confronts the neighbor on the street and shoots him to death.  No justification, no self-defense.  Cold-blooded killing.  Okay?

A.   Yes, ma'am.

Q.   That's regular murder.  And you're thinking what could Capital Murder be?  Well, Capital Murder is that type of murder, the intentionally causing the death, plus something else.  Regular murder plus a couple other elements.  Let's talk about that in a minute.  It could be intentionally causing the death of a police officer in the line of duty, knowing that they are a police officer.  Could be intentionally causing the death of a child younger than 10 years of age.

A.   Yes.

Q.   Intentionally causing the death of more than one person during the same criminal transaction.  Like if I walked into a convenience store and shot five people to death.  Am I making sense?

A.   Yes, ma'am.

Q.   Intentionally causing the death during a murder for hire.  I was hired to do it, I did it, and so that's the special element that raises it to either life without parole or the death penalty.  That raises it.  It's murder plus.

So now we have this type of murder, Capital Murder.  The person intentionally commits murder in the course of committing or attempting to commit the kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat.  So they intentionally cause the death during the course of burglary or robbery.  Remember, I read that?

A.   Yes, ma'am.

Q.   That's what raises it to Capital Murder.

So let me go a little further.  A person acts intentionally or with intent with respect to a result of his conduct when it is his conscious objective or desire to cause the result.  The killing.  The death.  Am I making sense?

A.   Yes, ma'am.

Q.   Okay.  So let's go a little further.  Anyone who sits on a jury has to be able to follow the law.  Okay?  So I'm going to ask you if you can.  My burden to prove the elements in the indictment to you is beyond a reasonable doubt.  Okay?

A.   Yes, ma'am.

Q.   I gladly assume that burden.  So I want to ask you, the prosecution -- you're going to get an instruction if you

were on a jury.  The prosecution has the burden of proving the Defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt.  It is not required that the prosecution prove guilt beyond all possible doubt.  It is required that the prosecution's proof excludes all reasonable doubt concerning the Defendant's guilt.  Okay?

A.   Yes, ma'am.

Q.   Can you follow that instruction?

A.   Yes, ma'am, I can.

Q.   Then I'm going to tell you a little bit about those burdens of proof, the levels.  So -- and I told you that is a burden I gladly assume.  I should have that high a burden, shouldn't I?

A.   Yes, ma'am.

Q.   Okay.  Accusing someone of a crime is not a minor matter to me.  Is it to you?

A.   No, ma'am.

Q.   Okay.  And Capital Murder is the worst crime anybody can be excused of.

A.   Yes, ma'am.

Q.   To me, it's all the more reason that I would have to prove to you beyond a reasonable doubt.

A.   Yes, ma'am.

Q.   Okay.  So my question to you is if I prove to you the

elements of the indictment -- I have to prove all of them. County, I never forget it. I haven't forgotten. The county, burglary, robbery, intent to cause the death. I'm required to prove to you what I read to you. If I prove to you the elements of Capital Murder beyond a reasonable doubt, can you find someone guilty of Capital Murder?

A.    Yes, ma'am.

Q.    The other question -- it's a serious crime, you know; and it involves serious consequences. If I do not prove to you -- let's say my co-counsel and I are having a bad week and we don't do it. We do not prove to you our responsibility, beyond a reasonable doubt the elements of Capital Murder. Can you find someone not guilty?

A.    Yes, ma'am.

Q.    Because, to me, that's my responsibility. Yours is to tell me did I prove it or not.

A.    Yes, ma'am.

Q.    If I didn't do it, the jury's responsibility is to find someone not guilty, no matter what the crime.

A.    Yes, ma'am.

Q.    Do you agree with that?

A.    I do.

Q.    Okay. Let's go a little further. The State is required to prove to you the elements alleged in the indictment. The intentionally causing the death during the

course of robbery or burglary. There will always be inconsistencies in any case.

Let me give you an example. Let's pretend there is a car wreck outside the courthouse and a guy is charged with running a red light. Ten witnesses saw him do it. He admits he did it. So I've proven beyond a reasonable doubt he ran the red light; but a couple witnesses disagree on the time, 3:20 p.m. or 3:30, or whether it was misting or raining or the color of the vehicle. They may not go to the elements of the indictment. Do you see what I'm saying?

A.    Yes, ma'am.

Q.    There will always be inconsistencies in any case on the planet Earth. Okay?

A.    Yes, ma'am.

Q.    Okay. Let's go a little further. Here are the levels of burden of proof. The lowest level of burden of proof is preponderance of the evidence, meaning the greater weight and degree of credible evidence. Civil cases where you seek money damages, 50 percent plus a grain of sand. Just slight tipping the scales. That's the lowest burden for civil lawsuits, car wreck.

The next highest burden is a civil burden, clear and convincing evidence. The measure or degree of proof that produces a firm belief or conviction that the allegations sought to be established are true. That's higher than

preponderance, isn't it?

A.   Yes, ma'am.

Q.   That's parental rights termination cases.  And, to me, there should be a higher burden when we're trying to take someone's kids away.

A.   Yes, ma'am.

Q.   Okay.  And then there is the highest burden.  And do you consider beyond a reasonable doubt higher than those two?

A.   Yes, ma'am.

Q.   Beyond a reasonable doubt is the burden for criminal cases.  Highest burden that you could find.  But there is no definition.  It's up to the jury.  Go figure.  But it's higher than these.  Okay?

A.   Yes, ma'am.

Q.   All right.  Presumption of innocence.  If you or I were accused of a crime -- any crime, misdemeanor, felony -- or a family member -- burglary, theft, robbery, assault -- we would be innocent until the State comes forth -- presumed innocent until the State comes forward with evidence to show otherwise.  Okay?

A.   Yes, ma'am.

Q.   So all persons are presumed to be innocent and no person may be convicted unless each element of the offense is proved beyond a reasonable doubt.  The fact that a defendant has been arrested, confined, indicted, or otherwise charged

with an offense gives rise to no inference of guilt at his trial.

    **A.**    Yes, ma'am.

    **Q.**    Okay.  Can you follow that instruction?

    **A.**    Yes, ma'am.

    **Q.**    Do you believe in that instruction?

    **A.**    I do.

    **Q.**    Okay.  So as he sits here today, can you presume Mr. Harris to be innocent?

    **A.**    Yes, ma'am.

    **Q.**    Okay.  All right.  Let's go a little further.  Burden of proof.  The Defendant has no burden of proof.  The law does not require a defendant to prove his innocence or produce any evidence at all.  They don't have to bring you a shred of evidence.  I'm required to prove to you beyond a reasonable doubt, and they have no responsibility to prove anything to you.

    **A.**    Yes, ma'am.

    **Q.**    Can you follow that instruction?

    **A.**    Yes, ma'am.

    **Q.**    You know, some people say, oh, I wish I would have heard from the defendant, particularly in this serious a crime.  But these are our rules; and to me, they're important.  I don't have to prove my innocence.  The State has to prove my guilt.  Am I making sense?

A.    Yes, ma'am.

Q.    Okay.  You could follow that instruction?

A.    I have no problem with it.

Q.    Okay.  Fifth Amendment.  To me, this is one of the hardest fought rights that separates the United States from every other country on this planet.  If you or I were accused of a crime, we have an absolute privilege not to say anything.  A right against self-incrimination, a right not to testify.

In other words, he doesn't have to bring any evidence.  You can't consider it.  And he or she, the defendant, has a right not to testify.  We never know in a case whether a defendant will choose to take the witness stand.  But it's their choice.  They don't have to.  So you would be given an instruction if a defendant chose not to take the witness stand.  Every defendant in any criminal case has a right not to testify.  You cannot consider it for any reason.  Can you honestly follow that instruction?

A.    Yes, ma'am.

Q.    Okay.  You know, sometimes -- there is maybe a lot of reasons why someone might not testify, other than being guilty.  They may not present themselves well.  They may hold the State to their burden, and that's good enough.  Would you agree with me some people are farther ahead until they open their mouths?

A.    Yes, ma'am.

Q.    Okay.  You're thinking of some family members, aren't

you, Ms. Lee?

A.    Yes.

Q.    Or maybe myself.  Okay?  But you couldn't consider it for any reason.

A.    Yes, ma'am.  No problem.

Q.    So I either prove to you beyond a reasonable doubt -- and if the defendant didn't testify, you couldn't consider it. If I fell on my face and didn't meet my burden, if the defendant didn't testify, you could still find someone not guilty?

A.    Yes, ma'am.

Q.    All right.  If you had to vote right now, you would have to vote not guilty because you have not heard any evidence yet.

A.    Yes, ma'am.

Q.    Okay.  Now the indictment alleges one charge of Capital Murder, the victim being Alton Wilcox, with different alternate methods of committing the same.  Either by robbery or by burglary.  In other words, intentionally causing the death of Mr. Wilcox by stabbing him to death during the course of a robbery or burglary.

As long as the jury unanimously agrees beyond a reasonable doubt that the elements of Capital Murder are met, intentionally causing the death of Alton Wilcox, they don't need to unanimously agree on which manner and means.  Six of

you can agree on robbery and six of you could agree on the burglary. Am I making sense?

A. Yes, ma'am.

Q. All right. The manner and means -- and I'll explain what that means later.

If you were on a jury, you will get to hear certain types of evidence. Direct evidence. Evidence that directly demonstrates the ultimate fact to be proven, such as eyewitness testimony, a video of a crime, or a confession. That's direct evidence.

Now there is another type of evidence, and I hate this definition. Circumstantial evidence. Evidence that is direct proof of a secondary fact which, by logical inference, demonstrates the ultimate fact to be proven.

I'll give you an example. Let's say there is a 5-year-old little boy. He's got a backyard pool, and he wants to go swimming. He asks his parents and they say not right now, Honey, later. They go about their housework and the next they hear, pitter-patter of little feet on the stairs, backdoor opens, big splash. Mom and Dad go to the backyard. The little boy is laying in the wet swimsuit in the lounge chair. Now Mom and Dad have concluded, based on those secondary facts, he's been in the pool. Am I making sense?

A. Yes, ma'am.

Q. All right. Without witnessing it. Okay?

Now there is also an example from my own childhood.  You and I come from the day and age when they actually gave children St. Joseph's baby aspirin a long time ago.

A.    Yes, ma'am.

Q.    Now it's supposed to kill them, but we got it all the time.  I liked the way it tasted, the little orange candy.  So my mom had St. Joseph's baby aspirin for when we were sick.  She had a supply.  And she happened to be sick that day, and she is checking on us every 15 minutes.  She'd set a kitchen timer.  My brother who was 3, and I was 4, we are playing with Play-Doh at the kitchen table.  When she went to lay back down, my brother looked at me and said, I'm hungry.  We got on the stool, we got up to the refrigerator, we took the baby aspirin.  We ate three bottles of St. Joseph's baby aspirin.  150 aspirin.  I only ate one.  My brother ate two bottles.

My mom gets up, and she panics.  She asked us -- she sees the aspirin bottle and orange faces -- who ate those aspirin?  My brother and I told her the cat had eaten the aspirin.  Now the cat's mouth was not orange.  Ours were very orange.  So she ran us to the hospital to get our stomachs pumped.

Now she had to conclude from those secondary facts that we ate the aspirin.  Am I making sense?

A.    Yes, ma'am.

Q.    Without seeing it.

So my question to you is if the State proves to you beyond a reasonable doubt the elements of the offense, can you convict someone of Capital Murder based on circumstantial evidence, if it raises to the level of beyond a reasonable doubt?

A.    Yes, ma'am.

Q.    Okay.  Let's go a little further.  Eyewitness testimony.  Now there are some crimes that are committed in front of eyewitnesses, right?

A.    Yes, ma'am.

Q.    There are some that are committed in front of whole baseball stadiums these days.

A.    Yes, ma'am.

Q.    Okay.  Some are on video.  Some crimes are committed where no one sees, right?

A.    Yes, ma'am.

Q.    And some are committed in front of five, six, or just one eyewitness.

A.    Yes, ma'am.

Q.    So my question to you is if the State had one eyewitness and if I -- and if you believed the testimony of that eyewitness beyond a reasonable doubt and if that eyewitness' testimony established all of the elements of Capital Murder beyond a reasonable doubt, could you convict

someone of Capital Murder based on that eyewitness' testimony?

A.   Yes, ma'am.

Q.   Okay.  Now in order to sit on any jury you have to be able to consider the penalty range for the crime.  If you were on a robbery jury and the penalty range was 2 to 20, not less than 2 years, more than 20 years, in order to even sit on the jury you would have to consider the full range.

Now I hate to say this on the record, but penalty ranges are one good thing that the legislature has done.  One.  Would you agree with me that there are no two crimes that are alike?

A.   Yes, ma'am.

Q.   Are there any two human beings alike?

A.   No, ma'am.

Q.   And so there is a range for a jury to apply the facts and the people factor and the events and the evidence to make an appropriate punishment.  Am I making sense?

A.   Yes, ma'am.

Q.   And the range may be -- may seem to be too high on one end or too low, but you have to consider the full range to make an appropriate decision.

A.   Yes, ma'am.

Q.   Okay.  And so would you honestly be able to keep an open mind and apply the facts?  And no one can say to you what you would do because you haven't heard the evidence.

A.    Yes, ma'am.

Q.    In other words, would you give somebody 10 years?  You don't know because you haven't sat and listened to the evidence.

A.    Yes, ma'am.

Q.    So can you understand why there is a full range?

A.    Yes, ma'am.

Q.    Now the penalty range for Capital Murder is life without parole or the death penalty.

A.    Yes, ma'am.

Q.    Okay.  Now would you agree with me that both of these are pretty stiff sentences?

A.    Yes, ma'am.

Q.    Life without parole is a horrible sentence, isn't it?

A.    Yes, ma'am.

Q.    The death penalty is a horrible sentence, isn't it?

A.    Yes, ma'am.

Q.    Do you believe there should be a penalty range for Capital Murder, some choices?

A.    Yes.

Q.    It's the highest crime.  Some people automatically say there should be only one penalty, the death penalty.  Or only one punishment, life without parole.  Well, the legislature gives two penalties.  Do you believe that either could be appropriate, depending on the circumstances?

**A.**    Yes, ma'am.

**Q.**    So can you consider the full penalty range for Capital Murder?

**A.**    Yes, ma'am.

**Q.**    Let's go a little further.  If you sat on a jury you might be asked to consider lesser offenses, and then we would have to know if you can consider the penalty range for those lesser offenses.  In a prosecution for an offense with lesser-included offenses, the jury may find the defendant not guilty of the greater offense but guilty of any lesser-included offense.

Let's say that I didn't prove to you the elements of Capital Murder beyond a reasonable doubt.  I fell on my face on the robbery or burglary.  But then murder is always a lesser-included charge of Capital Murder.  Then you would be asked to go on and consider murder, intentionally causing the death of an individual.  If that person was found guilty of regular murder -- remember what I gave you, the first example?

**A.**    Yes, ma'am.

**Q.**    Then the penalty range for that would be not less than 5 years nor more than 99 years, including life, and up to a 10,000-dollar fine.

Now we talked about that there are different types of circumstances, correct?

**A.**    Yes, ma'am.

Q.   Could be strangers, right?

A.   Right.

Q.   Could be family.

A.   Right.

Q.   Could be premeditated.

A.   Yes, ma'am.

Q.   Could be instantaneous rage, desperation.

A.   Yes.

Q.   Could be substance abuse.

A.   Yes.

Q.   Could be partly responsibility of the victim, or could be totally innocent victim.  Am I making sense?

A.   Yes, ma'am.

Q.   So there are a whole variety of circumstances.  So if you found someone not guilty of Capital Murder and guilty of regular murder with the penalty range being 5 years to 99 years, including life -- which is parolable life.  You could parole under these circumstances -- and up to a 10,000-dollar fine, can you consider the full range for murder, from the minimum to the maximum?

A.   Yes, ma'am.

Q.   Even if it started out as a Capital Murder?

A.   Yes, ma'am.

Q.   Okay.  Let's go a little further.  Witness credibility.  Jurors are the sole judge of the credibility of

the witnesses. They can believe -- jurors can believe all, some, or none of what a witness says. All witnesses have equal credibility before they begin to testify. Before they hit that witness stand where you're sitting, they have to be started out equally.

A. Yes, ma'am.

Q. So I ask you can you start out all witnesses equally?

A. Yes, ma'am.

Q. Okay. All right. Some people say, you know, if somebody's a doctor, I'm going to automatically believe them or not believe them. Is that you?

A. No.

Q. Okay. If somebody is a police officer, I'm going to give them an edge. Or I'm going to disregard them because I don't like cops.

A. No, ma'am.

Q. Would you judge that person just based on what you hear?

A. No, ma'am. Just on what I hear, yes.

Q. Just from the stand?

A. Yes.

Q. Somebody doesn't have a particular edge because they have an occupation?

A. No.

Q. Okay. Let's go a little further. Now there are

certain rules that I have to play by.  Let's talk about them. And the police have to play by.  And they are legal rules and they are important rules.

The rules for a confession.  A confession of a defendant is admissible in evidence if freely and voluntarily made, electronically recorded or written, the confession shows that the accused has been warned prior to making such confession of the right to remain silent, used against him in court, the right to a lawyer, if they cannot afford a lawyer the right to have a lawyer appointed, the right to stop questioning at any time, and if they knowingly, intelligently and voluntarily waive those rights.  Do you think those are important?

A.   Yes, ma'am.

Q.   Okay.  Now I asked you is it important that the police play by the rules.

A.   Definitely.

Q.   Okay.  To me, law enforcement has a responsibility to make sure they comply with the law, right?

A.   Yes.

Q.   They expect us to, don't they?

A.   Yes, ma'am.

Q.   Okay.  So do you consider those warnings important?

A.   Yes.

Q.   Okay.  Let's go a little further.  The jury gets to

decide whether the police comply -- it's your decision based on evidence -- or if the confession was involuntary.  Okay?  Not voluntarily given.

A.   Yes, ma'am.

Q.   Coercion, duress, a variety of reasons.  Okay?  Or it could be that an essential warning is missing.  Okay?  Let me ask you this.  On those warnings, on the prior page, do you consider them all essential?

A.   Yes, ma'am.

Q.   Okay.  So let's go a little further.  If the jury did not believe the police complied, if you do not believe the police complied or the confession was involuntary, you would get an instruction from the Court.  Now it's up to the jury whether they believe it.  You get to decide.  But if you don't believe the police complied, or the confession was involuntary, then you will wholly disregard the alleged statement or confession and not consider it for any purpose.

A.   Yes, ma'am.

Q.   Can you follow that?

A.   Yes, ma'am.

Q.   So let me tell you what that really means.  Let me put it in context.  Okay?  Because these are not easy decisions. You told me the State has to play by the rules, right?

A.   Yes, ma'am.

Q.   Okay.  And the end doesn't justify the means, does it?

A.    No, it does not.

Q.    Okay.  And I don't get to do something illegal just to get what I want, do I?

A.    No.

Q.    Okay.  Particularly where people's lives are at stake. Is that a fair statement?

A.    Definitely.

Q.    You have been a juror on a Capital Murder case -- not this one.  You're sitting in that jury room and you've heard a defendant -- you've heard it.  You've listened to the confession.  Ugly, gory details.  Killing the victim, enjoying it, no justification, no excuse, no self-defense.  Cold-blooded killing.  You've heard it.  The cat's out of the bag.  All right?  But you believe the police did not comply.  An essential warning was clearly left off, or it was involuntary. Can you wholly disregard the statement and confession and not consider it for any purpose?

A.    Yes, ma'am.

Q.    Okay.  Let's go a little further.  Let me tell you what that means.  Let's say that confession was the piece of evidence that got me beyond a reasonable doubt.  It's serious because wholly disregarding it, if I don't meet my burden of proof -- because you have honestly had to wholly disregard it --

A.    Yes, ma'am.

Q.    -- can you find someone not guilty?

A.    Yes, ma'am.

Q.    Okay.  I'm not saying it's pleasant.  But can you do that?

A.    I can.

Q.    Okay.  Voluntary intoxication.  Now voluntary intoxication does not constitute a defense to the commission of a crime.  Okay?

A.    Yes, ma'am.

Q.    If I decide to drink 20 beers, tie one on and assault a couple people, my voluntarily intoxicating myself is not a defense.  Can you follow that instruction?

A.    Yes, ma'am.

Q.    Okay.  Let's go a little further.  This is a mouthful, but I'll explain it.  A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

          Let me give you an example.  I've always read that and I finally had to figure out an example.  Let's say I live in an apartment and I set a fire in my apartment and it kills -- I intentionally set a fire, and it kills the people next door.

A.    Okay.

Q.   They die.  The fire department is having a bad day. It's a holiday weekend and two engines break down and they are short staffed and their response time is about twice the time and they can't save the family next door.  Okay?

A.   Okay.

Q.   My act in setting the fire was clearly sufficient alone to cause the result.  Am I making sense?

A.   Yes, ma'am.

Q.   Okay.  Now let's talk about what burglary is.  A person commits an offense -- now that's the underlying offense. Remember, I have to prove to you the burglary or robbery.  The course of burglary or robbery, am I making sense --

A.   Yes, ma'am.

Q.   -- for it to be Capital Murder.

So you'd get an instruction that a person commits an offense if, without the effective consent of the owner, the person enters a habitation with intent to commit a felony, theft, or an assault, or enters a habitation and commits or attempts to commit a felony, theft, or an assault.  Okay?

A.   Okay.

Q.   So can you hold me to my burden to prove to you that there was a burglary?

A.   Yes, ma'am.

Q.   Okay.  Let me go a little further.  And if I don't prove to you the elements of the burglary or the robbery, then

it's not Capital Murder.  Am I making sense?

A.    Yes, ma'am.

Q.    Okay.  Robbery.  A person commits an offense if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another.

I decide to go shoplifting, and I'm going to get some makeup from Wal-Mart.

My husband and I went to Wal-Mart Saturday in Angleton and -- we were going to pick something up on our way out of Angleton, and there were three police cars.  And we just decided, should we even go in?  Must have been a shoplifter. We went in anyway.

Okay.  Intentionally, knowingly, or recklessly caused bodily injury.  I punch the manager out.  I give him a black eye in the course of committing theft.  That's robbery. Okay?

A.    All right.

Q.    "In the course of committing theft" means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft. Okay?

A.    Okay.

Q.    All right.  So can you hold me to my burden on that definition of robbery?

**A.**    Yes, ma'am.

**Q.**    Okay.  Now there are two parts of a trial, okay, most of the time, some of the times, depending on what the jury decides.

Now you indicated to me that you could consider the full penalty range for Capital Murder.

**A.**    Yes, ma'am.

**Q.**    Okay.  Would you turn to page 28 of your questionnaire?  I want to ask if you can consider and follow the rules on this process, wholly consider all the evidence.  Because you said something to me that very much rang with me on Number 153.

**A.**    Okay.

**Q.**    What would be your greatest concern if you were to be selected to be a juror in a capital case?

To be as open to the facts and the case as possible so whatever decision reached, I can live with it.

**A.**    Yes, ma'am.

**Q.**    Is that your true feelings?

**A.**    Yes, ma'am.

**Q.**    So I'm going to ask you if you can be open to all the facts and evidence and follow the law.  Because a man's life is at stake.

**A.**    Yes, ma'am.

**Q.**    Okay.  The jury who is selected here, based on the

evidence, decides whether that man over there lives or dies.

A.   Yes, ma'am.

Q.   It's that serious.  So I want to ask you if you can honestly follow the process?

A.   Yes, ma'am.

Q.   Okay.  Now there are two parts of a trial.  Guilty or not guilty.  The first part is guilt or innocence.  Okay?  Now I believe you told me if I don't prove to you beyond a reasonable doubt the elements in the indictment, you could find a defendant not guilty of Capital Murder.

A.   Yes, ma'am.

Q.   Is that true?

A.   That's true.

Q.   And is what I'm asking you your honest feelings today?

A.   Yes, ma'am.

Q.   Okay.  And I know I'm asking it quick, but I want whatever is your honest feelings.  Okay?

A.   Okay.

Q.   And I want to know if you can follow the law.  Okay?  Because in order to sit as a juror, you have to be able to honestly follow this process.

A.   Okay.

Q.   So if you found somebody not guilty, the trial is over, right?

A.   Right.

Q.    We go home.

All right.  If you found -- if I proved to you beyond a reasonable doubt the elements of the indictment, could you find someone guilty of Capital Murder?

A.    Yes, ma'am.

Q.    If you find someone guilty, you move on to punishment.

Now in order to consider the full penalty range of life without parole or the death penalty -- and you've told me they are both stiff sentences, right?

A.    Right.

Q.    Would you consider them both?

A.    I would.

Q.    You can't have made up your mind --

A.    No.

Q.    -- upon a finding because that's only half the trial. Am I making sense?

A.    Yes, ma'am.

Q.    Now there is not going to be any good kind of Capital Murder.  There will never be self-defense if you found somebody guilty of Capital Murder.

A.    Yes.

Q.    There will be no justification or excuse, and the facts will be awful.  Okay?

A.    Yes, ma'am.

Q.    Can you keep an open mind at that point?

**A.**    Yes, ma'am.

**Q.**    All right.  So here are the principles for handling a punishment phase.  And I'm going to go over them.  Right after a guilty verdict, before any punishment evidence is presented, you cannot have made up your mind as to what's going to happen.  Okay?

**A.**    Okay.

**Q.**    It wouldn't be fair to the State or the Defendant, would it?

**A.**    No.

**Q.**    Okay.  Because some people say, once I find someone guilty of Capital Murder, I'm automatically going to give them the death penalty.  Or I'm automatically going to give them life without parole.  Is that you, or could you listen to the evidence?

**A.**    I could listen to the evidence.

**Q.**    Okay.  You can't have made up your mind.  You have to -- you shall consider guilt/innocence evidence, but you must be able to consider any and all punishment evidence as well.  Okay?

**A.**    Okay.

**Q.**    In order to consider all the evidence -- it doesn't say some.  It says all the evidence, right?

**A.**    Right.

**Q.**    That means the trial has to be concluded, right?

A.   Right.

Q.   You can't make up your mind in the middle.

A.   No.

Q.   All right.  In order to consider all the evidence, you have to keep an open mind.

Each question -- you may get one or more questions, depending on how you answer, because it is not an up or down vote for life or death.  You have to answer a question or questions.  So I'm going to talk to you about what those are.

A.   Okay.

Q.   Each question is independent of the verdict.  Each question is independent of each other.  It's based on the evidence.  Okay?

A.   Okay.

Q.   And each question is based only on the evidence presented to you.

A.   Okay.

Q.   So let's talk about what the rules say.  You're going to get an instruction first.  So you're telling me if you found somebody guilty of Capital Murder, you're keeping an open mind?

A.   Yes, ma'am.

Q.   You don't have any feelings one way or another about a sentence?

A.   No.

Q.   Death or life without parole?

A.   No.

Q.   All right.  Otherwise, it isn't fair to the State or defense.  Is that accurate?

A.   Yes, ma'am.

Q.   In deliberating on issues submitted you shall consider all evidence admitted at the guilt/innocence stage and the punishment stage, including evidence of the Defendant's background or character or the circumstances of the offense that militates for or mitigate against the imposition of the death penalty.

It says shall consider all evidence, right?

A.   Yes, ma'am.

Q.   At both phases, guilt/innocence and punishment, right?

A.   Yes, ma'am.

Q.   Including Defendant's background and character.  Will you consider all evidence?

A.   Yes, ma'am.

Q.   Guilt/innocence and punishment?

A.   Yes, ma'am.

Q.   Will you make up your mind before the evidence is in?

A.   No, ma'am.

Q.   Okay.  Let me go a little further.  Okay?  Now -- and sometimes wouldn't you want to know what led somebody to a particular situation in life?  Wouldn't you want to know why

something happened at times?

A.    Everyone is curious, but that doesn't necessarily mean anything further than that.

Q.    No.  But the Defendant's character and background, you would consider?

A.    Yes.

Q.    And you will follow that instruction?

A.    Yes.

Q.    Let's go a little further.  Okay?  So you have to consider all the evidence, guilt/innocence and punishment, and then you get to the first question.  It's the future danger issue.  Special Issue No. 1.  Okay.  Now I have to prove this to you.  Okay?  Now you haven't -- he's a guilty capital murderer, right?

A.    Right.

Q.    You haven't made up your mind at that time, correct, about punishment?

A.    No.  About punishment, no.

Q.    Sorry.  Prayers have gotten answered because I'm losing my voice.  I still have a sense of humor, Ms. Lee.

        Okay.  So you made up your mind about guilt/innocence but not punishment.  Is that fair?

A.    Fair.

Q.    Okay.  First Special Issue.  Do you find from the evidence beyond a reasonable doubt that there is a probability

that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?  Okay?

**A.**    Okay.

**Q.**    All right.  Now I have to prove to you beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society.  All right?  I'm predicting future danger by showing you evidence.  Okay?

**A.**    Okay.

**Q.**    Some people say, oh, I can never do that.  Could you honestly answer that question based on the evidence?

**A.**    Yes.

**Q.**    I have the burden of proof.  Would you hold me to my burden, beyond a reasonable doubt, to show you there is a probability that the Defendant would commit criminal acts of violence that will constitute a continuing threat to society?

**A.**    Yes.

**Q.**    Okay.  And if I didn't show you that, could you answer it no?

**A.**    I could.

**Q.**    Okay.  In other words, some people say, once I convict someone of Capital Murder, I'm automatically going to answer that question yes.  They have got to be a future danger.

Can you agree with me that some people can commit Capital Murder and not be a future danger?

A.    Yes, ma'am.

Q.    Okay.  So I want to keep going.  I have to prove to you beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society.  Now probability, under the law, means more than possibility.  More than a possibility.

A.    Right.

Q.    Okay.  Could you agree with that?

A.    Definitely.

Q.    To you is it more likely than not a probability?

A.    Probability is more likely, yes.

Q.    Okay.  It's not just a possibility?

A.    No.

Q.    Okay.  So I have to prove to you the probability the Defendant would commit criminal acts, plural.  To you does that mean more than one?

A.    Yes.

Q.    Acts of violence that would constitute a continuing threat to society.

Let's go a little further.  What is society?  Society is limited to but -- I'm sorry.  Is not limited to but it includes prison.  Let me tell you why.  Because if someone was convicted of Capital Murder, there is only two possible penalties.  Life without parole or the death penalty.  Right?

A.   Right.

Q.   So they are going to be in prison --

A.   Right.

Q.   -- awaiting execution or living out the rest of their earthly life, right?

A.   Right.

Q.   All right.  Now society has to include prison then. Am I making sense?

A.   Yes, ma'am.

Q.   Now it's kind of -- I'm going to tell you what it focuses on in a minute.  But in your mind can a city be a little society?

A.   Yes, ma'am.

Q.   Could a courthouse?

A.   Yes.

Q.   Could a workplace?

A.   Yes, ma'am.

Q.   Could a school?

A.   Yes.

Q.   And could a jail or prison?

A.   Yes.

Q.   Okay.  Do you believe that people in jail, the prisoners, other inmates, have a right to be safe from each other?

A.   Yes.

Q.   Do you believe the prison staff, chaplain, ministry, medical have a right to be safe?

A.   Yes.

Q.   Do you believe visitors have a right to be safe?

A.   Yes.

Q.   So what Special Issue future danger is focusing on is the character for violence of a particular individual, not the quantity or quality of institutional restraints put on them. Okay?  This Special Issue, predicting future danger, focuses upon the internal restraints of the individual, not merely the external restraints of jail or prison.  Am I making sense?

A.   Yes, ma'am.

Q.   Okay.  So let's go back to the grid.  Okay.  So if I prove to you beyond a reasonable doubt that there is a probability that the Defendant would commit a criminal act of violence -- and let me go to criminal acts of violence real fast.  I did not answer that.  I'm getting a little slower here.

Criminal acts of violence can be violence against property or violence against people.  Okay?

A.   Okay.

Q.   Can you consider both to be criminal acts of violence?

A.   Yes.

Q.   All right.

MS. YENNE:  Let's go back to Special Issue,

please, real fast, and then the grid.  Special Issue No. 1.

Q.    Okay.  So you can answer this question based on all evidence, guilt/innocence or punishment, Special Issue No. 1. And you have to -- if I prove to you beyond a reasonable doubt that there is a probability the Defendant would commit criminal acts of violence that will constitute a continuing threat to society, can you answer that yes?

A.    Yes.

Q.    If I don't prove it to you, even though he's a guilty capital murderer, can you answer it no?

A.    I can.

Q.    Okay.  Now what is a continuing threat to society to you?  What does continuing mean?

A.    Ongoing.

Q.    Okay.  So let me ask this.  So you can honestly answer based on the evidence -- he's a guilty capital murderer.  And if I don't prove to you beyond a reasonable doubt that there is a probability the Defendant would commit criminal acts of violence that would constitute a continuing threat to society, you could answer that no, right?

A.    I can.

Q.    Okay.  So you haven't made your mind up on a conviction, right?

A.    Right.

Q.    You could keep an open mind and you could answer

Special Issue No. 1.  I either prove it to you or not, right?

**A.**   That's right.

**Q.**   Beyond a reasonable doubt.  Because some people say, the minute I convict someone of Capital Murder, I'm going to answer Special Issue No. 1 yes.  They have got to be a future danger.  Is that you, or will you hold me to my burden?

**A.**   You will be held to your burden.

**Q.**   Okay.  Now to answer yes, this must be unanimous.  If it's proven to the jury beyond a reasonable doubt and they answer yes to that, that there is a probability the Defendant will commit criminal acts of violence that will constitute a continuing threat to society, it has to be unanimous because that's the road to the death penalty.  Okay?

**A.**   Okay.

**Q.**   Now you told me you can answer no if I don't prove it to you, Special Issue No. 1.

**A.**   Right.

**Q.**   No requires ten or more jurors and then the Defendant will be sentenced to life without parole.  Okay?

**A.**   Okay.

**Q.**   And the trial would end.  You can answer either way based on the evidence.  Is that a fair statement?

**A.**   That's fair.

**Q.**   Okay.  You can't -- now at this point you haven't gone through the whole punishment stage.  So let's say you found him

guilty of Capital Murder and found him to be a future danger.

**A.** Okay.

**Q.** You still cannot have made up your mind on death penalty or life without parole. Can you still keep an open mind --

**A.** Yes.

**Q.** -- that both could still be an appropriate penalty?

**A.** Right.

**Q.** Because the legislature has a built-in safety valve to spare someone's life. So, Ms. Lee, do you believe there should be a mechanism to spare someone's life?

**A.** Yes.

**Q.** Okay. The mitigation issue, Special Issue No. 2. You must be able to consider and give effect to mitigation. In other words, is there a reason to spare someone's life? We're talking about killing somebody here. So shouldn't there be Special Issue No. 2 to see if there is a reason somebody should be spared?

**A.** Yes.

**Q.** All right. So I'm going to talk to you about what mitigation is. Okay. I'm going to go to Special Issue No. 2 first. All right. Now I had the burden on Special Issue No. 1. You've already found him to be a guilty, guilty, guilty Capital Murderer. No excuse, no self-defense. Because if it was self-defense, he would have to be acquitted, right?

**A.** Right.

**Q.** No excuse, no justification, no defense of property. Cold-blooded, unprovoked killing. And you've now found him to be a future danger. You've answered yes, along with the rest of the jury, to Special Issue No. 1. Can you still keep an open mind and consider the next issue?

**A.** Yes.

**Q.** Okay. Special Issue No. 2 has no burden. Neither party has a burden of proof. Okay?

**A.** Okay.

**Q.** Mitigation can come to you during the course of the trial, but you have to be able to consider every piece of evidence. Consider and give effect to. Now nobody's defined what "give effect to" means, but let's talk about it in a minute.

Special Issue No. 2. Whether taking into consideration all of evidence -- doesn't say some, does it?

**A.** No.

**Q.** All the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed. That's a good issue, isn't it?

**A.** Yes, ma'am.

Q.   It can just be somebody wanting to spare somebody's life.  We'll talk about that.

A.   Okay.

Q.   So I want to know -- you haven't made up your mind even though you've found him to be a future danger.  Can you answer Special Issue No. 2 based on the evidence?

A.   Yes, ma'am.

Q.   Neither party, the State or the defense, has a burden.

A.   Yes, ma'am.

Q.   Would you hold either of us to a burden?

A.   No.

Q.   Okay.  All right.  It says all the evidence.  The circumstances of the offense, the Defendant's character and background, personal moral culpability.

So let's find out what mitigation means.  Mitigating evidence is evidence that a juror might regard as reducing the Defendant's moral blameworthiness.  I'm going to explain that in a minute.  Okay?

MS. MALLON:  Your Honor, we would object to this slide under the Eighth Amendment of the Constitution, Eddings versus Oklahoma, as unconstitutionally limiting mitigation.  Also, that it misstates the law and gives the juror an incorrect definition of what mitigation is.

THE COURT:  Overruled.

Q.   (BY MS. YENNE)  Okay.  Evidence that a juror might --

it doesn't have to, right?  Might regard as reducing the Defendant's moral blameworthiness.  Not his guilt.  Lessening his blame, not his guilt.

In other words, let me give you an example.  Have you ever seen a child that you just can't believe how the parents treat that child?  How they never had a chance in their life, they were abused, nobody ever gave a darn about them their whole life?  You think, oh, my gosh, I wish a relative would step in or the State and help that kid because the die is cast.  The road is paved at times for that kid.  They never had a chance.  They were treated so horribly.  Have you ever seen that, Ms. Lee?

A.    I don't --

Q.    You haven't seen it?

A.    No, I really haven't.

Q.    Okay.  Let's go a little further.  Can you think of a circumstance where you look and say, that person never had a chance in life or the parents -- raised by two very limited parents, abusive parents, alcoholics, drinkers, never encouraged them, never helped them to where they might have had less of a chance in life than somebody else?

A.    Yes.

Q.    Is that fair?  Something that might lessen that person's blameworthiness.  Not their guilt.  Am I making sense?

A.    Yes.

Q.   Not their responsibility.  A reason to spare -- a sufficient reason to spare their life.  Am I making sense?

A.   Yes.

Q.   You know, to me, I would want to know what led somebody to that act.  I'd want to know everything.  Do you feel that way?

A.   Yes.

Q.   Okay.  Is it important to you to know the whole set of circumstances in a Capital Murder?

A.   Yes.

Q.   Before you would sentence someone to life without parole or death?

A.   Yes.

Q.   Okay.  Let's go a little further.  What is mitigation?  Now a jury -- a juror has to be able to consider and give effect to.  It doesn't mean you have to find it.  Now let me level with you.  There will always be mitigation in every case, something that will always lessen someone's blame.  But it may not be sufficient to warrant life without parole as opposed to the death penalty.  Am I making sense?

A.   Yes.

Q.   All right.  In other words, there will always -- somebody will always have done something nice for someone in their life.  Am I making sense?  We would hope.

A.   We would, yes.

Q.   Okay.  Somebody may have always been in the college of hard knocks.  Do you think no bad experience has ever happened to anybody?

A.   No.

Q.   In other words, everybody has had some hard roads to walk, right?

A.   Right.

Q.   Everybody has done something nice, right?

A.   Right.

Q.   It just depends on if the jury considers -- finds something to be sufficiently mitigating to lessen the blame to warrant life without parole versus the death penalty.  Am I making sense?

A.   Yes.

Q.   So you have to be able to consider and give effect to. Now nobody defines "give effect to," but I would suggest to you that consider means more than where I'm going for lunch today, right?

A.   Yes.

Q.   This is serious business, isn't it?

A.   Right.

Q.   Would you seriously evaluate everything before you?

A.   Yes.

Q.   Every piece of evidence that comes in?

A.   Yes.

Q.   And when they say "give effect to," that doesn't mean you have to find it.  But serious, serious consideration.

A.   Yes.

Q.   All right.  Now what one juror thinks is mitigation, another may not.  Now mitigation is something to lessen the blame, not the guilt.  Am I making sense?

A.   Yes.

Q.   All right.  And it doesn't mean that it's sufficiently -- it's sufficient.  I'm going to talk to you in a minute.  Youth could be mitigating -- somebody committing a crime at 18 or something, you know -- for one juror.  It may not be for another.  Old age could be something that lessens someone's blame.  Child abuse, physical or sexual injuries during childhood, a good work history, drug abuse, drug addiction, acts of kindness for others, alcohol abuse, low IQ, low intellectual functioning, drug abuse, drug addiction, family breakup, single parent home, intellectual issues, poverty, exposure to chemicals, exposure to poisons, exposure to toxins, toxic material, toxic mold, mental retardation, desperation.  Okay?  Or remember the causation issue?  If somebody is only, in your mind, partially responsible.  Am I making sense?

A.   Yes.

Q.   Okay.  And it could also be mercy.  Let me ask you a question.  I mean, we're talking about killing somebody here.

A.   Yes.

Q.   It's about as serious as it can be, right?

A.   Yes.

Q.   Okay.  You want -- you in your own questionnaire said, I want to be able to live with it?

A.   Right.

Q.   A jury should be able to show mercy if they want to, shouldn't they?

A.   Yes.

Q.   Okay.  In this type of case.  So any piece of evidence that comes in, you have to consider and give effect to, whether you find it or not.  Am I making sense?

A.   Yes, ma'am.

Q.   Can you honestly do that?

A.   Yes.

Q.   Okay.  Let me go a little further.  Let's go back to the Special Issue.  Okay?  Remember, there is no burden of proof.  So could you honestly answer that question based on the evidence, whether taking into consideration all of the evidence -- remember, all of it -- including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance?  Remember, it has to be sufficient.

A.   Right.

Q.   And by the way, that list is not exhaustive.  It could be anything that comes in trial to you.

A.   Okay.

Q.   Okay.  So you're going to take into consideration all the evidence, including the circumstances of the offense, Defendant's character and background, and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.  Is that an important Special Issue?

A.   Yes, it is.

Q.   Okay.  If there is a sufficient mitigating circumstance -- now you told me you could honestly consider and give effect to.

A.   Yes.

Q.   It doesn't mean you have to find it.

A.   Right.

Q.   One juror can agree or disagree what's mitigating or not.  But you could find it.  If you find it, it has to be sufficient to warrant life without parole.

A.   Yes.

Q.   Okay.  Can you answer that question yes if there is a sufficient mitigating circumstance?  It could be just one circumstance.  It doesn't have to be two.

A.   Right.

Q.   Could you honestly answer it yes?

A.   Yes, I can.

Q.   Knowing that he's a guilty capital murderer -- you've already found him guilty -- he's a future danger, and now you're going to say that there is something to lessen his blame.  If there is and you honestly believe there is, can you answer it yes?

A.   Yes, I can.

Q.   Okay.  If there isn't and you honestly believe -- remember, taking into consideration all of the evidence, guilt/innocence and punishment, can you answer it no?

A.   I can.

Q.   Okay.  Let's go a little further.  Let me tell you why.  Because remember I told you yes must be unanimous on a future danger?

A.   Right.

Q.   Okay.  Now you haven't made up your mind.  He's a guilty capital murderer.  He's a future danger.  You said you'd keep an open mind --

A.   Right.

Q.   -- to anything that could be mitigating, lessening his blame.

A.   Right.

Q.   Is that true?

A.   Yes, it is.

Q.   Okay.  So you said you could answer it yes, that you really could find a sufficient mitigating circumstance to spare his life.  Can you do that?

A.   Yes, I can.

Q.   All right.  Yes requires ten or more jurors.  And if you found yes, that there was a sufficient mitigating circumstance, the Judge will sentence the Defendant to life without parole.  Okay?  That's pretty fair, isn't it?

A.   Yes.

Q.   If you answer no, it has to be unanimous by the jury, and then the Defendant receives the death penalty.  Am I making sense?

A.   Yes, ma'am.

Q.   Can you honestly answer -- first of all, guilt/innocence, can you honestly render a decision based on the evidence beyond a reasonable doubt?

A.   Yes.

Q.   Once somebody has been found guilty of the worst crime you could ever commit, Capital Murder, can you keep an open mind?

A.   Yes.

Q.   Okay.  And so you haven't formed an opinion --

A.   No.

Q.   -- whether or not he's a future danger yet, right?

A.   No.

Q. Okay. If I don't prove to you beyond a reasonable doubt that he is a future danger, can you answer that no?

A. I can.

Q. Okay. If I prove to you that he's a future danger, can you answer it yes?

A. I can.

Q. Now once he is guilty and a future danger, are you honestly going to keep an open mind, knowing that there could be a death penalty here?

A. Yes.

Q. And determine whether or not there is something sufficiently mitigating to spare his life?

A. Yes, ma'am.

Q. Okay. How serious is this to you, Ms. Lee?

A. I take it very seriously.

Q. Okay. And it's something I should prove to you, shouldn't I?

A. Yes, ma'am.

Q. Now on the -- now on Special Issue No. 2, remember there is no burden on the mitigation.

A. Yes, ma'am.

Q. Okay? And you can just decide to give somebody mercy. Do you think that's okay?

A. Yes, ma'am.

Q. I mean, we're talking about killing somebody here,

right?

     A.    Right.

     Q.    Okay.  Nothing minor?

     A.    No.

     Q.    Not at all.

     A.    Nothing to be taken lightly.

     Q.    So let me ask you a question.  Are you going to judge this case based on the law and evidence given to you and not emotion?

     A.    Yes.

     Q.    Okay.  To me, it would never be more important to judge something based on the law and evidence, right?

     A.    Right.

     Q.    I mean, people can have general views on the death penalty and they are for or against; but they still could follow the law in a case.  Is that a fair assessment?

     A.    Yes, ma'am.

     Q.    Are you going to be emotion-driven and decide, well, my feelings are he should get a death penalty or life without parole before all the evidence is concluded?

     A.    No.

     Q.    Would you ever do that?

     A.    No.

     Q.    Okay.  So let me go a little further.

               THE COURT:  Eight minutes, for your information.

Q.   Okay.  Let me go a little further.  And you can honestly answer yes if there was sufficient mitigation, even after finding him to be a future danger?

A.   Yes, I could.

Q.   Okay.  So let me go a little further.  When you answered your questionnaire I noticed -- let me go to -- one thing I noticed is that -- page 18, Number 105.

Your answer to Number 100.  What are your feelings about the death penalty?  You said, Necessary but it needs to be used wisely.

A.   Yes.

Q.   When we threw these questionnaires at you, you didn't have any information.  We threw them at about 200 people.  We couldn't give you the information.  So now that you understand the process, do you think the process is fair?

A.   Yes.

Q.   Okay.  Should it be fair?

A.   Yes.

Q.   Okay.  And are you going to judge this based on the facts of the case and the evidence?

A.   Yes, ma'am.

Q.   Okay.  Says:  What is your best argument against the death penalty?  Page 18, Number 104.  It is possible for an innocent person to be found guilty.

Right?

**A.** Right.

**Q.** Okay. So let me ask you this. Even if they are a guilty capital murderer, would you keep your mind open and consider all the punishments for them?

**A.** Yes, ma'am.

**Q.** Okay. And then you also put, I am in favor of capital punishment except in a few cases where it may not be appropriate.

**A.** Right.

**Q.** And page 19 you said, I would consider all the penalties provided by law and the facts and the circumstances of a particular case.

**A.** Yes.

**Q.** Okay. Can you be fair, Ms. Lee?

**A.** I try to be fair in all life. I mean, yes.

**Q.** Would you follow the law and the instructions?

**A.** Yes, I would.

**Q.** Okay. So let me go a little further. What that really means, you've told me you won't make up your mind, you'll keep an open mind. Now some jurors have been given hypothetical circumstances. So pretend you're a hypothetical juror on a hypothetical Capital Murder case, not this one.

**A.** Okay.

**Q.** You and the 11 other jurors have found beyond a reasonable doubt the defendant is guilty of capital murder, an

unjustifiable, horrific, non-self-defense crime.  No insanity, no self-defense, no victim provocation, no substance abuse. Innocent victim.  Okay?

A.    Okay.

Q.    You can still keep an open mind and go through the punishment phase?

A.    Yes, ma'am.

Q.    Okay.  You wouldn't say, oh, my feelings are now he should get a death penalty or not?

A.    No.

Q.    Because can you agree with me -- what's missing from that hypothetical?  You can't have any feelings form after guilt.

A.    Right.

Q.    You have to be able to honestly consider the evidence.

A.    Yes, ma'am.

Q.    Can you do that?

A.    I can.

Q.    Okay.  Let's go a little further.  Murder can be a man intentionally killing a man, a man intentionally killing a woman, a woman intentionally killing a woman, a woman intentionally killing a man.  Do you make any distinction based on gender, or is murder murder?

A.    Murder is murder.

Q.    Let's go a little further.  Murder can be a white

person intentionally killing a white person, a white person intentionally killing a black person, a black person intentionally killing a black person, a black person intentionally killing a white person, a Hispanic person intentionally killing a Hispanic person, a Hispanic person intentionally killing a white person.  Do you make any distinction based on race or is murder murder?

A.    No, murder is murder.

Q.    Okay.  Can you judge this case based on the evidence and the law provided to you by the Court?

A.    Yes, ma'am.

Q.    Will you honestly keep an open mind and consider and give effect to anything that could lessen the Defendant's blame, mitigation?

A.    Yes.

MS. YENNE:  May I have a minute, Judge?

Q.    Now you had indicated that you had some health problems?

A.    Yes, ma'am.

Q.    Okay.  What are they?

A.    A lot of autoimmune things.  I have thyroid issues.  I have rheumatoid arthritis.  I have some diabetes.

Q.    Okay.

A.    I have glaucoma.

Q.    Could you sit fairly on this jury?

A.    Yes, ma'am.

Q.    Okay.  There is no health issue that would preclude you from doing that?

A.    No, ma'am.  I have medications.  I'm fine.

Q.    Okay.

MS. YENNE:  I'll pass the juror.

THE COURT:  Ms. Mallon?

MS. MALLON:  Thank you, Your Honor.

**VOIR DIRE CROSS—EXAMINATION**

**BY MS. MALLON:**

Q.    Ms. Lee, how are you?

A.    I'm okay.  And you?

Q.    I'm well.  Thank you.

My name is Kerri Mallon.  This is Jay Wooten, and that's Mr. Harris down there.

A.    Hi.

Q.    We represent Mr. Harris, and I'm going to ask you a lot of questions as well.  And it's probably going to sound like I'm asking the same questions that the State has already asked you; but, you know, there is a lot of law and Ms. Yenne has to get you a lot of information very quickly.  So I heard a lot of yes and no's from you, but not a lot of explanations.

A.    Okay.

Q.    So what I'm going to do is I'm going to pick your brain as well, and I'm going to probably ask you some more

questions about why.

A.    All right.

Q.    Okay?  Because we -- you know, like Ms. Yenne said, the stakes don't get any higher than they are right now.  You know?  Mr. Harris' life is on the line.  So it's very important for us and for Mr. Harris that we know how you really, really feel in your heart of hearts.

A.    Okay.

Q.    On capital punishment and the death penalty, you know, everybody feels differently about it.  You know, and it varies from person to person.  And the majority of the people we've had come here to speak to about it are very much in favor of it.  And we just want to get your feelings about it.  Okay?

A.    Okay.

Q.    And, you know, we asked you a bunch of questions without telling you what the law is.  But I tend to think -- and then -- but we do that on purpose so we get what your feelings are.  Okay?  Because sometimes after the law is explained to you, jurors feel like they have to change their answers.  And I don't want you to feel that way.  And I don't want you to feel like you can or cannot change the answers that you already gave Ms. Yenne.  Because everybody in this room wants to know how you really feel.  Okay?

A.    Yes, ma'am.

Q.    Does that make sense?

A.    Definitely.

Q.    Okay.  And where you sit right now as a potential juror, you don't have to do anything.  You know, there was a lot of as a juror you can't do this and you can't do that and you must do this and you must do that.  And that's true as a juror; but where you are right now, the only thing you have to do is tell us the truth.  Okay?

A.    Yes, ma'am.

Q.    And if you disagree with something, we want to know. Does that make sense?

A.    Yes, ma'am.

Q.    And I don't want you to think anybody in this room, the State, the defense, the Judge, are going to be disappointed in you, think badly of you, nothing.  Nothing like that at all. Even if your answers change, if your feelings change, we just want to know honestly how you feel in your heart of hearts. Does that make sense?

A.    Yes, ma'am.

Q.    And I think you're in a very difficult position because you come in here and you're told a whole bunch of new things about capital punishment law -- and I promise you most lawyers don't know capital punishment law.  It's a very specialized area of law.  And so you come in here, you've answered these questions, and now we're throwing a bunch of law at you and asking you, you can be fair, can't you?  You can

follow the law, can't you?  And I think in that situation it would be very difficult to say, you know what?  I don't know that I can.  You know, I don't know that I can do that.  But if that's how you honestly feel, I am begging you to please tell me.  Okay?

A.    Okay.

Q.    Because I know that there are some cases, even as a defense attorney, I would not be able to sit as a juror on.  Because what they are accused of would be so upsetting to me and so bad to me that I, no matter what the law is -- and I would like to think I could be fair and I would try to be fair; but sitting over there in that jury box, I don't know that I could.  Does that make sense?

A.    Yes, ma'am.

Q.    Okay.  A lot of people tell us that they could never be a juror on a child sexual assault case, you know, because if someone is accused of that, there has got to be something there and I just could not -- I couldn't do it.  I couldn't be fair to the person accused of that.  Does that make sense?

A.    Yes, ma'am.  It does.

Q.    And frankly, a lot of people feel that way about Capital Murder.  You know, they think if someone has been indicted for Capital Murder, there must be something there.  How do you feel about that?

A.    No, I don't really feel that way.  I feel like that

it's an indictment.  It's an alleged offense.  Again, I think someone needs to be where they can look at the evidence and make the decision based on our society here.  I mean, our judicial system is the best; and I would hope that everybody that would have a chance to do something would try to make it the best they could do.

Q.   So would I.  I think we all would.  You know, we've all heard on the news about people on death row who have later been found to be, you know, not guilty now that DNA is here and all that good stuff.

A.   Right.

Q.   So I appreciate that answer.  I really do.  And I believe you.  I'm just asking you if you honestly feel differently about something, if you'll tell me.

A.   Oh, I'll tell you.  Yeah.

Q.   Okay.  I want to ask you a few things about your questionnaire.

A.   Okay.

Q.   And some of these are just curiosity questions.

A.   Not a problem.

Q.   And some of them are actually about the law.

On page 3 you said you had written a letter to the editor.  What was that about?

A.   Oh, that was some -- actually, traffic issues and stuff in the neighborhood.

Q.     Okay.  I probably get 25, 30 e-mails a day asking me to send a letter to my Senator and send a letter to the President.

A.     Well, I have sent a letter to the Senator or President on a couple of issues; but it's mostly economics, et cetera.

Q.     I think I probably do that daily, honestly.  Because now they make it so easy.  All you have to do is hit a button and it goes.

A.     Right.

Q.     Let's see here.  Okay.  You talked a little bit about your health problems.

A.     Yes, ma'am.

Q.     And on page 4 we asked you if you had any health problems that might affect your service as a juror and you said yes.

A.     Well, only if -- you know, I have the medication, as I said, for all of these.  And there is -- I'm on maintenance. If I had to do extraneous walking, et cetera, I would have some issues with the arthritis.  With sugar issues, I have some issues there.  But as long as I do what I'm supposed to do, I should have no issues.

Q.     Okay.  So sitting for a long period of time is okay?

A.     That's what I do every day.

Q.     Me, too.  Okay.  I just wanted to make sure because I don't want you to feel like -- I certainly don't want to risk

your health.

A.   No.

Q.   On page 5 we asked you if there was any reason that you will be unable to serve from October 23rd to November 22nd. And you said, I don't think so.  I just want to make sure that hasn't changed.

A.   No.  I haven't any issue.  Right now my husband has a knee surgery scheduled for the 1st of December.  That's the only thing that I'm aware of.

Q.   Okay.  You also told us that you had served as a juror twice?

A.   Yes, ma'am.

Q.   How was that experience for you?

A.   It was educational both times.  I was pretty pleased with the panels that I sat on in the sense that the people I served with did try to take in effect only the facts that were presented in the courtroom itself and they also tried to be very fair and tried to examine it from both sides.  So I was -- it actually left a good impression.

Q.   Good, good.  That's nice to hear.  That's one thing I do not know is what goes on in a jury room.  And I would love to know, but I don't.  I've never been -- I've never -- and it would be no surprise I've never been selected, but I've only been called once.  I want to be on a jury so bad, but I can't get that.  It just hasn't happened.

A.    I need to swap names with you.  I get called often.

Q.    Yeah, it looks like it.  It looks like it.

On page 8 we asked you if you ever had a member of your family accused of a criminal action.  You said your brother.

A.    Yes, ma'am.

Q.    Was that 40 years ago?

A.    At least.  I will have to be honest with you.  I was probably between high school and college at the time.  So I don't know much of the facts that went on in the household.  And I haven't seen my brother in 30 years.

Q.    Okay.  Was he treated fairly?  Do you know?

A.    As far as I know.

Q.    Okay.  I just wonder if that left you with a bad taste in your mouth, anything about that?

A.    No, not really.

Q.    Okay.

A.    I didn't even really remember it until you asked that question.

Q.    Okay.  And, you know, we just want to make sure and see what it's all about.

A.    Right.  I understand.

Q.    On page 12 we asked you Question No. 65:  What do you think are the reasons that people commit most of the violent crimes in our society?  And you said, No family structure, not

taught how to handle conflict.  Tell me what you were thinking when you wrote that down.

A.    I guess it's my opinion of the society that we live in now is because we don't have a good family structure.  You don't have both parents in the home.  They are not taught how to behave.  You know, they are not taught individual accountability, own up to your own actions, et cetera.  And they don't know how to handle a conflict in a sense that, you know, fighting with your brothers and sisters kind of gets you where you can handle it in school, which can get you where you can handle it in life, et cetera.

Q.    So if you don't have a good example from a parent --

A.    It's -- you know, I know that there are times that people overcome their circumstances.  Someone in the same circumstances turns out different than the one that's with them.  So there is a lot of individuality into that; but you start off with a little more chance, I guess, if you have that structure.

Q.    And I would say I agree with you.  On page 14, Question No. 80, we asked you if you knew any attorneys, investigators, et cetera.  And you said that you know lawyers and bailiffs.  Anybody here in town?

A.    No.

Q.    Okay.

A.    Mostly out in Harris County.

Q.    Okay.  Anybody you're real close to?

A.    No.

Q.    Okay.  On Page No. 15 on Question No. 85 we asked you: What would you change about the system if you could?  And you said, Clear, defined, less trivial, more emphasis on serious issues.  Tell me about that, please.

A.    I think that the system as we have it right now is too clogged by the smaller offenses.  Not that they can't lead to larger ones, but I think that there should be -- even though there are separation in courts, et cetera, that there needs to be some more emphasis on that.  On the victimless, quote unquote, crimes, they need to be handled differently and more expeditiously than others.

Q.    Sure.  Okay.  That makes sense to me.  That does.

Okay.  Page 16, Number 91:  Do you believe the type of victim or status of the victim should affect the punishment in a criminal case?  And you said, No.  Violence is not easily untaught.  Every individual should be viewed equally.  Tell me what you mean by that.

A.    The crime is the crime.  Whether you're a millionaire or whether you're in poverty, the crime is the crime and it should be considered as the facts of the law, not as -- you know.

Q.    Okay.  That makes sense.  What about violence is not easily untaught?

**A.** If you've been reared with the idea that -- you know, even a 2-year-old, if they are not taught how to behave, that's how they are going to behave until they reach somebody who won't give in to them or whatever.

**Q.** Okay.

**A.** And if they are never thought that that's not how you resolve anything, then that's how you solve a problem.

**Q.** Makes sense.

On page 17, Question 97: Have you ever known anyone who had a serious drug problem as a result of drug use? And you said, Yes. And the problem was divorce and prison. Do you mind? I know it's a personal question, but do you mind talking about it?

**A.** It was my brother. He was in the Navy during the Vietnam War and did get into drugs. Then he married someone who was also in the drug scene and of course it, you know, divided their family, tore it up. And it, you know, impacted my family as well.

**Q.** Yeah. It's sad.

**A.** It is. And it was difficult to watch. My mother actually turned her grandchildren over to social services to get them out of the situation. So it was hard.

**Q.** Is he doing well now?

**A.** It's -- he's the one I have not heard from in -- so he removed himself from the family. It was not us. I think it

was his idea that we held ourself to a certain accountability and he did not.

Q.    Okay.  Do you think -- so you feel like he was actually addicted to drugs?

A.    Yes, I do.

Q.    Okay.  That's a big problem in society, it seems?

A.    It is.

Q.    And like you were talking about the victims, you know, it hits millionaires.

A.    Yeah.  It's not just the person that has the problem. It's through the outlying family and society around them.

Q.    Yeah.  And now they are saying that a lot of, like, suburban housewives are addicted to painkillers.  And it's just -- it affects everybody.

A.    It does.

Q.    Okay.  Page 18.  Now we're going to get to a little more meaty questions.

A.    Okay.

Q.    Okay?  Question 100 -- and I know Ms. Yenne asked you about this, but -- what are your feelings about the death penalty?  And you said, Necessary but needs to be used wisely. So I want to ask you why do you feel it's necessary?

A.    I actually studied it at one time a long time ago, high school kind of thing.  And I did do a little research about why they used it, how we used it in history, et cetera,

and what the benefits and pros and cons were. And actually I ended up more on the side of that it was necessary, it was beneficial; but it had to be used appropriately, wisely.

Q. Okay. Number 105: Check one statement that best summarizes your general views about capital punishment, the death penalty. And you said, I'm in favor of capital punishment except in a few cases where it may not be appropriate. That is the one you checked. What were you thinking when you checked that?

A. Probably closest to the definition that she was giving with mitigation. You know, that there were circumstances that could lessen the severity of the crime. You know, it shouldn't ever get to the point where somebody is facing that without having been proven beyond doubt; but there is always -- you know, as we've seen in the news, there is chances for errors, et cetera. And I think that it needs to be left to the people that are on that panel to do what they can decide.

Q. Okay. I'm not trying to put words into your mouth.

A. No.

Q. And if I am, please correct me. From that answer you just gave me, it sounds like you lean towards the death penalty versus life without parole.

A. I really don't know that I do. It is, you know, a possibility; but also considering punishment as humane or not humane, et cetera, is something that I would like to take into

consideration when I'm asked to decide something like that.

Q.   Okay.

A.   And that would have to be laid out in the details.

Q.   Can you?

A.   I guess, personally, something would be worse to me than the alternative.  And it might be that prison might not be the alternative I would want to do for myself; but then again, I'd have to look at it as to what that person would choose.

Q.   Okay.  Are you saying that you think the death penalty -- and I think that was a question in here somewhere -- is more humane than life without parole?

A.   It could be, yeah, depending upon the personality.

Q.   Explain that to me.

A.   There are certain individuals that, I mean, being confined would be more of a burden and would be harder on them than to accept the guilt and go toward the death penalty.  I mean, after everything has been exhausted.  I don't think that anybody needs to go from A to B without having all the steps in between.

Q.   You said that, I think -- and again, correct me if I'm wrong -- for you personally you would not want to be in prison. You said something along those lines.

A.   Right.  Confinement might not be -- I'm not saying personally because you can give me a book and I can sit in that corner and I'd be okay all day long.

Q.    Me, too.

A.    But it is something that I would think it would be up to that individual.

Q.    Okay.

A.    And I would like to factor that in if I have that information.  If I don't, then it's going to have to be just strictly on --

Q.    Okay.  But you're not going to make a decision based on how you feel?

A.    No.

Q.    Okay.

A.    No.  I try very hard not to impose my feelings on anyone.

Q.    Okay.  I'm probably going to come back to your questionnaire; but I want to go through the process again, coming from our point of view.

A.    Okay.

Q.    Because as you can imagine, it's very different.  And like I said, I really want to get your feelings about different things.

A.    Okay.

Q.    And like I said, I think it's hard to be in that chair.  And I think it's difficult -- when, you know, you want to be a good juror, you want to say you can follow the law, I think it would be difficult to say, I can't.  Especially in

front of the Judge and, you know, all the lawyers in here.  But if that is how you feel, I'm asking you to tell me.  Okay?

A.    Right.

Q.    And the other thing about being in that chair versus being in that chair over there as a juror is, you know, we can't really -- well, we can't tell you about the facts of the case, obviously.  But it's important for us to really paint a picture for you of how it would be in that chair versus being in your chair.  Does that make sense?

A.    Yes.

Q.    Because once you are over there, you are obligated to follow the law.  And what I don't want to happen is someone who says they can and then they get over there and realize they cannot.  Does that make sense?

A.    Yes, ma'am.

Q.    And so, you know, we talk about Capital Murder and death and the death penalty, you know; but it's much worse than that.  Does that make sense?

A.    Yes, ma'am.

Q.    Okay.

A.    It does.

Q.    I was thinking, you know, we try to put it in context for you so you can really see it and picture yourself over there and see how you would honestly answer and how you would honestly feel.

I'll give you just an example in my life. I go to the gym and I have a personal trainer. And clearly you can't tell, but I do go. And the first time I met with my trainer he said, How many times a week do you want to workout? And I was like, Five. Five days no matter what. He's like, Okay. Well, what time do you want to come? And I was like, Well, you know, I need to come in the morning before work. So how about 5:00 a.m.? And he looked at me and he's like, Five days a week at 5:00 a.m.? I was like, Yeah. I can do that. He was like, Okay. I went to bed that night. The next morning my alarm went off at 4:15 and I was like, Oh, no. This is not going to work for me. Does that make sense?

A. Yes.

Q. It sounded good.

A. Abstract.

Q. It sounded like something I could do.

A. Right.

Q. But once I was actually there, I was like, Oh, no, this isn't going to work for me.

A. Right.

Q. So I want to put you in the context of being a juror over there and just see how you feel.

A. Okay.

Q. Okay? So I'm going to give you a hypothetical. It's not about this case. It's about a completely different case.

It's a made-up case.  Okay?

A.  Okay.

Q.  And you know, because you spent a lot of time talking to the State about this, that there are two penalties in a Capital Murder case, right?

A.  Right.

Q.  What are they?

A.  Life without parole or death penalty.

Q.  Okay.  Always.  There is always two penalties.  Life without parole and death penalty.  And I'm not trying to tell you there aren't.  There are.  Okay?

A.  Right.

Q.  So I don't want you to think I am trying to tell you there are not because there are.

So I want you to assume with me that you have been selected as a juror on a Capital Murder case.  Okay?

A.  Okay.

Q.  And you and 11 other jurors have found beyond a reasonable doubt that this person is guilty of Capital Murder.

A.  Okay.

Q.  Okay?  Now to be Capital Murder, as the State explained to you, it has to be an intentional killing plus some other crime.

A.  Right.

Q.  The example Ms. Yenne gave was burglary or robbery.

A.    Right.

Q.    Okay.  It's an intentional killing in the course of a burglary or robbery.  Intentional means conscious desire to kill.

A.    Right.

Q.    Are you with me?

A.    Uh-huh.

Q.    Okay.  You and 11 other jurors have also decided beyond a reasonable doubt that it was not self-defense, it was not in defense of a third party, it was not done in defense of property, the killer was not provoked by the victim, it wasn't a mistake, and the defendant was not insane at the time of the murder.

A.    Okay.

Q.    Are you with me?

A.    Uh-huh.

Q.    So I want to know in that situation what are your feelings about the death penalty for that guilty murderer?

A.    Well, it would definitely be on the table.

Q.    Okay.

A.    The other two issues would still have to be decided.

Q.    Okay.

A.    You know, but it is definitely on the table.

Q.    Okay.  So in that situation it's not a definite for you?

A.    No.

Q.    Okay.

A.    No.

Q.    Because I will tell you, Ms. Lee, there are a lot of people who are that way.  You know?  And, you know, it's not something we take lightly.  But a lot of people tell us if you tell me he intentionally killed someone during the course of another felony, it's always going to be a death sentence for me.

A.    No.  It's -- as I said, it's on the table but it's not decided.

Q.    Okay.  All right.  Now I want to talk to you about the first Special Issue, and I have it up here.  Special Issue No. 1.

A.    Okay.

Q.    And I know you've read it already.  But from the evidence, do you find beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Now in Texas the death penalty is never required.  Okay?  It's never ever required.  Not in this case, the worst case you could think of.  Okay?

A.    Okay.

Q.    It's never required.  It only happens if we go through these two Special Issues.

A.    Okay.

Q.    Does that make sense?

A.    Yes, ma'am.

Q.    Okay.  And the State has to prove every element in that question beyond a reasonable doubt.

A.    Okay.

Q.    So they have to prove to you what's going to happen in the future.  Does that make sense?

A.    Right.

Q.    Do you think that's a difficult burden?

A.    Yes, it is.

Q.    Okay.  Do you think it should be?

A.    Yes.

Q.    Okay.  Good.  And if you'll look with me, you know, it doesn't say what might happen, what could happen, what I'm afraid will happen.  I mean, they have to prove this to you without any reasonable doubt.

A.    Right.

Q.    And because this -- essentially, you know, as Ms. Yenne says, this question puts you on the road to the death penalty.

A.    Right.

Q.    Right?

A.    Uh-huh.

Q.    So would you agree with me that it should be taken

literally?

A.   Right.

Q.   They have to prove to you that he's going to be a future danger.

A.   Right.  With the word probability in there.

Q.   Correct.  More likely than not.

A.   Right.

Q.   Right?  And Ms. Yenne talked to you about society and society is anything.  But in reality, if a person is convicted of a Capital Murder, whether they get a life without parole sentence or they are sentenced to death, where are they going to be?

A.   In prison.

Q.   Correct.  Okay.  And Ms. Yenne told you that it does focus on the internal restraint on an individual, but you can also take into consideration the external restraint as well.

A.   Right.

Q.   Okay?  And let me ask you.  If you had the opportunity to change the law and take that away, would you take that Special Issue away?  Would you?

A.   No.

Q.   Okay.  Why not?

A.   It makes you ask that one more question.  It makes you go that one more step.

Q.   Okay.  And you think that's important?

A.   Yes.

Q.   Tell me why.

A.   Because nothing should be ever taken lightly or without looking at issues when you get to this point.  I mean, you hold things in your -- the balance in your hand, and you have to be able to consider all the issues.

Q.   Okay.  And the legislature is -- and tell me if you agree with me.  You know, they are trying to decide who is going to, I mean, continue to be violent in the future.

A.   Right.

Q.   Right?  And the caselaw tells us that the death penalty is reserved for those few incorrigibles who cannot be safely contained in the penitentiary.  Does that make sense to you?

A.   Yes.

Q.   Okay.  Now, you know, I have to -- I have to ask you because a lot of times -- you know, Ms. Yenne said a life is on the line; and it absolutely is.  It's very, very, very important to me, clearly.  But you can't forget that a life has been taken as well.

A.   Right.

Q.   So I don't want you to forget that when you're answering these questions because I think that's important for you to remember.  And I think, ultimately, that's what jurors have a hard time getting past.  Does that make sense?

A.    Yes, ma'am.

Q.    Okay.  Again, I want to ask you, you have found someone to be a guilty capital murderer, no reasonable doubt in your mind.  Could you honestly ever answer that question no?

A.    I think I could, you know, depending upon what is put out there.  I try to make all decisions based on what is out there.  I don't try to -- I come at it with no preconceived ideas.

Q.    Okay.

A.    I mean, I haven't been in that position.  It's hard for me to take and speculate at this time; but I will try my best to do that, yes.

Q.    Okay.  It sounds like -- and you have some hesitation.

A.    Well, I think any time you get to this point that you would have some hesitation if you are a thinking individual.

Q.    Okay.

A.    I mean, everybody is human.  We all have things that we have in our lifestyle, et cetera, that would get you to question things.  But, yeah, I really do try to take what -- even from the examples that I've had being a juror, I try to take everything -- only what's said in the courtroom and only what's permissible.  I try.  I mean, I'm human and I do other things but --

Q.    You're exactly right.  I mean, you are.  Every juror that sits in that seat is human.  You know, they have feelings,

they have experiences, they have values, they have morals that they bring to that chair.

**A.** Yes.

**Q.** And that's why we ask these questions because it can be different for everybody.

**A.** Right.

**Q.** You know?  So I want to know if you can tell me what is it that's in your mind or in your heart that says -- that makes you say I'll try instead of --

**A.** Yes or no?

**Q.** Yes, ma'am.

**A.** I guess because I am an intelligent human being -- or I like to think that I am -- and I know that I probably have something in my head that wouldn't be allowable or whatever.  I don't know about what it would be because I haven't been put in that position.  I haven't had that question asked.  So, you know, I'm trying my best to think of different things that might make me lean one to the other.  I can't come up with one, but it doesn't mean it's not there.

**Q.** Okay.  Let me give you a little more context.  Okay?

**A.** Okay.

**Q.** Again, a guilty capital murderer.  Okay?  And I want to put you in that chair.  During the course of a Capital Murder trial you would see and hear really gruesome details.

**A.** Yes, ma'am.

Q.   You would see autopsy photos, crime scene photos, hear the scene described in detail, right?

A.   Right.

Q.   That's hard to hear.

A.   Yes, ma'am.

Q.   And, you know, there is someone's loved one is gone, right?

A.   Right.

Q.   So you're probably going to hear how that impacted them as well.

A.   Right.

Q.   And so you've heard all that and you've seen all that when you get to this first Special Issue.  So they are a guilty capital murderer.  You've seen the horrible things that happened.  You've seen, you know, the family is very upset.  Knowing all that, seeing all that, you and 11 others determined that this person is guilty of Capital Murder, can you ever answer that question no?

A.   I could.

Q.   Okay.

A.   I could.

Q.   Okay.  Now I want to go back to your questionnaire, Ms. Lee.

A.   Okay.

Q.   Let's go to page 20, please.  That's Question 109.

And we gave you a lot of agree or disagree. The second one down you said, Capital punishment is absolutely justified. Tell me about that.

A.    Again, it is something that has been proven through time to be both a deterrent -- not necessarily from somebody committing a crime over and over again because, obviously, they can't if they -- but it's also a deterrent in the sense that I think if someone is on the fence, riding it or whatever, and they stop and they think, this is a death penalty state, you know, it gives them reason to stop, reason to think, if they can. Also, it's a deterrent in the sense of just anybody else contemplating something like that. So it is a deterrent.

And it is justifiable in the sense that the law is specific. Even going back to biblical times, the law is specific. A life is a life. And if you take a life, then a life is called for.

Q.    Is that how you feel?

A.    Again, yes, within -- you know --

Q.    Okay.

A.    -- with the reasons that I've explained before.

Q.    So you feel an eye for an eye?

A.    Well, yes. To say -- the short answer is yes.

Q.    Okay.

A.    I do feel that way. If there is a crime, there is a punishment.

Q.   Okay.  So to take that one step further, if there is a death, there needs to be another death?

A.   There needs to be a punishment.

Q.   Okay.

A.   Okay?

Q.   Okay.

A.   Everything else has to go along with it, the laws, et cetera.  I don't believe that -- no, revenge is not on the table.  That is not the way I feel at all.  I just feel like that every crime -- it's the law of physics.  Every action has an equal and opposite reaction.

Q.   Sure.  But in the Bible an eye for an eye means a death for a death, right?

A.   If you take it literally.

Q.   Okay.  So are you saying you do not?

A.   Not necessarily.  Again, I would say it's a crime equals a punishment.

Q.   Okay.  Not necessarily a death sentence?

A.   Not necessarily the death sentence.

Q.   Okay.  Now I have to ask you something.  When you were talking about a deterrent, committing crimes, it seemed like you pointed over here.

A.   No, I was just waving.

Q.   Okay.

A.   I'm sorry.  I talk with my hands.

Q.    That's okay.  I'm sorry.  I just wanted to -- I had to ask.

A.    No, no.  I have no preconceived ideas.  I don't know Mr. Harris.

Q.    Okay.  The next one down you said, I think capital punishment is necessary, but I wish it were not.  Tell me about that.

A.    I just think that's humanity in the sense that I wish things didn't happen, you know.  I wish we all had sunshine and roses, but we don't.  If you had said something besides "wish."

Q.    Okay.  What would you have put in there if you could put another word?

A.    I don't know.  It's just -- it's just necessary. Again, I wish humanity would not be that way; but people are people.

Q.    Let me ask you another question.  You said deterrent, and you said that a few times.

A.    Okay.

Q.    Is that going to play a part in your decision?

A.    I don't really understand which way you mean it, but would I use this as an example?  Is that what you're trying to get to?  If so, then no.  I would try to look at just what's here in the courtroom.  I wouldn't think about externals.

Q.    Okay.  So if you were a juror on any capital -- not this Capital Murder case -- a Capital Murder case, would you

think, you know, I need to -- we need to sentence this person to death so we can send a message to others?

A.   No.

Q.   Okay.  On page 21, Ms. Lee, towards the top of the page, not quite halfway down, it says:  Capital punishment is just and necessary.  And you said you agree.  I think you've explained why it's necessary.  Tell me why you think it's just.

A.   Again, it goes into the crime equals punishment and if -- or equal reactions, et cetera.  Once the guilt has been determined and the other -- then you're into that stage of if it's a guilty plea, then it's just.  It's a just punishment.  I don't think it's outlandish.

Q.   A death sentence?

A.   A death sentence.

Q.   Okay.  Because it's sounding, again, like you're telling me an eye for an eye, a death for a death.

A.   No, no.  I am just saying that it is a just punishment.  It is an equal one.  It is something that could be considered on its own.  It's not necessarily the only answer; but it is a just answer, as is life without parole.  It's a just punishment as well.

Q.   So you feel that life without parole is as just a punishment as a death sentence?

A.   Yes.

Q.   Okay.  You said yes, but you shook your head no.

A.   I'm just trying to think of any way that it wouldn't be.

Q.   Okay.

A.   I can't think of one that would -- where one would be weighed more heavily on than the other.  So, yeah, it's a just punishment.

Q.   Okay.  On page 18, Question 104, we said:  What is your best argument against the death penalty?  And you said, It is possible for an innocent person to be found guilty.

And I agree with you.  That is an argument to be against the death penalty.  But I want to ask you something.  I want to take you back into the context of it is a guilty capital murderer.

A.   Right.

Q.   Okay?  You know it's a guilty capital murderer, proven beyond a reasonable doubt to you and 11 others.

A.   Right.

Q.   Okay?  Knowing that, do you have another -- and if you don't, you don't.  Do you have another argument against the death penalty?

A.   Not really.  Just that I know that you make the best decision you can based on what you've got in front of you.  Something else could always come about later, but you can't take that into factor at this stage.  So that's why I said it is possible for someone to be found guilty when not.

Everybody, I think, that sits on a jury tries to not be in that situation.

Q. Okay. I'm trying to process your answers.

A. That's all right. I'm trying to process them, too.

MS. MALLON: May I have a moment, Your Honor?

THE COURT: You may.

VENIRE PERSON: Could I have a drink of water, please?

THE COURT: Yes, ma'am.

VENIRE PERSON: Thank you.

Q. (BY MS. MALLON) Okay. Ms. Lee, I'm going to talk to you about Special Issue No. 2; but I want to talk to you about some of the other things that Ms. Yenne talked to you about.

A. Okay.

Q. The confession. And again, I want to put this in context for you. Okay?

A. Okay.

Q. Let's say that the confession was videotaped. So you saw it, you heard it, you believed it. Okay?

A. Okay.

Q. And it was a horrific Capital Murder. The person who confesses tells you in detail how they did it, why they did it, no remorse, just horrific. Okay? Are you with me?

A. Okay.

Q. And you see it and you believe it. You believe it.

Okay?

And then as a jury you find that when the police Mirandized this person, they left out a warning.  Okay?  And as Ms. Yenne told you, that's a violation of the law.

A.   Yes, ma'am.

Q.   So then you would be given an instruction from the Court that you could not consider -- you have to wholly disregard that confession and you could not consider it for any purpose.

A.   Yes, ma'am.

Q.   You said you could do that?

A.   It would not be easy.

Q.   Of course not.

A.   It would have to be a conscious decision to set it aside.  I think that I can do that.  Sitting on one of the prior juries we had something similar.  And to be honest, it came up in deliberations but we told them it had to be set aside and it could not be considered as part of it.  I cannot answer for anybody else on the jury.  I can say that that was not used in my decision.  Okay?  It was not nearly to the extent of this one.  Okay?

Q.   Okay.  And that's kind of my point.  What kind of case was that?

A.   It was on the DUI.

Q.   Okay.  And now we're talking about a murder.

A.    Right.  It's very difficult to unsee, unhear.  So it does have to be a conscious decision to set it aside.  It is hard to do, and I'm not sure that anybody can answer 100 percent that they do it.  I really can't tell you that.

Q.    So you can't answer 100 percent?

A.    No.  I can say that it would be something that I would try to do and that I would be conscious of it, but I cannot say that it would not be in there.

Q.    Okay.  So are you telling me you would -- you can't say you wouldn't consider it?

A.    No, I can't say that I cannot.

MS. YENNE:  Your Honor, I'm going to object to the form of question as to the instruction and framed whether she could follow the Court's instruction and the law.

THE COURT:  Sustained.

MS. MALLON:  May we approach?

THE COURT:  You may.

**(The following discussion was held at the bench.)**

THE COURT:  We are at a bench conference.  The venire person cannot hear.

MS. MALLON:  Can you tell me what was wrong with my question?  Just so I make sure.

MS. YENNE:  Judge, I'm objecting to the question as not -- as failing to give the legal instruction, again in the second question, about whether she can follow the law and

the legal instruction. She has testified that she could; and now in the questioning, that is not in counsel's question. I would ask that the juror be asked and the law be explained to her and whether or not she can follow it. And I'm going to object to a question that does not explain the law again and then come back again regarding the confession.

MS. MALLON: Your Honor, I believe I'm entitled to ask questions that I think I will get the most information from, as long as they are not commitment questions. The law has been explained to her for an hour, that Ms. Yenne thoroughly did a good job of. I don't have to ask her my questions in the way that she wants me to.

The other thing, Your Honor, is Ms. Yenne's questions were, if not all, at least mostly leading questions. And the law clearly says that that is not sufficient to determine a bias. So that's why I should be able to ask the question I want to as long as it's not an improper commitment question, which it clearly was not. I should be able to ask the questions as I choose to, to get the information I need to exercise my challenges for cause or a peremptory challenge.

MS. YENNE: And my exact point is that it would have to lead to a challenge for cause. And if counsel is attempting to ask the question in a way that is a commitment question but then wants to make it for challenge for cause that's exactly what Standefer is talking about. And the

question is if she would take a position that this would suggest a challenge for cause then it is improper not to explain the law regarding the question.

THE COURT:  All right.  The way the question was asked, I'm going to sustain the objection.

MS. MALLON:  Can you tell me how the question was asked so I know not to ask it again?  At this time I don't remember.

(Court shows attorney realtime screen.)

MS. MALLON:  Okay.

**(Bench discussion concluded.)**

Q.   (BY MS. MALLON)  Ms. Lee, I apologize for that long pause.  That happens a lot in trials.

A.    It does.

Q.    You're used to that because you sat on a trial, right?

A.    I've sat on a couple of them that did that.

Q.    And because of that long pause, I'm not a hundred percent sure where we were.  But I know we were talking about this confession.  And I appreciate your honesty.  I really do.  And I need to know where you are on that.

A.    Again, as I said, it's very hard to unhear or unsee; and it's a conscious decision to not take that into consideration.  And, you know, you try to set it aside as best you can.  I'm going to say that I would probably -- again, not being in the situation, it's hard for me to say definitely that

I would be able to set it aside totally. I would try my best to do so. And that's about the best answer I can give you on it.

Q. Okay. Let me take it a step further. Okay? The confession is what, for you, proved the case beyond a reasonable doubt.

A. Then I would have to say that I would take that into consideration and say that it would be not -- I would have to find either the not guilty or the not step or whatever. Because if that's what tipped the balance and it was something that I could say that otherwise the case was not proven, then I would have to say that I would have to go on the other side. I would say that it was not guilty, not death penalty, whatever, if that was the scale.

Q. Okay. So let me just make sure I understand you. You've heard a confession. You believe it a hundred percent.

A. Right.

Q. But you also believe that the police missed a warning.

A. Right.

Q. And this confession is what, for you, would prove their case beyond a reasonable doubt.

A. Right. If there was not a supporting documentation, whatever, behind that that would have caused me to be on the guilty, then I would have to say not guilty because it is the deciding factor for me.

Q.   Well, you don't have -- let's say you don't have any other supporting documentation?

A.   Then I would have to say that there was nothing -- the case had not been made.

Q.   Okay.  So even though you heard someone confess to a Capital Murder --

MS. YENNE:  Objection.  Asked and answered repeatedly.

THE COURT:  Sustained.

Q.   (BY MS. MALLON)  Okay.  Ms. Lee, let's talk about this lesser-included offense Ms. Yenne talked about.

A.   Uh-huh.

Q.   I think her words were -- well, you know the range of punishment as she explained to you was 5 to 99 or life, right?

A.   Right.

Q.   Okay.  That's for murder.  That's still an intentional killing, as she said, right?

A.   Right.

Q.   And I think she even said let's assume that it started at Capital Murder.  So it was originally Capital Murder, but she wasn't able to prove burglary or robbery and so -- but she was able to prove an intentional killing.

MS. MALLON:  Can you tell me how much time I have, Your Honor?

THE COURT:  You started at 11:15.

Q.   So it's still an intentional killing.  Okay?

A.   Uh-huh.

Q.   Can you say you would honestly consider as little as 5 years for an intentional killing?

A.   Yeah.  Yes.

Q.   Okay.  It sounds like you're hesitating.  Are you hesitating?

A.   Well, I'm just trying to think that -- you know, I don't know -- I never have studied the law or whatever.  I don't understand all of the consequences, et cetera; but I know that it's what happens in this room.  And I do believe that I could take it from the range --

Q.   Okay.

A.   -- based on what happens in the room.

Q.   So you could honestly consider as little as 5 years?

A.   Yes.

Q.   Okay.  So let's go on to the last Special Issue.  And I'm going to try not to blow through this so you don't understand, even though I only have four minutes, probably?

A.   Okay.

Q.   As Ms. Yenne said to you, you know, this is the mechanism to spare a life.  And you said that was important to you.  Why is that?

A.   I like to be able to consider the circumstances.

Q.   Okay.

A.   Justifiable -- to justify to myself that the decision I reach is fair, equitable, and something that I could live with.

Q.   Okay.  And I will tell you a couple things.  The list that she provided you is not exhaustive.  Okay?

A.   Right.

Q.   The law says mitigation can be anything.  She told you a juror can decide that they want to bestow mercy, and they can do that for that reason alone.  Okay?

A.   Okay.

Q.   The other thing is every individual juror can find something different mitigating.  They don't have to, but they can.  Does that make sense to you?

A.   Right.

Q.   Okay.  And I'm certainly not in any way, shape, or form telling you that if you're a juror on a Capital Murder case you do not have to deliberate because you do.  That's what the law requires.  But deliberation is not legally defined for us anywhere.  No surprise, either, is beyond a reasonable doubt, right?

A.   Right.

Q.   So I want to ask you would you respect a decision that was different than yours?

A.   Yes.

Q.   Okay.  And do you think any juror should ever be

bullied --

   **A.**   No.

   **Q.**   -- because they have a decision different than anybody else?

   **A.**   No.

   **Q.**   Okay.  And if you make a decision in your heart of hearts that is the decision for you, are you okay expressing that to the 11 other jurors?

   **A.**   Yes.

   **Q.**   Even if it's different than all 11 others?

   **A.**   Yes.

   **Q.**   Okay.  Now I'm going to put you in context one more time, Ms. Lee.  Okay?

   **A.**   Okay.

   **Q.**   It's a guilty, guilty, guilty capital murderer, no question.  Brutal, ugly, horrendous.  And you have found beyond a reasonable doubt, you and 11 others, that this person is going to be a future danger.  Are you with me?

   **A.**   Uh-huh.

   **Q.**   Okay.  Ms. Yenne said that mitigation is anything that might -- it doesn't lessen the guilt, but it lessens the blame.  Okay?

   **A.**   Okay.

   **Q.**   Guilty capital murderer, future danger.  Would you ever consider anything that would lessen the blame of that

person?

A. I think I could. You know, again, not being in the position, trying to forecast myself there, I would hope that I could still -- and I think I could still -- consider other circumstances, mitigating things that happen.

Q. Do you have doubts?

A. Yes, I do.

Q. Tell me about that.

A. I just -- it's hard for me to picture once coming to those two things that there is something out there. However, you know, it is a possibility that it's out there.

Q. Okay. You said it's hard for you to consider that?

A. It's just hard to think of it. Not consider. I mean, that's probably the wrong word. But it's hard to come up with it in my head right now. I can't imagine it.

Q. Okay.

A. But it doesn't mean it's not there.

Q. Sure. But I need to know whether or not you can do that. It's a guilty capital murderer. You have determined beyond a reasonable doubt they are going to be a future danger. Can you ever consider anything that will lessen the blame of that guilty murderer?

A. I could consider it if I can see it. I mean, I don't know what it would be. I don't know what that mitigation could be. I don't know what it would be. I just don't.

THE COURT:  Your hour is up.

MS. MALLON:  Thank you, Your Honor.

THE COURT:  Ms. Lee, if you would step down, accompany the bailiff outside, we'll be back with you in a few minutes.  Just leave your questionnaire there.  Remember all the instructions I've previously given you.

**(Venire person out.)**

THE COURT:  We are continuing on the record.  The record will reflect that counsel for the State, counsel for the defense and the Defendant are present.  Ms. Lee has left the courtroom.

Present Ms. Lee to the State for any challenge for cause.

MS. YENNE:  None, Your Honor.

THE COURT:  Present Ms. Lee to the defense for any challenge for cause.

MS. MALLON:  We do, Your Honor.  And if you'll bear with me.  The juror said -- and I'm reading Mr. Wooten's notes, so bear with me, Your Honor.

We believe that Ms. Lee is an automatic death penalty juror; and to allow Ms. Lee to sit on the jury would be a violation of due process under the 5th and 14th Amendment; Texas Constitution Article 1, Section 13 and 19; and the Code of Criminal Procedure 1.04.

We also believe it would violate effective

assistance of counsel under the 6th and 14th Amendment; Texas Constitution Article 1, Section 10; the Code of Criminal Procedure 1.051.

It would also be a violation of the 8th Amendment and the 14th Amendment as cruel and unusual punishment; Texas Constitution Article 1, Section 10, 13 and 18; and the Code of Criminal Procedure 1.09.

It would also violate the right to an impartial jury for Mr. Harris under the 6th and 7th Amendment; Texas Constitution Article 1, Section 10 and 15; and the Code of Criminal Procedure Section 1.05, 1.12, 35.16 and 35.17.

It's also a violation of Code of Criminal Procedure 35.16(c)(2).  The juror does have a bias or prejudice against the law as applicable to this case in that based on her answers she would automatically sentence someone to death on a Capital Murder charge and leans towards a death sentence.

It's also a violation under Morgan versus Illinois, Wainwright versus Witt, Cumbo versus State, Pierce versus State and Cuevas versus State.

And she said, Your Honor, that when she was in high school and she had a class about Capital Murder, that she did research and she looked at the pros and the cons and ended up on the pro side of the death penalty.

She leans toward the death penalty as a possibility.  The death penalty would be more humane than life

without parole for some people. And after I gave her the hypothetical, she said the death penalty is definitely on the table.

With respect to future danger she said she would try her best to not -- to answer that question based on the evidence and she would try to keep an open mind. She said she probably has something or would have something in her head that might make her lean one way or the other. She said that capital punishment is justified due to deterrence. Capital punishment is justified due to life for a life, eye for an eye. The death penalty is not outlandish. That was her quote.

With respect to the confession, Your Honor, she said she would try. That would have to be a conscious decision. It would be hard to do. She's not sure. She said anyone could not be a hundred percent. She can't say it's a hundred percent for her that she could disregard the confession.

With respect to mitigation she said, I think I would consider it. I would hope that I would. But she has doubts. It's hard to picture that there is something out there -- these are her words. It's hard to picture that there is something out there. Hard to envision. Can't imagine what it would be. She also stated, I could consider it if I could see it.

And with respect to future danger, again, Your

Honor, she said, I would try my best to keep an open mind. Again, Your Honor, that would be a violation of the Due Process Clause, effective assistance of counsel, cruel and unusual punishment, right to an impartial jury, Code of Criminal Procedure 35.16(c)(2), and Ladd versus State.

And I understand that when Ms. Yenne spoke to her she said that she could follow the law and she would do what was requested of her; however, as the Court well knows, under Morgan versus Illinois, leading questions are not sufficient to determine a juror's bias. That's up to the Court to decide. And based on the answers that we elicited from her that were not leading questions, she has clearly indicated a bias. We believe she would be an automatic death penalty juror, she would not consider future danger, and she would not consider mitigation.

THE COURT: Do you wish to respond?

MS. YENNE: Judge, yes. The record is exactly the opposite. First of all, in asking whether she would be an automatic sentence, she repeatedly said that there should be no automatic sentence. She was repeatedly asked if she found someone guilty could she keep an open mind or have an automatic sentence towards life without parole or the death penalty. She said no.

She was repeatedly asked when we put up the grid whether or not she would automatically answer the Special Issue

No. 1 yes. She basically said that -- under oath, that you could be a convicted capital murderer and she could still answer no, that you weren't a future danger, that I would have to prove it to her beyond a reasonable doubt. After having the grid fully explained to her, she could answer yes or no to Special Issue No. 1 based on the evidence.

She also at that point in time, on continued questioning, indicated that she would have to keep an open mind and freely discuss the mitigation issue about sparing someone's life. She went through and said she could consider and give effect to everything that was on the screen: Violence, poverty, low IQ, exposure to toxic materials, chemicals. We discussed mercy and indicated that mercy could be a factor, consider and give effect to. She answered that she could honestly consider. At the conclusion of my questioning I asked if she could honestly do this and she said yes.

Regarding the confession, she was very forthright and said that while it would be difficult, she could do it. In response to my questioning she said that she would wholly disregard it and find someone not guilty of Capital Murder. But more importantly, in response to defense questioning when the more open questioning, as counsel described it, occurred, she actually demonstrated that. She said she had been on a previous jury and had to disregard it and that she disregarded it, did not consider it.

She also, in response to further questioning from counsel, verified and volunteered that as to the confession that she would try her best, which by the way, was like Ms. Maniet.  But then she went a separate step further.  She said, well, if that's the only piece, I couldn't consider it, I'd have to find not guilty.  Which actually verified that she would have to find not guilty.

Additionally, in the record she has said from her questionnaire, I would consider all of the penalties provided by law and the facts and the circumstances of a particular case.

In response to counsel's hypothetical she said that the death penalty would still be on the table but that it was not the only penalty, so would life without parole, and that she considered punishment -- even when they pressed her for an eye for an eye -- to include life without parole.

She is clearly a qualified -- and by the way, on Number 153 she verified that she wanted to be open to the facts of this case so whatever decision she reached she could live with it.  And the record is clear that she's not challengeable for cause.

THE COURT:  All right.  Based on her demeanor and the thoughtful way that she answered the questions, I think the hesitation that was referred to is an indication, to me at least, of an honest reflection that a person gives that will

seriously consider all of the options and take this very seriously.  I'm going to deny your challenges for cause.

I'll pass her to the State for peremptory.

MS. YENNE:  None, Your Honor.

THE COURT:  Pass to the defense for peremptory.

MS. MALLON:  May we talk with Mr. Harris, Your Honor?

THE COURT:  You may.

**(Discussion off the record.)**

MS. MALLON:  Yes, Your Honor, we would.

THE COURT:  That's Defense Peremptory No. 7. That's granted.

Mr. Falks, would you have Ms. Lee come back?

Mr. Harris, you talked to your counsel about that exercise?

THE DEFENDANT:  Yes, sir.

THE COURT:  And you're in agreement with that?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  Thank you.

**(Venire person in.)**

THE COURT:  We're on the record.  The record will reflect that counsel for the State, counsel for the defense and the Defendant are present.

Counsel, you may be seated.

Ms. Lee, I want to thank you very, very much for

continue that. Sometimes we get people who will sit up there and a question will be asked and they will nod their head or shake their head, and that makes it very difficult for the court reporter and for the record. So if you would, give a clear audible response and try to avoid things like uh-huh and things of that nature. Can you do that for me?

VENIRE PERSON: I'll sure try.

THE COURT: All right. Do you have any questions of me before we get started?

VENIRE PERSON: No, I don't.

THE COURT: Ms. Aldous, you may begin when you're ready.

**DONNA VANSCOY**,

having been first duly sworn, testified as follows:

**VOIR DIRE DIRECT EXAMINATION**

**BY MS. ALDOUS:**

Q. Good morning, Ms. Vanscoy.

A. Good morning.

Q. Did I say that correctly?

A. You sure did.

Q. My name is Mary Aldous, and I'm an Assistant District Attorney. I work for the elected District Attorney, Jeri Yenne, who is seated to my right.

MS. YENNE: Good morning.

VENIRE PERSON: Good morning.

Q.    And we represent the State of Texas in this case.

The Defendant, James Harris, Jr., is represented by Jay Wooten and Kerri Mallon.

MS. MALLON:  Good morning.

VENIRE PERSON:  Good morning.

Q.    And there are no right or wrong answers here.  This is one time where, you know, there is no right or wrong.  We just need to know how you feel about the law, what your true feelings and honest heart-to-heart feelings are.  Okay?

A.    Okay.

Q.    And you don't need to say anything that you think would please the State or say anything that you think would please the defense.  We just need to know what -- about you and your feelings.  Okay?

A.    Okay.

Q.    And there is nothing to be concerned about.  If you feel that, you know, you can't follow the law, then we just need to know about it.  Okay?

A.    Yes.

Q.    And the reason that we have this process, voir dire, is to insure that the parties get a fair trial.  Because both the State and the Defendant have a right to a fair trial in a criminal case.  Okay?

A.    Okay.

MS. ALDOUS:  May I approach, Judge?

THE COURT:  You may.

Q.  I'm going to hand you your questionnaire just in case I need to ask you some questions about it.  I don't know if you're like me.  Sometimes it's hard for me to remember what I put down two weeks ago or yesterday.

A.  That's what I was worried about.

Q.  I did notice something on there that you know Jerome Aldrich?

A.  Yes.

Q.  And I'll tell you a little story.  I've been blessed in my life because not only did Jerome Aldrich give me a break with a job, but so did Jeri Yenne.  So I've been hired by two great District Attorneys.  And Jeri hired me twice.  So I will say that, you know, that says she must like me.

And you know him through church.  Is that right?

A.  Yes.

Q.  Did you -- was there -- do you know him from any other place, or is it just from Brazos Pointe?

A.  Just from Brazos Pointe Church.  He's in our small group.

Q.  Okay.  All right.  Well, this is the State of Texas versus James Harris, Jr., and it's a Capital Murder case and the State is seeking the death penalty.  Okay?

A.  Okay.

Q.  And he's charged by indictment, which sets out the

JILL FRIEDRICHS
Official Court Reporter
412th Judicial District Court          **01/28/2015**

elements of the offense that the State has to prove beyond a reasonable doubt.  And those elements are that on or about the 14th day of January, 2012, in Brazoria County, Texas, the Defendant did then and there intentionally cause the death of an individual, to-wit: Alton Wilcox, by stabbing Alton Wilcox with a knife, and the Defendant was then and there in the course of committing or attempting to commit the offense of Robbery of Darla Wilcox.

And then there is a second paragraph, on or about the 14th day of January, 2012, in Brazoria County Texas, the Defendant intentionally caused the death of an individual, to-wit: Alton Wilcox, by stabbing Alton Wilcox with a knife, and the Defendant was then and there in the course of committing or attempting to commit the offense of Burglary of a Habitation owned by a Darla Wilcox.

And then the third paragraph, on or about the 14th day of January, 2012, in Brazoria County, Texas, the Defendant intentionally caused the death of an individual, to-wit: Alton Wilcox, by stabbing Alton Wilcox with a knife, and the Defendant was then and there in the course of committing or attempting to commit the offense of Burglary of a Habitation owned by Alton Wilcox.

And that sets out the charge of Capital Murder and the elements that the State must prove beyond a reasonable doubt.  Okay?

A.    Okay.

Q.    And if you don't understand something that I'm saying, if you'll please just let me know so I can rephrase it or figure out what I'm doing wrong.

A.    Okay.

Q.    Because I want to make sure you understand my questions.  Okay?

A.    Yes.

Q.    Murder is intentionally causing the death of an individual.  There is no self-defense, no justification, no excuse, no defense of a third person, no insanity.  It's cold-blooded killing of another human being.  Okay?

An example, two neighbors.  One neighbor is just tired of living next door to his neighbor and decides that he's going to kill him.  So he gets a gun and meets him outside and shoots him and he kills him.  That's murder.

A.    Okay.

Q.    Do you understand?

A.    Sure do.

Q.    All right.  Then there is Capital Murder.  And before I go to the slide, Capital Murder is murder plus additional elements that bump it up to a higher degree.  Okay?

A.    Okay.

Q.    And some examples of Capital Murder are when a police officer is killed in the line of duty and the person knows that

they are a police officer, that's Capital Murder. Intentionally killed.  I'm sorry.  And then when a child under the age of 10 intentionally -- they intentionally cause the death of a child under 10, that's Capital Murder.  Or if you intentionally cause the death of several people at one time. Like you go into a convenience store and you shoot and kill three people at one time.  That's Capital Murder.

And then there is Capital Murder the way we have it alleged in our indictment; and that is this person intentionally commits murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat.  So as you can tell, we have burglary and robbery in red up there, and that's because that's what was alleged in the indictment, that it was in the course of committing burglary of a habitation or in the course of committing robbery.

A.    Okay.

Q.    So that's what makes it Capital Murder.

A person acts intentionally or with intent with respect to a result of his conduct when it is his conscious objective or desire to cause the result.  And in this situation it would be to cause the death.  That's your conscious objective or desire.  Like in my neighbor example, the one neighbor wanted to kill his neighbor and cause the death; and

that's what he did.  Okay?

A.   Okay.

Q.   Now the prosecution has the burden of proving those elements in the offense -- in the indictment that I read to you.  We have to prove that to you beyond a reasonable doubt.  Okay?  And the -- you would get an instruction if you were on the jury that says the prosecution has the burden of proving the Defendant guilty and must do so by proving each and every element of the offense charged beyond a reasonable doubt.  It is not required that the prosecution prove guilt beyond all possible doubt.  It is required that the prosecution's proof excludes all reasonable doubt concerning the Defendant's guilt.

A.   Okay.

Q.   Do you understand that instruction?

A.   Yes, I do.

Q.   Okay.  And what I do know about beyond a reasonable doubt is that it doesn't mean beyond all doubt.  Does it mean -- what does beyond a reasonable doubt mean to you?

A.   To me it means that there is more than just one or two factors that is -- you know, that proves that they had committed the crime or whatever.  Not just, you know, one thing.

Q.   So it doesn't -- I mean, to you it doesn't mean beyond all doubt, correct?

A.   No.

JILL FRIEDRICHS
Official Court Reporter
412th Judicial District Court          **01/28/2015**

Q.    And how would you know something beyond all doubt? Would you have to witness it?

A.    Yes.

Q.    Okay.  And if you were a witness, then you couldn't be a juror on the case.

A.    That's right.

Q.    Because you'd have to take the stand to tell the jury what you saw.

A.    Right.

Q.    Okay?  So that's why it's proof beyond a reasonable doubt.  Okay?

A.    Yes.

Q.    And not beyond all doubt.

The State is required to prove to you the elements alleged in the indictment.  And that's what we have the burden of proof on, beyond a reasonable doubt, those elements that I read to you in that indictment.

In any case there is going to always be inconsistencies to things.  Let me give you an example.  We had a car accident outside the courthouse and a car ran a red light and that's what I needed to prove beyond a reasonable doubt, that the car ran the red light.  There were ten witnesses, and all ten witnesses said that the car ran the red light.  Now some of the witnesses said that it was 2:00 in the afternoon and some said it was 2:10.  Some said that it was a cloudy day.

Some said it was misting.  I mean, those are inconsistencies. However, everybody was consistent that the car ran the red light and that's what I had to prove.  Do you understand?

A.    Yes, I sure do.

Q.    I mean, because people -- would you agree with me people perceive things differently sometimes?

A.    Yes.

Q.    Okay.  And so everybody's recollection may be a little bit different.

A.    Right.

Q.    All right.  There are several levels of burden of proof.  The lowest level is preponderance of the evidence, and that means the greater weight and degree of credible evidence. It's used in civil cases like the car accident if someone was suing someone for money.  Okay?  And it's a slight tipping of the scales in your favor.  All right?

A.    Okay.

Q.    Then there is the next level of burden of proof, a higher level than preponderance, and that's clear and convincing evidence.  It is that measure or degree of proof that produces a firm belief or conviction that the allegations sought to be established are true.  And that's used in another type of civil cases where CPS is trying to terminate parental rights.

A.    Okay.

Q.    And then there is the highest level, and that's beyond a reasonable doubt.  And that's used in criminal trials.  Not just Capital Murder, but all criminal trials.  And there is no definition for what beyond a reasonable doubt means.

A.    Okay.

Q.    But it is the highest burden of proof, and we do know that it doesn't mean beyond all doubt.

A.    Okay.

Q.    All right?

A.    Yes.

Q.    So let me take it a little bit further.  If I prove to you -- well, let's say that Jeri and I have a bad day.  And it could happen.  We forget to prove one of those elements, a major element.  We forget to prove a burglary of a habitation or the robbery.  Okay?  And so we haven't proven the case to you beyond a reasonable doubt.  All right?

A.    Okay.

Q.    Are you with me?

A.    Yes.

Q.    And if we haven't proven the case beyond a reasonable doubt because we forgot to prove -- and that's our burden -- we forgot to prove something very important, you will have to find the Defendant not guilty.  Correct?

A.    That's right.

Q.    Okay.  And you could do that?

A.    Yes.

Q.    Okay.  And just the opposite.  If we prove it beyond a reasonable doubt, all those elements of the offense, you could find him guilty, correct?

A.    Yes.

Q.    Okay.  All persons are presumed to be innocent and no person may be convicted unless each element of an offense is proved beyond a reasonable doubt.  And that's what we've been going over, right?

A.    Right.

Q.    And the fact that a defendant has been arrested, confined, or indicted for, or otherwise charged with an offense gives rise to no inference of guilt at his trial.  So as he sits here today, can you presume Mr. Harris innocent?

A.    Yes.

Q.    Okay.  And the law does not require the Defendant to prove his innocence or produce any evidence at all.  Do you understand that?

A.    Yes.

Q.    Okay.  And so back to my example of Jeri and I falling down on the job and we forgot to prove something, a major element, that burglary or robbery.  Okay?  So we didn't prove it beyond a reasonable doubt, and the Defendant is not required to prove his innocence or produce any evidence at all. Correct?

A.    Right.

Q.    So if we fall down on our responsibility of proving the case beyond a reasonable doubt, you would have to find him not guilty, right?

A.    That's correct.

Q.    Okay.  And it wouldn't matter because you can't require him to produce any evidence at all, right?

A.    Right.

Q.    All right.  And then one step further with that is the Fifth Amendment privilege against self-incrimination.  You know, and this is one of those rights that sets us apart from other countries in the world -- I mean, sets the United States apart from other countries.  We have this Fifth Amendment privilege against self-incrimination.  Every defendant in any criminal case has the right not to testify.  That would be me if I was charged with a crime.  I have that same right.  It would be anybody in this room if they were charged with a crime has the right not to testify.  And you cannot consider it for any reason.  Do you understand that?

A.    Yes, I do.

Q.    Okay.  So there are times people say, you know, that they would like to hear from, you know, the Defendant.  It's a serious case, they want to hear from him.  But this says that you cannot consider his lack or failure to testify for any reason.

A.    Okay.

Q.    Do you understand that?

A.    Yes.

Q.    Can you follow that law?

A.    Yes.

Q.    Okay.  Are you going to require -- I mean, if we fell down on the job, didn't prove the case beyond a reasonable doubt, we didn't prove those elements to you and the Defendant chose not to testify and we failed on our burden, I mean, you would have to find him not guilty, correct?

A.    That's correct.

Q.    And you couldn't consider for any purpose his failure to testify, right?

A.    That's right.

Q.    Now if you had to vote right now, you would have to vote not guilty.

A.    Not guilty.  That's right.

Q.    Because we haven't produced any evidence yet.

A.    Correct.

Q.    Okay.  The indictment alleges one charge of Capital Murder.  Remember I was reading to you and I'd tell you there was another paragraph and another paragraph?

A.    Yes.

Q.    Well, there is three paragraphs in that indictment, and it's one charge of Capital Murder of the victim, Alton

Wilcox, with alternate methods of committing the same offense. And these alternate methods are by robbery or by burglary. Okay?  Are you with me?

    **A.**    Okay.  Yes.

    **Q.**    As long as the jury unanimously agrees beyond a reasonable doubt that the elements of Capital Murder are met, the jury does not need to agree unanimously on which manner and means, being the burglary or the robbery.  So six of you could believe -- if you are on the jury, six could believe that it happened in the course of a robbery and six jurors could believe, well, it happened in the course of a burglary.  But everybody is unanimous that it was a Capital Murder.  Okay?

    **A.**    Yes.  I understand.

    **Q.**    All right.  Now there is two different types of evidence in a criminal case.  There is direct evidence, and that's evidence that directly demonstrates the ultimate fact to be proven.  Okay?  Examples are eyewitness testimony or video of a crime -- now Jeri always says, I don't know if it's called video anymore.  It's maybe called something else.  But electronic something.  But, I mean, you know, video of a crime I think pretty much says it, even though it's on a different type of media -- and then or a confession.  Okay?

    **A.**    Okay.

    **Q.**    Those are examples of direct evidence.

        And then there is what's called circumstantial

evidence.  And this definition is a mouthful.  Evidence that is direct proof of a secondary fact which, by logical inference, demonstrates the ultimate fact to be proven.

I'm going to give you an example.  There is a young child who wants to go swimming and goes and asks -- they have a pool in their backyard -- his mother if they can go swimming.  The mother says, Not right now.  We'll go later. She hears the child go towards the backdoor.  She hears the backdoor open.  She hears a splash in the pool.  She goes outside to check.  She sees her child there, bathing suit dripping wet.

Now she didn't see the child in the pool. Correct?

A.  Correct.

Q.  But she has direct proof of a secondary fact which, by logical inference, leads her to believe that the child had been in the pool.  Are you with me?

A.  I am.

Q.  Okay.  Now I have to ask you a question.  If the State proves to you beyond a reasonable doubt the elements of the offense, can -- so we've proven it to you beyond a reasonable doubt.  All right?  Our burden has been met.  Can you convict someone of Capital Murder based on circumstantial evidence?

A.  Yes, I can.

Q.  Okay.  All right.  And then we have what's called one

eyewitness. If we -- I mean, the law allows someone to be convicted on the basis of one eyewitness testimony alone. Okay? If we prove to you all those elements in the indictment beyond a reasonable doubt and you believe it beyond a reasonable doubt and we do so through one eyewitness alone, they establish all the elements in the indictment and you believe them beyond a reasonable doubt, can you convict someone of Capital Murder based on one eyewitness' testimony?

A.   Yes, I could.

Q.   All right. The penalty range for Capital Murder is life without parole or the death penalty. So there is two options for Capital Murder. And would you agree with me they are both serious options?

A.   Yes, they are.

Q.   Okay. Life without parole, that's serious.

A.   Yes.

Q.   That's a big punishment.

A.   Yes, it is.

Q.   Would you agree with me?

A.   Yes.

Q.   And death penalty, that's an ultimate punishment.

A.   Yes, it is.

Q.   Can you consider the full range, penalty range, for Capital Murder?

A.   Yes, I could.

Q.   Now I'm going to take you to your questionnaire because I want to ask you something that I noticed that you put down.

A.   Okay.

Q.   On page 22, it was the agree and disagree.  And we threw these questionnaires to people without giving them any information or any law whatsoever just to kind of get your ideas or feelings.  And I noticed on the last agree and disagree you checked, Agree.  The death penalty should never be imposed if the alternative is a life sentence without the possibility of parole.

A.   Yes.

Q.   And is that how you feel or --

A.   Well, I think I need to hear all the evidence --

Q.   Okay.

A.   -- to decide, you know, on that.  And if without a shadow of a doubt that you've proven everything, I could convict on death penalty.

Q.   Okay.  So it's not shadow of a doubt.  It's beyond a reasonable doubt.

A.   I'm sorry.  Beyond a reasonable doubt.  I'm sorry.

Q.   Okay.  So that was just a general feeling; but now that I've explained the law to you, you could consider the full range?

A.   Yes.

Q.   Okay.  Thank you.

Now I will continue on.  I just want to make sure on that.  And I'm not picking on you either.  I just -- like I said, we need to get your feelings.  Okay?

A.   Yes.

Q.   Now sometimes there are lesser-included offenses.  And in the prosecution for an offense with a lesser-included offense, the jury may find the Defendant not guilty of the greater offense but guilty of any lesser-included offense.  Well, in Capital Murder the lesser-included offense of Capital Murder would be murder.  Okay?

A.   Okay.

Q.   And so in order to be a juror on a case where there is a lesser-included, you have to be able to consider the penalty range for the lesser-included as well.  Okay?

A.   Okay.

Q.   And the legislature for murder gave a very wide penalty range because, would you agree with me, there is all different kinds of murder?

A.   Yes, there is.

Q.   I mean, and every set of facts is different.

A.   Yes.

Q.   Would you agree with me?

A.   Yes.

Q.   So they gave us a large penalty range for that, and

that penalty range is 5 years to 99 years or life and up to a 10,000-dollar fine.  Okay?

A.    Okay.

Q.    And in order to be a juror on a Capital Murder case, you have to consider the full range -- penalty range for murder, including the minimum to the maximum.  And, you know, there is all different kinds of murder.  There could be a mercy killing of a terminally ill child.  There could be a cold-blooded killing of someone.  I mean, there is always different kinds of killing.  It could be a drug-related killing.  Could be a gang-related killing.

So let's go -- you're a juror on this case.  Okay?

A.    Okay.

Q.    On another case.  Sorry.  Sorry.

MS. YENNE:  Hypothetical case.

Q.    Hypothetical case.  You've found the person not guilty of Capital Murder.

A.    Okay.

Q.    Can you consider the full range of punishment for murder, including the minimum, the 5 years, up to the maximum, the 99 years or life, and up to a 10,000-dollar fine?

A.    Yes, I can.

Q.    Okay.  All right.  Jurors are the sole judge of the credibility of the witnesses.  Jurors can believe all, some, or

none of what a witness says.  All witnesses have equal credibility before they begin to testify.

Now some people say that, you know, if an officer comes to testify, they are going to -- they may hold them to be a little more credible than other witnesses.  And some people say they might hold an officer to a little less credibility, depending on their circumstances of their life.  But you have to hold all witnesses with equal credibility before they testify.  Can you do that?

A.  Yes, I can.

Q.  Okay.  You're not going to hold an officer to a higher standard just because they are an officer?

A.  No.

Q.  Or a doctor because they're a doctor?

A.  No.

Q.  All right.  A confession of a defendant is admissible in evidence if certain requirements are met.  The law lays that out.  It's important, you know, for us to follow the rules; and it's important for the police to follow the rules.  Would you agree with me on that?

A.  Yes.

Q.  Okay.  And the law says that a confession is admissible in evidence if freely and voluntarily made, electronically recorded or written, the confession shows that the accused has been warned prior to making such confession of

the following rights -- and these are important rights -- the right to remain silent, used again him in court, the right to a lawyer, if cannot afford a lawyer the right to have a lawyer appointed, the right to stop questioning at any time, knowingly, intelligently, and voluntarily waives these rights.

Now would you agree with me that those are all important rights?

A.   Yes.

Q.   Okay.  And it's important that the police follow this law, correct?

A.   That's correct.

Q.   Okay.  And so the law says that the jury gets to decide whether the police complied with it or not.  And if you do not believe that the police complied or that the confession was involuntary, then you will wholly disregard the alleged statement or confession and not consider it for any purpose. Do you understand that?

A.   Yes, I do.

Q.   Can you honestly follow that?

A.   Yes.

Q.   Okay.  Let me give you an example.  You hear -- you see a video confession of a Capital Murder.  You see the defendant talk about how he enjoyed killing the person, and you believe he did it.  It was a brutal killing.  He's laughing about it.  Innocent victim, no self-defense, no justification,

no insanity.  He enjoyed it, and you see this.  But the police left off the right to stop questioning.  It was a computer glitch.  It wasn't -- they left that out.  It's not on there.  Can you wholly disregard the alleged statement or confession and not consider it for any purpose?

A.    Yes.

Q.    Now let me go a little bit further on that.  Okay?  Are you with me?

A.    Yes, I am.

Q.    The same scenario, same video confession.  Brutal, brutal Capital Murder.  He's laughing about it.  No self-defense, no justification, no insanity.  The same right missing, the computer glitch with the right to stop questioning at any time.  You believe that it happened.  Okay?  You believe what he said, but that's all I had to prove my case to you beyond a reasonable doubt.  Can you disregard the confession and find him not guilty?

A.    Yes, I could.

Q.    Was that yes?  I'm sorry.

A.    Yes.

Q.    Okay.  Sometimes I can't hear as well.  I thought you might have said "I guess."  But that's -- all right.

Voluntary intoxication does not constitute a defense to the commission of a crime.  So if I go out and drink a lot of alcohol and decide to go steal makeup from Wal-Mart,

it's not a defense that I'm intoxicated.  Okay?

A.  Okay.

Q.  Can you follow that?

A.  Yes.

Q.  All right.  A person is criminally -- causation.  A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

Let me give you an example.  I set my apartment on fire to cover up a crime.  I'm setting it on fire.  A family that lives next door to me, they die.  Now the fire is set and the fire department is having equipment problems and they don't have the response time that they should have to get to the apartment to save the family.  Now my act of setting the fire to the apartment is clearly sufficient to cause the death of the people, correct?

A.  Yes.

Q.  Okay.  Did that kind of explain?

A.  Yes.

Q.  Burglary.  A person commits an offense if, without the effective consent of the owner, the person enters a habitation with intent to commit a felony, theft, or an assault, or enters a habitation and commits or attempts to commit a felony, theft,

or an assault.  So you can either have the intent when you enter or you can form it when you're -- you can do it when you're in there.  Okay?

A.    Okay.

Q.    And then robbery.  A person commits an offense if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another.

Now when I'm stealing my makeup from Wal-Mart, the manager is running after me and I push or I shove the manager down and the manager breaks an arm or scrapes an elbow.  That would be robbery.  Okay?

A.    Okay.

Q.    In the course of committing theft means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft.  Okay?

A.    Okay.

Q.    All right.  So there are two parts of a trial.  If the Defendant is found guilty, then there is two parts to a trial.  Okay?

A.    Okay.

Q.    If a defendant is found not guilty, it stops right there.  Okay?

A.    Okay.

Q. If the Defendant is found guilty, then it goes on to the punishment phase. All right?

A. Yes.

Q. And there are certain principles that you have to follow in a death penalty case. It's not just a vote for life or death. It's more involved than that. Do you understand?

A. Yes, I do.

Q. All right. And right after a guilty verdict, before any punishment evidence is presented, you can't have your mind made up as to how you're going to answer the questions. There is going to be two -- well, one question; and then depending on how you answer, another question.

A. Okay.

Q. Okay? So you can't have your mind made up to what you're going to sentence the Defendant to. Do you understand?

A. Yes, I do.

Q. You have to have an open mind.

A. Yes.

Q. So after guilt/innocence, after you found the Defendant guilty of Capital Murder, you have to have an open mind.

A. Okay.

Q. You have to consider still both appropriate penalties. You have to listen to all the punishment evidence before any opinion, answers, can be formed. Okay?

A. Okay.

Q. And you shall consider guilt/innocence evidence but must be able to consider any and all punishment evidence as well.

A. Okay.

Q. All right? So that's -- that pretty much tells you you can't have your mind made up.

A. That's right.

Q. Right? In order to consider all evidence, you have to keep an open mind. And each question is independent of the verdict, and each question is independent of each other.

A. Okay.

Q. And each question is based only on the evidence presented.

A. Okay.

Q. So after you've convicted someone of Capital Murder, will you have an open mind?

A. Yes, I will.

Q. Are there two appropriate penalties after you've convicted someone of Capital Murder?

A. Yes.

Q. Possible penalties, life without parole and the death penalty?

A. That's right.

Q. All right. And in deliberating on the issue submitted

you shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the Defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.  It says to consider all evidence, correct?

A.    That's correct.

Q.    Guilt/innocence and punishment evidence.  Defendant's background and character, circumstances of the offense that militates for or mitigates against the imposition of the death penalty.  Okay?  So you have to have an open mind.  Will you do that?

A.    Yes, I will did.

Q.    All right.  And the first question after you found someone guilty of Capital Murder and you have an open mind, then you get this Special Issue No. 1 which says, do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?

And so the first thing is, do you find from the evidence -- that's guilt/innocence and punishment evidence. Okay?

A.    Okay.

Q.    Beyond a reasonable doubt.  I, the State, has a burden of proof on this Special Issue No. 1.  We have to prove it to

you beyond a reasonable doubt. And remember, that doesn't mean beyond all doubt, right?

A. That's right.

Q. Okay. That there is a probability. Probability, the law says probability is more than a possibility. Would you agree with me on that?

A. Yes.

Q. Okay. Do you think probability means more likely than not?

A. Yes.

Q. Okay. That the Defendant would commit criminal acts of violence. Criminal acts of violence. I mean, does that mean two acts to you or -- is that plural?

A. Plural.

Q. That would constitute a continuing threat to society. Society, the law says, is not limited to but includes prison.

A. Yes.

Q. And that's because if you find someone guilty of Capital Murder, then they are going to prison either one way or another. They are either going life without parole or the death penalty to wait on death row. Okay?

A. I understand.

Q. Okay. And so does society, to you, include prison?

A. Yes.

Q. Can you follow that?

A.    Yes.

Q.    I mean, there is all types -- would you agree with me there is all types of society?

A.    Yes.

Q.    The courthouse could be a society?

A.    Right.

Q.    Your workplace could be a society?

A.    Yes.

Q.    Your volunteer group.  Are you the one that volunteers for a group?  I can't remember.

A.    Yeah.

Q.    Everybody runs together.

A.    The Gathering Place for Alzheimer's.

Q.    Okay.  That could be a society, couldn't it?

A.    Yes.

Q.    All right.  Criminal acts of violence.  These may be property crimes.  Can you consider property crimes to be criminal acts of violence in answering Special Issue No. 1?

A.    Yes.

Q.    Okay.  So they may be violence against people or violence against property?

A.    Yes.

Q.    Okay.  Can you hold me to my burden on Special Issue No. 1?

A.    Yes.

Q.   All right.  Can you hold me to my burden, beyond a reasonable doubt, on Special Issue No. 1 --

A.   Yes.

Q.   -- to prove that to you beyond a reasonable doubt?

A.   Yes.

Q.   And if I make my burden, can you answer that yes?

A.   Yes.

Q.   Okay.  And if I don't make my burden, can you answer it no?

A.   Yes.

Q.   Okay.  Now you've already found someone guilty of Capital Murder.  Can you honestly answer that no if I don't make my burden, knowing that you've already found him guilty of Capital Murder?

A.   Yes.

Q.   All right.  Now Special Issue No. 1, it's predicting future dangerousness.  Correct?

A.   Yes.

Q.   Can you answer that based on the evidence presented?

A.   Yes.

Q.   I mean, some people say, I can't -- I wouldn't be able to do that.  That's predicting future dangerousness.  But you would be able to answer that based on the evidence, correct?

A.   That's correct.

Q.   All right.  Now Special Issue No. 1 focuses upon the

character for violence of the particular individual, not merely the quantity or quality of the institutional restraints put on that person.  And this Special Issue focuses upon the internal restraints of the individual, not merely the external restraints of incarceration.

And I think I can just sum that up.  It's how someone controls them self, not how the prison can control you.

A.    Okay.

Q.    Do you agree that -- would you agree that people in prison have a right to be safe from each other?

A.    Yes.

Q.    Would you agree that the staff has a right to be safe?

A.    Yes.

Q.    Would you agree that the chaplain has a right to be safe?

A.    Yes.

Q.    That the people that visit have a right to be safe?

A.    Yes.

Q.    All right.  So Special Issue No. 1, the future danger issue, the State has to meet its burden beyond a reasonable doubt, right?

A.    Right.

Q.    And if we meet our burden and you answer that yes, yes must be unanimous.  And the reason yes must be unanimous is because that's the road to the death penalty.

A.   Okay.

Q.   So it requires a unanimous vote by the jurors.  No -- if you answer it no, we failed to meet our burden, then that requires ten or more jurors and the Judge will sentence the Defendant to life without parole and you stop at that point.

A.   Okay.

Q.   Okay?  But if you -- if we meet our burden and all 12 answered yes, then we proceed on to Special Issue No. 2, which is the mitigation issue.  And the mitigation issue is, I guess, a safety net.  It's a safety net, okay, to spare someone's life.  All right?

A.   Okay.

Q.   And you still have to have an open mind.  Okay?

A.   That's correct.

Q.   And you must be able to consider mitigation.  And you can't have made up your mind about punishment at that time.

A.   That's correct.

Q.   Okay.  Now you've already found him to be a guilty capital murderer and you found him to be a future danger.  Can you still keep an open mind?

A.   Yes.

Q.   All right.  So mitigation, Special Issue No. 2, says whether taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of

the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Now nobody has the burden of proof on this.  The State doesn't have the burden.  Defense doesn't have the burden.  You just answer the question based on the evidence.  All the evidence.

A.    Okay.

Q.    And remember, the Defendant never has to bring you any evidence, including mitigation.

A.    Yes.

Q.    Okay?  So you cannot require the Defendant to ever bring you anything.

A.    Okay.

Q.    Can you follow that?

A.    Yes.

Q.    And let's talk about mitigation.  Mitigation evidence is evidence that a juror might regard as reducing the Defendant's moral blameworthiness.  Not reducing his guilt, but his blameworthiness.  Lessening his blame.

MR. WOOTEN:  Your Honor, we'd object to this slide.  For the record, it's the same slide that we introduced a copy of in Defendant's Voir Dire Exhibit No. 1.  We believe that it violates Eddings versus Oklahoma and the Eighth Amendment by misstating the law on mitigation on Capital Murder

in Texas.

THE COURT: Overruled.

Q. (BY MS. ALDOUS) So it's not reducing his guilt. Because you've already found him guilty, correct?

A. Correct.

Q. It's lessening his blame. Do you understand?

A. Yes, I do.

Q. Okay. Let me give you an example. Do you know -- I mean, have you ever seen children that they don't have a chance in life? They've got really rotten parents that don't take care of them, don't do for them, don't love them. You know, and you've thought I really wish someone would step in and take those kids away from their parents. Never had a chance, weren't raised right. That might be a situation where it lessens someone's blame.

A. Okay.

Q. Some examples of mitigation -- now the law says you must consider and give effect to, but there is no definition of what "give effect to" means. But I would submit that it would mean serious consideration. Look at it seriously. Would you agree with me?

A. Yes.

Q. What one juror thinks is mitigation, another might not. Okay?

A. Okay.

Q.    And so there is nothing that says that you have to find something to be mitigation.  Okay?

A.    Okay.

Q.    And then if you did find something to be mitigation, then you have to decide whether it's sufficient to warrant a life sentence without parole rather than a death penalty sentence.  Okay?

A.    Okay.

Q.    And some examples of mitigation -- now everybody is going to have mitigation in their life.  Everybody is going to have done something good for somebody or everybody has been to the college of hard knocks.  Everybody has had a rough time in life at some point or another, right?

A.    That's right.

Q.    So what one juror might think is mitigation may be youth.  Another might not.  Old age may be mitigation to someone, and it might not to another juror.  Child abuse, physical or sexual; injuries during childhood; good work history; drug abuse or drug addiction; acts of kindness for others; alcohol abuse; low IQ; low intellectual functioning; family breakup; single parent home; intellectual issues; poverty; exposure to chemicals; exposure to poisons; exposure to toxins; exposure to toxic material; exposure to toxic mold; mental retardation; desperation; causation.  Remember we talked about the causation?  That can be mitigation to someone and

maybe not.  Lessening his blame, but not his guilt.

A.  Okay.

Q.  Or mercy.  Someone could simply find mercy.  A jury can choose to give mercy.

A.  Okay.

Q.  Do you think that that's good?

A.  Yes.

Q.  And this is not everything.  This is not an exhaustive list.  Okay?

A.  Okay.

Q.  So back to Special Issue No. 2, whether taking into consideration all of the evidence -- and it repeatedly says all of the evidence, correct?

A.  Yes.

Q.  Punishment and guilt/innocence.  Including the circumstances of the offense, the Defendant's character and background, the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment without parole rather than a death sentence.

So that mitigation, if you find something mitigating -- it could be one circumstance that you could find mitigating.  And if you find one circumstance of mitigation, then you have to go back to see is it sufficient to warrant a life sentence without parole rather than a death sentence.

A.   Okay.

Q.   Now it's never going to be an excuse to the crime.  It could have nothing to do with the crime.  Okay?

A.   Okay.

Q.   So it's something that would lessen the blame.  Lessen his blame, never his guilt.

A.   Right.

Q.   All right?  Because we've already established that he's guilty of Capital Murder.  All right?

A.   Right.

Q.   So it would be something that would be sufficiently mitigating to warrant a sentence of life imprisonment without parole rather than a death sentence.  Okay?

A.   Yes.

Q.   Could be one circumstance, could be more than that.  Okay?

A.   Okay.

Q.   Could be mercy.  Okay?

A.   Okay.

Q.   Could you honestly answer Special Issue No. 2 based on the evidence?

A.   Yes, I can.

Q.   Okay.  If there is sufficient mitigation to lessen the Defendant's blame, can you answer that yes?

A.   Yes.

Q.    If there is not, can you answer it no?

A.    I can.

Q.    Now when you answer -- when you answer the mitigation issue, if you answer no, that there wasn't sufficient mitigating circumstance or circumstances to warrant a life sentence without parole rather than a death sentence, then it must be unanimous.  The Defendant receives the death penalty.

A.    Yes.

Q.    And if you find that there is sufficient mitigating circumstance or circumstances to warrant a life sentence, then that requires ten or more jurors, and the Judge will sentence the Defendant to life without parole.

A.    Okay.

Q.    Okay?  Can you honestly answer that based on the evidence?

A.    Yes, I can.

Q.    So can you answer Special Issue No. 1 based on the evidence?

A.    Yes.

Q.    Can you hold me to my burden on Special Issue No. 1?

A.    Yes.

Q.    Can you answer Special Issue No. 2 based on the evidence?

A.    Yes.

Q.    And you realize nobody has a burden on Special Issue

No. 2?

A.    That's right.

Q.    The Defendant never has to bring you any evidence.

A.    That's right.

Q.    Now you've already found him to be a guilty capital murderer, no excuse, no self-defense, no justification.  He's a guilty capital murderer.

A.    Okay.

Q.    Innocent victim.

A.    Okay.

Q.    And you found that he's a future danger.  You found beyond a reasonable doubt that there was a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society.

A.    Okay.

Q.    Are you still going to keep an open mind and consider and give effect to mitigation?

A.    Yes.

            THE COURT:  Ten minutes.

Q.    And will you answer -- can you answer the mitigation issue based on the evidence presented?

A.    Yes, I can.

Q.    So can you answer it yes if you find sufficient mitigating circumstance or circumstances?

A.    Yes.

Q.   Even if -- even after finding him to be a guilty capital murderer and a future danger, can you answer that yes if you find sufficient mitigating circumstance --

A.   Yes.

Q.   -- or circumstances?

A.   Yes.

Q.   Can you answer it no if based on the evidence -- after you've found him to be a guilty capital murderer, future danger, can you answer it no based on the evidence?

A.   Yes.

Q.   Can you answer these issues yes and no, knowing that this man over here will die based on your answers?

A.   Yes.

Q.   All right.  Now I'm going to give you a hypothetical. You and 11 other jurors have just found someone guilty of Capital Murder.  It was a horrible, brutal Capital Murder.  No self-defense, no provocation from the victim, innocent victim, no insanity, no excuse; and you found him guilty of Capital Murder.  Now after you found him guilty of Capital Murder, there is two appropriate penalties, correct?

A.   That's correct.

Q.   Life without parole and the death sentence.  Are your true feelings that you will consider both?

A.   Yes.

Q.   And that you will keep an open mind?

A.    Yes.

Q.    So you don't have your mind made up one way or another after a guilty -- after you've found someone guilty, correct?

A.    No.

            MS. YENNE:  May we have just a minute, Judge?

            THE COURT:  You may.

Q.    (BY MS. ALDOUS)  All right.  Now I explained to you the law on murder and Capital Murder, right?

A.    Right.

Q.    And I noticed in your questionnaire on page 26:  Do you believe there should be a death penalty?  And you said, Yes.  It's question 144.  I'm sorry.

A.    Yes.

Q.    And if yes, for what crimes?  Premeditated murder.

            And premeditated murder means planned.

A.    Planned.

Q.    Planned murder?

A.    Yes.

Q.    And when I explained the law to you, I mean, there is no requirement of premeditation for Capital Murder.

A.    Okay.

Q.    Okay?  So I mean, do you -- are you going to require that I prove premeditation?

A.    No.

Q.    Okay.  So somebody could form the intent on the spot?

They could go into a rage and kill someone and commit a Capital Murder?

A.   Yes.  That's correct.

Q.   Okay.  Now if you were governor for a day and the governor had the ability -- okay?  So in my theory he has the ability right here in this courtroom.  If you were governor for a day and you had the ability to end the death penalty in Texas, would you?

A.   No.

Q.   Okay.

MS. ALDOUS:  Pass the juror.

THE COURT:  Mr. Wooten.

MR. WOOTEN:  Thank you, Judge.

**VOIR DIRE CROSS-EXAMINATION**

**BY MR. WOOTEN:**

Q.   Is it Ms. Vanscoy?

A.   Yes.

Q.   My name is Jay Wooten, as the State said, and this is Kerri Mallon.  And at the end of the table is Mr. James Harris.

I wanted to ask you a little bit of follow-up on the example that the State was talking to you about.  I want to continue with their hypothetical that you and 11 others have just found -- and by the way, let me stop for a second.

First off, I guess you figured out by now that we can't tell you the facts of the case?

**A.**    That's right.

**Q.**    And I'm sure you figured out how annoying that is for you because that's what we always hear.  Frustrating and annoying, that kind of thing.

Secondly, when I give you a hypothetical or the State gives you a hypothetical, it's not a thinly veiled way of getting around that rule.  These are really hypotheticals that we're just making up.

**A.**    Okay.

**Q.**    Because what we're trying to do is just get a feel for how you feel about the topics that we're talking about.

So anyway, back to the hypothetical.  You and 11 others have found beyond a reasonable doubt that this hypothetical defendant has committed Capital Murder.  And for it to be capital, it has to be an intentional killing plus some other crime like, for instance, burglary that we've talked about before.  So in other words, an intentional killing in the course of a burglary.  Are you with me?

**A.**    Yes.

**Q.**    You and 11 other jurors have also decided beyond a reasonable doubt that it wasn't self-defense, it wasn't in defense of a third party, it wasn't in defense of property. The killer was not provoked in any way, and it wasn't a mistake.  Please also assume that the defendant was not insane. Okay?

**A.** Okay.

**Q.** What are your feelings about the death penalty for that guilty murderer in that hypothetical?

**A.** I would probably find him guilty.

**Q.** Okay. What are your feelings about the death penalty as an appropriate punishment?

**A.** I think the death penalty should be warranted unless there is other circumstances, you know, the upbringing of the person like we had talked about earlier.

**Q.** Okay. Can you tell me a little bit more about that?

**A.** Well, I guess if, you know, they -- like we talked about, that they hadn't been raised correctly, they hadn't been taught morals. I think that needs to be, you know, a factor in the decision.

**Q.** Okay. Based on what I'm talking -- let's take -- and that's later down the road. I'm trying to get to what you would be feeling right after when you found this person guilty.

**A.** Okay.

**Q.** And remember, we talked about it not -- and this is a list of defenses, if you will. Okay? And some other facts. You know, not self-defense, not defense of a third party, not defense of property, no provocation, not a mistake, and no insanity. Okay? At that point -- we'll talk maybe more about the other stuff later.

**A.** Okay.

Q.    But at that point what are your feelings about the death penalty for that convicted capital murderer?

A.    I think they should get the death penalty.

Q.    Okay.  Can you tell me why?

A.    Well, taking of another life is -- you know, should not -- you know, we don't have a right to do that.

Q.    Okay.  Now let me stop and ask you this question.  You know that if there is a Capital Murder, obviously, a life has been taken.  So any time, you know, a jury, a lawful jury, convicts someone of Capital Murder -- let's just assume that no jury would ever convict anybody of Capital Murder if a life hadn't been taken.  Can we assume that?

A.    Yes.

Q.    Okay.  So I guess my question to you is since a life will have been taken in every situation where a Capital Murder has been found to be guilty -- or found to be proven, does that mean that every time -- and I'm just asking your opinion.  Does that mean that every time you would be looking at the death penalty for that?

MS. ALDOUS:  Your Honor, I'm going to object to the form of the question.  It's confusing.  It's suggesting, versus setting out the penalty range, too.

THE COURT:  Overruled.  You can answer that question.

A.    Okay.  Could you repeat it, please?

Q.    Yeah.  Based on the hypothetical that we had, and given that in every Capital Murder if a person has been found guilty, a life will have been taken, and based on your prior answer saying that the death penalty would be warranted because a life had been taken, what I'm asking you is since any time you would have -- any time you're sitting on a jury and somebody has been found guilty of Capital Murder, would that mean that for you that the penalty would always be the death penalty?

A.    I think I would need to hear about the situation.  You know, the case itself and exactly what happened.  I know that, you know, if they are found guilty, I would have the death penalty.  I would be thinking about that.  But I would definitely want to have heard, which I would have, all the evidence from both sides.

Q.    Okay.  And for me what I'm trying to get to is the timing of what we're talking about.  I'm talking about at the point where you found the person guilty but you have yet to move into the punishment stage.  So when you say you will need to hear all the evidence, are you talking about you'd need to hear all the evidence for the whole thing or at that point?

A.    For the whole thing.

Q.    Okay.  So when earlier when you said that you felt the death penalty would be warranted if a life was taken, can you tell me more about that?

A. Well, if a life is taken and, you know, the evidence shows that he or she had really done that, I would definitely -- I could give the death penalty.

Q. Okay. And I understand. And, of course, you'd have to be able to consider the full penalty range to be a death qualified juror.

A. Yes. That's right.

Q. What I'm trying to figure out is would you automatically -- or would you think that only the death penalty would be warranted if a life was taken?

A. No.

Q. Okay. Can you tell me why?

A. I just think there is just circumstances about the situation that caused -- you know, caused the death, what was going on. And then I would either think it was death penalty or life in prison.

Q. Okay. Can you tell me what would be important to you when you said you'd have to know what had been going on? What's in your mind when you say that?

A. Well, I guess if somebody came in and, you know, killed two people just because, you know, they didn't like them or something, to me the death penalty would be that because they are taking a life without reason.

Q. Okay. So if you were in a situation where someone had been -- committed -- and you understand that one of the ways to

commit Capital Murder is by killing more than one person.  So if you were seated on a Capital Murder jury and it was shown that two people had been killed, would that mean that for you the penalty for that crime would be only death?

A.   Yes.

Q.   Okay.  Can you think of any other situations where you would feel that way?

A.   Not that I can think of.

Q.   Well, let's go -- let me go back to what you were talking about before.  You said for no reason.  And when you say somebody had killed somebody for no reason, what were you thinking about when you said that?

A.   Okay.  For no reason is if somebody came in and had a gun and came in and saw two people standing there and then decided to kill them and then decided after that maybe they wanted to rob them after -- or whatever, you know.  Get them out of the way, and then commit this unlawful act.

Q.   Okay.  And under those circumstances that you just said, would that be an automatic death penalty punishment for you?

A.   To me it would.

Q.   Let me ask you -- now when we talk about death penalty views -- and I never know what to call that when I'm talking about somebody's death penalty views.  And we're just asking you about your views, by the way.  So we'll just call them your

death penalty views.  Do you know about how long you've felt that way?  I mean, has it been your whole life or --

A.    No, not my whole life.  No.  Probably the last 20 years maybe.

Q.    All right.  And are these feelings that you feel strongly about?

A.    Yes.

Q.    Okay.

MR. WOOTEN:  May I have a moment, Judge?

THE COURT:  You may.

Q.    Ms. Vanscoy, I want to talk to you a little bit about some of the things that the District Attorney's Office talked to you about.  For instance -- and I want to put some things into context, if I can, for you -- or give you a context.  I don't want to put them in context.  I want you to put them into context because I'm just trying to figure out how you feel.

A.    Okay.

Q.    And what I always tell is this little example that, you know, I just sent a kid off to A&M.  He's 18 years old.  Never been away from Mom and Dad.  I talked to him on the phone and he tells me he has his classes set up and they all start at 8:00 o'clock in the morning.  Okay?  And I say to him, hey, you know, do you think that's a good idea?

And he says, oh, yeah.  I'd never miss class.

And I go, okay.

And then later when I went up and visited him, because we took some stuff up to him, I sat down and we talked a little bit about college life and about being away from Mom and Dad for the first time and about how that sometimes maybe people go out late at night and don't come home exactly when they had planned and that, you know, if you come home at 3:00 a.m. sometimes maybe it's hard to get out of bed and go to class.

And what I was trying to do is put it in context for him.  Because he knew what the answer that he wanted to say was, which was, I'm going to do the right thing.  And that's what came glibly out of his mouth when I was talking to him on the phone.  Because, you know, he's not going to say to me, well, Dad, you're right.  I'm probably going to miss a lot of those classes.  Because he's not going to say that because it's not the right thing to do, if you will.

But after, talking to him for a while and talking about human nature, then he started kind of putting it into context.  And he changed some of those classes.  A couple of them he couldn't change.  Some of them he changed.  Because I think what he was saying is, you know, I don't know for sure that I'll get up every morning at 7:00 o'clock, being in College Station free from Mom and Dad for the first time.

And what I'd like to do is talk to you a little bit.  You know, the State covers a whole lot of ground and

crams, like I said, two or three law courses into an hour when they talk to the witness. It's true. It's absolutely -- I promise you if you took a class on Capital Murder, it would be two semesters in law school; and they are giving you the whole thing. Okay?

A.   I didn't have trouble understanding any of that.

Q.   Well, maybe you need to go teach.

But a lot of those questions, they don't have the opportunity to ask you to really think about them --

A.   Right.

Q.   -- because they are covering a lot of territory. And I'm not saying that anything is going to change, but I do want to put it in context for you.

Like for instance, I want to ask you about the context of, you know, if you have a -- you know, we find when we talk to jurors after trials, that kind of thing -- and this isn't just in Capital Murder. In fact, you know, I haven't been doing Capital Murder my whole career. You know, we talk to people and a lot of times what jurors say or they say in voir dire is, you know, if somebody accused me of "X," then, you know, for me -- they are talking about themselves. And we also know that what we do as humans is we transfer onto other people what we think they should do. Does that make sense?

A.   Yes.

Q.   And so what they say is, you know, if I was innocent,

I would stand up and tell everybody every chance I got that I did not do it. And they seem to feel more strongly the worse the allegation would be. Like if it was a littering charge, okay, nobody really cares. Maybe you fight that, maybe you pay the ticket if you think you didn't do it. It's littering.

But if it's an allegation, you know, some type of abuse of a child or in this situation a Capital Murder, which is our most serious crime, then, you know, I think it's reasonable to think that at least some hypothetical juror out there would think, you know, if that were me, I would tell everybody I didn't do that if the State indicted me and said that I did. Because let's face it, once you're indicted, you're being accused of that crime.

A.   That's right.

Q.   And the fact that what they would do is not a problem; but there always seems to be a component to it of if I didn't do it, I would stand up and tell everybody that I didn't do it. And so with that transference we talked about, it puts them in a situation where perhaps they think if someone is not testifying, that maybe that means they did do it. Maybe they just don't feel comfortable standing up lying to an entire courtroom full of people, et cetera, et cetera.

And what I would like to say, first off, is you know, the law will tell you that you can't consider the fact that the Defendant hasn't testified for any reason at all. You

basically just have to take it totally out of your mind.  You know?  And in a Capital Murder trial, I want to put you in that jury room where things are heated and where people are trying to do the right thing and they realize how serious a case it is.  Do you think you could follow that instruction and not consider it if the Defendant didn't testify?

A.    Yes, I can.

Q.    Okay.  And I want to also take you to the lesser-included that the State talked about.  You know, it's a Capital Murder; and for some reason the lesser-included charge of murder has occurred.  Okay?  Or that's what the jury has found the Defendant guilty of, of the lesser-included of murder.  So we started out at Capital Murder, and then we end up with a murder.  And of course, to be able to be on this jury, you would have to be able to say -- you know, to answer questions that would cover that eventuality.  It probably won't happen, but the possible eventuality.  Does that make sense?

A.    Yes.

Q.    And what I need to -- and as you know from the State talking to you, is that murder -- you know, we love our juries in Texas.  We give them wide latitude.  And I like that.  I like that.  Because if you tell the jury that they pick between giving somebody 1 year and 2 years, that's not really a jury system, is it?

A.    That's right.

Q.   You know, if you give them 5 to 99, now that's doing it right.  That's my opinion.

But in this situation you will have to be able to envision yourself on a murder, reduced from Capital Murder, to be able to consider 5 years as an appropriate punishment. Could you do that?

A.   Yes, I could.

Q.   Okay.  And then the last one I want to talk to you about is the confession part.  And you know, I've said this before talking to people and I'll say it again.  I can't think of a worse pickle to be in if you're a juror.  But that's just the way it could lay out in a case where -- to figure out if the police did the right thing, gave the right warnings, you have to listen to the confession.  That's the only way to know whether they did it or not.  So there is no way around that part.  And what I want to point out to you is -- first off, I know now you know that these aren't just simple votes that people take in any part of this trial like you would at a club meeting as to whether they want to have a fish fry this year. You know?

A.   Yeah.

Q.   For instance, you don't go in the back, as you know, and say, okay.  Who thinks he did it?

It doesn't work that way.  You look at -- like the State said, you look and see if they've proven each and

every element beyond a reasonable doubt.  Okay?

     **A.**    Okay.

     **Q.**    So that's this part.  And that's the part we try to get people to follow because what common sense cries out for is the fish fry vote.  Who thinks he did it?  And we think about it.  You know, if you were allowed to talk to your neighbors while you were on any trial, at some point they would say to you, do you think he did it?  That's human nature.  Or she did it.  I'm being sexist.  But, of course, the good news is you can't talk to your neighbors, so that doesn't happen.  But that's what they would ask.  That's what I would ask if I was allowed to talk to a juror and I wasn't involved in the case.

             So over here is did he do it, which is the human nature part.  And over here is did the State prove each and every element beyond a reasonable doubt.  See, that sounds like a lawyer wrote that, right?

             But to judge the confession and the warnings on confession, you've had to hear the confession.  And it's videotaped, and so you're hearing the person that's in the courtroom with you day-in and day-out talking about this confession.  And I know -- and talking about the killing.  And I know the State in their example -- and I'll borrow it from them.  You know, it's a horrible crime.  It's explicit details.  Perhaps he enjoyed doing it.  Perhaps it was for no reason.  Just a heinous recounting of this crime.

And so you go back in the room and your human part of your brain is there is no doubt that he, quote unquote, did it. But over here is your juror part of your brain. And you have to say to yourself, did the State prove each and every element of this crime to me beyond a reasonable doubt? And if there is plenty of other evidence, then when the Judge says if you believe that a warning was left out, you're supposed to wholly disregard the statement or the confession, then that's fine because there is plenty of other evidence. So it doesn't really put you in that pickle.

But let's say that up until, you know, the confession was taken, the police didn't really know what was going on. That happens sometimes. You know, so there is some corroborating evidence but certainly not anything to you that will get them beyond a reasonable doubt without that confession. But yet, you believe in your heart of hearts that it's clear to you that a warning was left out, that it was improperly taken. You know, I want to put you in that jury room where you're sitting there knowing how serious a case this is, knowing that there is a person who a life was taken, by definition. Could you wholly disregard that confession even if it meant -- well, wholly disregard that confession and under that hypothetical vote for not guilty?

A. I believe I could.

Q. Okay. Well, and this is what we always talk about

being lawyers because "I believe I could" sometimes doesn't quite cut it, although I understand that's the way you really feel.  And I appreciate it.  But I need to know whether you would or whether you would not.

A.    I probably would.

Q.    Okay.

A.    I say probably.  I will.

Q.    Okay.  So you would?

A.    Yes.

Q.    Okay.  Now I want to talk to you a little bit about mitigation.

MR. WOOTEN:  May I have a moment, Judge?

THE COURT:  You may.

Q.    All right.  My co-counsel is pointing out to me that I probably should go through the Special Issues in order -- because it becomes -- if I talk about Special Issue 2 first and then talk about Special Issue 1 just because I thought about something I want to ask you about Special Issue No. 2, it starts giving the wrong impression on how this goes.  So she's right.  Let's go in order.

I want to talk to you a little bit about future danger.  And we call that Special Issue No. 1, the future danger issue.  You're familiar that this is the same thing that the State put up?

A.    Yes.

Q.   It's just a different color.  Okay.  So I want to make sure you understand we're not dealing with different issues.  These are the same issues.  And as far as I know, they say the same thing.

Now do you understand, first off, that -- I want to take you to the example you were talking about.  Let's say that two people have been killed for whatever this phrase means to you.  And the only reason I say that is because I don't want to put my words in there.  I want to use your words.  So when I say whatever that means to you, I don't mean that in a flip way.  I mean whatever it means to you.  But you had said for no reason.  So whatever that means to you, that's the hypothetical I'm dealing with now.

A.   Okay.

Q.   That two people have been killed and that was the aggravating circumstance that made it a Capital Murder and to you there was -- the crime was committed for no reason.

And you've seen -- you've gone through a long and lengthy guilt/innocence trial.  I don't know how long, but certainly I think we can all agree this is not something that gets wrapped up in three days, right?

A.   That's right.

Q.   Okay.  And because the State has a very high burden, they are going to bring as much evidence as they can and they are not going to ask people questions for ten minutes and then

let them off.  You know, they are going to do a nice, good, thorough job, right?

A.    That's right.

Q.    And since someone -- I don't think I'm letting the cat out of the bag to say that if someone is dead, that you're going to hear from a medical examiner of some kind.  Whatever you want to call him.  That's what we call him around here. Some people call them other things on TV.  And that person is going to bring -- it's going to be the person that did the autopsy.  Because remember, you can't have Capital Murder without someone having died by violence.  So we know that there is going to be an autopsy, someone testify as to an autopsy. And I don't think, once again, I'm letting the cat out of the bag to say that there will be autopsy photos and whatever crime photos that there are.  Obviously probably not pictures -- you know, not to be purposely gory or gross, but you know in the questionnaire we asked you how you felt about gruesome -- gruesome is the word we used.  And that's because very often there are what somebody might term gruesome photos, gruesome evidence that's brought to the jurors, right?

Okay.  So this hypothetical case where two people are dead for no reason and you've got all these gruesome photos and you've had to live with that crime for a while and you know that more likely than not, you know, there is survivors, victims, families, that kind of thing.  And so you found this

person guilty of this crime we're talking about, of the Capital Murder that I just spoke of.  And now what I need to know is -- the State asked you if you could keep an open mind when you went to the future danger question.  And that's something that you know, once again, like my son, you know, are you going to go to class?  Sure, I'm going to go to class.  But what I want to do is put you in that jury room where -- or put you in that trial now in punishment when you've heard all that.  And remember, this is a hard thing for them to do to prove future danger.  It's beyond a reasonable doubt.  Not impossible.  It's not beyond all doubt.  But they will tell you themselves it's a high burden.  It's the highest burden we have in law.

Can you see yourself, after hearing all that, after hearing that this murder that we've talked about -- and whatever it means to you, no reason, can you envision yourself answering Special Issue No. 1 no?

A.  Yes.

Q.  Okay.  And then now that you've -- let's say that -- let's move forward a little bit.  You found -- and if we move forward, then we know -- if we move forward to Special Issue No. 2, we know how Special Issue No. 1 went, correct?

A.  Correct.

Q.  Okay.  If we get to Special Issue 2, basically what's happened is all 12 of the jurors, including you, have now found future danger unanimously, right?  Because that's how we move

on.  You know, ten the other way, you go the other way.  We stop.  But we know if you're talking about Special Issue No. 2, we know that you've had a unanimous yes to Special Issue No. 1.  Does that make sense?

A.  Yes.

Q.  And you personally have found yes because you're one of the jurors.

A.  That's right.

Q.  All right.  So now we're at Special Issue No. 2 and now we're back to the fact that here's this crime, two people dead, no reason to you, and the person is -- you've found beyond a reasonable doubt that there is a probability that that defendant would commit criminal acts of violence that would constitute a continuing threat to society.

Now my question is at that point is there anything that you can envision that will make you answer Special Issue No. 2 yes?

A.  Yes.

Q.  Okay.  And I want to talk to you a little bit about mitigation.  We know that when we talk about, you know -- you know, the law uses the word "consider" a lot.  Like you're not supposed to consider the fact that the Defendant doesn't testify if he doesn't testify, right?  And we also know that it's just a word we use a lot.  When we talk about the full range of punishment, we say could you consider the full range

of punishment. Well, in mitigation we actually have a little more there. Now I can't tell what you it means because there is not technically a definition, but for mitigation the juror must consider and give effect to mitigation. Does that make sense to you?

A. Yes.

Q. Okay. So I want to talk to you a little bit about that. Number one, each juror decides for them self what is mitigation. In fact, the law calls it a personal moral judgment. That's not true on these other verdicts. But on this verdict -- when I say "verdict," I mean your verdict, your decision.

A. Right.

Q. They don't call it that. They call the -- the other ones they call them other things. They call them just a verdict or a vote or a decision. But in this situation they call it a personal moral judgment. Some cases call it a reasoned moral response. Okay? Does that make sense to you?

A. Yes.

Q. And what I would say to you is that given that it's a personal moral judgment, would you agree with me that if I said to you that, to me, a personal moral judgment was, you know, where I went to church or whether I went to church, would that make sense to you?

A. Yes.

Q. Okay. Or how many children to have. Does that make sense to you?

A. Yes.

Q. Okay. And so when I say to you that each juror decides for them self, it's true that each juror decides for them self anytime they are given a decision to be made in a case like this. But moreover, more so, in Special Issue No. 2.

I also want to tell you that each vote for life -- and of course, that's what a yes is if you find a sufficient mitigating circumstance. Number one, it can only be one if you want it to be. If you'll notice, it says is there a sufficient mitigating circumstance and then it says or circumstances. So it can just be based on one thing. Does that make sense?

A. Yes.

Q. Okay. And you're okay with that?

A. Yes.

Q. All right. Also, each -- because it's a personal moral judgment, each juror -- let's say that each juror -- we know that in this hypothetical we're talking about that every juror found -- answered this question yes and every juror told us that they all decided that there was -- they only based it on one mitigating circumstance. Okay? Are you with me?

A. Yes.

Q. There can be a list of 12 different ones because it's

a personal moral judgment and each one of those people, they don't have to share the opinion of that other person. They can all disagree as to what was mitigating to them. Does that make sense?

A.    Yes.

Q.    Okay. Also, the law tells us that a juror can answer Special Issue No. 2 based entirely on mercy alone. What do you think about that?

A.    Well, I guess you could, you know, look at mercy and decide the person would probably do better by getting a certain number of years rather than death.

Q.    Okay. Well, and let me -- and I'm not fussing at you. It's my job to correct these little things as they come through. I think I understand what you're saying, but you understand there is only two. So it wouldn't be a certain number of years because when somebody gets life without possibility of parole, what -- they do, I guess, ultimately get a number; but it's based on how long they live. Does that make sense?

A.    Yes.

Q.    Okay. And this is something I always mean to say and I always forget to say is back a long time ago -- not even that long ago. But awhile back all we had was the death penalty, and then it was life but there was always a possibility of parole. So a lot of people would say, well, you know, it's not

really life.  And so -- and that made people -- well, it upset a lot of people.  I guess I understand why.  You give somebody life and later on they are out running around.

But that's not true anymore.  I want to make sure you understand that.  And I'm not giving you the lawyer speech now.  I'm telling you real speech, which is if you get sentenced to life without possibility of parole, you're going to die in prison.

A.    Yes.

Q.    Okay?

A.    I understand.

Q.    So based on your answer before, you said that -- let me make sure.  Can I correct it to the point where you would say sometimes based on mercy alone someone might -- you might give somebody life in prison other than the death penalty?

A.    Yes.

Q.    And not a number of years?

A.    Yes.

Q.    Okay.  The other thing I want to point out is mitigation.  And I think that the D.A.'s Office does a pretty good job of throwing up lots of different types of mitigation up there, and I know they always tell it's not an exhaustive list.  It's not.  It can be anything.  Anything that to the juror is mitigating and they find sufficient.  That's why they throw so many things up there.  And it can have really -- well,

if you use the State's example of the person being raised so badly and neglected, obviously, that's not connected necessarily to the actual crime, right?

A.    That's right.

Q.    I mean, you could possibly connect it up; but you can see a situation where it would have nothing to do with it.  And my point is that's because there doesn't have to be a link or a nexus back to the actual Capital Murder.  So -- and I think you understand.  Obviously, they say in there, I think, good work history.  Well, good work history -- you know, the crime may not have occurred at work.  May not have anything to do with work.  This good work history might not have been even going on when this crime was committed.  I think I probably made that point.

A.    Yes.

Q.    Okay.  Now the other thing that's odd about Special Issue No. 2 is there is no burden of proof.  And that's really very odd for us.  Usually there is a burden.  Like on Special Issue No. 1, you understand the burden is on the State.  And you understand how high their burden is.  Same thing on the guilt/innocence.  I know you understand the burden is on them and you understand how high that is.  And by the way, both those burdens are very high; and I want to make sure you understand or you agree with me that the burden on guilt/innocence is the same burden on future danger, right?

A.   Yes.

Q.   Okay.  But when it gets to Special Issue No. 2, there is no burden, which is odd.  And I guess what I want to make sure is would you require the Defendant or the defense to bring you mitigation to answer this issue?

A.   No.

MR. WOOTEN:  May I have a moment, Judge?

THE COURT:  You may.

Q.   All right.  Ma'am, I want to talk to you a little bit about mitigation.  You know, what mitigation says -- and we've talked about it -- is that you have to be able to consider and give effect to mitigation to be qualified on a jury like this.

Could you consider and give effect to low intellectual functioning as mitigation?

A.   Yes.

Q.   Could you consider and give effect to drug addiction as mitigation?

A.   Yes.

Q.   Could you consider and give effect to desperation as mitigation?

A.   Probably not.

Q.   Okay.  And when you say probably, does that mean no?

A.   No.  I'm sorry, yes.

Q.   And what about causation as mitigation?  You know, like the State talked about the fire example.  And I'm --

obviously, if they used -- you know if they use that example, it's not the facts of this case.

A.    Yes.

Q.    Because it would be improper.  So you know that.  But I'm going to go ahead and use their example because I think it's a good example.  Would you consider a causation situation like that?  Could you consider and give effect to that as mitigation?

A.    No.

Q.    Now when we talk about this mitigation, where would you -- as far as the way this goes, where would you -- I know it says taking into consideration all the evidence, including the circumstances of the offense, Defendant's character and background, personal moral culpability of the Defendant, where would you expect the mitigation to come from?

MS. ALDOUS:  Your Honor, I'm going to object.  May we approach on this?

THE COURT:  You may.

**(The following discussion was held at the bench.)**

THE COURT:  We're at a bench conference.  The venire person cannot hear.

MS. ALDOUS:  Judge, this question is misleading to the juror.  It's a deliberate backdoor attempt to get her to say that she can't follow the law.  She repeatedly said that she would not require the defense to produce any evidence at

all, that they don't have a burden on Special Issue No. 2, and that neither party has a burden.

MR. WOOTEN:  Actually, Judge, the reason I'm asking this question is because what a juror said yesterday or the day before.  Because they actually said that and it occurred to me that, I mean, that's what the juror said.  It's not a backdoor attempt.  I'm asking her if she assumes that we're going to bring it, then that would be putting the burden on us.

MS. ALDOUS:  Judge, he also just asked her would you require them to produce any mitigation evidence, and she said no.  And now they are attempting to --

THE COURT:  So what's your legal objection?

MS. ALDOUS:  That the question is confusing to the juror and --

MS. YENNE:  Additionally, Your Honor --

THE COURT:  One lawyer.

MS. ALDOUS:  And there may or may not be mitigation in a case depending on the evidence.

MR. WOOTEN:  Judge, it's not a trial.  There is no asked and answered in voir dire.

THE COURT:  Okay.  I'm going -- I'm going to go ahead and sustain the objection.

**(Bench discussion concluded.)**

MR. WOOTEN:  We pass the juror, Judge.

THE COURT: All right. Ms. Vanscoy, if you would just step down, the bailiff will show you out to the walkway. We'll be back with you in a few minutes. Just remember all the instructions I've previously given you.

VENIRE PERSON: Okay.

**(Venire person out.)**

THE COURT: We're continuing on the record. The venire person has left the courtroom.

Present Ms. Vanscoy to the State for challenge for cause.

MS. ALDOUS: None.

THE COURT: Present Ms. Vanscoy to the defense for challenge for cause.

MR. WOOTEN: Yes, Judge. We have some challenges for cause. We believe that Ms. Vanscoy is a -- what we call an ADP juror, an automatic death penalty juror. And the following examples will be based on the following legal precedent: Due process, United States 5th and 14th Amendments; Texas Article 1, Section 13 and 19; Code of Criminal Procedure 1.04.

Effective assistance of counsel, United States 6th and 14th Amendments; Texas Article 1, Section 10; Code of Criminal Procedure 1.051.

Cruel and unusual punishment, United States 8th and 14th Amendments; Texas Article 1, Section 10, 13, 18 and Code of Criminal Procedure 1.09.

The right to an impartial jury, United States 6th and 7th Amendments; Texas Article 1, Section 10 and 15; Code of Criminal Procedure 1.05, 1.12, 35.16 and 35.17.

Code of Criminal Procedure 35.16(c)(2), that the juror has a bias or prejudice against any of the law applicable to the case on which the Defendant is entitled to rely, unable to consider the full range of punishment.

Also, under Morgan versus Illinois, Wainwright versus Witt, Cumbo versus State, Pierce versus State, Cuevas versus State. And those are the precedent, Judge.

The juror stated that -- after I asked her what her feelings would be after guilt and after I did the hypothetical questions, she said -- and asked her what were her feelings about the death penalty, she said, quote, "He should get the death penalty," end quote. And I believe she also said -- and I think that is a quote -- taking of another life, we don't have the right to do that.

Also, under -- that when -- that the death penalty is warranted when a life is taken and that the evidence shows that the Defendant really did it, I could give the death penalty.

Also, the juror stated that if you -- if a person -- if a hypothetical defendant had killed two people because he didn't like them, to me that's the death penalty.

Also, under a question, if two people were killed

for you only death?  She said, yes.

Also, I believe as to a question she said and if there was no reason -- and she said in response to a question, Well, if a person took a gun and saw two people and for no reason decided to kill them and then rob them after that, it would be the death penalty.  And I asked her would that be an automatic death penalty?  And she said, yes.

Also, Judge, we believe that Ms. Vanscoy is what we call mitigation impaired.  I believe that she cannot consider and give full -- consider and give effect to mitigation as to be qualified on this jury.  That's pursuant to due process, United States 5th and 14th Amendments; Texas Article 1, Section 13 and 19; Code of Criminal Procedure 1.04.

Effective assistance of counsel, United States 6th Amendment; Texas Article 1, Section 10; Code of Criminal Procedure 1.051.

Cruel and unusual punishment, United States 8th Amendment; Texas Article 1, Section 10, 13 and 18; and Code of Criminal Procedure 1.09.

Penry versus Lynaugh, Morgan versus Illinois, Tennard versus Dretke, Eddings versus Oklahoma, Lockett versus Ohio, and Boyde versus California.

I asked her if she could consider and give effect to desperation.  She said, no.  And also could she consider and give effect to causation.  She said, no.

Also, I believe that the Court observed Ms. Vanscoy's demeanor in answering the question about the confession. I do believe she said ultimately that she could disregard the confession, but I would bring up to the Court's attention how much trouble she had answering that question and her demeanor, which I know the Court took notice of.

For all those reasons we believe that she is not qualified and has disqualified herself through her answers, and we'd ask that you grant our challenge for cause.

THE COURT: Does the State wish to respond?

MS. ALDOUS: Yes, Your Honor. As to defense counsel's referral -- reference to Ms. Vanscoy being an automatic death penalty juror, I believe the record speaks exact opposite of that. She stated to defense counsel during his question she'd consider the whole thing. And I believe what her words were -- she was trying to tell him that she would consider all of the evidence in both guilt/innocence and punishment stage is what I believe she meant by that. And she would listen to all of it.

On State's questioning she said she could follow the law. She would listen to all the evidence, the evidence in guilt/innocence and evidence in punishment. She would not have her mind made up after guilt/innocence. She would not have her mind made up after Special Issue No. 1, finding a future danger. She would still not have her mind made up and she

would consider and give effect to mitigation.

She also said she could answer Special Issue No. 1 no, even after finding someone guilty of Capital Murder. She said that she could -- if after finding someone guilty of Capital Murder and finding them to be a future danger, she could listen, consider and give effect to mitigation; and if it was sufficient, find there to be sufficient mitigating circumstances and answer Special Issue No. 2 yes.

Also, the circumstances of the crime itself alone are sufficient to find someone a future danger.  I believe the caselaw -- there is a case out there that says Special Issue No. 1 can be answered with a yes based on the facts of the offense alone.

And in response to defense counsel's questioning on Special Issue No. 1 and on the hypothetical, she did say that she can answer Special Issue No. 1 no.  She also said that she can answer special -- she could find sufficient mitigation in Special Issue No. 2.

As for not considering a certain type of thing mitigating, Morrow versus State, which is 910 S.W.2d 471, says that you're not challengeable for cause just because you can't consider a particular variety of mitigation, a particular thing being mitigating, which is what we have here.  What one juror might find mitigating, another may not -- may not consider it to be mitigation.

She repeatedly said that she would follow the law.  And when given specific instances, she said she would follow the law.

Defense counsel's hypothetical about how do you feel about the death penalty after you found someone guilty, I believe, is confusing to jurors.  I believe it only gives them one option, and I don't think just a general -- and she also clarified in her response to him that she would listen and consider all the evidence.  And that's what she volunteered.

She said repeatedly she needs to hear all the evidence for the whole thing.  She would not have her mind made up automatically at any phase.  She said she could -- and I believe on the confession she made it clear on the record that she would disregard it if she felt that the police did not comply.  I don't think that she had that much trouble with it, as other jurors have had trouble.  She seemed to understand it and said she would disregard it and find him not guilty.

And she also said she would never require the defense to bring them any evidence.

THE COURT:  All right.  I did observe her demeanor and the responses that she gave to all the questions, including the second follow-up on the hypothetical dealing with the Special Issues 1 and 2, and I am going to deny the challenge for cause.

Does -- I'll pass her to the State for a

peremptory challenge.

MS. ALDOUS:  No, Your Honor.

THE COURT:  Pass her to the defense for peremptory challenge.

MR. WOOTEN:  Yes, Judge.  We would exercise one.  But let me talk to my client.

THE COURT:  All right.

MR. WOOTEN:  Yes, Judge.  I spoke with my client, and we would exercise a peremptory strike.

THE COURT:  All right.  I will then grant your Peremptory Challenge No. 8.

All right.  Would you ask Ms. Vanscoy to come back in?

**(Venire person in.)**

THE COURT:  We are continuing on the record.  Ms. Vanscoy has now reentered the courtroom.

Ms. Vanscoy, at this time I am going to excuse you from any further jury service in this case.  But before I do that, I want to thank you very, very much for your taking the time to come up here for three days to answer a long questionnaire, to sit and very thoughtfully -- and I think very considerately -- give answers to all these questions.  They are not easy questions that are asked.

VENIRE PERSON:  That's right.

THE COURT:  And, you know, what makes our system

be in recess until you get back.

**(A short recess was taken.)**

THE COURT:  All right.  We're back on the record. The record will reflect that counsel for the State, counsel for the defense, the Defendant are back in the courtroom.

Mr. Wooten, have you and your client had sufficient time to visit?

MR. WOOTEN:  Yes, Judge, we have.

THE COURT:  All right.  Are you ready to proceed?

MR. WOOTEN:  Yes, sir.

THE COURT:  All right.  I would present Mr. Martinez to the State for any challenges for cause.

MS. YENNE:  None, Your Honor.

THE COURT:  Present Mr. Martinez to the defense for any challenges for cause.

MR. WOOTEN:  Yes, Judge.  Judge, based on due process, United States 5th and 14th Amendments; Texas Article 1, Section 13 and 19; Code of Criminal Procedure 1.04.

Effective assistance of counsel, United States 6th and 14th Amendments; Texas Article 1, Section 10; Code of Criminal Procedure 1.051.

Cruel and unusual punishment, United States 8th Amendment; Texas Article 1, Section 10, 13 and 18; Code of Criminal Procedure 1.09.

Right to an impartial jury, United States 6th and

7th Amendments; Texas Article 1, Section 10, 13 and 15; Code of Criminal Procedure 1.05, 1.12, 35,16, 35.17.

Also, pursuant to Code of Criminal Procedure 35.16(c)(2), the juror has a bias or prejudice against any of the law applicable to the case upon which the Defendant is entitled to rely and this would be unable to consider the full range of punishment.

Also, under Morgan versus Illinois, Wainwright versus Witt, Cumbo versus State, Pierce versus State, Cuevas versus State.

We believe that among other challenges Mr. Martinez said he is an automatic death penalty juror under the stripping question that I asked him. He said that if a criminal went in purposely to kill and rob and did so, it warrants the maximum penalty. He did later come back and change his answer, but he did say that.

He also said in his questionnaire that I believe that if the crime is serious enough that the death penalty should be enforced. Later he said that he really meant should be an option but, in fact, his questionnaire did say enforced. And that's in the record.

He also stated -- I asked him about Number 108: Do you believe the death penalty should be used for other crimes in addition to Capital Murder? He said, Yes. I said, If yes, which ones? And he said, Rapists. That's in the

record.

He also said -- it also said based on himself, when I was talking to him about that, he said yes, I think capital punishment for rapists and child molesters.

We believe, of course, that if he's willing to inflict the death penalty for cases where there is not a death involved, that he would certainly find the death penalty for a case where there was a person killed by violence.

He also said that under 109 that the death penalty gives a criminal what he deserves. He did come back, in all fairness, and say he meant capital punishment was life or death; but earlier on when I talked to him, he admitted that he really hadn't been thinking too much about the life part. And I believe that on the first blush when he filled out this questionnaire, that he did mean -- when he said that the death penalty gives a criminal what he deserves, that he was talking about the death penalty. He said that if charged with the crime that allows for the capital punishment and is proven, then he deserves capital punishment.

And finally, as far as the confession, his first response was if that was the only evidence, can you find not guilty? He said, yes, I guess. It would be hard. And then after the State did proffer some leading questions from him, he did come back and say that he could. But we believe that under Morgan versus Illinois that the follow the law or the leading

questions are not really what the Court should focus on, but his initial more honest response because that would be based truly on his feelings.

Also, Judge, we'd also, of course, make an objection based on the fact that this juror was qualified using the -- what we believe, the impermissibly reduced definition of mitigation, which is Eddings versus Oklahoma and the Eighth Amendment.

Based on all that, we would challenge Mr. Martinez for cause.

THE COURT:  Response?

MS. YENNE:  Judge, we would like to respond. First, I'd like the Court to take judicial notice of the answers in his Mr. Martinez's questionnaire.

THE COURT:  The answers in the questionnaire or the answers that were referred to in open court?

MS. YENNE:  The answers that were referred to in open court, but I'd also like the Court to take judicial notice of the questionnaire questions because I am specifically going to respond to them in response to this argument, as to the way things in the questionnaire are phrased by capital punishment. I'm going to point out something to the Court.

But let me start, and then the Court can decide on the other.  First of all, Judge, I think that this is a very fair juror.  In response to the questions in open court, Number

105: Check one statement which best summarizes your general views with about capital punishment, the death penalty. By the way, there is a huge distinction on the way we ask this in the questionnaire. In fact, we distinguish between the death penalty and capital punishment in the agree/disagree, and that's significant.

But he stated, I am neither generally opposed nor generally in favor of capital punishment.

He's not a 5/5, he's not a 5/1, he's not a 5/2. He's not even a 4.

Then you go on to Number 106: Assume you're on a jury to determine a sentence for somebody who been convicted of Capital Murder. The law gives you a choice of death or life imprisonment without parole. He's a 3. I would consider all the penalties provided by law and the facts and the circumstances of a particular case.

Let's go a little further. In response to my questioning. What is your best argument for the death penalty?

If the criminal has a history of crime and violent nature and has committed murder, then the death penalty should be enforced.

He's the first person that started bringing up the process in a long time. Crime plus history plus violent nature. And then when the process was explained to him, he said how important mitigation was. He thought mercy was a good

thing.

At the end of guilt/innocence he wasn't leaning one way or another.  Life without parole or the death penalty could be just as appropriate.  He himself said something to me that was striking.  This could be a one-time event.  When conscious objective or desire to kill, inexcusable Capital Murder event was explained to him, he said it's possible that somebody is not a future danger because it could be a one-time event.  In other words, capital -- an ugly, brutal, conscious objective, desire to kill Capital Murder could be a one-time even and not a future danger to him.  He volunteered that.  Besides acknowledging that people could change.  In fact, he acknowledged that he believed that prison can change -- they can change on their own after that.  That's in his questionnaire and came out during questioning.

He would not have his mind made up in guilt/innocence.  He would consider life without parole, which he says is stiff, and the death penalty, the ultimate, and would not have his mind made up or lean even after guilt/innocence.

In fact, on defense counsel's questioning he said, so would that be an automatic future danger?

No.  He answered no.

Now keep in mind that caselaw says the facts of a crime are sufficient enough to answer yes to Special Issue

No. 1. But he said no for him.

He's not an automatic future danger person. In fact, I believe him to be the opposite.

And he said that it should be eligible for death. When you go to page 20 of our questionnaire, as opposed to suggesting death penalty, Number 109, the agree/disagree questions, are phrased this way. You will find a number of statements below expressing different attitudes towards capital punishment. Please check in one of the spaces next to each statement indicating whether you more nearly agree or disagree with the statement.

We're assuming capital punishment means the death penalty; but yet, on some of the questions we rephrase the death penalty versus capital punishment to agree or disagree. We never captioned on the agree or disagree that capital punishment meant the death penalty on the agree or disagree. In fact, this particular juror says capital punishment, to him, meant either life, the most strict, or death. Something significant.

He said it should be an option. Well, of course it should be because those are the two options under the statute for the penalty range.

Additionally, he said he was not leaning towards death or life without parole. He would hold me to my burden beyond a reasonable doubt on Special Issue No. 1 and make me

prove it.  He could answer it no if I didn't prove it to him beyond a reasonable doubt.  Never in any phase was this man a burden shifter, as they phrase it.  In fact, he said he didn't expect them to produce anything.  He would keep an open mind and thought mitigation was good.  Thought it was a good thing. Thought mercy was good.

His demeanor.  I'd ask the Court to take notice of his demeanor.  This man is the opposite of an automatic death penalty juror.  He would consider all the options.  He thought it was good that a jury could give mercy to another human being.  And in response to the question on the confession, there was no difference from his response than anybody else's.  That's one that you have to carefully consider because it is nothing minor.  And I went back and specifically asked him.  He indicated, just like a lot of other people who have been selected for this jury, that it would be difficult but they can follow the law.

He also specifically indicated that he could follow -- can you judge this case based on the law and the evidence provided to him?  And as a juror that he will be fair and listen to all the facts before making my decision.  That's in his questionnaire.  That's before the Court.

He also very, very specifically testified that he could consider the full penalty range, 5 to 99, if he convicted someone of murder as opposed to Capital Murder.

This man is open, honest. He would fairly judge it, and he is not an automatic life without parole or death.

THE COURT: All right. I observed his demeanor. I heard his answers. I thought he probably was as much down the middle of the line that the defense has been looking for as anybody we've had. I'm going to overrule your challenges for cause.

Present Mr. Martinez to the State for peremptory challenge.

MS. YENNE: None, Your Honor.

THE COURT: The defense does not have any other peremptory challenges.

MR. WOOTEN: No, sir. We would have that motion for the Court.

MS. MALLON: If I may approach, Your Honor?

THE COURT: Yes.

MS. YENNE: Judge, may we run and make some additional response copies? We have a response to any motion that would request additional peremptories.

MR. WOOTEN: Yes. And for the record, that is the motion that we're filing.

THE COURT: All right. The motion has been filed. I have a courtesy copy of it.

Ms. Yenne, you may go make some copies.

Mr. Anders, you can tell Mr. Martinez that we

have some things we need to take up.  It will probably be half an hour or so before we get back to him, but we'll -- just tell him we'll get back to him as soon as we can, but it will probably be a few minutes before we do it.

MS. YENNE:  I'm sorry, Judge.  I might need 15 minutes.  I have every exhibit and every juror challenge transcription to attach to my response, so let me see if I can get that, also.

THE COURT:  Okay.

MS. YENNE:  Could you give us about 15 minutes?

THE COURT:  Of course.

MS. YENNE:  Okay.

THE COURT:  Take what time you need.

MS. YENNE:  I forgot I had to attach Exhibits A and B to it.  Thank you.

**(A short recess was taken.)**

THE COURT:  We're on the record.  The record will reflect that counsel for the State, counsel for defense, the Defendant are present.

Ms. Yenne, you had requested we reconvene.

MS. YENNE:  Yes, Judge.  In starting to peruse this Defendant's Request for Additional Peremptory Challenges, this motion refers to jurors's answers in questionnaires that may not be in the record before the Court.  That is a significant issue.  We've had this discussion before, and the

Court is ruling what's in the record.  No one has taken judicial notice, which could only be the Court, of these jurors's questionnaires.  There is a concern about confidentiality, but I think it is blatantly unfair to refer to questions that may not be testified to before on this record.  And I would object to -- I mean, we provided defense counsel copies of all the juror transcriptions that we had up to that point.  We may have another one since.  They have gotten it in the last --

MR. WOOTEN:  But two days ago, Judge.  So they were very nice to do that.  They don't have to do that.  But I'm saying, unfortunately, the timing was not great.  So we weren't able to use the transcripts.  We can reform it if we have time.

I didn't mean to cut you off.  I just wanted to say.

MS. YENNE:  They're not entire transcripts.  They are just the challenges for cause or peremptories.

MR. WOOTEN:  I understand.

MS. YENNE:  In other words, he would have to -- the Judge would have to look at the entire record on each prospective juror.  But we weren't asked for those transcripts until, like, two or three days ago.

MR. WOOTEN:  That's exactly true.  I don't think --

MS. YENNE:  But we would object to the Court considering anything from a questionnaire that isn't on the record unless the Court is going to admit all of these jurors' questionnaires to look at that they're objecting to or take judicial notice of that they're part of the record.  Because this motion reflects as if all of these questions that they are referring to are in the record before the Court.  You can't just go pick and choose what a questionnaire says if it wasn't on the record, Judge.

And now I'm going to tell you, that's days and weeks gone by.  You can pick a questionnaire that you're quoting from -- let me see if I could refer to just basically -- page 23, for example.  On one of the jurors they said on Question 100, What are your feelings?  Please explain.

You can't just go back and say what they wrote if it wasn't in the record before the Court.  Because that issue came up before about what is in the record, not just general questions, and bootstrapped to a challenge -- a request for additional peremptories if it's not in the record before the Court, if we didn't develop it.  And that is the State's objection.

I have no idea what five weeks ago is in the record versus what counsel is putting in their questionnaire they stated, and they are trying to make it part of the record when it may not be.  So that is a huge concern for the State at

this point.

MR. WOOTEN: Judge --

THE COURT: Well, I do note in one place it says in the questionnaire in response and in some places it says the venire person stated. So stated --

MR. WOOTEN: Yes, Judge. And let me see if I can clarify a little bit. I don't really have an argumentative response. I have a clarification. And it may not be -- it may not fix it, but I want the Court to know what's going on.

Number 1, I did not write this part of the motion. I support it, of course. It's got my name on it. But to be able to say to you here is exactly the way it was done, I can't do until we get ahold of Ms. Conn. She's not here today. She had a doctor's appointment. She got all our notes from me, Ms. Mallon, and herself, and then she worked on this motion. I know sometimes -- or what I try to do is I ask people, like I did with Mr. Martinez, I ask them what was in the questionnaire. And then that's in the record.

Number two, it's always been my opinion -- and that's all it is -- that these questionnaires were just part of the voir dire that was done without me asking the questions to somebody. I mean, we typed them up. We had input in the questions. Those are their answers. That's been my opinion.

I don't believe the Court ever ruled, ultimately -- well, and maybe I'm wrong; but I don't think the

Court ruled, ultimately, how to handle that. Because -- well, I just don't remember that being decided. I know the State had a concern about it. We, of course, will follow whatever the Court said. If the Court tells us that they have made a ruling that the questionnaires are not in play unless it comes from the witness stand, then what I will need to do is get ahold of Ms. Conn and see if she did it, if she kept within those parameters or not. But I don't remember the Court making a ruling.

MS. YENNE: The State would object --

THE COURT: Even if I didn't make the ruling, how could it be in the record if -- how can it be in the record because those questionnaires aren't filed? Those questionnaires are -- were never filed. Nobody asked for them to be filed. So I don't think that can be in the record.

MR. WOOTEN: Once again, I think if someone was writing a motion, Judge, I think they could say that -- it would be more precise to say that Mr. Wooten asked Mr. Martinez what he wrote in the questionnaire and it came in. But I can envision somebody writing a motion and saying the questionnaire said this because I asked him directly about that. So before -- at this point, I don't know how that was developed.

MS. YENNE: That's exactly the State's objection. The State would object to anything that is not on this Court's record by a court reporter regarding each prospective

peremptory or juror.  We would object to the Court considering anything that did not come before this Court on the very thorough examination done by the defense and the State because the Court is basing its rulings, as it has for eight weeks, on what is before the Court in the record.

MR. WOOTEN:  Well, then I think the State would have to be able to say which things that they actually object to.  Because I don't think we can just come in and say there might be some mistakes of this -- of this, you know, in here so the entire motion should be thrown out.  I don't think that's fair either.

MS. YENNE:  We believe this is an attempt to bootstrap from questionnaires, and we would ask the Court then if -- and this is going to be very painstaking, and we -- and I'm deeply concerned about the manner in which this motion was written because it is taking questionnaire information and it may not be in the record.  I'm deeply concerned about that occurring.

THE COURT:  Well, I would hope that that's not the case unless it's clearly indicated that that is from the questionnaire.  The Court --

MR. WOOTEN:  Can we agree to -- I'm sorry.

THE COURT:  The Court will not consider anything that is not in the record as for this motion.

MR. WOOTEN:  And that's the Court's ruling, and I

would say that in this situation I think that -- it's kind of like when the Court is doing a bench trial and the Court hears irrelevant information.  The Court just doesn't consider that information.  Or the Court hears hearsay.  So I don't think that the motion on its -- is void somehow.  I just think that we -- we understand your ruling and would ask that you look at our motion in that regard.

THE COURT:  Well, I just have one curious question.  I was just looking at this.  You have 15 objections to peremptory challenges listed.  My recollection is that there was one juror -- and I don't know which one it was -- that you did not have any --

MR. WOOTEN:  I think there is three.

THE COURT:  -- you did not have any challenge.

MR. WOOTEN:  I think there is three, from my recollection.  Is that not what the motion says?

THE COURT:  There were three what?

MR. WOOTEN:  I think there are three times that we used peremptories and did not object for cause.

MS. YENNE:  Judge, we will be attaching the acceptances of the jurors and the peremptories to our response very shortly.  But before I started my response attachments, I wanted to address this.  There are several.  They will be in our attachments; and there is, in fact, one juror who was accepted and unaccepted.  That was Ms. Wardlow.

MR. WOOTEN: But -- no, I think the Court is exactly right. I believe from my recollection that there are three jurors that we used peremptories on. Two or three that we did not challenge for cause. But I don't know that the law is that we have to challenge all of them for cause. But if you're saying that our motion is wrong, that's --

THE COURT: I'm just saying when I read your motion it says used all 15 strikes and we said they were erroneously denied. And you list 15 people, as I read your motion. And -- turn to page 4. Am I misreading that second paragraph in request? It said were erroneously denied for -- and I just counted those. It seems like I'm counting 15 of them. Am I reading it wrong?

MR. WOOTEN: Well, Judge -- well, no, I don't think you're reading it wrong; but I think what I would direct the Court's attention to, respectfully, is that it says that we've used all 15 strikes. The defense requests an additional 12 strikes because defense challenges for causes were erroneously denied for jurors.

Now did we list the jurors here?

THE COURT: You list -- my -- my count you list 15.

MR. WOOTEN: That's unfortunate. I'm sorry. We'll have to fix that.

THE COURT: Because I know one of those you

weren't challenging for cause.  You used a peremptory just because your client wanted you to.  And I don't remember which one that was.

MR. WOOTEN:  Yes, Judge.  I belive that -- I believe that --

MS. YENNE:  That was Wardlow.

MR. WOOTEN:  I think there is three.  Not just that one.  I think there is two additional ones, in all candor to the Court.

MS. YENNE:  There are additional ones.

MR. WOOTEN:  And I'm sorry that --

MS. YENNE:  Well, like yesterday there was no challenge for cause, also.

MR. WOOTEN:  I think it's Blanchard and Martinez, but we would have to check.  And I apologize that it's wrong.

MS. YENNE:  I'm going upstairs because I've got the attachments.  I should have the attachments that reflect that.

THE COURT:  Okay.  So which ones are you challenging that --

MR. WOOTEN:  Can you give us a second to make sure that we don't present further incorrect information to the Court?

THE COURT:  You can.  I'm just trying to get a handle on what you're complaining about.

MS. MALLON: I know for certain, Judge, that we did not challenge Mr. Blanchard or Mr. Martinez for cause.

THE COURT: And there was one that you did not want to challenge for cause but your client requested and you exercised a peremptory on that one.

MS. YENNE: Is that the one that was accepted and then unaccepted? That was Ms. Wardlow.

THE COURT: Yes, that was Wardlow.

MS. MALLON: Then those are the three.

MR. WOOTEN: We need to make sure.

THE COURT: All right. Let's take a recess and you look at your motion and tell me which ones you're complaining about.

MR. WOOTEN: Thank you, Judge. We'll do that.

**(A short recess was taken.)**

THE COURT: All right. We're on the record. The record will reflect that counsel for the State, counsel for the defense, the Defendant are present. The venire person is still not present.

We've been -- I didn't check to see when we went off the record because I didn't think it was going to be that long, but I think we've been off the record for -- I show that Mr. Martinez -- the State -- the defense finished at 2:02 with Mr. Martinez, and it's now 3:28. So has everyone -- the State had sufficient time to review the request of the defense for

additional peremptory challenges?

MS. YENNE: Yes, Your Honor.

THE COURT: Okay. Mr. Wooten, I'll hear you on your request.

MR. WOOTEN: Thank you, Judge.

First, Judge, I would ask -- well, first I would like to address the fact that our motion had some problems. I want to apologize to Mr. Harris for that. I'd like to apologize to the Court, and I apologize to the State. We're sorry about that. We think that we have it lined out now.

I would like to go to page 4 and make an oral request that the Court amend the second full paragraph to say that the defense requests an additional 11 strikes. We'd also like the Court to not consider, because we believe this to be erroneous, Juror No. 19, Jamie Charlene Wardlow; Juror No. 143, Gregory Paul Blanchard; 142, Richard Martinez; and 162, Brian Paulk.

THE COURT: All right. I think Mr. Blanchard's number is actually 135.

MR. WOOTEN: But anyway, Judge, we'd like you to not consider that name, if you would, please.

THE COURT: All right. The Court will receive and grant that oral motion.

MR. WOOTEN: Thank you, Judge. We'd also at this point ask that the Court take judicial notice of the juror

questionnaires.  Juror number -- well, of Audrey Holt, Krystine Turner, Deborah Batson, Brenda Woods, Stephanie Cooper, Brenda Lee, Donna Vanscoy, Donald Westbrook, Linda Georgia, Elizabeth Tennill, and Phillip Scott.

THE COURT:  All right.  The Court will not take judicial notice of anything that has not been filed with the court clerk or anything that was not testified to in the record as to specific questions in the questionnaires.

MR. WOOTEN:  Yes, sir.

Your Honor, as far as our motion goes, you know, for the record we've now challenged for cause Juror No. 168, Mr. Martinez.  That challenge has been denied.  We object to having Number 168, Mr. Martinez, on this jury.  We object due to the reasons that we put in the cause and also due to strategic trial reasons.  However, we have exhausted all our peremptory strikes.  We would strike Number 168, Mr. Martinez, if we had a peremptory available.

We believe that the seating of Mr. Martinez, Number 168, would deny Mr. Harris a fair and impartial jury pursuant to the United States -- 6th and 7th Amendments to the United States Constitution; Texas Constitution Article 1, Section 10 and 15; Code of Criminal Procedure 1.05, 1.12, 35.16, 35.17.  And also pursuant to the 4th, 5th, 6th, 8th, 14th United States Amendments; Article 1, Section 3, 10, 13, 15 and 19 of the Texas Constitution.

Your Honor, respectfully, we would ask for an additional 11 strikes or, in the alternative, however many strikes that the Court may feel that is warranted in this situation. We assert, respectfully, that the Court has made us -- by necessity, through erroneously denying our challenges for cause, made us use peremptories where we would not have had to had the Court ruled in our favor. Specifically, those challenges in question are set out in the body of the motion.

We, of course, at this point would ask that the Court only -- and I know the Court will do this; but I think in deference to the Court's order, we would ask that you only consider what came from the stand. And if in our motion it does cite something that did not come from the stand, we'd ask that you disregard it.

These challenges are set out in the body of our motion. In the interest of time and accuracy, I rely on the written recitation. The State was nice enough to give us transcripts two days ago. Unfortunately, apparently, we were unable to get those into our motion, so we went from our notes and we apologize for any inaccuracies therein.

Accordingly, we would request the Court provide us with these additional peremptories. Otherwise, Juror No. 168, Mr. Martinez, an objectionable juror to the defense, will be seated on this jury.

Please don't allow any arguments that I make --

oh, one thing I would say is in looking through this motion this morning and looking at the caselaw, Jones versus State, I don't know is as strong a case as is cited in our motion.  I believe it does stand for the proposition that if any of the parties run out of peremptory strikes, if the Court makes erroneous -- grants erroneous challenges for cause or -- grants challenges for cause erroneously, that that can be unfair.  But I don't know if that -- I don't know if it actually says -- actually addresses the Court giving the defense additional peremptories.  However, I do believe that it is not wrong for the Court to give the defense additional peremptories.  I believe it is done in numerous cases, and I think it is up to the Court's discretion as to whether to, pursuant to the authority that we cited, grant us these peremptories.

So, Judge, pursuant to the authorities that I've already cited and asserting Mr. Harris' right to an impartial jury -- and please, if the Court would not allow anything I said today to somehow waive any arguments that we made that are in the body of our motion, we would respectfully request that you grant our motion and give us an additional 11 peremptory strikes.  Thank you.

THE COURT:  Just so the record is clear, anything you said today will not waive anything that is in your motion that is supported by the record.

MR. WOOTEN:  Yes, sir.  Thank you.

MS. YENNE: Judge, I'd like to respond. And I'd like to start out with the original motion because it does pertain to accuracy and perspective.

You know, Judge, sometimes you lose all credibility when you throw the baby out with the bath water. And to challenge every one -- to state that you request an additional 12, now 11 -- you know, you'd have some credibility if you had 1, maybe 2 in the process. But really to say an additional 12, and now 11, strikes because defense challenges for cause were erroneously denied for these jurors: Audrey Holt, Krystine Turner -- now a modified Ms. Wardlow because it's been proven to be a blatant inaccuracy -- Deborah Lynn Batson, Brenda Woods -- I would refer the Court to Ms. Woods's record because I'm going to talk just briefly. One of the most stout, honest jurors the State accepted and defense exercised a peremptory on and tried to challenge her for cause any way they could. A fair juror -- Stephanie Cooper, Brenda Lee, Donna Vanscoy, Donald Westbrook, Linda Georgia, Elizabeth Tennill, Phillip Scott, Gregory Blanchard, now taken out, Richard Martinez, now taken out. Inaccuracy, Inaccuracy. Now Brain Paulk, now taken out. Everybody? Really?

You know, I've never in 30 years seen jurors subjected to the type of questioning that I've seen here; and I've done three capitals, minimally, and was a party to an old capital questioning. These jurors have withstood grueling

questions -- average citizens, not versed in the law -- and they were honest and forthright.  And the people that have been called for this jury have been a fair and honest calling and selection and a moderate, middle-of-the-road jury.  In fact, the times -- I refer the Court to all of the record before the Court -- that counsel has said that this is a pro death penalty jury, the Court even corrected on record that this is a very moderate jury.  And I think, frankly, to be honest with you, defense counsel themselves would have to acknowledge that.

But you have to be able to state that the Court has improperly overruled your challenge for cause in order to -- in order to sustain, and that you've exhausted all your peremptories and now you're having to take an objectionable juror.  Which challenge for cause was improperly overruled?  All of these?  That is not so, Your Honor.  The record does not reflect it.  Not a one had been improperly overruled.  They were subjected to grueling questioning by defense counsel, and they withheld it and honestly and openly answered it.

It's like you don't -- you just -- you don't get to have your cake and eat it, too.  Just because you wanted to challenge for cause and weren't legally entitled doesn't mean the Court didn't make the right ruling.  The Court has been abundantly fair.  In fact, this Court has granted challenges for cause of defense counsel and given the Defendant -- and the State has no objection to that, in fairness.  It's a death

penalty case. We want to be fair -- and given the Defendant challenges for cause that the record really did not support. With all due respect, Your Honor, every equivocation went to the benefit of the Defendant in a challenge for cause. We have no objection to that; but we are pointing out that the Defendant by that action, by your granting of those challenges for cause that the record really did not support, gave them additional strikes by that, gave them every benefit of the doubt. Up to Ms. Means yesterday, up to people that, literally, when the whole record would support it --
Mr. Ghiselin, Richard Ghiselin; Norman Payne; Christy Kittrell; William Mccord -- these are effective extra peremptory strikes given to the Defendant.

Judge, there is no improperly overruled challenge for cause that you've made of the Defendant. According to them, it's every ruling you made. That's not right, Judge. But I'm going to say to you -- I'm going to go over the motion that he's orally amended. I'd like to give you a theme through that motion. It's a cookie cutter. And to put in
Mr. Blanchard, Mr. Martinez, Brian Paulk, and Charlene Wardlow shows a level of carelessness about this motion. It's just a cookie cutter.

It's saying that the Court has improperly given an instruction on mitigation, that the State has led each and every juror. But seeing as counsel admits this, I put an "X"

through Charlene Wardlow, Gregory Paul Blanchard, Richard Martinez, and Brian Paulk because it was blatantly untrue what they put in this motion.

But, yet, even in the motion when they put to the back of it, oh, by the way, you didn't grant a motion -- you didn't overrule a challenge for cause but we get one anyway, that's not the law. And this is a system of laws to get to justice. And to suggest -- in each and every juror to suggest that the State is improperly committing and in the mitigation -- if asking a juror if they could follow the law and the evidence and take -- they take an oath to follow the law and the evidence -- is improper, then the Courts need to stop doing it, also. But that is the test.

If you look at every one of their arguments, there is -- and I would ask the Court to ignore, as counsel has stated, the questionnaire questions. Because I'm going to tell you that I believe that the record will not support what Mary Conn has put in this motion regarding it. I think she has picked and chose from the questionnaires, and it is unfair to inject error in a record in this manner.

Judge, they have not demonstrated that you have improperly overruled any one of their challenges for cause. In fact, you have been abundantly fair to the Defendant. You would have to find that you improperly overruled a challenge for cause. You did not. And then they would have to show harm

by taking an objectionable juror.  I would refer the Court to the record on Mr. Martinez and say is the man before you an objectionable juror?  He is not, Judge.  They are not entitled.

The State's job is to see that justice is done; but there are two victims out there -- one is a victim of a robbery, and there is a dead man -- and they deserve justice, too.  The equal treatment.  And this Court has been abundantly fair.  We have no objection to that.  But at some point in time the law has to be followed, and we're asking the Court to follow it.  They are not entitled to any additional challenges for cause.

I was defense counsel on a Capital Murder case. I know what it's like to have your client receive the death penalty, receive -- and to be a State's prosecutor, life without parole.  I respect the process.  But I'm going to tell you one of the parts of that process is to delay as long as you can.  So wanting 11 additional strikes, wanting any additional strikes, is unreasonable.  And then at the same time to object to a new panel being brought in after you asked for additional strikes is wholly and completely --

THE COURT:  Well, that's our issue for tomorrow.

MS. YENNE:  Yes.  But I'm saying it's -- I think that they are in direct contradiction with one another.  I think that this is a pattern to get to that point, and it is a pattern to delay this case until beyond the beginning of the

year.  This could go on forever, Your Honor.  But it has gone on for many, many, many, many weeks in a very fair manner; and they are not entitled to additional strikes.  We would ask the Court, respectfully, to deny those requests for additional strikes.

MR. WOOTEN:  Your Honor, may I respond?

THE COURT:  You may.

MR. WOOTEN:  Well, Judge, I certainly -- well, I'm not even going to say I hope.  I know the Court will not make this decision on most of what Ms. Yenne said.  Because the real issue here is whether you believe that by the challenges that you denied for us, we deserve more peremptory strikes.  Whether I made a bad motion, whether Ms. Conn made a bad motion, that may be true.  It may not be true.  But, of course, this Court, I know, will just look at the facts of this motion and not hold that against Mr. Harris.  Because I'm not the one on trial.  He's the one on trial.  And I know the Court knows that.

How we challenge tomorrow, bottom line here is this.  Number one, it's not in any way disingenuous for us to challenge all of those because we don't know how the Court may review the Court's decisions.  What kind of lawyer would I be if I only went to one or two, when the Court may have rethought the fifth or sixth one?  I have to be a good lawyer and file a motion that allows the Court, if the Court in its wisdom wants

to rethink one of its decisions or three or whatever, on any of those challenges. I have to preserve that, number one, and file it in such a way as to most fully benefit my client's rights.

But once again, we just would ask that you look at our motion, look at the challenges for cause from whatever source the Court wants to, and just apply whatever standard the Court wants to apply. And I think if the Court looks at that and sees that, goes back through all those challenges, I think it's very important that the Court may feel like that one or two of those could have gone the other way, perhaps, or whatever. But all this other stuff I don't think should come into it. This is a legal argument. We've made a legal argument, and we ask that you -- and I know you will -- carefully and fairly consider our motion. Thank you.

THE COURT: Give me -- we'll be in recess until 5 minutes until 4:00 o'clock.

**(A short recess was taken.)**

THE COURT: We're on the record. The record will reflect counsel for the State, counsel for the defense, the Defendant are all present and seated in the courtroom.

I have gone back and looked at the notes that I took on the -- each of the 11 that were now subject to the challenge for cause, and I want to say before I rule that I did not hold -- I do not hold it against the defense in any way,

shape, or form for pointing out all of the particular people because it allowed me to go look at them. So I didn't hold that. I realize that things move pretty quickly; and to the extent there were errors or inconsistencies in the motion, I'm not holding that against the defense either. We've all been here. We've all taken notes. We've all got our recollections.

I will, and did, consider everything in the motion that is supported by the record. But I'm going to deny your request for additional challenges for cause.

MS. YENNE: Additionally peremptories, you mean?

THE COURT: I'm sorry. Additional peremptories. I keep wanting to -- early in the game I kept wanting to put theirs on yours.

Request for additional peremptories. As a result, Mr. Martinez will be seated as a juror.

MR. WOOTEN: Judge, for purposes of the record -- and in no way to argue with your ruling -- I believe at this point I just want to make sure that the record is set that we do object to Mr. Martinez being seated for all of the reasons that we presented before.

THE COURT: The record does so reflect.

MR. WOOTEN: Thank you, Judge.

THE COURT: Okay. Mr. Anders, would you go have Mr. Martinez step back to the courtroom, please?

**(Venire person in.)**

obviously, if they used -- you know if they use that example, it's not the facts of this case.

Q.   Because it would be improper.  So you know that.  But I'm going to go ahead and use their example because I think it's a good example.  Would you consider a causation situation like that?  Could you consider and give effect to that as mitigation?

A.   No.

Q.   Now when we talk about this mitigation, where would you -- as far as the way this goes, where would you -- I know it says taking into consideration all the evidence, including the circumstances of the offense, Defendant's character and background, personal moral culpability of the Defendant, where would you expect the mitigation to come from?

MS. ALDOUS:  Your Honor, I'm going to object.  May we approach on this?

THE COURT:  You may.

**(The following discussion was held at the bench.)**

THE COURT:  We're at a bench conference.  The venire person cannot hear.

MS. ALDOUS:  Judge, this question is misleading to the juror.  It's a deliberate backdoor attempt to get her to say that she can't follow the law.  She repeatedly said that she would not require the defense to produce any evidence at

all, that they don't have a burden on Special Issue No. 2, and that neither party has a burden.

MR. WOOTEN:  Actually, Judge, the reason I'm asking this question is because what a juror said yesterday or the day before.  Because they actually said that and it occurred to me that, I mean, that's what the juror said.  It's not a backdoor attempt.  I'm asking her if she assumes that we're going to bring it, then that would be putting the burden on us.

MS. ALDOUS:  Judge, he also just asked her would you require them to produce any mitigation evidence, and she said no.  And now they are attempting to --

THE COURT:  So what's your legal objection?

MS. ALDOUS:  That the question is confusing to the juror and --

MS. YENNE:  Additionally, Your Honor --

THE COURT:  One lawyer.

MS. ALDOUS:  And there may or may not be mitigation in a case depending on the evidence.

MR. WOOTEN:  Judge, it's not a trial.  There is no asked and answered in voir dire.

THE COURT:  Okay.  I'm going -- I'm going to go ahead and sustain the objection.

**(Bench discussion concluded.)**

MR. WOOTEN:  We pass the juror, Judge.

MS. YENNE: Object to full effect. Object to the form of the question.

THE COURT: Sustained.

Q. (BY MS. CONN) You're not going to give effect to that?

A. Okay.

Q. I want to ask you a hypothetical question. So can you just go with me on a hypothetical?

A. Yes.

Q. This is not as much as -- it's not this case. It's not disguised -- this case is not being disguised. This is really just a hypothetical question.

I'd like you to consider that you sat as a juror on a different Capital Murder case and you know that -- and the Judge instructs you that Capital Murder is an intentional murder where it was the Defendant's conscience desire to kill and the Defendant accomplished that desire along with some other serious crime. Like, for example, one of the things Ms. Yenne mentioned was killing a police officer. You know that could be a Capital Murder.

A. Right.

Q. So you and the 11 other jurors heard all the evidence and decided beyond a reasonable doubt that the Defendant in that case intentionally or knowingly killed --

MS. YENNE: Objection. Not knowingly.

MS. CONN:  I'm sorry.

Q.    Intentionally killed an innocent victim who did not deserve to die.  Are you with me?

A.    Yes.

Q.    And in that case there was no -- you found that there was no self-defense.  There was no defense of another person. There was no defense of property.  It was not a mistake.  It was not an accident.  The Defendant in that case was not forced to commit the murder.  Nobody made him do it.  And the victim did not provoke the Defendant, nor did the victim deserve to die.  You had an innocent victim.

A.    Okay.

Q.    So are you following me?

A.    Yes.

Q.    All right.  Despite whatever evidence you heard concerning those defenses, you and 11 other jurors decided beyond a reasonable doubt that the Defendant acted intentionally and he knew what he was doing.  He meant to do it.

A.    Okay.

Q.    Just a senseless, cold-blooded killing.  And, further, you found that there was -- that no matter what evidence you might have heard or not, you found that the Defendant was not insane, he was not mentally retarded, and it was a murder in which the Defendant was able to form the specific intent or

conscious desire to commit the murder and did so.

A.    Okay.

Q.    You also found that he wasn't so drunk that he couldn't act intentionally or he wasn't so high on drugs that he couldn't act intentionally.

A.    Okay.

Q.    So no -- there was no -- he has no -- one way to say it is he has no defenses.  No defenses and no other circumstances.  It was just plain-vanilla, cold-blooded killing.

A.    Right.

Q.    Assume that you and the 11 other jurors all agreed beyond a reasonable doubt that all that's true.  I'm going to ask you about your feelings.  What are your feelings in that hypothetical about the death penalty being the only appropriate remedy for that guilty murderer?

MS. YENNE:  I'm going to object to the form of the question.  It's an improper commitment to an improper hypothetical, injecting a police officer and being the only appropriate.  The question is misleading as to the options available.  Object.

MS. CONN:  May we approach, Your Honor?

THE COURT:  You may.

**(The following discussion was held at the bench.)**

THE COURT:  We're at a bench conference.  The

venire person cannot hear.

MS. YENNE: The State is going to object that is an improper hypothetical, improper commitment. It adds a factor -- a specific police officer factor, knowing that this juror's husband is a police officer, and suggests once again what has been attempted to be suggested to every juror, that there is only one appropriate penalty. What are your feelings? It is a unique creative hypothetical; but it suggests, based on emotions in an improper hypothetical, that there is only one appropriate penalty. I would object to this continuous form of this question.

THE COURT: Ms. Conn?

MS. CONN: Your Honor, it was a proper question under Standefer v. State and Cardenas v. State. And you have the cases, I believe, Your Honor; and if you don't, I'd be happy to provide them again. It was a proper question under the 5th, 6th, 8th, and 14th Amendments. An instruction from the Court to not allow me to ask that question denies effective assistance of counsel to my client, it denies his rights to be heard under the Texas Constitution and, again, violates Standefer and Cardenas.

It is the -- I was very careful to say what are your feelings about this issue? This is not wouldn't you agree? I counted no less than 30 or more times Ms. Yenne said wouldn't you agree with this? Wouldn't you agree with that?

So I'm not asking would she agree on this.  I'm not committing her at all.  I am asking her what her feelings are, and that's the way I asked the question.  I was very careful to approach it in that respect.

It's Morgan versus Illinois and Standefer and Cardenas versus State.  The law is, Your Honor, that a commitment question is proper if one of the possible answers gives rise to a challenge for cause; and automatic death penalty is a possible answer to this question.  Then it's proper.  It contains no unnecessary facts and tracks the penal code elements and the defenses.

Ms. Yenne herself gave a homicide of a police officer as a death penalty as a Capital Murder, and I'm certainly entitled to use the same example she used.

MS. YENNE:  And we don't believe that "what are your feelings" is an appropriate mechanism to arrive at a challenge for cause.  Yet this is what defense counsel is attempting to do by what are your feelings questions; and therefore, it is improper.  And the manner in which they are doing it.

THE COURT:  Okay.  I think that I understand under Standefer -- you know, not all open-ended questions are -- I mean, open-ended questions can be commitment questions.  And I think it is misleading in the example of the officer, so I'm going to sustain the objection to the way the

question was asked.

MS. CONN: Does the Court have a recommendation as to how I can ask the question that would be non-objectionable?

THE COURT: I can't. I can't give you suggestions on how to ask them.

MS. CONN: I'd like to make a bill.

THE COURT: Okay.

**(Bench discussion concluded.)**

Q. (BY MS. CONN) Thank you for your patience. I ask you to look further back at Number 157. That would be page 29.

A. Okay.

Q. You said -- the question is: Do you believe that the death penalty should be a possible punishment for someone who participated in the crime but who did not personally do the actual killing?

And you said yes. And you explained, If someone helped plan the crime and/or helped acquire the means for the killing, they should also be held responsible and they should also get the death penalty.

Is that your feeling?

A. Yes.

Q. You said further -- you told Ms. Yenne that if there was doubt in the case, that it would be unfair to send someone to the death penalty. Is that right?

I will present Ms. Cooper to the State for any challenges for cause.

MS. YENNE:  None, Your Honor.

THE COURT:  Present Ms. Cooper to the defense for challenges for cause.

MS. CONN:  Your Honor, I am not prepared at this moment to do that; but I would like to make a bill before I exercise any challenge.

THE COURT:  You may.

MS. CONN:  Okay.  The question that I asked, Your Honor, that I want to have answered is I asked Ms. Cooper, assuming with me that you sat in a hypothetical death penalty case, not this case, and in that case you were instructed that Capital Murder is an intentional murder where it was the conscious desire of the defendant to kill and he accomplished that desire, along with some other serious crime, for example, a homicide of a police officer.  You and the 11 other jurors heard all the evidence and decided beyond a reasonable doubt that the defendant intentionally killed an innocent victim who did not deserve to die.

Further, in that case there was no self-defense, no defense of another person, no defense of property, it was not a mistake, it was not an accident.  The Defendant was not forced to commit the murder.  The victim did not provoke the murder or deserve to die but was innocent.  Despite whatever

evidence concerning those defenses that I just discussed you heard during that trial, you and 11 other jurors decided beyond a reasonable doubt that the defendant acted intentionally.  He knew what he was doing and he meant to do it.

Further, it was not a murder where the defendant was insane, mentally retarded or -- mentally retarded.  It was a murder where the defendant was able to form the specific intent or conscious desire to murder and did so.  The defendant was not so drunk that he couldn't act intentionally, not so high on drugs that he couldn't act intentionally, and you and 11 -- excuse me.  Despite any evidence you heard about those things, you and 11 other jurors decided beyond a reasonable doubt that the defendant acted intentionally, he knew what he was doing and he meant to do it and did it.  You and 11 other jurors all agreed beyond a reasonable doubt that he is guilty, along with all those other things that we discussed.

I'm asking about your feelings.  What are your feelings about the death penalty as the only appropriate remedy -- or excuse me, penalty -- not remedy -- for this guilty murderer?

This is a proper question under Morgan versus Illinois and under Standefer versus State and under Cardenas.  Standefer says that a commitment question is proper in the event that it is one of the possible answers -- excuse me.  That one of the possible answers to the question gives rise to

a challenge for cause. An automatic death penalty answer is a possible answer to this question in this case so, therefore, it's a proper question under Standefer.

It contained no unnecessary facts and tracked the penal code elements and the defenses. We want to ask the question pursuant to the 5th, 6th, 8th and 14th Amendments, the denial of the right to be heard under the Texas Constitution, right to effective assistance of counsel under the U.S. Constitution, Cardenas versus State and Standefer versus State.

And what I'd like to do is get the juror back and ask the question and receive an answer to my ultimate -- to my question to -- to the question at the end that has the question mark, Your Honor, if I may.

THE COURT: All right. Does that conclude your bill?

MS. CONN: Yes.

THE COURT: All right. Do you have a challenge for cause?

MS. CONN: Yes, Your Honor. May I have just a moment for that? May I have a ruling on my bill?

THE COURT: You made the bill. You requested a bill, and I gave you a bill. It's in the record.

MS. CONN: May I ask the question of the juror, Your Honor, before we go further?

THE COURT: I ruled on the question you asked

before and you asked to make a bill and you've made your bill.

MS. CONN:  All right.  May I have just a moment, Your Honor?

THE COURT:  You may.

MS. CONN:  Your Honor, if I may, initially, Your Honor, I talked with Ms. Cooper about her distractibility.  She had said she did not want to sit.  I know it was the very end of the questionnaire she said that she was -- Number 161 and also up earlier she talked about she would not be able to sit.  She said specifically that it seems really overwhelming.  She said she did not want to sit.  She said she would be distracted.  She said she would be thinking about her work, her obligations at home, and her responsibilities outside of the courtroom.  So I believe that's a reason for her not to sit.

She said that she considered the death penalty as a deterrent, which is a factor in her applying the death penalty.  I asked her that specifically, in those words, whether or not she believed it to be a factor in her consideration; and she said it was.  A deterrent is not a proper reason for giving death, Your Honor, in that the Defendant in a Capital Murder case -- you know, death is different.  He is entitled to an individualized sentencing based on the individual facts and the other Special Issues in this individual case.  And a deterrent or a message to the community is not a proper consideration.  It's not a factor for

A.    I feel that there are some people within the prison system that have grown used to not having to necessarily work and are actually comfortable with being in that particular society.  And therefore it may not be a deterrent.

Q.    Okay.  Do you think life without parole is a substantial penalty?

A.    Yes, I do.

Q.    Do you think it's an appropriate penalty for Capital Murder?

A.    Depending on the case, yes.

Q.    Okay.  You said you live here in Angleton.  Is that right?

A.    Yes.

Q.    Okay.  Do you have a feel for what the community thinks about the death penalty?  Do you think most of the community is in favor of it?

MS. YENNE:  Your Honor, I'm going to object to relevancy and improper form of the question by venire about the Angleton community.

THE COURT:  Sustained.

MS. MALLON:  Can we approach, please?

THE COURT:  You may.

**(The following discussion was held at the bench.)**

THE COURT:  Your response?

We're at a bench conference.  The venire person

cannot hear.

MS. MALLON:  Your Honor, this is not a witness in a case.  It's a juror in a Capital Murder case.  There is no relevancy objection to determining a juror's feelings on all the issues at stake in this case.  Voir dire is intended to be very broad.

THE COURT:  I agree.  But to elicit facts.

MS. YENNE:  It's her feelings, not a community's feelings, on their perspective in an effort to put pressure on the venireman.

THE COURT:  I'm going to sustain the objection as to the community's feelings.

**(Bench discussion concluded.)**

Q.  (BY MS. MALLON)  Okay.  Ms. Holt, I'm going to talk a little bit about this future danger issue that you spoke about the State with.

A.  Okay.

Q.  And that's what we tend to call the short -- to make it short, future danger.

A.  Yes.

Q.  But it's this first Special Issue that you looked at when you talked to the State.  They had it on a slide?

A.  Yes.

Q.  This is the same thing, but we shorten it to say future danger.  Now in the guilt/innocence phase of the trial